UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
Mohamed Aly Saad Aly,              File No. 12CV1960
                                         (JRT/FLN)
          Petitioner,

vs.                                Minneapolis, Minnesota
                                   November 13, 2012
Amal Aden,                         9:50 A.M.

          Respondent.
------------------------------------------------------------
          BEFORE THE **HONORABLE JOHN R. TUNHEIM**
            UNITED STATES DISTRICT COURT JUDGE
               **(EVIDENTIARY HEARING—VOLUME I)**


<u>APPEARANCES</u>
For the Petitioner:       Walling, Berg & Debele, PA
                          **NANCY ZALUSKY BERG, ESQ.**
                          **LILO KAISER, ESQ.**
                          121 South Eighth Street
                          Suite 1100
                          Minneapolis, MN  55402


For the Respondent:       Robins Kaplan Miller & Ciresi
                          **BRIAN S. CARTER, ESQ.**
                          **DAVID P. SWENSON, ESQ.**
                          **KATHERINE K. BRUCE, ESQ.**
                          **ANDREA C. YANG, ESQ.**
                          **LAURA E. NELSON, ESQ.**
                          Suite 2800
                          800 LaSalle Avenue
                          Minneapolis, MN  55402


Present via phone:        Mohamed Aly Saad Aly


Interpreter:              Ibrahim Rddad


Court Reporter:           **KRISTINE MOUSSEAU, CRR—RPR**
                          1005 United States Courthouse
                          300 Fourth Street South
                          Minneapolis, Minnesota 55415
                          (612) 664—5106


     Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1                                             9:50 A.M.

 2

 3                      (In open court.)

 4           THE COURT:  You may be seated.  Good morning,

 5   everyone.  This is civil case number 12-1960, Mohamed Aly

 6   Saad Aly versus Amal Aden.  We're here for an evidentiary

 7   hearing.

 8           Counsel, would you note appearances, first for

 9   the petitioner?

10           MS. BERG:  Good morning, Your Honor.  Nancy

11   Zalusky Berg and Lilo Kaiser from Walling & Berg, and also

12   present is my legal assistant Jen Heinen, and Mr. Aly Saad

13   Aly is present by telephone.

14           THE COURT:  Good morning.

15           MR. CARTER:  Good morning, Your Honor.  Brian

16   Carter.  With me at counsel table is Amal Aden, as well as

17   my colleagues from Robins, Kaplan, Miller & Ciresi, Kate

18   Bruce, David Swenson, Laura Nelson, Andrea Yang, and our

19   paralegal Kia Schneckpeper.

20           We represent Amal Aden pursuant to the FBA

21   project.

22           THE COURT:  All right.  We're ready to begin this

23   morning.  The Court has reviewed the submissions.  We have

24   some motions in limine?

25           MS. BERG:  Correct, Your Honor.
```

1           THE COURT:  Who is ready on that?

2           MS. BERG:  Before we launch into argument, have

3     we sorted out all the timing now?  I'm looking at your

4     clerk.

5           THE COURT:  We're going to run until two o'clock.

6     I can't stay much past two today, but we will have a

7     shortened lunch break to gain time.

8           Tomorrow I think we have the whole day available.

9           MS. BERG:  What time do you anticipate the lunch

10    break to be?

11          THE COURT:  Somewhere around noon, whenever it is

12    convenient, but we will break only for 20, 25 minutes or so

13    so we can save on time.

14          MS. BERG:  Thank you.  We did bring a motion to

15    request that certain reports --

16          THE COURT:  Come over to the lectern.

17          MS. BERG:  My apologies -- to request that

18    certain reports be excluded from evidence.  We have

19    provided detailed pleadings to you, but essentially the

20    reports are more in the nature of bootstrapped evidence

21    than they are in offering any evidentiary help to the Court

22    under the rules.

23          This is a pretty simple case, a child wrongfully

24    removed from the home, the place of habitual residence.

25    First, we have to establish wrongful removal occurred,

1    which I believe will be relatively straightforward.  The

2    defenses are limited, and those defenses are very well

3    detailed in the law.

4         Now they're arguing grave risk and arguing that

5    domestic violence occurred, therefore qualifying as grave

6    risk.  I would point out to the Court that Mr. Edleson's

7    report does not rely on any evidence.  It relies solely on

8    his interview with the respondent and his review of certain

9    information, all of which was created through interview

10   with the respondent.

11        So we have an order for protection proceeding in

12   Anoka County.  It was ex parte.  It has never been served

13   on petitioner, and therefore the allegations contained

14   therein are nothing more than allegations.  The police

15   reports, which I don't believe Mr. Edelson reviewed because

16   he certainly doesn't specify that review in his report,

17   provide some scintilla of evidence that could be credible.

18        However, close review of those police reports

19   reveals that the police concluded neither party had been

20   harmed, there had not been domestic violence and that

21   frankly neither party was very credible.

22        This is a situation, which unlike other expert

23   reports where you have credible evidence of an incident, an

24   oil spill, a car accident, something where we can know what

25   happened, we have none of that here.  The evidence being

1    offered by Jeffrey Edelson is simply leveraging the

2    allegations made by respondent into 1264 pages of articles

3    and reports that he has accumulated, and from all of that,

4    he draws conclusions without any facts on which to rest

5    those conclusions.

6          The same is true for the report of Ms. Boyle and

7    again both of these reports -- strike that.  Ms. Boyle does

8    the same thing.  I would caution the Court that even in

9    looking at, and I don't have it in front of me, but the

10   response of respondent in which she attaches a UN report on

11   female genital mutilation, that report indicates that the

12   prevalence rate in Somalia, the nation of her culture, is

13   98 percent, greater than in Egypt.

14         So whatever Ms. Boyle says as to petitioner is

15   true as to respondent, effectively neutralizing the

16   information that she would suggest would be relevant to

17   this proceeding and helpful to the Court.

18         Finally with regard to Nora Roundtree,

19   Ms. Roundtree and Mr. Aly Saad Aly were married briefly

20   some ten years ago.  Same exact situation.  Order for

21   protection obtained ex parte.  No service, and it is used

22   solely as Rule 404 character evidence.  It's ten years old.

23         It is attempting to bootstrap an allegation,

24   which is nothing more than an allegation.  There is no

25   finding by a Court that domestic violence occurred ten

1    years ago in that brief relationship, therefore you must

2    draw the conclusion that the allegations that we're going

3    to hear from respondent today are not credible.

4            I'm satisfied that this Court, even though you're

5    not in a state court and don't hear domestic abuse

6    proceedings on a regular basis, has the skill and the

7    ability to ascertain the credibility of witnesses when

8    allegations such as these are made.

9            Frankly, Your Honor, these expert reports offer

10   nothing, other than the volume of paper that we have

11   received in this proceeding.  So we are requesting, Your

12   Honor, that those expert reports be excluded and the

13   testimony and documentary evidence of Ms. Roundtree be

14   excluded as well.

15           Thank you.

16           THE COURT:  All right.  Thank you, Ms. Berg.

17           Go ahead.

18           MS. BRUCE:  May I go, Judge?

19           THE COURT:  Sure.

20           MS. BRUCE:  Good morning, Your Honor.

21   Unfortunately, this is not a simple case.  Your Honor knows

22   that we are alleging the defense of grave risk and

23   everything that these two experts speak to goes directly to

24   that defense.

25           Everything that Ms. Berg has said is more

1      important to the weight that this Court will give to these

2      experts, but not so much to their admissibility.  These

3      cases, these Hague cases, as Your Honor well knows, are

4      largely allegation based, credibility of witnesses.  We

5      have made a very, very good faith effort to obtain every

6      document humanly possible in the short turnaround that we

7      have had.

8              And as for the type of evidence both experts rely

9      on, both experts have reviewed the petitions, the counter

10     petitions, the exhibits that are attached.  It's concrete

11     evidence.  Allegations are what experts often rely on and

12     is important for experts to rely on.  The -- and I won't --

13             You received the pleadings in this matter, but

14     both of these experts are certainly qualified.  They are

15     internationally recognized, have published extensively, and

16     Ms. Boyle establishes the grave risk of harm where female

17     genital mutilation or cutting is conducted, which is

18     directly our defense that this is a grave risk of harm to

19     the daughter in this case.

20             And Dr. Edelson talks about the grave risk of

21     harm when exposed to domestic abuse.  Directly goes to the

22     harm of the child in this case, an essential element of our

23     claim.  I think certainly these experts are reliable.

24     Everything they have written is peer reviewed and published

25     all over this country and in fact all over the world.

1             Thank you.

2             THE COURT:  Thank you, Ms. Bruce.

3             Did you have anything else, Ms. Berg?

4             MS. BRUCE:  Your Honor --

5             THE COURT:  Go ahead.

6             MS. BRUCE:  As to Ms. Roundtree, it's on my

7    second page there.  First of all, counsel mentioned the OFP

8    that was never served on Ms. Roundtree.  That's precisely

9    why we are putting Ms. Roundtree forward.  She will testify

10   about the OFP, and it's important that she talks.  And, you

11   know, again, the type of harm she has suffered and the fear

12   of harm she had for her daughter when she separated from

13   Mr. Aly goes directly to the type of grave harm that we're

14   talking about in this case.

15            I'm not sure if counsel for petitioner still is

16   looking to exclude the past marriages, but it was something

17   that was included in the motion, but, you know, again, at

18   the risk of repeating myself, this goes directly towards

19   the pattern of abuse that Mr. Aly has had toward

20   significant others and children and related parties, and

21   that's at the heart of this case.

22            Thanks.  I don't know when you would like to hear

23   our motions?  Should I just stay up here?

24            THE COURT:  Why don't you?  Go ahead.  That's

25   fine.

1              Unless you had a reply here.  You can do it when

2      you respond there.

3              Go ahead.

4              MS. BRUCE:  All right.  In terms of the

5      petitioner's experts, Ms. Gladkykh, I'm not sure exactly

6      how to pronounce it, we submit has no specialized knowledge

7      in any of the issues in this case.  The Court can look at

8      the issue of what will happen when or if the child is

9      returned to Canada, but it's not required to under the

10     Convention.

11             And I don't, I don't doubt that Canada has

12     excellent systems for victims of abuse, but what we are

13     alleging is that there is no situation in which the

14     Canadian system can prevent the grave risk of harm should

15     this child be returned to where the father is.

16             Mr. Aly has had a pattern of disregard for

17     authority.  The evidence is going to show today that he

18     manipulated the system in Canada to get his current court

19     order, lied to the police, lied to this Court in his

20     discovery, and so we think that the undertaking issue

21     should not be heard by this Court.

22             And as to Mr. Awad, he discusses the issue of the

23     legality of the marriage status of Mr. Aly, which we submit

24     is not relevant to the material issues in this case.  We're

25     not discussing whether or not he was legally married or

1    divorced at any given time, but we are talking about the

2    ongoing pattern of abuse towards women.

3           Thank you.

4           THE COURT:  All right.  Ms. Berg?

5           MS. BERG:  Thank you, Your Honor.  Frankly, this

6    has been part of our frustration with the manner in which

7    this case has been handled and the excessive litigation.

8           With regard to Mr. Abed, what counsel for

9    respondent has failed to acknowledge is that the issue of

10   the marriages and the cultural nature of the marriages is

11   relevant to this Court because at the time that respondent

12   married religiously petitioner, she was married to someone

13   else.

14          So what is good for the goose is good for the

15   gander, and that's going to be the tried and true theme of

16   this case.  The fact is that, and I'm not sure I can say

17   her name, either, the Canadian lawyer's testimony is

18   relevant because the Convention directs you to return the

19   child to the place of habitual residence.

20          To suggest that the Canadian system is incapable

21   of providing protections and that only America can do that

22   is beyond arrogant.  Mr. Abed provides specialized

23   knowledge.  He is Palestinian by birth.  He is fluent in

24   the Egyptian language and the law of Sharia.  That's what

25   his report is about because it was suggested in this

1    petition -- strike that -- the response that Mr. Aly Saad

2    Aly was not only going to engage in female genital

3    mutilation and otherwise terrorize the respondent, but

4    further that he might be a terrorist.

5           If there was ever any specious arguments totally

6    intended to negatively, excuse me, to prejudice somebody

7    simply trying to assert their rights, it was the response

8    that we received to our verified petition, and thus, it was

9    necessary to obtain an expert in Egyptian law and Sharia

10   law.

11          Your Honor, certainly if there is any suggestion

12   that an expert should be limited, it would be the experts

13   offered by respondent and not those by petitioner.

14          Thank you.

15          THE COURT:  Anything else, Ms. Bruce?

16          MS. BRUCE:  Three quick things if I may, Your

17   Honor.

18          THE COURT:  Go ahead.

19          MS. BRUCE:  First, I would just really like to be

20   clear that we have never suggested that the Canadian courts

21   are incapable of handling these types of situations.  In

22   fact, I just said that, and we have never stated that

23   Mr. Aly is a terrorist in any way, shape or form.

24          THE COURT:  All right.  At this stage, I'm going

25   to deny each of the motions in limine.  The arguments that

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

1    I've heard and what I have read really do go primarily to

2    the weight of the issues, as opposed to the admissibility.

3    I will, of course, if I believe the testimony is straying

4    off the mark and is unhelpful, at that point in time, I may

5    stop testimony or restrict testimony of any of these

6    witnesses, but at this point I'm going to allow the

7    testimony, and we'll see where all of this goes.

8              All right.  Anything else evidentiary related

9    issues or organizational issues?

10             MR. CARTER:  One thing, Your Honor.  Before trial

11   we had tried to work out with petitioner a stipulation to

12   the admissibility of all of the exhibits.  As Your Honor is

13   well aware, this is a Hague Convention case.  There are

14   relaxed evidentiary standards.

15             We suggest -- we are willing to stipulate to the

16   admissibility of all of the exhibits that petitioner has

17   provided to us in their binder.  We ask -- we weren't able

18   to work out a stipulation beforehand, so now we would

19   request if petitioner is willing to do that now, go ahead

20   and have everything offered in evidence.

21             If there are some objections, we think for

22   efficiency of the hearing it might make sense to address

23   the objections to particular exhibits at this point in

24   time.

25             THE COURT:  All right.  Ms. Berg?

1          MS. BERG:  I believe, Your Honor, that we can

2     stipulate as to basic foundation.

3          THE COURT:  Mm-hmm.

4          MS. BERG:  However, and I apologize that we

5     weren't able to accomplish this before trial, but during

6     the month and a half we've had this case, we receive an

7     average of ten e-mails a day from the Robins Kaplan firm,

8     and it became a bit chaotic.

9          I do have a practice to run, and we're also doing

10    this pro se.

11         THE COURT:  Mm-hmm.

12         MS. BERG:  Unfortunately, we don't have the

13    overhead to cover it like they do.  So we have had to limit

14    our ability to respond.  We will handle it as best we can.

15         THE COURT:  Okay.  Well, let's move forward.  As

16    we run into issues as we go along, we will resolve them as

17    we reach them.  It strikes me that we likely will not have

18    too much in the way of evidentiary objections, given the

19    standards that should be applied.  All right?

20         So anything else or I think the parties wish to

21    do a relatively brief opening statement.  Is that the plan?

22         MS. BERG:  Yes, Your Honor.

23         THE COURT:  Okay.  All right.  Let's proceed.

24    Ms. Berg, the podium does go up and down or the lectern, I

25    should say.  There is a button on the side if you want to

1    move it up or down.

2         MS. BERG:  Thank you.  Thank you.  I'm used to

3    reaching like this (indicating).

4         Really, Your Honor, I find it easiest to

5    understand this case in terms of the chronology.  The Hague

6    Convention is pretty straightforward.  I'm not going to

7    lecture the Court on that.  Really what you have before you

8    is going to be solely determinations of credibility around

9    this issue of the alleged domestic violence.

10        One of the things I will preface my comments by

11   saying that I was surprised to learn in my discussions with

12   Mr. Abed Awad about the Egyptian culture, the Muslim

13   culture generally and the concept of marriage.  Strict

14   Muslims such as Mr. Aly Saad Aly do not date.

15        So what we call dating, they call marriage, and

16   it is not uncommon to have many marriages, multiple

17   marriages such as we see in this case, while one looks for

18   a life mate, particularly when one is an expatriate from

19   their own country and culture.

20        These two people are both Muslim.  They're from

21   different cultures, however.  I think it's also important

22   to note when you consider the issues before the Court

23   really resting solely on the question of credibility the

24   recent amended answer or response.

25        All of a sudden, the weeks we've spent trying to

1    verify that Mr. Aly Saad Aly could not possibly have met

2    her at a wedding as she claimed, we have copies of his

3    passport to show he was not in the country.  We have spent

4    countless hours trying to verify that fact.  Now she amends

5    her response and says, oops, I'm sorry.  I guess I did meet

6    him online.

7          Those are not things one would easily mix up in

8    my book.  So you have already some erosion of the

9    credibility of respondent as we go forward.  When these

10    parties met in January and immediately visited in Ontario

11    and then commenced their religious married state within a

12    couple of months, I believe they married religiously in May

13    of 2010.  They met in January online.

14          They marry in May.  She was already married to

15    someone else religiously.  She moves to Waterloo, Canada,

16    in Ontario in May 2010, keeping her home here that she

17    owns, renting it out.  Our understanding from Mr. Aly Saad

18    Aly is that she generates approximately $300 a month in

19    additional income between the costs of paying the mortgage

20    on that property and renting it.

21          That money she keeps in a separate account at

22    Wells Fargo.  That money never travels to Canada, but she

23    alleges she has been held financial hostage by Mr. Aly Saad

24    Aly.  In fact, during the time she was in Ontario, she who

25    has an American passport traveled regularly to New York

1    state to work at a hospital.

2              Her salary from that hospital was deposited in a

3    separate bank account in New York state.  Now she has got

4    two bank accounts, neither of which Mr. Aly Saad Aly has

5    access to, where funds are being deposited.  Yet they

6    assert, Mr. Edleson asserts there is clear evidence of

7    financial coercion here.  The fact couldn't be farther from

8    the truth.

9              We have the e-mails and text exchanges between

10   the parties where they refer to each other lovingly.  Yes,

11   that happens in situations where there is domestic abuse,

12   but this is a smart woman.  This is a registered nurse.

13   This is somebody who probably knows better than any of the

14   women who are sitting before you in their support staff

15   roles, simply because she is trained as a nurse, what to do

16   if there is domestic violence or injury.

17             She never once -- let me rephrase that.  One

18   occasion, the one occasion when the police officers

19   observed she was alleging her fingers were broken, but they

20   were noticing her using her hands to pack a suitcase that

21   she understood she had the right to file a charge of

22   domestic violence, but they didn't believe any domestic

23   violence had occurred.

24             The two police officers that observed the setting

25   in the home, that's the one time she went and filed a

1    complaint alleging domestic violence.  All of the other

2    allegations, and there are many of them.  There are

3    allegations in the OFP that was never served, filed in

4    Anoka.  There is allegations in Mr. Edleson's report that

5    are not recounted in any other police reports or medical

6    reports.

7              What's most interesting is, I believe it was

8    on -- let's see.  On April 25th, she alleges the child was

9    thrown across the room by Mr. Aly Saad Aly.  The next day,

10   that child was seen in a medical facility because of the

11   genetic problems she has that has been followed since

12   birth.

13             There is the mother and the child are sitting in

14   a doctor's office.  No concern is expressed by this

15   registered nurse about whether or not this baby was injured

16   when she was allegedly thrown across the floor by her

17   father.  They ask her in that medical visit if there is any

18   problems in the family, any family conflict problems.

19   Nothing is checked off.

20             So frankly, Your Honor, this is going to be

21   solely on credibility.  I want you to look with great

22   scrutiny and skepticism on the report of Mr. Edleson.  We

23   know he's got an international campaign going on here, and

24   it's very important for him to show up in each one of these

25   cases for free.

1            He writes essentially the same affidavit in each

2      one.  He cites the same research in each one.  Each one is

3      helping build his resume with the Hague Convention, with

4      the UN, with the State Department.  We know what his

5      motivations are, and we would ask Your Honor to take into

6      consideration all of that as you consider the facts heard

7      before you.

8            THE COURT:  Thank you, Ms. Berg.

9            Go ahead, Mr. Carter, when you're ready.

10           MR. CARTER:  Thank you, Your Honor.  Good

11     morning.  With the Court's permission, we're sensitive to

12     the privacy of the child involved, but with the Court's

13     permission we will refer to her by her first name.

14           THE COURT:  Very well.

15           MR. CARTER:  This case is about a child,

16     Princess.  In evaluating the case about the child, two main

17     issues are before the Court.  First, is Princess Hafsah's

18     habitual residence Canada or the United States, and second,

19     whether returning her to Canada would expose her to a grave

20     risk of physical or psychological harm or an otherwise

21     intolerable situation.

22           Now, the evidence that will be presented to the

23     Court will show that Princess's habitual residence is the

24     United States, and it will also show that returning her to

25     Canada will expose her to a grave risk of physical or

1    psychological harm.  I would like to look at the specific

2    evidence supporting each of these two conclusions, but

3    first I will briefly discuss the parties and their

4    relationship.

5              Ms. Aden is Somali.  In 1999, speaking little

6    English, she immigrated to Minnesota.  She learned English

7    and put herself through school, eventually becoming a

8    nurse.  She became an American citizen.  She met petitioner

9    online on a Muslim dating web site and visited him in

10   February of 2010.

11             They decided to get married, and in May 2010,

12   they were married in a religious ceremony.  Ms. Aden then

13   began staying with petitioner in Kitchener, Ontario,

14   Canada, and later in 2011, they were married in a legally

15   binding civil ceremony.

16             Now, the parties approached marriage from

17   drastically different scenarios.  Ms. Aden viewed marriage

18   as a serious commitment and intended to begin a family with

19   petitioner.  Now, Ms. Berg has mentioned Ms. Aden's

20   previous marriage.

21             Ms. Aden will testify that she was divorced from

22   her previous husband in Kenya in 2008, well before she met

23   petitioner, and only had to seek a divorce in Minnesota to

24   verify that divorce in a foreign country later in 2010.

25             Now, petitioner on the other hand has been

1    married at least five times and is an admitted bigamist.

2    Ms. Aden knew of only one of these marriages when she went

3    to Kitchener in May of 2010.  Petitioner's own expert

4    witness will explain that petitioner believes it to be a

5    grave mortal sin to sleep with a woman outside of marriage.

6    So rather than committing that sin or abstaining,

7    petitioner serially marries women so he can sleep with

8    them.

9            Now, let's turn to the evidence supporting the

10   conclusion that returning Princess to Canada would expose

11   her to a grave risk of harm or an otherwise intolerable

12   situation.  Ms. Aden and petitioner did not have a happy

13   marriage, in spite of the few chat messages.  In fact,

14   throughout their time together, petitioner engaged in a

15   pattern of emotional and psychological abuse of both

16   Ms. Aden and Princess.

17           He also engaged in physical abuse.  Petitioner's

18   previous marriages and his false representation that he was

19   still married to an Egyptian woman were major sources of

20   conflict in the marriage, conflict that often ended in

21   petitioner assaulting Ms. Aden and Princess.

22           Another trigger of petitioner's abuse was

23   Ms. Aden's attempts to end their abusive relationship, and

24   that's exactly what triggered the incident of abuse against

25   Ms. Aden's and Princess on April 25th, 2012, a fight that

1    culminated when petitioner threw his eight-month-old

2    daughter across the room onto the floor.

3            After petitioner threw his infant daughter,

4    Ms. Aden immediately went to the baby and using her

5    training as a nurse examined Princess for injuries.  She

6    also examined Princess hourly throughout the night.

7    Thankfully, Princess wasn't injured.

8            After the baby and petitioner went to bed,

9    Ms. Aden gathered her courage, packed a few bags and

10   secreted them in a storage room down the hall from

11   petitioner's apartment.  When the baby awoke, Ms. Aden took

12   her to a previously scheduled doctor's appointment, and

13   after that appointment, she drove home to Minnesota.

14           The April 25th assault was not the only time that

15   petitioner physically abused Ms. Aden.  His propensity to

16   abuse is demonstrated by more than five assaults during

17   that short time together.  On February 27th, 2011, for

18   example, Ms. Aden told petitioner that she was going to

19   leave him.

20           The fight turned violent.  Petitioner hit her and

21   threw her to the floor and kneed her in the stomach.  She

22   was three months pregnant.  In a direct attack against the

23   child, petitioner told Ms. Aden that he wanted the baby

24   aborted.  Petitioner grabbed all the phones in the

25   apartment to keep Ms. Aden from calling the police, and

1    petitioner himself eventually called the police claiming

2    that Ms. Aden threatened him with a knife.

3             Now you will see, Your Honor, the police report

4    regarding this incident, and you will see how it describes

5    how petitioner stumbled over questioning about the knife,

6    how he could not describe the knife and how he, quotes,

7    "Pretended to look for the knife through kitchen drawers."

8             Now, Ms. Aden went to the hospital after the

9    attack, and the Court will see medical records documenting

10   her injuries.  The reports will show five bruises on her

11   arm where he grabbed her, and the report will show more

12   bruises on her upper arm and shoulder where he also grabbed

13   her.

14            Now, Ms. Aden had badly swollen fingers, and the

15   records will report how the doctor saw fit to x-ray these

16   swollen fingers in spite of the fact that Ms. Aden was

17   pregnant at the time.  The report also documents Ms. Aden's

18   statements that she was experiencing cramping from the

19   assault.

20            Now the Court will also hear testimony describing

21   more incidents of petitioner's abuse, namely when

22   petitioner assaulted Ms. Aden in July of 2011 when she was

23   nine months pregnant and when he assaulted her in early

24   fall 2010, just months after Ms. Aden began staying with

25   petitioner.

1          Petitioner's pattern of abuse also has

2     psychological and emotional components.  Petitioner would

3     tell Ms. Aden that she was nothing but a woman nurse with

4     no intelligence and that he could buy five women just like

5     her in Egypt for ten cents.  He controlled the family

6     finances.  He isolated her from family and friends, and he

7     would take her passport with him when he went to school

8     during the day.

9          Petitioner monitored Ms. Aden's e-mails, and when

10     she returned home to Minnesota, he broke into her e-mail

11     account and deleted relevant e-mails and instant message

12     chats.  He even logged into her Facebook and Skype accounts

13     and pretended to be her to keep tabs on her.

14          Ms. Aden isn't the only victim of petitioner's

15     abuse.  Nora Roundtree, petitioner's former wife, will

16     testify that petitioner abused her in a pattern of abuse

17     that is nearly identical to that suffered by Ms. Aden and

18     Princess.

19          In one assault, petitioner punched Ms. Roundtree

20     in the forehead at 3:00 a.m. because she refused to sleep

21     with him, and as he has with Ms. Aden, petitioner has even

22     spoken favorably about female genital mutilation with

23     Ms. Roundtree.  Ms. Roundtree will testify that she would

24     fear for her child's safety if she were in the custody of

25     petitioner.

1              Petitioner's misogynistic attitude toward women

2      is consistent with the abuse described above.  He believes

3      women shouldn't work.  He believes they shouldn't be

4      educated.  He believes that it is shameful to have a

5      daughter because that daughter might get pregnant outside

6      of marriage.

7              In fact, as I mentioned, petitioner has stated

8      that he favors having girls undergo female genital

9      mutilation, and he wants to have that procedure done on

10     Princess.  He has even articulated a specific plan to have

11     her circumcised as they pass through Egypt during the

12     pilgrimage to Mecca.

13             Thus, the evidence will establish that returning

14     Princess to Canada would expose her to a grave risk of

15     psychological or physical harm or an otherwise intolerable

16     situation.  I would like to move on to the second main

17     issue now:  Princess's habitual residence.  It was and is

18     the United States.

19             Ms. Aden was not a resident of Canada.  She was

20     always a visitor in Canada, merely staying with petitioner.

21     She is an American citizen, and petitioner, an Egyptian,

22     was only in Canada to pursue his studies there.  In fact,

23     the two planned on returning to Minnesota when petitioner

24     finished his studies.

25             While staying in Canada, Ms. Aden worked as a

1    nurse in Buffalo, New York.  She even rented out her room

2    there.  She had a New York driver's license and bank

3    accounts in both New York and Minnesota.  She maintained

4    contacts with Minnesota, with her mosque, with her family

5    and friends, with community organizations.

6         She owned her town home in Minnesota and stored

7    furniture there while she was staying in Canada and

8    Buffalo.  When in Kitchener, Ms. Aden never really

9    established permanency or considered it her home.  She will

10   testify that she basically lived out of a couple of bags,

11   bouncing back and forth between petitioner's apartment, her

12   apartment in Buffalo and her cousin's in Kitchener where

13   she would go to flee the abuse.

14        After Ms. Aden got pregnant, petitioner and

15   Ms. Aden initially planned on having the baby in Minnesota

16   where Ms. Aden had a support network of friends and

17   extended family.  When petitioner could not get a visa to

18   come into the United States because he had a history of

19   illegally being in the country, they decided to have the

20   baby in Buffalo, New York, closer to Kitchener.

21        All of Princess's prenatal care occurred in

22   Buffalo, and the C section was scheduled there, but when

23   Ms. Aden went into labor a few days before the scheduled C

24   section, she wasn't able to make the trip to Buffalo and

25   had to have the baby in Canada.

1          After Princess was born, petitioner and Ms. Aden

2     obtained a certificate of birth abroad from the United

3     States.  Princess is an American citizen.  She has an

4     American Social Security number and an American Social

5     Security card, and she has an American passport.  Minnesota

6     was and is Ms. Aden's and Princess's home.

7          This point is borne out by how quickly she and

8     Princess settled back into Minnesota.  In short order,

9     Ms. Aden found a job, moved back into her town home and got

10    Princess into a day-care.  She reconnected with family and

11    friends that petitioner had isolated her from.

12         Princess is now fourteen months old and has been

13    in Minnesota since she was eight months old.  Arguably,

14    these months have been the most important of her

15    development thus far.  From Princess's perspective,

16    Minnesota was and is her habitual residence.

17         I would like to address one final issue, Your

18    Honor.  As is often true in cases of domestic violence, the

19    credibility of the parties is at the forefront.  Ms. Berg

20    talked a little bit about Ms. Aden's explanation of how she

21    met petitioner.

22         She will testify and explain to the Court why she

23    initially said that they met at a marriage -- at a wedding,

24    why she was ashamed of that and later decided that she

25    needed to correct it.  Now, let's take a look at what

1    petitioner has said.

2           On June 5th, 2012, over a month after Ms. Aden

3    and Princess left, returned home to Minnesota, petitioner

4    called 911.  He called the Canadian police, and he

5    concocted an elaborate lie.  He told them that Ms. Aden had

6    left Princess behind when she returned to Minnesota.  He

7    told them that Princess was staying with his cousin in

8    Toronto.

9           He told them that he would take the bus to visit

10   Princess once per week and that he would call frequently to

11   check up on them, on the baby.  These were all lies, and

12   even when the police caught him in this lie, as is clearly

13   documented in the police report and petitioner admitted

14   that he had lied to the police about Princess being in

15   Canada, he continued to lie to them about other facts.

16          The evidence will also show that he lied to the

17   Canadian family court when he filed his ex parte affidavit

18   seeking sole custody of Princess.  Petitioner lied to the

19   police.  He lied to the court in Canada, and the evidence

20   will make clear that he has lied to this Court.

21          In short, Your Honor, we expect that the evidence

22   will demonstrate that returning Princess to Canada will

23   expose her to a grave risk of psychological or physical

24   harm or an otherwise intolerable situation.  And moreover,

25   it will show that Princess's habitual residence is the

1    United States.

2              Thank you.

3              THE COURT:  Thank you, Mr. Carter.  Okay.

4    Testimony?  Let's --

5              Why don't, before we give testimony, let's take

6    about a seven-minute break.

7              MS. BERG:  Thank you, Your Honor.

8              THE CLERK:  All rise.

9                        **(Recess taken.)**

10

11                       **(In open court.)**

12             THE COURT:  You may be seated.  Okay.  Let's

13   proceed with our first witness.

14             MS. BERG:  Your Honor, at this time petitioner

15   calls quite literally Mohamed Aly Saad Aly.

16             THE COURT:  And he is on the telephone, is that

17   correct?

18             MR. ALY SAAD ALY:  Yes, sir.

19             THE COURT:  Are you able to hear us okay?

20             MR. ALY SAAD ALY:  Yes, sir.

21             THE COURT:  All right.  Very well.

22                       **(Witness sworn.)**

23             THE WITNESS:  I do.

24

25

1             **MOHAMED ALY SAAD ALY (VIA PHONE),**

2      after having been first duly sworn, was examined and

3      testified as follows:

4                       **DIRECT EXAMINATION**

5      BY MS. BERG:

6      Q.  Mohamed, state your full name and spell.

7      A.  Mohamed Aly Saad Aly.  The spelling of my first name is

8      M-o-h-a-m-e-d.  The spelling of my last name is A-l-y space

9      S-a-a-d space A-l-y, Aly Saad Aly.

10     Q.  Mr. Aly Saad Aly, how did you meet the respondent in

11     this proceeding?

12     A.  We have met on a Muslim web site, match web site date

13     called Muslima.com.

14     Q.  I want to remind you to speak very slowly.

15     A.  We have met --

16     Q.  Would you spell the name of the web site?

17     A.  It is Muslima, M-u-s-l-i-m-a, dot com.

18     Q.  Because we have a court reporter here that has to take

19     down everything you say, so you must speak very slowly.

20     A.  Yes, ma'am.

21     Q.  Remember my three second rule.  You have to count to

22     three before you answer.

23     A.  Yes, ma'am.

24     Q.  All right.  And why did you pursue a relationship with

25     respondent through that web site?

1    A.  Well, living in Canada and it was a new environment for

2    me and kind of like a cold weather and being alone and

3    doing a PhD, so I had to look for, for, for a marriage

4    relationship.

5            When I went, I tried to do it through family.  It

6    didn't work out, so a friend of mine advised me to go and

7    use this web site.  So that's what --

8    Q.  Mr. Aly Saad Aly, why are you in Canada?

9    A.  I am in Canada because I want to live in Canada.  I

10   migrated to Canada from the U. S. in 2007, and I'm

11   considering Canada as my permanent place to live.

12   Q.  Have you applied for citizenship?

13   A.  Yes, I -- yes, I did.  Recently on March 15th, and I

14   have applied for an application for a citizenship, and they

15   replied back to me, and it's being, you know, processed.

16           MS. BERG:  Your Honor, you look upset?

17           THE COURT:  Just one moment.

18                         **(Pause.)**

19

20                      **(In open court.)**

21   BY MS. BERG:

22   Q.  Mr. Aly Saad Aly, what is your employment?

23   A.  I am currently pursuing my PhD for almost close to

24   three years in engineering, and I am living on a

25   scholarship basically, which is my source of income or

1    employment, because I am a PhD student/researcher

2    assistant.

3    Q.  So you're a teaching assistant/researcher, is that what

4    you said?

5    A.  Researcher assistant.

6    Q.  I'm going to repeat back because sometimes I have

7    trouble understanding your accent.  So you're getting your

8    PhD in engineering, is that correct?

9    A.  Yes, ma'am.

10   Q.  And you have been in Ontario three years working on

11   your PhD, is that correct?

12   A.  In PhD three years, yes.  I have been in Ontario since

13   2007.

14   Q.  Say that again?

15   A.  I have been in Canada since 2007 and in Waterloo,

16   Ontario, since 2010.

17   Q.  Since 2010?

18   A.  Yes, ma'am.

19   Q.  All right.  How big is the Muslim community in

20   Waterloo, Ontario?

21   A.  Actually, Waterloo has one mosque that is, that is

22   basically one prayer could take 2,000 Muslim people, so for

23   this small city, it's a big community.

24   Q.  If I understood you correctly, you said for this small

25   a city, it's a big community?

1     A.  Yes.

2     Q.  All right.  You, do you remember when you first met

3     respondent through the web site?

4     A.  I, I, I would say as far as I remember, toward the end

5     of 2009.

6     Q.  Okay.  And when did you and respondent first meet each

7     other in person?

8     A.  In sometime in February 2010, my wife have, fly to

9     Kitchener, Ontario, and we have met in three days weekend.

10    Q.  During that meeting, were the two of you chaperoned at

11    all?

12    A.  Meaning what?

13    Q.  Did you have any third parties present to supervise

14    your interactions?

15    A.  Not really.  The only time, her cousin that she would

16    stay with when she lived in the same city was with us on a

17    lunch with the second date.  She said I want her to meet

18    you so she can assist me in my decision to marry you.

19         So me, Mrs. Amal Aden and Mrs. Asha Aden, Amal's

20    cousin, and we had met over lunch.

21    Q.  Okay.  Mohamed, you're going way too fast.

22    A.  Okay.  And second date, my wife have arrived to

23    Kitchener, and me and her and her cousin Mrs. Asha Aden, we

24    have met over lunch because my wife said at the time she

25    want her cousin to see me so she can assist her in her

1    decision for getting married.

2    Q.  So the very first time you met her, did you propose

3    marriage?

4    A.  Actually, by the end of the three days, we have spent

5    together, I, I, I liked her, and I like, you know, what I

6    have seen, and I ask her to get married.  She said let me

7    go back to Minnesota and discuss this with my, with my

8    family in Africa and my friends in Minnesota and come back

9    to you.

10            And when she went back to Minnesota, and

11    actually, we were married religiously over the phone by

12    calling her, her, her family in Somalia sometime in March

13    or beginning of April.

14    Q.  And what you're describing is what we would think of as

15    calling the person you're intending to marry's family and

16    requesting permission for the marriage.  Is that what you

17    did?

18    A.  Well, true.  But in Islam, a religious marriage is a

19    symbol.  If a man want to marry a woman from a religious

20    point of view, he can call the parents and two witnesses

21    exist and they agree on a dowry, if these conditions are

22    met, the marriage is religiously happen, so that's what we

23    did.

24    Q.  All right.  And at the time of the phone calls you just

25    described, where was respondent living?

1    A.   She was living in an apartment she was rented -- she

2    was renting in Minneapolis.  So she called a third party,

3    which is one of her relatives in Minnesota as well was

4    translating because her uncles in Somalia does not speak

5    English.

6             So I was talking and her friend or relative in

7    Minnesota translated for her uncles.

8    Q.   Okay.  When did respondent first move to Ontario?

9    A.   I believe May 15th, 2010.

10   Q.   Did you know whether or not she was already married to

11   someone else at the time that you conducted the religious

12   ceremonial marriage?

13   A.   At the time she did not tell me.  She surprised me like

14   a month or a month and a half later on.

15   Q.   And how did she surprise you?

16   A.   Well, because she, she, she asked me to come to,

17   because she want -- she was asked to, to make some

18   paperwork, an affidavit and has to be from the embassy,

19   from the American embassy in Toronto.

20   Q.   Slow down.  Slow down.  Slow down.  Go ahead.

21   A.   I got to know because she want to, to, to make the

22   divorce, and she was applying, as she told me, she was

23   applying for divorce in U. S.  So and she was in contact

24   with, with the court in Minnesota to, to make the divorce

25   in Minnesota.

1          And then in order to do this, they ask her to go

2     to the closest U. S. embassy, which was in Toronto, but she

3     need somebody to go, to go with her and witness that she

4     has done so.  And then she asked me to go with her to the

5     embassy and to sign that waiver, that paper she applied.

6     It's I have seen.

7     Q.   Okay.  Mohamed, I'm going to just stop you there.

8     Based on my understanding of the situation, is it correct

9     that respondent explained to you that she married this man

10    in Africa for the purpose of assisting him in coming to the

11    United States, but he failed to follow through with certain

12    expectations, and so she had decided to divorce; is that

13    correct?

14    A.   Yes.  Actually I was coming to this.  She told me

15    basically she made a deal with this guy in Kenya to bring

16    him to here, and he would pay her some money.  And she told

17    me as well that he paid her the first payment, which is

18    around $10,000, but then he failed to continue to provide

19    the papers needed by the court.  That's why it didn't work

20    out.

21    Q.   And do you recall when the, when she obtained the

22    divorce from this man?

23    A.   Well, the only divorce I was aware of, the one she

24    obtained when she was in Canada.

25    Q.   Okay.  I'm going to get an exhibit now.  Mohamed, do

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

1   you have the book in front of you?

2   A.  Yes, ma'am.

3   Q.  Turn to section 25.

4   A.  Okay.  Yes, ma'am.  Yes, ma'am.  I'm there.

5   Q.  All right.  To the best of your knowledge, is that the

6   divorce decree that respondent obtained from her apparent

7   husband on September 3, 2010?

8   A.  I would believe so.

9          MS. BERG:  Your Honor, we move the admission of

10   Exhibit 25.

11          MS. YANG:  No objection.

12          THE COURT:  25 is admitted.

13   BY MS. BERG:

14   Q.  Mr. Aly Saad Aly, is it against Islam to have more than

15   one spouse?

16   A.  For the man or for the woman?

17   Q.  Both.  For the man, first?

18   A.  Well, for the man, the polygamy is accepted in Islam.

19   Q.  You're going to have to say it again slower.

20   A.  In Islam, the polygamy for the man is accepted in

21   Islam.

22   Q.  Polygamy?

23   A.  Polygamy.  I'm sorry.  Polygamy.

24   Q.  What about for the woman?

25   A.  For the woman, only one husband is allowed.

1    Q.  So when you discovered after the religious ceremony

2    with respondent that she was already married to someone

3    else, weren't you upset?

4    A.  I was upset, but she started crying and using emotion

5    against me, and then I, you know, I fell for this.

6    Q.  When did -- did she take up occupancy in Waterloo on

7    May 15th, 2010?

8    A.  Rephrase the question, please.

9    Q.  Did she begin living in Waterloo on May 15th, 2010?

10   A.  Yes.  Yes.  She drove from Minnesota to, to, to

11   Kitchener, along with other two members of Somali

12   communities.  Drove with her to bring her stuff, the bags.

13   She even brought her covers, the winter covers, the

14   blankets and all this, some kitchen wares and some stuff

15   she used in it.

16         And two of the Somalian men, I believe they are

17   either relatives or part of the community, they drove with

18   her, and they arrived in Kitchener, Ontario, on May 15th,

19   which at that time I got the new apartment, so to live

20   there, me and her.

21   Q.  All right.  I'm going to ask you again now.  I'm going

22   to remind you to speak slowly and try to keep your answers

23   brief.  Okay?

24   A.  Yes, ma'am.  Yes, ma'am.

25   Q.  And did the two of you enjoy a loving relationship

1    during that period of time, say from May 15th to the first

2    of the new year, January 2011?

3    A.  I, I, I from my side, I loved her so much, and she

4    shared with me the same love.  The only problem we had that

5    she was, she get angry quick, and she always, you know,

6    upset and frustrated quick.

7    Q.  Was she using birth control at any time during this

8    period?

9    A.  From day one.  Actually, she started the birth control

10   before she moved because you have to start like a month

11   before.

12   Q.  And what did you observe about her behavior during that

13   period of time we just discussed, May 15th, 2010, to

14   January 1, 2011?

15   A.  I felt like I live partially in hell because she is,

16   she has a mood swinging.  She has anger problems.  She

17   start to have some being frustrated quick.  She started

18   sometimes screams when we talking in argument.  So I was

19   sickening of her behavior with me and the relationship.

20   Q.  And did the two of you discuss the mood swings and

21   problems she was having with her temper?

22   A.  Yes, we did.

23   Q.  And what discussion did you have?

24   A.  Well, I even remember one time I went and almost teared

25   and cried and I told her, I love you, dear, and I want our

1    relationship to be better than this, so can both of us have

2    a better happy life.  She cried as well, and she said, I

3    don't know what to do, sometime I respond like this without

4    knowing why.

5            And she then by the end of the conversation, we

6    said, and I, and I agreed at the time that that might be,

7    that might be the reason of using the birth control.

8    Q.  And to the best of your knowledge, did she stop taking

9    birth control pills?

10   A.  She did, and initially, for the first week and so, she

11   did without telling me.  And then when I figure out, she

12   said she did this because she think that's the reason of

13   her mood swinging.

14   Q.  And to the best of your knowledge, did she become

15   pregnant?

16   A.  Well, we -- a month, a month after or even less we

17   learned that she become pregnant.

18   Q.  At what time of the year?  Can you give us a month when

19   you learned that respondent was pregnant?

20   A.  Up to my knowledge, I'm not sure on this, but sometime

21   toward the end of the year, November, December.  I'm not

22   sure.

23   Q.  All right.  And just to keep the chronology going,

24   during the fall of 2010, did you and respondent plan to

25   have a civil wedding ceremony?

1    A.  Of course we did, and actually, I want to have this

2    early on, but she told me, I remember now, she told me she

3    cannot because she legally married to other man.

4    Q.  Okay.  Now I'm going to direct your attention to

5    Exhibit 16.

6    A.  Okay.

7    Q.  Do you have that in front of you?

8    A.  Yes, ma'am.

9    Q.  Tell me what Exhibit 16 is.

10   A.  It's marriage license.

11   Q.  And what is the date of it?

12   A.  It's July 6, 2011.

13   Q.  All right.  Now, you were planning on marrying in the

14   fall of 2010?

15   A.  Yes.

16   Q.  You had the problem of her having to complete her

17   divorce.  Did you make a request or what was required for

18   you to accomplish getting married?

19   A.  Well, in order to get married in Canada, we have to, to

20   apply for request.  So in order to have request, I was

21   getting what was divorce and outside of the country, then

22   we have to, to, to, to write the letter, go to a lawyer and

23   write a letter to explain why the marriage happened.

24   Q.  Okay.

25   A.  So --

1    Q.  And I'm getting that exhibit, and while I'm waiting for

2    that, what happened to prevent the marriage going forward,

3    then?

4    A.  Well, there is two reasons.  First, her, her, she was

5    not legally divorced yet.  Second, she broke her ankle

6    while she was in Buffalo, which was one month after she

7    start her work in Buffalo, the nurse on weekends.

8    Q.  Now, while I'm waiting for that exhibit, I'll just ask

9    you a couple more questions.  When did respondent start

10   working in Buffalo?

11   A.  As far as I remember, I'm not sure.  Maybe sometime in

12   September, October.  I'm not actually sure, but sometime

13   around this.

14   Q.  In 2010?

15   A.  Yes, ma'am.

16   Q.  So if she moved there on May 15th, 2010, and then she

17   began working sometime in the fall, then she broke her

18   ankle one month, you say, after she started working so she

19   had to stop, is that correct?

20   A.  One month, month and a half, two months, I'm not

21   actually sure, but shortly after.

22   Q.  Okay.  Now, Mohamed, I'm going to direct you to

23   Exhibit 11.

24   A.  Yes, ma'am.

25   Q.  Would you tell me --

1    A.  Again --

2    Q.  Would you tell me what Exhibit 11 is?

3    A.  Give me a second.  This is a letter from me, yes,

4    because -- that is basically to -- we have to apply for the

5    marriage license.  Then we have send this letter on in, in,

6    in March to request another marriage, you know, permission

7    from the Canadian government.

8    Q.  And is that because your original marriage license

9    expired and was no longer good?

10   A.  Exactly.  When we applied back in, in, in 2010, we

11   waited more than six months, so we have to apply again.

12   Q.  Okay.  And that's the marriage license we looked at

13   earlier?

14   A.  Yes, ma'am.

15           MS. BERG:  Your Honor, I move the admission of, I

16   forget where I am now, Exhibit 11.

17           MS. YANG:  No objection.

18           THE COURT:  It's admitted, and then 16 as well?

19           MS. BERG:  Yes, Your Honor.  I'm sorry.

20           MS. YANG:  No objection as well.

21           THE COURT:  They both are admitted.

22   BY MS. BERG:

23   Q.  Now, in October of 2010, did respondent leave and come

24   or go to Toronto without discussing it with you ahead of

25   time?

1    A.  I don't remember the exact date, but she did this, yes,

2    around this time.

3    Q.  Well, how was she able to do that without you knowing?

4    Didn't you notice the money being used to purchase plane

5    tickets?

6    A.  She was using her own money so --

7    Q.  I'm sorry?

8    A.  She was, she was using her own money.

9    Q.  Okay.  Do you share any joint accounts with respondent?

10   A.  No.  The only bank or joint bank account we share, the

11   one in Canada here in TD Canada Trust Bank.

12   Q.  Say again the name of the bank?

13   A.  TD Canada Trust.

14   Q.  CT?

15   A.  TD, T, as in Tom, D, as in David, Canada Trust.

16   Q.  Turning your attention to Exhibit 23, do you have the

17   Exhibit 23 in front of you?

18   A.  Yes, ma'am.

19   Q.  And tell me what Exhibit 23 is?

20   A.  This is a letter from the bank saying to whom it

21   concern, this confirms that Mohamed Aly Saad Aly made an

22   account joint with Amal Aden on September 2nd, 2010.

23   Q.  Did respondent ever make her accounts in Buffalo joint

24   with you?

25   A.  No.

1    Q.  What about the account in Minnesota where she deposited

2    her rent proceeds?

3    A.  Are you asking me if she have joint with the one in

4    Minnesota?

5    Q.  Yes.

6    A.  I was never joint with Ms. Amal Aden with any American

7    account.

8    Q.  Okay.  Do you recall discussions with her about the

9    rental of her town home and how much it cost to pay the

10   mortgage and what was left afterwards?

11   A.  She would voluntarily say this like, you know, in the

12   conversation how much --

13   Q.  Slow down.

14   A.  As far as I remember, she voluntarily mentioned this to

15   me that she -- the difference between the mortgage and the

16   rent she get in of the tenant is around $300.

17   Q.  Around $300?

18   A.  Yes, difference.

19   Q.  Now, so in the fall of 2010 when she went to Toronto,

20   how long did she stay?

21   A.  I believe around a week.

22   Q.  Okay.  And were you surprised?

23   A.  Of course.  I was, you know, something like this has

24   not really happening in my family or my culture, but, you

25   know, previously I had a problem with her with the mood

1    swinging and anger and all this, so it just adds to the

2    list.

3    Q.  Let me ask you now.  Were you aware of her ever seeking

4    the help of a psychiatrist or psychologist?

5    A.  At one point in time when we discuss a solution of her

6    anger and problems, you know, her, her, her family and my

7    mother suggest to either be treated, you know, by the Koran

8    or by going to psychiatric.

9    Q.  I'm sorry.  I'm going to repeat that.  Were you saying

10   by the Koran?

11   A.  Yes, ma'am.

12   Q.  Or by seeing a psychologist or psychiatrist of some

13   sort?

14   A.  Yes, ma'am.

15   Q.  Do you know whether she ever sought any help?

16   A.  Actually, me and her, we went twice to a mosque in

17   Toronto so an Imam can recite some Koran for her to see if

18   she has any like, any issues and stuff, but the Imam

19   reciting the Koran and different verses --

20   Q.  Say that last part, Mohamed, say the last part again

21   slowly.

22   A.  Me and my wife went to Toronto twice to a mosque, when

23   the Imam is reciting the Koran on her, and she is

24   listening, and so to see if this can cure her or this can

25   try to make it better.  After two times when that did not

1    improve anything, we stopped going.

2          So when I asked her to go seek any professional

3    help, she is a nurse, and she know better, she keep

4    delaying and delaying it.  At one time she said, no, I'm

5    doing something, but I don't have to tell you.  She show

6    me.  She forwarded an e-mail that she had sent initially to

7    a psychiatric.

8    Q.  I'm now going to show you Exhibit 35.

9    A.  Yes, ma'am.  Yes, ma'am.

10   Q.  Do you have it in front of you?

11   A.  Yes, ma'am.

12   Q.  And do you recognize that exhibit?

13   A.  Yes, ma'am.

14   Q.  What is it?

15   A.  This is an e-mail forward from Amal to me, showing an

16   initial e-mail from Amal to a psychiatric called Roberta

17   McKay and her responding back and saying, you know, how

18   much is charged and stuff.

19   Q.  Okay.  Do you know if she ever met with that

20   individual?

21   A.  I have no idea.

22   Q.  Now let's see.  When did you learn that she was

23   pregnant?

24   A.  Around November, December, 2010.  I'm not sure of exact

25   date.

1    Q.   Okay.  Now, you're aware that respondent has alleged

2    some abuse of her occurred in January of 2011, is that

3    correct?

4    A.   Yes.

5    Q.   Let me get to the police report.  Turning your

6    attention to Exhibit 20 --

7    A.   Okay.  Yes, ma'am.

8    Q.   -- do you have that in front of you?

9    A.   Yes, ma'am.

10   Q.   First, I'm showing you some e-mails.  Tell me about

11   these e-mails.

12   A.   Okay.  Yes.  This is, the first time I called the

13   police was, once I came home, I couldn't found my wife, and

14   I couldn't found her suitcase, and along with this, I

15   couldn't found my backpack, which contains my travel

16   documents like passport and landing immigrant, you know,

17   immigration lands for Canada, you know, some Social

18   Security papers and stuff and very important things.

19          So I got freaked out, and the first thing that

20   happened to me, I didn't know if she took it, somebody else

21   came into the apartment because it's very important

22   documents for me.  So I called the police, and I have

23   reported my documents missing.

24   Q.   All right.  Stop, Mohamed.

25             THE COURT:  Is he referring -- are you referring

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

1      to your travel documents or her travel documents?

2                  THE WITNESS:  Mine, sir.

3                  THE COURT:  Okay.

4                  MS. BERG:  I apologize, Your Honor.  We didn't

5      Bates stamp these.

6                  Can you go to the police report?  It's towards

7      the back.

8      BY MS. BERG:

9      Q.  Go to the back of Exhibit 20, Mohamed.

10     A.  Yes, ma'am.

11     Q.  And you'll see two police reports.

12     A.  Yes, ma'am.

13     Q.  The one that's got a lot of things blanked out, ignore

14     that.

15     A.  Okay.

16     Q.  And go to the second one?

17     A.  Which is the last one?

18     Q.  Yes.  And that says in the narrative at the bottom, on

19     January 17th, Officer or Constable, I guess it would be,

20     Lukasik, L-u-k-a-s-i-k.

21     A.  Mm-hmm, yes, ma'am.

22     Q.  Is this the incident in which you were referring to

23     when you were describing the earlier e-mails?

24     A.  Yes, ma'am.

25     Q.  Now next -- so she returned eventually, is that

1    correct?

2    A.  Yes, ma'am.

3    Q.  She was staying at her cousin's?

4    A.  Yes, ma'am.

5    Q.  And your daughter wasn't born yet?

6    A.  No.

7    Q.  Now, then later on in February of 2011, and that would

8    be the police report that was just before the one we were

9    discussing --

10   A.  Yes.

11   Q.  -- which has a lot of things blacked out --

12   A.  Yes, ma'am.

13   Q.  -- is this the incident where you say she took a knife

14   and was threatening to kill herself or stab her belly?

15   A.  Yes, ma'am.

16   Q.  And have you read this police report?

17   A.  Yes, ma'am.

18   Q.  And do you agree with what the police officers wrote at

19   least about you?

20   A.  Not really.  Not really.

21   Q.  Why?  What's different?

22   A.  Well, of the struggling or describing the knife or

23   finding the knife.  I told them she had the knife and it

24   might be among the kitchen drawer with the knife, and I

25   described the knife.  I said it's a big knife that usually

1    cuts chicken or meat or something, you know.

2    Q.  Okay.  In another copy of this report supplied to us by

3    respondent was the portion of the police report where they

4    blacked out all your information and included her

5    information, do you recall reading that?

6    A.  Yes, ma'am.

7    Q.  And I'll ask Lilo.  Would you see if we can get an

8    exhibit number and which one that is so we can refer to it

9    for the record.

10            In effect, the police didn't believe either one

11   of you in this incident, is that correct?

12   A.  Yes.  As far as I know, yes.

13   Q.  All right.  And it was after this incident that

14   respondent was seen at the Domestic Violence Center in

15   Waterloo, is that correct?

16   A.  According to the report, yes.  I didn't know until this

17   week because I received this one week ago.

18   Q.  All right.  And she apparently made these reports but

19   then went and resumed your marriage, is that correct?

20   A.  True, because I didn't know anything about these

21   reports.

22   Q.  Okay.  Then it was after these two incidents that the

23   exhibit we just discussed, 11, which was the letter

24   requesting a marriage license, the two of you decided to

25   proceed with a civil marriage, is that right?

1    A.  Yes, ma'am.

2    Q.  I'm just trying to get the time line together.

3    A.  Yes, ma'am.

4    Q.  The complete police report will be found at

5    Respondent's Exhibit 21, just so that the Court is aware.

6    Well, it's not even complete there.  Let's see.

7           No.  This is the other version.  This is

8    respondent's version.  So, Your Honor, you're going to have

9    to kind of piece the two together.  We couldn't get a

10   complete copy.  Everyone's privacy is being protected.

11          MS. YANG:  Your Honor, very briefly.  If counsel

12   would like to refer to the complete set of three reports,

13   that can be found in RTX 75, I believe.

14          MS. BERG:  Fine.

15          THE COURT:  All right.

16   BY MS. BERG:

17   Q.  So you go ahead and get married in March of 2011, and

18   then -- I'm sorry.  You make the request to get married in

19   March of 2011, and the two of you actually married on July

20   6th, 2011, is that correct?

21   A.  Yes, ma'am.

22   Q.  All right.  Now, when was your daughter born?

23   A.  August 27th, 2011.

24   Q.  All right.  Shortly before her birth, did respondent

25   ask you to write a check?

1    A.  Yes.  She quit working I believe in July to, to, to

2    have a break before she delivered, and she want me -- she

3    wrote a check to me so I can, you know, go and cash it and

4    send it to, to, to -- she called some organization which

5    she used to send the money to Africa to her mother called

6    AMOexpress.com.

7          So she took that representative to the phone, and

8    I went and cashed this check and give this person the

9    money.

10   Q.  All right.  Now was it Ms. or respondent's practice to

11   send money to her family regularly?

12   A.  As I was being told before marriage, she said to me

13   that she, she, she along the whole ten years she lived in

14   Minnesota she was sending money to her mother in Kenya, as

15   her stepfather in Canada does not care for them

16   financially.

17         So she told me that she used to send between

18   1,000, $2,000 monthly.  When she moved here, the reason she

19   insisted to go back to work is to do this because I

20   couldn't afford as a student.  As far as she has told me

21   again, she has continued to pay like $2,000 or as much

22   money to send to her mother in Africa.

23   Q.  Now you read the response to the petition in which she

24   alleged and doctor or Mr. Edleson allege that you exerted

25   coercive control over her finances.  Did you read that?

1    A.  Yes, I did, ma'am.

2    Q.  Did you have any control over respondent's money?

3    A.  Not really.  Mrs. Aden is a very strong person.  She

4    would not allow anybody to do so to herself.

5    Q.  You're going to have to repeat that and talk slower.

6    A.  No, ma'am.  As far as I'm concerned, Mrs. Aden is a

7    very strong person.  She would not allow any person to do

8    that to herself.

9    Q.  All right.  Did you take her passport with you to work

10   each day?

11   A.  No, I did not, ma'am.

12   Q.  And in fact, was she traveling to the United States on

13   a regular basis to her own employment?

14   A.  Yes.  In the weekends, she travels.

15   Q.  Okay.

16   A.  Sometimes she has an appointment, you know, as well as

17   she travels, so --

18   Q.  So is it true that she could not travel, that you

19   effectively isolated her and held her hostage?

20   A.  No, that is not true.

21   Q.  Now, let's see.  Once Princess was born, did things

22   change?

23   A.  I would say dramatically changed than before.

24   Q.  How?

25   A.  Like the mood, the mood swinging is become way less.

1    The anger problem become way less.  She get busy with her,

2    with her, with the girl.  I get busy.  We have something

3    coming both we love and adore, so we were so excited about

4    having Hafsah, Princess Hafsah.

5    Q.  We're just going to refer to her as Princess for the

6    record.

7    A.  Princess.  I'm sorry.

8    Q.  Okay.  And she received not only a Canadian birth

9    certificate, but respondent also registered her for the

10   purpose of receiving an American birth certificate, is that

11   correct?

12   A.  Yes, ma'am.

13   Q.  Did you in any way acquiesce or agree that the habitual

14   place of residence for your daughter would be in a place

15   other than in Canada?

16   A.  No, I myself wouldn't accept anyplace than Canada for

17   me and my daughter.

18   Q.  Am I correct in understanding then from the time of her

19   birth on August 27th, 2011, until the time that we don't

20   really know when she arrived, but let's say the 1st of June

21   of 2011, that she lived in Canada with you as her father?

22   A.  Yes.  Yes.

23   Q.  Now, you heard counsel for respondent allege that she

24   had no intention of establishing a residence in Canada, did

25   you not?

1    A.  That's not true, ma'am.

2    Q.  Why did she maintain her real estate in Minnesota if

3    she was going to be living in Canada?

4    A.  It bring her $300 of income every month.  Why not?

5    Q.  All right.  Now, did you read in her verified petition

6    and the allegations in Jeff Edleson's report that she

7    alleges a brutal beating by you in April of 2011 in which

8    you threw Princess across the room?

9    A.  I did read it, ma'am.

10             THE COURT:  What?  What date?

11             MS. BERG:  April 2012, I'm sorry.  April 25th.

12   BY MS. BERG:

13   Q.  Did that ever happen?

14   A.  Of course not.

15   Q.  Tell us about the medical condition of Princess.

16   A.  As far as I know, she is a healthy kid, except we have

17   noticed that she has some extra hair in her private areas.

18   So me and her went to her pediatrician, which every time

19   she has an appointment, we both go, and she said that might

20   be unbalance of the hormones.

21             So I was told by the doctor, her pediatrician, to

22   go and she might need some scans, bone scans to see if her

23   bones is growing with the right proportion of her age.

24   That's all I know.

25   Q.  And attached to your verified petition was the medical

1    reports generated by a medical visit on April 26th, is that

2    correct?

3    A.  Yes, ma'am.

4    Q.  And I believe they describe Princess as -- they wanted

5    to rule out precocious adolescent or pubescence I guess is

6    the word.  Does that sound right?

7    A.  Yes, ma'am.

8    Q.  All right.  Did you look over those medical records?

9    A.  Yes, ma'am, I did.

10   Q.  Anywhere in those records does respondent suggest to

11   the physicians that the child was injured the previous

12   night?

13   A.  Not as far as my knowledge.

14   Q.  Does Princess bruise easily?

15   A.  No.  No.  She is a happy kid.  So, I mean, along the

16   time that she lived with us, she has never bruised.

17   Q.  And so I'm just trying to imagine how a physician could

18   examine her the day after being thrown across the room and

19   not notice any injury.

20   A.  To me, I was shocked and surprised.  How would a child

21   eight months be, you know, month old being thrown around

22   the room and not having any brain injury or be bruised.  I

23   can't just imagine.  I cry when I hear such a thing.

24   Q.  Now, Mohamed, and now respondent is a registered nurse.

25   Wouldn't you think that she would have mentioned to the

1    doctor this assault and wanting the doctor to rule out any

2    possible injury?

3    A.  I would imagine she would do so, and also I would

4    imagine she would take her to emergency right away.

5    Q.  So after that doctor's visit on April 26th, what

6    happened?

7    A.  The next day, the same day she told me that she is

8    having a scan, McMaster --

9    Q.  Mohamed, slow down.  She went to where?

10   A.  McMaster University Hospital.

11   Q.  McMaster?

12   A.  Yes, which is in Hamilton city, Ontario.

13   Q.  Okay.

14   A.  And she told me that she needed to go, her pediatrician

15   advise that she needed to go make a scan in this hospital

16   because most of the two hospitals we have does not have the

17   capability or she has to wait for longer time.  So that the

18   closest one, McMaster in Hamilton which is almost an hour,

19   hour far.

20        And at the time, you know, we planned to go

21   together, but because I have invited some people over and

22   that the same day, she said don't worry.  I was going to

23   cancel the invitation, but she said no.  No.  No.  You can

24   go and have fun with your friends, and I go and come back.

25   Q.  Okay.  Slow down.  So she told you she was going to a

1    doctor's appointment with Princess, right?

2    A.  Yes, ma'am.

3    Q.  And you said earlier that normally you went to these

4    appointments with her.  Why didn't you go this time?

5    A.  I went to her pediatrician which is in Cambridge city,

6    which is, you know, ten minutes away every time except that

7    visit to McMaster Hamilton which is arranged, and I was

8    going to go with her, but, you know, I accidentally

9    arranged a gather with my friends to have a dinner in my

10   house at the same day.

11        The moment I told my wife, okay, no, when I got

12   to know, she remind me, I said don't worry about the

13   invitation.  I go with you, but surprisingly she said no.

14   Don't need to.  I am fine.  I will be okay.  I wish I went

15   with her, but I was convinced by her.

16   Q.  Okay.  Now, look at your Exhibit 28 and turn to page

17   48.

18   A.  One second, please.

19   Q.  Exhibit 28, down in the bottom right-hand corner you

20   will see a bunch of numbers.  Go to 48.

21   A.  Yes, I see 28 with a check, I believe.

22   Q.  Right.

23   A.  Yes.

24   Q.  Is that her checking account?

25   A.  Yes, ma'am.

1    Q.  And go to page 20 -- I'm sorry -- 49, actually?

2    A.  49?

3    Q.  Are you there?

4    A.  Yes, ma'am.  Give me, give me the page.  Yes, ma'am.

5    Q.  And do you see that some large withdrawals were made,

6    one on April 26th, 2011 -- I'm sorry -- 2012, in the amount

7    of $2400 -- I'm sorry.  I'm reading.  April 27th, that

8    $2400 was withdrawn.  Do you see that?

9    A.  Yes.

10   Q.  Did you have access to this account?

11   A.  No, ma'am, I did not.

12            MS. BERG:  Your Honor, I move admission of 28.

13            MS. YANG:  No objection.

14            THE COURT:  28 is admitted.

15   BY MS. BERG:

16   Q.  Now, when did you first -- were you first able to have

17   contact -- strike that.  Let me rephrase it.

18            Did you receive an instant message from

19   respondent on April 28th, 2012, advising you of anything?

20   A.  As far as my knowledge, no.

21   Q.  I'm sorry?

22   A.  As far as my knowledge, no, I did not.

23   Q.  Okay.  Now, I'm going to direct you to Exhibit 21.

24   A.  Okay.  Yes, ma'am.

25   Q.  Just a minute.  I'm getting there.  Let's start at --

1    it's sort of difficult to read, Mohamed.

2    A.  Okay.

3    Q.  But at the bottom right-hand corner, you'll see the

4    page, page number 176.  It's got a date over it, so it's

5    kind of hard to read, and this is actually, it looks like

6    text messages between you and respondent starting on April

7    23rd.

8    A.  One second please.  176 you said?

9    Q.  Yes.

10   A.  I see 167, is that correct?

11   Q.  No.  176, it's e-mails or text messages on April 23rd.

12   A.  Okay.  April 23rd.  I don't see 176, ma'am.

13                    **(Counsel confer.)**

14              THE WITNESS:  I see April 21st.

15   BY MS. BERG:

16   Q.  April 23rd.

17   A.  23rd.  Let me see.  The 23rd.  I, I, I see April 21st.

18   I don't see April 23rd.

19   Q.  Go back a couple more pages.  All right.  You know

20   what, Mohamed, you're --

21   A.  Yes, ma'am.

22   Q.  Mohamed?

23   A.  Yes, ma'am.

24   Q.  Let's go back to that April 21st date.  That's a good

25   place to start.

1    A.  Okay.

2    Q.  And this is -- and it's on Bates stamp page 168.

3    A.  '68.  Okay.

4    Q.  You got it?

5    A.  Yes.

6    Q.  It starts out, I will try with her when I get there,

7    right?

8    A.  Yes.

9    Q.  Well, that doesn't make me feel confident you found it.

10   A.  I have seen the sentence in a different page.  That's

11   why.  You said April 23rd, right?

12   Q.  Yep.  21.

13   A.  Yes.  Yes.  Yes.  I see April 21st, which is, ends up

14   with, I will massage your back and feet when you come back.

15   Q.  Well, now, what page are you on?

16   A.  166, according to the printout I have, which is April

17   21st.  The last message --

18   Q.  Let's see if we can just get on the same page.

19   A.  Okay.  April 21st, and I see, and the last, you know,

20   the last message saying, I will massage your back and feet

21   when you come back.

22   Q.  Okay.  Just one second.

23   A.  Me saying this.

24   Q.  I'm sorry.  I was confusing you because 168 on April

25   21st, you say I will try when you get here.  Are you there,

1    is that right?  It's Exhibit Number -- it's page 168.

2    A.  I see 166, 167, and then 169.

3    Q.  They're not in order, Mohamed.  It's by chronology.

4    A.  Oh, I see.  I see.  I see.  So give me a second, then.

5    Give me a second, please.  Yes.  I see 168, yes.  Yes,

6    ma'am.

7    Q.  All right.  Now let's just keep moving back from 168.

8    All right?

9    A.  Okay.

10   Q.  Now, the next page --

11   A.  I see 176.  Now I see it.

12   Q.  Now you found 176.  I don't want you to go too far.

13   A.  Okay.  Okay.

14   Q.  Just keep paging through.

15   A.  Okay.

16   Q.  168.

17   A.  I see 168, yes.

18   Q.  Okay.  And it says, I will try when you get there,

19   right?

20   A.  Yes, ma'am.

21   Q.  And then as we keep paging through, these are just

22   conversations between you and respondent, right?

23   A.  Yes, ma'am.

24   Q.  All right.  And then let's get up close to the date

25   when she leaves.

1    A.   Okay.

2    Q.   And that would be -- let's see.  Let's go to page 177.

3    A.   Okay.

4    Q.   From April 25th.

5    A.   Yes, ma'am.

6    Q.   That looks like a shopping list.

7    A.   Yes, ma'am.

8    Q.   Is that because you were having people for dinner?

9    A.   That's usual shopping.  I used to go for shopping.

10   Just give me the list, and I buy what she ask me for.

11   Q.   All right.  Now, turn to the next page, which is April

12   27th, 12:22 a.m.

13   A.   Yes.  177?

14   Q.   No.  Page 96.

15   A.   96.

16   Q.   I don't even understand how these are organized.  Okay.

17   There you are.

18   A.   96, I have it.

19   Q.   You see the date is April 27th.

20   A.   Yes, ma'am.

21   Q.   1:22 a.m.

22   A.   12:22.

23   Q.   Right.  Why did you send that message?

24   A.   I send this message to her to the, to the, to the

25   Canadian telephone that she has, asking her to please call

1    me or reply to my calls because I'm trying to contact her.

2    The whole day she never responds.  The only time she

3    respond to me, she says I'm in the parking lot of the

4    hospital and I am breast feeding the child and I will do so

5    on my way back.

6    Q.  Okay.  So keep going through the pages.

7    A.  Okay.

8    Q.  I believe our next page -- I'm going to check with Lilo

9    here.  I'm not even sure what my next page is.

10         Is the next page the June 21 -- sorry -- June

11    12th date?

12    A.  Yes, ma'am.

13    Q.  All right.  Is that a conversation between you and

14    respondent?

15    A.  Yes, ma'am.

16    Q.  Okay.  When did you first learn she had traveled to

17    Minnesota?

18    A.  To Minnesota specifically, I think around sometime when

19    I phoned her relative on the phone.

20    Q.  Okay.

21    A.  He said she is here, but I understood that she is

22    somewhere, he knows.

23    Q.  Now, on June 5th, did you have contact with the

24    Waterloo Police Department?

25    A.  Yes, ma'am.

```
1              MS. BERG:  Your Honor, I move admission 22.

2              THE COURT:  22, did you say?

3              MS. BERG:  Yes.

4              THE COURT:  Any objection?

5              MS. BERG:  Is it 21?  It's 21 we're looking at.

6     Sorry.  Numbers are not my thing.

7              MS. YANG:  No objection.

8              THE COURT:  21 is admitted.

9     BY MS. BERG:

10    Q.  Now, on June 5th, you contacted the Waterloo Police

11    Department, is that right?

12    A.  Yes, ma'am.

13    Q.  Why?

14    A.  Well, initially, I was, I was contacting the police to

15    report that my car is not in my possession to free my, to

16    free myself from any legal responsibility that could

17    happen.  You know, the car could be used in any illegal

18    action.

19    Q.  Well, now, why did you do that?

20    A.  Well, I know she is angry person, and I know she, she,

21    she, you know, she might do something with the car, and

22    she -- and it is in my name.  So maybe a lack of my knowing

23    the law or something, so I just want to be safe legal-wise.

24    Q.  Okay.  So did you tell the police that your daughter

25    was missing?
```

1    A.  Initially, I did not.

2    Q.  Why not?

3    A.  Initially, I did not.  Well, actually that's because of

4    two reasons.  The first reason is, that was out of fear.  I

5    didn't want to, to tell, to tell the police that my, my

6    wife, my wife took the child and ran away and get her in

7    trouble, and that might make her angry or upset, and in

8    return, she might not allow me to see my daughter, which I

9    love the most so -- and back then I didn't know my rights

10   toward the child.

11   Q.  Okay.  Directing your attention to -- I don't know if

12   you have it handy, Mohamed, but I know you've read it.

13   Respondent's Exhibit 75 is that complete police report.

14   A.  Yes, ma'am, I have it here.

15   Q.  Okay.  And those police, those police officers

16   confronted you about lying to them, didn't they?

17   A.  Actually, I am the one that admit to them.  They did

18   not confirm.  I am the one who said when they invite me to

19   the, to the, to their office and they said we have a hard

20   time to find your daughter the address you give us.

21          I said I did a mistake, and I broke in front of

22   them, and I crash, and I said I'm sorry that is a mistake.

23   I didn't want to tell you that my wife took the child for

24   the same reason.  I'm afraid.  I don't want to put my wife

25   in trouble.

1    Q.   Okay.  I want to remind you to speak slowly.

2    A.   Yes.  Should I repeat this again?

3    Q.   I think we're okay.  Now, what happened after you told

4    the police that your wife had abducted your child from

5    Canada?

6    A.   At first, they calmed me down because I was so sad and

7    angry and almost cried and was so nervous.  They calm me

8    down and bring me a glass of water, and they keep with my

9    rights of, you know, the child.  So, no, she cannot, as a

10   spouse, as a parent, no single parent can take a child and

11   leave without the consent or the knowledge of the other

12   parent.

13        And they teach me as well that I have a right, I

14   have a right to call the next day when she took the child

15   because I did not know this, and then they said don't

16   worry, we will investigate where they're at, and they

17   looked for them, and we will update you.

18   Q.   And isn't it a fact that you didn't contact the police

19   for over four weeks after she disappeared?

20   A.   Yes.

21   Q.   Why?

22   A.   Well, the first thing I have done when she did not come

23   back and she didn't answer my phone the first day and

24   second day, I contact her mother in Kenya, and I, I, I --

25   Amal, my wife, she has a pattern of leaving home several

1    times without letting me know, so I went to ask her mom,

2    and again, I was crying and was in very bad situation,

3    especially I was preparing for my proposal for a PhD, and I

4    have lost a wife and child.

5            Her mother told me to give her some time.  So

6    having known that her pattern -- I assumed that one of the

7    episodes would happen again, so I give her some time.

8    Q.  Okay.  Now, I'm going to go through some of the rest of

9    these exhibits because it's getting close to the noon hour,

10   and I think we need to try and move things along?

11   A.  Okay.

12   Q.  Exhibit 1 is a marriage certificate.  Do you see that?

13   A.  Exhibit 1?  Yes, ma'am.

14   Q.  And is it a fact that you obtained in Florida a

15   certificate -- an application to marry a woman named -- I'm

16   just going to spell it.

17   A.  Firyuza Gazizova.

18   Q.  Slow down.  I'm going to spell it, Mohamed.

19   F-i-r-y-u-z-a G-a-z-i-z-o-v-a, is that correct?

20   A.  Yes, ma'am.

21           MS. BERG:  I move Exhibit 2.

22           THE COURT:  Was that 1 or 2?

23           MS. BERG:  I'm sorry.  1.  I look at the tabs.

24           THE COURT:  Any objection?

25           MS. YANG:  No objection.

```
 1                    THE COURT:  1 is admitted.

 2      BY MS. BERG:

 3      Q.  Exhibit 2, Mohamed, is that the certificate of your

 4      divorce from the same woman?

 5      A.  Yes, ma'am.

 6                    MS. BERG:  Okay.  I move Exhibit 2.

 7                    MS. YANG:  No objection.

 8                    THE COURT:  Exhibit 2 is admitted.

 9      BY MS. BERG:

10      Q.  Exhibit 3, Mohamed, is your marriage registration to

11      Abeer, A-b-e-e-r, Saud, S-a-u-d, Yehia, Y-e-h-i-a, Saud,

12      S-a-u-d, is that correct?

13      A.  It's correct.  That's the marriage registration with

14      Abeer Saud Yehia Saud.

15      Q.  And on the second page of that, what is that document

16      written in Egyptian?

17      A.  This is Arabic version of the page previous to this.

18      Q.  That's an Egyptian version translation?

19      A.  Yes, ma'am.  It's an Arabic version, which is the

20      language in Egypt.

21                    MS. BERG:  Okay.  I move Exhibit 3.

22                    MS. YANG:  No objection.

23                    THE COURT:  3 is admitted.

24                    MS. BERG:  Okay.

25
```

1    BY MS. BERG:

2    Q.  Exhibit 4?

3              MS. YANG:  No objection.

4              THE WITNESS:  Yes, ma'am.

5              THE COURT:  4 is admitted.

6              MS. BERG:  I'll move right through them.

7    Exhibit 4?

8              THE WITNESS:  Yes, ma'am.

9              MS. YANG:  No objection.

10             THE WITNESS:  Yes, ma'am.

11             MS. BERG:  Exhibit 5?

12   BY MS. BERG:

13   Q.  This is your marriage certificate to Nora Roundtree, is

14   that correct?

15   A.  Yes, ma'am.

16             MS. YANG:  Your Honor, we're happy to stipulate

17   to the admissibility of the marriage and divorce

18   certificates.

19             MS. BERG:  Okay.

20             THE COURT:  Very well.  And that's through

21   Exhibit 6?

22             MS. BERG:  7, 8.

23             THE COURT:  Through 8?

24             MS. BERG:  Okay.

25             THE COURT:  So 1 through 8 are all admitted.

1    BY MS. BERG:

2    Q.  Now, direct your attention to Exhibit 9.  Exhibit 9 is

3    further verification that respondent was in fact married at

4    the time that you had your religious ceremony, is that

5    correct?

6    A.  Yes, ma'am.

7    Q.  Exhibit 10.  Tell me what Exhibit 10 is.

8    A.  It's Somerside Tax Center letter dated December 28th,

9    2011.

10   Q.  Mohamed, repeat what you just said.

11   A.  Somerside Tax Center letter dated December 28th, 2011.

12   Q.  And in that letter, does respondent state that you are

13   the primary caregiver of the child?

14   A.  Yes, ma'am.

15          MS. BERG:  I move 10.

16          MS. YANG:  No objection.

17          THE COURT:  10 is admitted.

18          MS. BERG:  I didn't move 9.  I'm sorry.

19          THE COURT:  Any objection?

20          MS. YANG:  No objection.

21          THE COURT:  9 is admitted.

22          MS. BERG:  Did we already do 11?  Yes.

23   BY MS. BERG:

24   Q.  I turn your attention to Exhibit 12.

25   A.  Yes, ma'am.

1   Q.  Tell me what that is.

2   A.  Letter from respondent to American Consul Office, dated

3   April 20th, 2011.

4   Q.  And is that a letter in which she is requesting they

5   give you a visa to attend your daughter's birth?

6   A.  Yes, ma'am.

7   Q.  Did they do that?

8   A.  Do what?

9   Q.  Did they grant you the visa?

10  A.  No, I was refused.

11  Q.  Okay.  Is that the reason that the child was born in

12  Ontario?

13  A.  That was the reason, you mean?

14  Q.  The reason that Princess was born in Ontario rather

15  than in New York?

16  A.  Oh, no.  No.  No.  No, that's not really the case.

17  Q.  What's the reason?

18  A.  First of all for her to deliver in Minnesota, I didn't

19  want this.  This was only her idea, and I, I just wanted to

20  be supportive husband, and I said okay.  And that's why she

21  convinced me to go and apply for the U. S. visa, and I went

22  and I failed.

23          And then we, we, we come to our original plan,

24  which was Princess to be delivered in Ontario, Canada.

25  Q.  Okay.

1                I move 12.

2                MS. YANG:  No objection.

3                THE COURT:  12 is admitted.

4        BY MS. BERG:

5        Q.  Exhibit 13, Mohamed, you're requesting that your wife

6        be included on the lease for your apartment, is that

7        correct?

8        A.  Yes, ma'am.

9                MS. BERG:  Okay.  I move Exhibit 13.

10               MS. YANG:  No objection.

11               THE COURT:  Admitted.

12       BY MS. BERG:

13       Q.  Exhibit 14 is the joint tax return prepared by you and

14       your wife, is that correct?

15       A.  Yes, ma'am.

16       Q.  And wife in this instance is referring to respondent,

17       is that correct?

18       A.  Spouse, yes, ma'am.  Amal Aden, yes.

19               MS. BERG:  Okay.  I move Exhibit 14.

20               MS. YANG:  No objection.

21               THE COURT:  14 is admitted.

22       BY MS. BERG:

23       Q.  Exhibit 15 is your child's birth certificate.

24               I believe that's already admitted, but if not, I

25       move it.

1          MS. YANG:  No objection.

2          THE COURT:  15 is admitted.

3   BY MS. BERG:

4   Q.  Now, directing your attention to Exhibit 17, tell me

5   what this is.

6   A.  Marriage license between petitioner and respondent.

7          THE COURT:  17 or 16?

8          MS. BERG:  17.

9          THE WITNESS:  Oh, 17 is different than --

10  BY MS. BERG:

11  Q.  Yeah.  Take a look at 17.

12  A.  17 is order on motion without notice dated June 13,

13  2012.

14  Q.  And did you lie to get this order?

15  A.  I don't remember I lied.

16  Q.  You don't remember if you lied?

17  A.  I don't think so I lied.  I wrote this in my hand.  I

18  did not remember anything is lie there.

19  Q.  Okay.  What did you write by hand?  This is a typed

20  document.

21  A.  No.  Yes.  I mean, I mean whatever the information is

22  entered is, it has no lie as far as my knowledge.

23  Q.  Okay.  And let's see.  This order clearly states that

24  the child was born in Canada and that you, you have

25  asserted the child was wrongfully removed and that you're

1      granted custody?

2      A.  Yes, ma'am.

3      Q.  All right.

4              I move 17.

5              MS. YANG:  No objection.

6              THE COURT:  Admitted.

7      BY MS. BERG:

8      Q.  Look at Exhibit 18.  Tell me what that is.

9      A.  That's University of Waterloo student information.

10     Q.  And this explains financially how you're living, is

11     that correct?

12     A.  Yes, ma'am.

13     Q.  And basically, you get a small stipend and then some

14     forgiveness of your fees for your course work, is that

15     right?

16     A.  Yes, ma'am.

17     Q.  Okay.  And turning to Exhibit 19, explain what that is.

18     A.  That's Estimated Ontario Trillium Benefits.

19     Q.  Is that a Canadian benefit for people with children?

20     A.  I believe this is -- because when you have to file, you

21     have to file for me and the spouse and the child.

22     Q.  Okay.

23     A.  So this portion, I believe, was given to us when we

24     filed the taxes for Princess.

25             MS. BERG:  Okay.  I move 19.


                    KRISTINE MOUSSEAU, CRR-RPR
                         (612) 664-5106

```
 1                MS. YANG:  No objection.
 2                THE COURT:  19 is admitted.
 3      BY MS. BERG:
 4      Q.  Now turn your attention to Exhibit 22.
 5      A.  22, mm-hmm.
 6      Q.  This is a letter from John T. W. Yeow, Y-e-o-u?
 7      A.  Yes.
 8      Q.  Is he your professor?
 9      A.  He is my advisor, yes.
10      Q.  Okay.  And have you had discussions with him about
11      establishing yourself in the Waterloo community?
12      A.  Yes, several times.
13      Q.  What kind of engineer are you?  What do you plan to do?
14      A.  I, I, I, my bachelor and master's was electrical
15      engineering, and my PhD currently belong to system design.
16      Q.  Stop.  Stop.  Say that again slowly.
17      A.  Okay.  My Bachelor Degree and my Master's Degree is in
18      electrical engineering, and my PhD currently is in system
19      design.
20      Q.  System design?
21      A.  System design engineering.  Yes, ma'am.
22      Q.  All right.  Thank you.
23      A.  And my current application is for biological and
24      biomedical applications for something called lab --
25      Q.  Lab --
```

1     A.  Lab on chip.

2     Q.  L-a-b?

3     A.  Yes.  On, o-n, chip, c-h-i-p.

4     Q.  Okay.

5             I move 22, yeah, 22.

6             MS. YANG:  No objection.

7             THE COURT:  22 is admitted.

8     BY MS. BERG:

9     Q.  Now, next turn your attention to Exhibit 24.  Is this

10    the joint bank account we referred to earlier?

11    A.  As far as 24 it's not the bank, ma'am.

12    Q.  The statements.

13    A.  The statement from my mother, yes.

14    Q.  Oh, I'm sorry.

15    A.  23, you mean?

16    Q.  Yeah, 23.

17    A.  Yes, ma'am.

18    Q.  I see a number and I say it.  That's your joint bank

19    account, correct?

20    A.  Yes, ma'am.

21    Q.  Did respondent make any transfers of cash into that

22    account to assist with the household expenses?

23    A.  I'm not sure because she could do it as her own because

24    both have a debit card and both has access online, so I

25    don't remember exactly that happening.  I mean, it's not

```
 1    sound in my mind, but she could have because she has an

 2    access to in and out.

 3    Q.  Mohamed, are you aware of her ever making any regular

 4    deposits to assist with the family bills?

 5    A.  I do not, I do not, I do not think so in particular.

 6    No.  No.  No.

 7    Q.  Okay.

 8    A.  Might be once here and there.

 9            MS. BERG:  I move, Your Honor, 23.

10            THE COURT:  Any objection?

11            MS. YANG:  No objection.

12            THE COURT:  23 is admitted.

13    BY MS. BERG:

14    Q.  And I direct your attention to 25.

15            Is 25 in?  No.  That's the judgment and decree.

16    You know, these numbers are off.

17    A.  24, you mean?

18            THE COURT:  25 is admitted.

19            MS. BERG:  Is that the divorce decree?  These

20    numbers are off, here.

21            Exhibit 25, Your Honor, that is the divorce

22    decree between respondent and her husband, we move that.

23            THE COURT:  I think that's already in.

24            MS. BERG:  Okay.

25
```

1     BY MS. BERG:

2     Q.  Okay.  I'm turning your attention to now Exhibit 24.

3     What is that, Mohamed?

4     A.  That's a statement from my mother.  Her name is Saadia

5     Mohamed Attia.

6     Q.  We'll spell that for the reporter.  She is on at 1:30.

7     A.  Yes.  Well, actually the one in the statement,

8     S-a-a-d-i-a, and then Mohamed, M-o-h-a-m-e-d, and then

9     A-t-t-i-a, and then F-a-r-a-g is her complete name.

10    Q.  All right.  Now, is your mother able to speak English?

11    A.  My mother is illiterate and does not read or write even

12    Arabic.  She only speak Arabic.

13    Q.  Do you know how this document was prepared?

14    A.  Yes.  She was talking, and my brother was writing.

15    Q.  All right.  And is this a product of a phone

16    conversation she had with respondent?

17    A.  Yes.  I mean, there is phone conversations.  There is,

18    you know, I believe so.

19              MS. BERG:  All right.  I move 24.

20              MS. YANG:  No objection.

21              THE COURT:  24 is admitted.

22              MS. BERG:  Did we already have 28 in?

23              THE COURT:  Yes.

24              MS. BERG:  Okay.

25

1    BY MS. BERG:

2    Q.  Now, I'm going to direct your attention, I'm going to

3    skip the other two expert reports and direct your attention

4    to 29.  Can you tell me what that is, Mohamed?

5    A.  It's resident ledger from First Select Equities.

6    Q.  And that is in the name of respondent?

7    A.  Yes, ma'am, Respondent's Exhibit 29.

8    Q.  Is that the documentation regarding the town home that

9    she rents out?

10   A.  No.  I believe this is the apartment she was, she used

11   to rent.

12   Q.  Okay.

13   A.  Before she moved.

14   Q.  All right.  So she was renting an apartment while she

15   was renting out her town home at the time you met her, is

16   that correct?

17   A.  Yes.  Yes.  Yes.  She was in apartment.

18            MS. BERG:  I move Exhibit 29.

19            MS. YANG:  No objection.

20            THE COURT:  29 is admitted.

21   BY MS. BERG:

22   Q.  And Exhibit 30 is the lease agreement, which included

23   respondent, for the property in Ontario, is that correct?

24   A.  Yes.  That's the listing agreement in an apartment we

25   reside in in Kitchener at one time, yes.

1    Q.  And are both of you obligated on this lease?

2    A.  Yes, ma'am.

3    Q.  How long is the lease for?

4    A.  A year.

5    Q.  Okay.

6         I move Exhibit 30 and then ask you to draw

7    yourself to the attention of 31.

8         MS. YANG:  No objection.

9         THE COURT:  30 is admitted.

10   BY MS. BERG:

11   Q.  And look at 31.

12   A.  Okay, ma'am.

13   Q.  Is that when respondent was added to the lease?

14   A.  31 is residential rental agreement term May 2nd,

15   2012-April 30th, 2013.  Is that what you're going to?

16   Q.  Yes.

17   A.  Okay.  What's your question here?

18   Q.  Is that, again, where respondent joined you in being

19   liable on this lease for the coming year?

20   A.  No, ma'am.  That's something, that was something that

21   happened and her own tenant and her own house.

22   Q.  Oh, I misunderstood.  I'm sorry.  So this is her tenant

23   agreement?

24   A.  Yes.  Yes, ma'am.

25   Q.  And so she had leased out her house from --

1   A.  I mean, according to this is May 2nd, 2012, to April

2   30th, on 2013.  That was the renewal.  She was renting

3   before as well.

4   Q.  I'm sorry.  Say that again.

5   A.  This period is, I believe, it's a renewal.  I mean, she

6   has rented to this person prior to this.

7   Q.  Okay.  So isn't it odd that she would be leaving you in

8   Canada and establishing herself in Minnesota at the same

9   time she is renting the town home out again?

10  A.  Well, from what I understood, she went -- that $300

11  difference was appealing to her.

12  Q.  That makes sense.  So she wanted to keep getting that

13  extra $300?

14  A.  Yes.  Yes.

15          MS. BERG:  All right.  I move admission 31.

16          MS. YANG:  No objection.

17          THE COURT:  31 is admitted.

18  BY MS. BERG:

19  Q.  And since we're not running into objections, I'm just

20  going to skip --

21          Well, Exhibit 32 is the travel arrangements when

22  she, I believe, went to Ontario in 2011.  I move that.  33

23  is his passport, which shows he was not in Canada at the

24  time of the alleged wedding where they met.

25          MS. YANG:  Your Honor, we will stipulate to admit

1      all petitioner's exhibits.

2              MS. BERG:  All right.  Thank you.

3      BY MS. BERG:

4      Q.  Mr. Aly Saad Aly, is there anything further that you

5      want the Court to know about this situation?

6      A.  Yes.  If, if, if the honorable judge can allow me to

7      say something, you know, about the relationship.

8              THE COURT:  That's fine.  Go ahead.

9              THE WITNESS:  Yes.  From the point that I have

10     been through in this relationship, my wife is, since we

11     got, since we got married, she is always angry, always

12     upset, always she had the mood swinging.

13             And, you know, we, I believe, I believe, I would

14     like to believe at the beginning that was because of the,

15     of the, the, the birth control, but after she quit the

16     birth control, the marriage came -- the, the, the baby and

17     the pregnancy came on board, so the same, the same, you

18     know, behavior and same attitude, you know, continued.

19             And even I have to contact my mother to complain

20     and to have her give me advice, and she has contacted my

21     mother as well.  We contact her mother, the same thing.  We

22     tried all possible avenues by going to the mosque, Koran,

23     you know, seeking some professional help.

24             TELEPHONE OPERATOR:  Pardon me, please.  This is

25     the AT&T teleconference specialist.  I have a Jeffrey

1     Edleson trying to join this conference, but he does not

2     have the correct security code.  Do you want to give that

3     out to him?

4              THE COURT:  When do you want him?

5              MS. BERG:  He's not my witness.  I don't want him

6     sitting through the trial.  I want the witnesses removed.

7              MS. YANG:  He is our witness, and we would like

8     him to be privy to the conversations so that he can

9     understand the testimony of the witnesses on both sides.

10             MS. BERG:  Not after he has missed -- I mean, I'm

11    done with my direct.

12             THE COURT:  Let's discuss this before we resume

13    again.

14             TELEPHONE OPERATOR:  So do not give it to him?

15             THE COURT:  Tell him that he will be contacted

16    soon.

17             TELEPHONE OPERATOR:  Thank you.  I'm leaving now.

18    Thank you.

19    BY MS. BERG:

20    Q.  Mohamed?

21    A.  Yes, ma'am.

22    Q.  The phone call was just interrupted.  I think the only

23    thing that matters to this judge that you need to address

24    is habitual residence and whether or not any domestic

25    violence occurred such that would warrant a grave risk of

1     harm established.

2     A.  Yes, ma'am.  Yes.  Yes.  Yes.  I'm coming to it, yes.

3     Q.  You need to come to it more correctly and directly.

4     A.  Yes, ma'am.  Yes, ma'am.  Yes, ma'am.  Yes, ma'am.  So

5     just one important thing that my wife, she was always

6     frightening me that if the relationship didn't go well, she

7     would disappear and go, and when she was pregnant, she

8     would leave and not allow me to see the child.

9          I didn't know the rights of my child are, and

10    always after we delivered the baby, when she get upset or

11    we have an argument, she say the same.  So that created

12    fear inside me and, and, and, and one more thing as well I

13    want to mention.  The story is opposite.

14         My, my wife, the one, she was abusive to me.  She

15    was, she used the knife against me several times.  She used

16    her hand over me several times.  She used the cursing and

17    the swearing on me several time, and because I came, my

18    family I was brought up in a family that have a father and

19    mother.  We, we, we brought great love to sacrifice

20    whatever it is for our children.

21         So I was sacrificing this just for the sake of

22    seeing the beautiful face of my daughter and to have her

23    raised between a father and mother.

24    Q.  Okay.  I'm going to stop you there.  The word you were

25    using was "sacrificing," right?

1    A.  Yes, ma'am.

2    Q.  It sounded like "sucking."  All right.

3    A.  Sorry.

4    Q.  Okay.  Did you ever threaten, make a phone call in

5    which you threatened to kill her?

6    A.  Never happened.  Never happened.

7    Q.  Did she ever make a phone call to you telling you that

8    you were never going to see your daughter again?

9    A.  She did and to my mother as well.

10            MS. BERG:  I have nothing further.

11            THE COURT:  All right.  I assume there is going

12   to be cross-examination?

13            MS. YANG:  There is, Your Honor.

14            THE COURT:  All right.  Let's take our break

15   here.  Like I said earlier, I want to just save enough

16   time, if possible.  Is 20 minutes too short to grab

17   something to eat or take a quick break?

18            MS. BERG:  No.  That's fine.

19            MR. SWENSON:  That's fine.

20            MR. CARTER:  Just to remind the Court, we do have

21   one expert witness, Professor Boyle, who has a time

22   constraint.  She needs to leave at two o'clock.  We expect

23   that.

24            MS. BERG:  Your Honor, I think it would have been

25   courteous to be informed that there was a witness sitting

```
 1    in the courtroom.
 2              THE COURT:  Well, we didn't talk about that ahead
 3    of time, so, you know, it's sometimes done.  Sometimes not.
 4    We can discuss that later if you wish, but so how long is
 5    her testimony?
 6              MR. CARTER:  20 minutes.
 7              THE COURT:  And cross?
 8              MS. BERG:  Not going to be much.
 9              MS. YANG:  Cross is about --
10              THE COURT:  I'm sorry.  Okay.  And how long are
11    you anticipating examination of the petitioner?
12              MS. YANG:  Cross of petitioner will take probably
13    around 20 to 30 minutes.
14              THE COURT:  Okay.  Why don't we get back here in
15    about 20 minutes or so.  We will wait for everyone, of
16    course.  Is that okay, and then we will just continue with
17    the cross-examination then.  I think we will have enough
18    time for the expert.
19              MS. BERG:  We do have an interpreter coming, too.
20              THE COURT:  All right.
21              MS. BERG:  Thank you, sir.
22                    (Lunch recess taken.)
23
24                      (In open court.)
25              THE COURT:  You may be seated.  Let's continue
```

1    with cross-examination.

2            MS. BERG:  Your Honor, Mohamed is not on the line

3    because we asked him to call his mother and see if she

4    could testify at a different time.

5            THE COURT:  Okay.

6            MS. BERG:  So let me just e-mail him.  Our

7    interpreter is here.

8            MS. YANG:  I have some notebooks for the Court.

9            **(Off-the-record discussion.)**

10

11                     **(In open court.)**

12            THE COURT:  All right.  Let's proceed with the

13    cross-examination.

14            MR. CARTER:  Your Honor, if I may.

15            THE COURT:  Yes.

16            MR. CARTER:  There is the outstanding issue of

17    the expert witnesses in the gallery, and we also have

18    Professor Edleson, who is ready to call in.

19            THE COURT:  I'm comfortable doing this either

20    way.  If you wish to have witnesses present and listening

21    in, that's certainly fine with me unless both sides don't

22    want it.

23            MS. BERG:  Your Honor, we oppose particularly

24    Mr. Edleson since he likes to testify from his observations

25    in the courtroom, and he did not participate in or observe

1    the direct examination of Mr. Aly Saad Aly.

2            MR. CARTER:  Professor Edleson is an expert

3    witness.  It seems quite logical and correct to have him

4    listen in to testimony.

5            THE COURT:  I don't think there is a problem in

6    this particular case with having witnesses listen to

7    testimony, so let's just allow this and go ahead.

8            MS. YANG:  Thank you, Your Honor.

9

10                        **CROSS-EXAMINATION**

11   BY MS. YANG:

12   Q.  Mr. Aly Saad Aly, my name is Andrea Yang, and I will be

13   asking you several questions.  In connection with some of

14   my questions, I will be referring to several of

15   respondent's exhibits.

16            Do you have in front of you a binder labeled

17   Respondent's Trial Exhibits?

18   A.  I have three of them with four of them with different

19   numbers.

20   Q.  Do you see a binder with, a binder on the front saying

21   Respondent's Trial Exhibits?

22   A.  Yes.  Is that with the numbers RTX?

23   Q.  Yes.

24   A.  Yes.  Which one?

25   Q.  It's the one with the dividers labeled RTX with

1   corresponding numbers.  Do you see that?

2   A.  Yes, but there is four of them, so which one of them,

3   which numbers?

4   Q.  I'm sorry.  There are what of them?

5   A.  I see four of them, so which -- I have four binders.

6   Which ones?

7   Q.  Well, we'll be referring over the course to several of

8   them, and so it would be helpful for you to have all four

9   of the binders in front of you.

10  A.  They are, ma'am.

11  Q.  Great.  And just so we understand the page numbering

12  system, inside, let's just take one of the binders.  You

13  will see that if you flip to the inside of one of these

14  dividers, there are page numbers listed in the middle

15  bottom area of each page.

16          Do you see that?

17  A.  Yes, ma'am.

18  Q.  And it says RTX, and then there is a number followed by

19  a dash and then another number.

20  A.  Yes, for example, RTX 048-001.

21  Q.  Right.  So the 48, that would correspond with the

22  respondent's exhibit number.

23  A.  Mm-hmm (Yes).

24  Q.  And then the number that follows the dash, that refers

25  to the page within the exhibit.  Does that make sense?

```
1    A.  Yes, ma'am.

2    Q.  Great.  Mr. Aly Saad Aly, research assistant jobs are

3    only temporary, correct?

4    A.  Could you repeat the question, please?

5    Q.  Your research assistant job at the University of

6    Waterloo, that is only temporary, correct?

7    A.  During my PhD, yes.

8    Q.  Dalia Motaleb has been called as a witness in this

9    case.  Who is she?

10   A.  She is an old friend of mine.

11   Q.  Are you romantically involved with her?

12   A.  No, ma'am.  She is engaged already.

13   Q.  During your direct examination, you testified that

14   Ms. Aden went to Toronto and stayed for about a week in

15   October of 2010, correct?

16   A.  Yes, ma'am.

17   Q.  But actually during that time, she went to Minnesota,

18   didn't she?

19   A.  October is a broad month, and I'm not sure exactly what

20   time of October she has done that, went to Toronto, but it

21   was in October.

22   Q.  In fact, you actually -- I'm sorry.  Go ahead.

23   A.  In October itself, even when she went to Minnesota, she

24   went to Minnesota, and it has been like I think less than a

25   week she came back.
```

1    Q.  And in fact, you actually took her to the airport when

2    she went to Minnesota in October 2010, correct?

3    A.  Yes.  She requested and I comply with it.

4    Q.  All right.  I want you to turn to, this is your earlier

5    binder used by your attorneys, Petitioner's Exhibit 32.

6    Let me know when you're there.

7    A.  Respondent travel document, reservation confirmation?

8    Q.  That's correct.  It's a Delta flight ticket it looks

9    like.

10   A.  Okay.

11   Q.  Okay.  I want you to turn to, at the bottom of the

12   page, PTX 32-007.  Are you there?

13   A.  Okay.  Yes, but this is dated March 23rd, 2011.

14   Q.  No.  If you look at PTX 32-007, top of the page, do you

15   see how it says, Monday, October 4th, Delta and --

16   A.  No.  We are in different, different -- you're referring

17   to Petitioner Exhibit 32, respondent travel reservation

18   confirmation.

19   Q.  Which binder are you referring to, Mr. Aly Saad Aly?

20   A.  The green one which was given to me by my attorney.

21   Q.  What's the labeling on the front of the binder?

22   A.  There is no label on the front of the binder, but there

23   is the first page saying the list of, petitioner amended

24   exhibit lists.

25   Q.  That's fine.  We'll just, we'll move on.

1    A.  Okay.

2    Q.  Mr. Aly Saad Aly, you had a dinner party at your home

3    on April 26th, 2011, is that correct?

4    A.  It was a Thursday.  That's what I most remember, the

5    date.

6    Q.  Right.  That was your testimony earlier.  That was also

7    the day that your wife left, correct?

8    A.  Yes.

9    Q.  Mr. Aly Saad Aly, you're only in Canada because you

10   were removed illegally because you were overstaying your

11   visa in the United States, correct?

12   A.  No.

13   Q.  All right.

14   A.  That is not correct.

15   Q.  Mr. Aly Saad Aly, I want to spend some time talking

16   about an Acer laptop that you used to own.  You previously

17   owned an Acer laptop, correct?

18   A.  I previously owned an Acer that was given to me by my

19   former advisor.

20   Q.  Now, this Acer laptop, that was a computer that both

21   you and your wife, Ms. Aden, would use, correct?

22   A.  For some time, yes.

23   Q.  At one point in time, the power supply to this laptop

24   computer broke, correct?

25   A.  Yes.

1    Q.  It's your position today that your wife took this

2    computer when she left Canada for Minnesota, correct?

3    A.  When she left, I couldn't find either this computer or

4    other computer as well.

5    Q.  In fact, that's exactly what you represented to this

6    Court, isn't it?

7    A.  Excuse me?

8    Q.  You represented to this Court that your wife had taken

9    your Acer laptop computer when she left Canada, correct?

10   A.  I represent that she took two computers, Toshiba

11   computer and Acer computer.

12   Q.  I want you to turn to Respondent Exhibit 27, please.

13   A.  Let me see.  Yes.

14   Q.  Let me know when you are there.

15   A.  Yes.  So give me a minute.  27.  27.  Okay.  27.

16   Q.  Do you see at the top of the page it reads United

17   States District Court, District of Minnesota?

18   A.  Yes, ma'am.

19   Q.  In the middle of the page, Petitioner's Response to

20   Respondent's First Set of Interrogatories, numbers 1

21   through 9, correct?

22   A.  Yes, ma'am.

23   Q.  All right.  Now I want you to flip to page 9 of

24   Respondent's Exhibit 27.

25   A.  Page 9.

1    Q.  Are you there?

2    A.  Yes, ma'am.

3    Q.  That's your signature, correct?

4    A.  Yes.

5    Q.  And you signed in front of a notary public, correct?

6    A.  Yes.

7            MS. YANG:  Your Honor, I offer RTX 27 into

8    evidence.

9            THE COURT:  Any objection?

10           MS. BERG:  No.

11           THE COURT:  27 is admitted.

12   BY MS. YANG:

13   Q.  Mr. Aly Saad Aly, I want you to turn to page 5 of this

14   exhibit.

15   A.  Okay.

16   Q.  In the middle of the page, it reads --

17           Mr. Aly Saad Aly, interrogatory number 5 reads:

18   Identify all computers and mobile computing devices, such

19   as smart phones and tablet computers including location and

20   the name, address, addresses, telephone numbers and e-mail

21   addresses of all persons who have custody or control over

22   the identified computers and mobile computing devices to

23   which you have had access from March to August 2012,

24   correct?

25   A.  Okay.  Yes.

1    Q.  And on the next page, you will find your answer, and

2    this is RTX 27-006, and in your answer you say, I do not

3    now own or have ever owned a smart phone, tablet computer

4    or mobile computing device other than a laptop.  I owned an

5    Acer laptop computer, which respondent took with her when

6    she abducted our child to the United States.

7              Those were your words, correct?

8    A.  Yes, ma'am.

9    Q.  But, in fact, you actually kept this laptop, didn't

10   you?  That computer is currently with you in Canada, isn't

11   it?

12   A.  No, ma'am.  No, that's not true.

13   Q.  All right.  I want you to turn to RTX 75.

14   A.  75 as the number of the page or the number of the --

15   Q.  It's Respondent's Exhibit 75.

16   A.  Yes.  Give me a second.

17   Q.  Sure.

18   A.  All right.

19   Q.  Page one, this is the declaration of Kimberly Nunez to

20   authenticate Waterloo Police reports concerning Mohamed Aly

21   Saad Aly and Amal Aden, correct?

22   A.  Yes, ma'am.

23   Q.  Now, if you will turn to the next page, you will see

24   paragraph six on RTX 75-002.

25   A.  The next page is the same as Aden 0074?

1    Q.  This is RTX 75-002.

2    A.  Okay.  Because here the numbers are numbered like

3    this --

4    Q.  Oh, yes.  Yes.

5    A.  I'm confused.

6    Q.  I think you're on the right page.  At the very bottom

7    of the page in the middle section it reads RTX 75-002.  Do

8    you see that?

9            MS. BERG:  No.

10           THE WITNESS:  I don't see it, no, ma'am.  I see,

11   I see, I see Aden, in addition to stamp TX number 75,

12   that's different than -- the actual page it say Aden 0073,

13   '74 and so on.

14   BY MS. YANG:

15   Q.  Okay.  Let's refer to the page that reads Aden 0074.

16   Do you see that?

17   A.  74.  Yes.  One second.  Aden 00074?

18   Q.  Right.  Now, do you see paragraph six that reads,

19   Attached hereto and marked as Exhibit B are the records

20   consisting of three police reports involving Mohamed Aly

21   Saad Aly and Amal Aden, dated January 17th, 2011; February

22   17th, 2011; and June 5th, 2012, that were released to Brian

23   S. Carter of Robins, Kaplan, Miller & Ciresi LLP, with

24   redactions mandated by Ontario statute governing privacy

25   requests and release of information, the Municipal Freedom

1     of Information and Protection of Privacy Act.

2          Do you see that?

3     A.  Yes.  Yes.

4          MS. YANG:  Your Honor, we would move to admit

5     Respondent's Exhibit 75 into evidence.

6          MS. BERG:  Your Honor, we would interpose an

7     objection only to the extent that we had a specific

8     agreement with counsel when we executed the releases with

9     these police reports to be obtained without the Irish lace

10    on them that they would immediately copy whatever they

11    received to us.

12         You'll note this was received by them on October

13    26th, 2012.  We did not secure this until the exchange of

14    exhibits, which I believe was on November 9th.  It's

15    unacceptable to us, given the absolute overbearing,

16    demanding e-mails that we received regarding -- I'm

17    sorry -- it was November 7th, regarding every little thing

18    in this case that they would sit on this police report for

19    at least a week without providing it to us.

20         And so for that basis alone, we would move to

21    exclude.

22         MR. CARTER:  Your Honor, if I may address --

23         THE COURT:  Go ahead.

24         MR. CARTER:  -- Ms. Berg's point.  Ms. Berg is

25    correct.  We worked together to get this, to get these

1    police reports from the Kitchener, the Waterloo Regional

2    Police.  Both parties executed consent forms, and I worked

3    with the Waterloo Regional Police to secure the reports.

4         We did not receive the reports until November

5    5th, late in the day.  I was actually out of the office.

6    We got them processed the following day and exchanged --

7    and submitted them to petitioner on November 7th.  We

8    certainly did not have these documents in late October.  We

9    received them on November 5th.

10        MS. BERG:  That's fine.

11        THE COURT:  Well, 75 will be admitted.

12   BY MS. YANG:

13   Q.  Mr. Aly Saad Aly, I want you to turn to page 26 of

14   Respondent's Exhibit 75.

15   A.  So tell me the page on the bottom, ma'am.

16   Q.  This is, this is RTX 75-026, and I'll --

17   A.  So what is the number on the bottom?

18   Q.  That is the number at the bottom middle area of the

19   page, and alternatively if you're looking at the bottom

20   right-hand corner of the page, it's Aden 00098.  Do you see

21   that?

22   A.  98 I see, yes.  One second, please.  One second.  Yes.

23   I see 98 now.

24   Q.  Mr. Aly Saad Aly, this was a report that was entered on

25   June 5th, 2012, correct?

1    A.  Let me go back to the beginning of the report and see

2    what was the date.  Yes.  June the 5th, yes.

3    Q.  And this was after an interview that you had with the

4    police at your home, correct?

5    A.  They came at my home, and they conduct the interview

6    with me, yes.

7    Q.  During this interview with the police at your home, you

8    specifically discussed the Acer laptop with the police,

9    didn't you?

10   A.  Actually, he asked me what kind of laptop she was

11   using, and I explained to him we have two laptops, that her

12   laptop, which was broken, and the other Acer, which was

13   power supply was not working and laid in the closet for six

14   weeks, six months.

15   Q.  Mr. Aly, I want to direct your attention to towards the

16   bottom of the page.  Do you see the line beginning, At

17   12:02 the interview ended?

18   A.  I do.

19   Q.  And immediately under that, the officer noted, I noted

20   that the complainant Mohamed was using an Acer laptop

21   computer.

22   A.  True.

23   Q.  I also observed on the main screen of that laptop a

24   folder entitled Amal and underneath that the caption for

25   messages.  That's what the police report says, correct?

1    A.  Yes.

2    Q.  Now earlier it was just your testimony a few minutes

3    ago that your wife had taken this Acer laptop when she left

4    Canada, correct?

5    A.  Yeah, but those are two different Acer laptops, ma'am.

6    Q.  So it's your testimony today that there were two

7    different Acer laptops, correct?

8    A.  Yes, because the Acer laptop I was referring to in my

9    answer in the beginning of my, of my police report was the

10   Acer laptop that was broke and the power supply was not

11   working.

12   Q.  All right.  Thank you.  Thank you, Mr. Aly Saad Aly.

13   Now, earlier in your testimony with your attorney you said

14   that at least initially you were okay with the baby being

15   born in Minnesota, correct?

16   A.  I was not okay.  I didn't want it, but in order to make

17   her happy, I did.

18   Q.  In order to make her happy --

19   A.  To be a supportive husband.

20   Q.  That's right.  To be supportive of your wife?

21   A.  Yes.

22   Q.  And in fact, that's what you told the Canadian court

23   when you filled out an affidavit, isn't it?

24   A.  Say again, ma'am?

25   Q.  I want you to turn to Respondent's Exhibit 33.

1    A.  Okay.  Okay.

2    Q.  Are you there?

3    A.  Give me a second, please.  Okay.

4    Q.  Now, page one, this is an affidavit that you filled out

5    for the Superior Court of Justice in Kitchener, Ontario,

6    correct?

7    A.  Yes, ma'am.

8    Q.  And the document is dated June 13th, 2012, correct?

9    A.  Yes, ma'am.

10   Q.  Now, if you look down into the middle of the page, you

11   swore and you affirmed that the following statements

12   contained in this document would be true, correct?

13   A.  Yes.

14   Q.  Now, I want you to turn to page 5 of this exhibit.

15   A.  Mm-hmm (Yes).

16   Q.  Are you there?

17   A.  Yes, ma'am.

18   Q.  That's your signature, correct?

19   A.  Yes, ma'am.

20   Q.  And you signed this document in front of a commissioner

21   for taking affidavits, correct?

22   A.  Yes.

23   Q.  Now, I want you to turn to page three of Respondent's

24   Exhibit 33.

25   A.  Mm-hmm (Yes).

1    Q.  Paragraph 13 in the middle of the page, it reads, We

2    had an initial plan for her to deliver the baby in U. S.

3    where she has some relatives that can be of a help for her

4    during her delivery and after.

5              That's what you wrote, correct?

6    A.  Yes, that we had a plan she wanted and I agree with

7    her.

8    Q.  And the relatives, the relatives that you refer to

9    here, those were relatives in Minnesota, correct?

10   A.  Yes.

11   Q.  All right.  Now I want to turn your attention to

12   Respondent's Exhibit 26.

13   A.  Mm-hmm.  26.  Okay.

14   Q.  This is Petitioner's Response to Respondent's First Set

15   of Requests for Admissions to Petitioner, correct?

16   A.  Mm-hmm (Yes).

17   Q.  Now, I want you to turn to page two.

18   A.  Okay.

19   Q.  And do you see request for admission number 5?

20   A.  Yes.

21   Q.  And that reads, You intended to have P-h-a-s-a's

22   delivery occur in Minnesota, correct?

23   A.  Mm-hmm (Yes).

24   Q.  And in your response, your response number 5 reads, I

25   deny that it was ever my intention or desire to have our

1    daughter's delivery occur in Minnesota.  That's what you

2    wrote, correct?

3    A.  True.  True.  True.

4    Q.  All right.  Mr. Aly Saad Aly, I want to discuss very

5    briefly your previous marriages.

6    A.  Okay.

7    Q.  With your marriages to Ms. Gazizova and Ms. Aljaish, at

8    some period in time you were married to both of them at the

9    same time, correct?

10   A.  Legally, yes.  True.

11   Q.  All right.  And I want to spend some time talking about

12   your former wife Ms. Roundtree.

13   A.  Okay.

14   Q.  You previously abused Ms. Roundtree, didn't you?

15   A.  No, ma'am, I did not.

16   Q.  You squeezed her jaw tightly in front of her mother,

17   correct?

18   A.  I did not, ma'am.  I did not.

19   Q.  You hurt her in the morning because she wouldn't sleep

20   with you, correct?

21   A.  That's not -- that's incorrect.

22   Q.  I want to turn your attention to Respondent's

23   Exhibit 38.

24   A.  Mm-hmm (Yes).

25   Q.  Are you there?

1    A.  One second, please.  Yes, ma'am.

2    Q.  This is page two.

3    A.  Mm-hmm (Yes).

4    Q.  This is a temporary restraining order, correct?

5         MS. BERG:  Your Honor, this is where we begin to

6    object on the relevancy and the character evidence.

7         MS. YANG:  Your Honor, we would submit that it's

8    absolutely relevant given the pattern of abuse that

9    petitioner has showed against his previous spouses, which

10   goes directly to our grave risk defense.

11        THE COURT:  Well, let's go through the document.

12   BY MS. YANG:

13   Q.  Mr. Aly Saad Aly, this is a temporary restraining order

14   that Ms. Roundtree obtained against you, correct?

15   A.  Yes.

16   Q.  Now I want to turn your attention to Respondent's

17   Exhibit 39.  You have a child with Ms. Roundtree, correct?

18   A.  No, ma'am.  As far as my knowledge, I don't know

19   anything about a child with her.

20   Q.  So it's your testimony today that you do not have a

21   child with Ms. Roundtree, correct?

22   A.  I was never told.

23   Q.  Now Respondent's Exhibit 39, this is a child support

24   order that Ms. Roundtree obtained against you, correct?

25        MS. BERG:  Your Honor, again I object as to

                    KRISTINE MOUSSEAU, CRR-RPR
                         (612) 664-5106

1    relevance and character.  Further, unless she can prove

2    that this was served on him, she cannot cross-examine him

3    on it.

4              THE COURT:  Well, overruled for now.  Go ahead.

5    BY MS. YANG:

6    Q.  Mr. Aly Saad Aly, in this order, you were found to be

7    under a legal obligation to support Alayna Roundtree born

8    April 19th, 2002, correct?

9    A.  From what I read, yes, ma'am.

10   Q.  You were married to Ms. Roundtree on April 19th, 2002,

11   correct?

12   A.  April 19th?  No.  That's not true.

13             MR. SAAD ALY SAAD ALY:  Hello?  Hello?

14             THE WITNESS:  That's my brother.

15             MR. SAAD ALY SAAD ALY:  My mom is with me now.

16   If you want to talk with her now, she is ready now.

17             THE COURT:  We're not quite ready, so just wait.

18   Okay?

19             MR. SAAD ALY SAAD ALY:  Okay.  I will wait.

20             THE COURT:  Okay.  If you could, if there is a

21   way to put the phone on mute, that would be helpful.  Go

22   ahead.

23   BY MS. YANG:

24   Q.  Mr. Aly Saad Aly -- I'm sorry.

25             Your Honor, I don't know if I have moved any of

1    these exhibits into evidence, but if I haven't, I would

2    like to offer 27, 75, 26, 33?

3            MS. BERG:  Should we tell them to call back?

4            THE COURT:  I think that's probably a good idea.

5                  **(Foreign language spoken.)**

6            MR. SAAD ALY SAAD ALY:  Okay.  Bye bye.

7            THE WITNESS:  Bye.

8            THE COURT:  75 and 27 were already admitted, so

9    you're moving 26, 33, 38 and 39, did you say?

10           MS. YANG:  That's correct, Your Honor.

11           MS. BERG:  Your Honor, our objections continue.

12           THE COURT:  I will admit the exhibits and

13   overrule the objections.  So 26, 33, 38 and 39 are

14   admitted.

15           MS. YANG:  Thank you.

16   BY MS. YANG:

17   Q.  Mr. Aly, I want to talk briefly about some of your

18   beliefs.  It's important to you that Muslim women are

19   chaste until marriage, correct?

20   A.  Excuse me?  I don't understand what you mean.

21   Q.  It's important to you that Muslim women do not have sex

22   before marriage, correct?

23   A.  That's not to me.  Islam said women is not supposed to

24   have sex before marriage.

25   Q.  And you hold your Islamic beliefs, correct?

1   A.  I mean, I believe women don't have sex outside of

2   marry, outside, outside marriage.  That's how Islam

3   believe.  We don't believe fornication nor--

4         MS. BERG:  I'm not understanding him.

5   BY MS. YANG:

6   Q.  So it's important to you that Muslim women do not have

7   sex before marriage, correct?

8   A.  The question kind of vague.  If you meant she was night

9   before, yes, but not -- she was having sex, fornication,

10  adultery, that's what you meant?

11  Q.  My question was simply, it's important to you that

12  Muslim women do not have premarital sex, correct?

13  A.  I heard in the past that woman have sex in the past and

14  was married altogether.

15  Q.  That's fine.  It's important for your daughter not to

16  have premarital sex, correct?

17  A.  Well, you raise her Muslim.  She is not supposed to

18  have sex without marriage.

19  Q.  Mr. Aly Saad Aly, you're the type of husband who gets

20  angry if your wife doesn't fix your food, correct?

21  A.  No.  That's not correct.

22  Q.  In fact, you have previously gotten into fights with

23  your wife because she wouldn't fix your lunch, correct?

24  A.  No.  That's not true.

25  Q.  And I want you to turn your attention to Respondent's

1    Exhibit 75.

2    A.  75.  Okay.  Yes, ma'am.

3    Q.  Now, if you will turn to page 36 of this report.

4    A.  Can you give me the number like Aden 00 number?

5    Q.  Sure.  Aden 00108.

6    A.  108.

7    Q.  Let me know when you're ready.

8    A.  Please.  Thanks.

9    Q.  This is a report that was entered on February 27th,

10   2011, correct?

11   A.  One second, ma'am.  '08, yes.  Was done in February

12   27th, yes.

13   Q.  All right.  I want you to go one, two, three paragraphs

14   up from the bottom where it starts, Both Mohamed and Amal's

15   stories.  Do you see that paragraph?

16   A.  Yes, ma'am.

17   Q.  That paragraph reads, Both Mohamed's and Amal's stories

18   was consistent in indicating that the fight today started

19   over Mohamed being upset that he had to make his own lunch.

20   This began a verbal argument, as Amal felt Mohamed could

21   make his own lunch.  The argument escalated.

22        That's what the police report said, correct?

23   A.  Yeah.  The police report said this, we verbally argue,

24   but I never fight.

25   Q.  In fact, you told the police that day that your wife,

1    your fiancee at the time, was threatening to kill you,

2    isn't that correct?

3    A.  I said she, she, she hold a knife and try to kill me

4    and kill herself and kill the baby inside her womb.

5    Q.  And you told the dispatcher that you were actually in

6    the bathroom for your own safety, correct?

7    A.  At the moment when I called him, I was in the bathroom,

8    true.

9    Q.  Mr. Aly Saad Aly, you're over six feet tall?

10    A.  Correct.  I'm six one.

11    Q.  You're over 180 pounds, correct?

12    A.  Yes.  190.

13    Q.  Mr. Aly Saad Aly, the police didn't believe your story

14    that day, did they?

15    A.  Well, from what I read, they didn't believe because

16    they say that I stumbled over describing the knife and

17    where the knife was, but that's not the case.

18    Q.  That's correct.  The paragraph that you're referring

19    to, in fact, is the paragraph starting, Police arrived at

20    the apartment.  Do you see that?

21    A.  Yes.

22    Q.  And that paragraph reads, Police arrived at the

23    apartment and found Mohamed in the kitchen.  Neither

24    Mohamed nor Amal had any injuries.  Mohamed was asked where

25    the knife was, and he stumbled upon questioning and stated

1    I think it's in the kitchen and began opening drawers,

2    pretending to look for it.  Mohamed could not describe the

3    knife that he reported Amal had.

4         That's what the report says, correct?

5    A.  That's what the report said, yes.

6    Q.  Mr. Aly Saad Aly, I want to spend some time talking

7    about some discussions that you had with the police on June

8    5th, 2012.

9    A.  Mm-hmm (Yes).

10   Q.  You love your wife, isn't that correct?

11   A.  Could you repeat that, please?

12   Q.  You love your wife?

13   A.  Of course I do.

14   Q.  And you love your daughter?

15   A.  I'm crazy about her.

16   Q.  You're concerned about your wife and your daughter's

17   safety, correct?

18   A.  Of course.

19   Q.  But it took you more than one month, more than one

20   month after your daughter and your wife had left Canada

21   before you reported them missing, isn't that correct?

22   A.  True.

23   Q.  All right.  So on June 5th, you called the police

24   several times, and I want to start with your morning call.

25   You made a morning call to the police, correct?

1      A.  Yes.

2      Q.  And after you called them, they interviewed you at your

3      home, isn't that correct?

4      A.  Yes.

5      Q.  When they interviewed you at your home, you made up a

6      story for the police, didn't you?

7      A.  Yes, ma'am.

8      Q.  You told the police that the kid, the daughter, had

9      been left behind in Canada, correct?

10     A.  Yes.

11     Q.  I want to turn your attention to RTX 75, same exhibit,

12     but if you will flip to page four, and I will --

13     A.  So Aden 001 what?

14     Q.  Aden 00076?

15     A.  Yes.

16     Q.  Are you there?

17     A.  Yes.  Yes, ma'am.

18     Q.  This is the report that was filed on June 5th, 2012,

19     and it was at your residence.  The location is your

20     residence, correct?

21     A.  Yes.

22     Q.  And the interviewers included Detective Sergeant Dermo

23     and Detective Schaus, as well as an Officer Murphy,

24     correct?

25     A.  That's what is written there, yes.

1    Q.  And the start time was 11:07 hours, and it ended at

2    12:02, correct?

3    A.  Yes.

4    Q.  Now I want you to turn the page to page six.  This is

5    Aden 00078.

6    A.  Mm-hmm (Yes).

7    Q.  And during your conversation with the police at your

8    home, the police asked you why Ms. Aden wouldn't have taken

9    your daughter with her, correct?

10   A.  Yes.

11   Q.  And in your response, and you'll see this in the first

12   full paragraph at the top of the page, Officer BD asked:

13   Why would she not take the child with her?

14              Aly Saad Aly, you said:  That was the plan.  Then

15   she said she wanted to leave child here.

16              You knew that when you made this statement to the

17   police the baby in fact was in Minnesota, didn't you?

18   A.  In Minnesota?  No.  I know she is somewhere in U. S.

19   Q.  But you knew that she was not in Canada, correct?

20   A.  Yes, due to logic that she have to work and sustain her

21   life.

22   Q.  And then you continued your lie to the police.  You

23   told them that you visited the baby who you had sent to

24   your cousin in Toronto, correct?

25   A.  That's true, ma'am.

1    Q.  I'll direct your attention a couple more paragraphs

2    down, about halfway where Officer BD says yes.  Do you see

3    that paragraph?

4    A.  Yes.

5    Q.  Aly Saad Aly, you replied:  I went to visit weekly

6    after I finished school.  So I sent her in May to my

7    cousin's.  Then every week I visit in Toronto.

8          None of that was true, was it?

9    A.  Yes.

10   Q.  And then you further stated:  I called my cousin every

11   day to make sure the child was fine.  I thought that was

12   better than putting her in child care.

13         Mr. Aly Saad Aly, you didn't actually call your

14   cousin every day to check on the child, did you?

15   A.  No, I did not.

16   Q.  Mr. Aly Saad Aly, you provided incredible detail to

17   your elaborate story to the police, didn't you?  In fact --

18   A.  Well --

19   Q.  Actually, I'll just turn your attention to Respondent

20   Exhibit 75, page nine, and this is Aden 00081.  Let me know

21   when you're there.

22   A.  Yes.

23   Q.  Two paragraphs up from the bottom of the page, the

24   officer asked:  You said you went to Toronto to visit your

25   child.  How did you get there?

1          You responded, Aly Saad Aly:  Bus.  Canada Go.

2    Greyhound.

3          Those were your statements, correct?

4    A.  Yes.

5          MS. BERG:  Your Honor, I'm going to interpose an

6    objection in the interests of time.  My client has already

7    testified on direct that he lied.  I don't know that we

8    need to go through each and every possible statement during

9    this police investigation.

10         THE COURT:  Well --

11         MS. YANG:  Your Honor, the lies continued

12   throughout the day over the course of several phone calls,

13   several conversations with the police, interviews at the

14   home, interviews at the station.

15         THE COURT:  Let's go ahead.

16         MS. YANG:  Thank you.

17   BY MS. YANG:

18   Q.  Mr. Aly Saad Aly, later that afternoon you called the

19   police, didn't you?

20   A.  Yes.

21   Q.  And when you called them in the afternoon, you made up

22   another lie.  You told them that your wife had called you

23   that afternoon, didn't you?

24   A.  No, I did not lie.  There I did not lie.  She really

25   called me.

1    Q.  Let's turn your attention to page 32 of this

2    Exhibit 75.

3    A.  Okay.

4    Q.  This is Aden 00104.

5    A.  Aden 00014?

6    Q.  00104.

7    A.  One second, please.  Okay.

8    Q.  Do you see a list of bullets --

9    A.  Yes.

10   Q.  -- at the top of the page?

11   A.  Yes.

12   Q.  Now there is a paragraph that immediately follows the

13   bullets, and it starts out, Approximately 1:50 p.m.  Do you

14   see that?

15   A.  Mm-hmm (Yes).

16   Q.  The report says, At approximately 1:50 p.m., Aly Saad

17   Aly contacted Sergeant Dermo and stated that his wife

18   called him at the University and stated to stop looking for

19   her and swore at him.  Aly Saad Aly advised that he

20   believed that she called him because Aden had found out

21   that police had been contacted.  However, no family had

22   been spoken with to that point.

23          That's what the police report said, correct?

24   A.  Yes.

25   Q.  Now, later on that night you were brought into the

1    station for another interview with the police, correct?

2    A.  Yes.

3    Q.  And that occurred probably around 6:51 p.m., correct?

4    A.  I'm not sure about the time, but it was after 3:00 or

5    after 4:00.

6    Q.  Let's go down further on this page.  There is a big

7    block that has been redacted.  I want to look at the

8    sentence that follows that first redaction or the first

9    paragraph that's been redacted.

10          Do you see the sentence starting with, Aly Saad

11   Aly was brought into Central Division.  Do you see that?

12   A.  Mm-hmm, mm-hmm.

13   Q.  And that sentence reads, Aly Saad Aly was brought into

14   Central Division at 6:51 p.m. and provided another

15   statement to police where he stated he had previously

16   deceived police with information regarding his child.  The

17   address he provided was fabricated, as was the report that

18   his child was left behind.

19          That's what the report says, correct?

20   A.  That's what the report said, yes.

21   Q.  Now I want to take a look at some of your own words

22   when you interviewed with the police for the second time.

23   Let's turn to page 14 of Respondent's Exhibit 75.  This is

24   Aden 00086.

25   A.  00086.  Mm-hmm (Yes).

1    Q.  If you go down --

2    A.  Yes, ma'am.

3    Q.  In the middle of the page, there is a sentence that

4    starts, MA:  I told you she didn't take the kid.

5              Do you see that paragraph?

6    A.  Yes.

7    Q.  And so in your conversation with the police when they

8    interviewed you for the second time on June 5th, 2012, you

9    stated:  I told you she didn't take the kid.  She woke up

10   in the morning, said she was going to the doctor.  She took

11   the kid and left.  I shouldn't have hidden that she took

12   the kid.  I should have told you that.  I just didn't want

13   to harm her.

14             Those were your words, correct?

15   A.  That's what is written here, yes.

16   Q.  And then after that the officer said that it was really

17   important for you to be honest, and in his statements

18   Officer BD followed up with:  It's important that you're

19   completely honest.  That's concerning to me.

20             That's what the officer said to you, correct?

21   A.  That's what is written here, yes.

22   Q.  Now I want you to turn to the next page, Aden 0007.

23   This is RTX 75-015.  At this point of the interview, the

24   police directly called you out on your lie.

25             At the top of the page, Officer BD said to you:

1        You made up a story about a cousin in Toronto.

2        A.  Where exactly is that, ma'am?  I don't see it.

3        Q.  That's at the very top of page Aden 00087.

4        A.  Because she has my car and the kid?

5        Q.  Yeah.  It's the chunk that follows after that sentence.

6        A.  Okay.

7        Q.  It begins with BD.

8        A.  Okay.

9        Q.  So Officer BD said:  You made up a story about a cousin

10       in Toronto.

11               You responded:  I did that.  It was a mistake.

12               That's what you said to the police, correct?

13       A.  That's what is written here, yes.

14       Q.  And so by this point, the police had reminded you of

15       the importance of telling the truth to them, correct?

16       A.  Yes.

17       Q.  But despite that, you continued to lie, isn't that

18       correct?

19       A.  I did not continue to lie.  What did I lie after that?

20       The only lie is she did not take my child and my child is

21       with my cousin.

22       Q.  Let's go to the same page, Respondent's Exhibit 75-015.

23       This is Aden 00087.  The officer specifically asked you

24       again about your conversation with Ms. Aden that afternoon,

25       correct?

1    A.  What's the statement start with?

2    Q.  It starts with BD:  What was the conversation with her?

3    Do you see that?

4    A.  One second.  What was the conversation, yes.

5    Q.  And you responded:  She was cursing and screaming.  She

6    said don't search for me.  Leave me alone.  I got freaked

7    out.  I wondered how would she know.  The only reason I

8    called this morning is I don't want to be responsible for

9    the car she has.

10          Officer BD stated:  I have a hard time believing

11   you called about your missing car and not your daughter.

12          That's what this report says, correct?

13   A.  That's what the report said, yes.

14   Q.  Now earlier in your direct exam and testimony, you

15   testified you never lied to the Canadian court, correct?

16   A.  Yes.

17   Q.  Let's turn back to Respondent's Exhibit 33.

18   A.  One second, please.

19          Yes, ma'am.

20   Q.  Are you there?

21   A.  Yes, ma'am.

22   Q.  This is the affidavit you filed with the Canadian court

23   in Kitchener, correct?

24   A.  Yes, ma'am.

25   Q.  Now, if you will turn to page 4 of that report,

1    paragraph 17.

2    A.  Okay.

3    Q.  In the middle of paragraph 17, there is a sentence that

4    reads:  On June 5th, 2012, I called 911 to report a missing

5    wife, child and a car.

6           That's what you wrote to the Court, correct?

7    A.  Well, that's what, after me and the -- after I come and

8    the same day I told the officer the truth, that's what the

9    report was about, missing child and car and wife.

10   Q.  But when you first called the police on June 5th, 2012,

11   you didn't actually report a missing child, did you?

12   A.  True, but what I made in the statement is just what I

13   told you.  The end up result is end up was calling was

14   missing child and car and wife.

15   Q.  Mr. Aly Saad Aly, do you receive Canadian child

16   benefits for Princess?

17   A.  Yes.

18   Q.  And in fact, the reason why you didn't report your

19   daughter initially missing was because you wanted to

20   continue receiving these benefits, correct?

21   A.  No, ma'am.  That is not anymore.

22   Q.  Mr. Aly Saad Aly, in this particular case, you have

23   requested your attorneys to move for Skype access to your

24   daughter, correct?

25   A.  Say again, ma'am?

1    Q.  You have previously asked this particular Court to

2    grant you Skype access to your daughter, correct?

3    A.  I did -- I don't remember requesting Skype access to my

4    daughter.

5    Q.  I didn't fully understand your answer.

6    A.  You're asking me if I asked the Court for a Skype

7    access to my daughter?

8    Q.  That's correct?

9    A.  I do not remember such a thing.

10   Q.  Are you aware if your attorneys have asked this Court

11   for you to have Skype access to your daughter?

12   A.  I do not remember.

13          MS. BERG:  To have what?

14   BY MS. YANG:

15   Q.  To have communication with your daughter via Skype?

16   A.  I do not remember this.

17          MS. BERG:  No.  That is a different case.

18   BY MS. YANG:

19   Q.  In the last couple of months, have you had any

20   communication with your daughter?

21   A.  Couple of month?  No.  I have not with my daughter

22   since she left.

23          MS. YANG:  Can we have a few minutes, please?

24          THE COURT:  Go ahead.

25          MS. YANG:  Thank you.


                    KRISTINE MOUSSEAU, CRR-RPR
                          (612) 664-5106

1           MS. BERG:  Your Honor, we're going to lose the

2     translator.

3           After 1:30 we have to pay for you, right?

4           THE INTERPRETER:  I don't know.

5           MS. BERG:  Oh, we're paying for him right now.

6     Gees.  We've got the affidavit in already of the mother, so

7     it's really their right to cross-examine her.

8           THE COURT:  Well, let's see how much longer we

9     have here.

10    BY MS. YANG:

11    Q.  Mr. Aly Saad Aly, just very, very quickly.  I just want

12    to make sure I understood you correctly.  Earlier you said

13    that actually there were two Acer laptops that you owned,

14    correct?

15    A.  What I said is, the Acer laptop that is mentioned, the

16    police officer that he say I was using, that's not the same

17    Acer that you guys asked me and I said I don't have in

18    possession anymore.

19    Q.  That's right.  So earlier you testified that there were

20    actually two Acer laptops, correct, one with a broken power

21    supply?

22    A.  The story include two Acers.  One Acer my wife took

23    with her and one Acer I purchased for a couple of weeks to

24    have my proposal, and I returned it back.

25    Q.  All right.  So let's look back briefly at Respondent's

1    Exhibit 27.

2    A.  Okay.

3    Q.  Page six.

4    A.  Yes, ma'am.

5    Q.  Your answer in this paragraph, you wrote:  I owned an

6    Acer laptop computer which respondent took with her when

7    she abducted our child to the United States.

8                  That's what you wrote, correct?

9    A.  One second, please.  In 006?

10   Q.  006, yes.

11   A.  I do not, I do not, I do not now own, is that what

12   you're referring to?

13   Q.  Yep.  I'm referring to, yep, the second sentence:  I

14   owned an Acer laptop which respondent took with her when

15   she abducted our child to the United States.

16   A.  Yes.

17   Q.  That's what you wrote, correct?

18   A.  Yes.

19              MS. YANG:  Thank you for answering my questions,

20   Mr. Aly Saad Aly.

21              THE WITNESS:  Thanks, ma'am.

22              THE COURT:  Do you want to do redirect right now,

23   or would you like to move on to the next witness?

24              MS. BERG:  Can I reserve my redirect and move on

25   to the next witness?

1          THE COURT:  You may.

2          MS. BERG:  Mohamed, can you get your mom on the

3     phone?

4          THE WITNESS:  Yes, give me a second.  I will put

5     it on mute and will quick call her.

6          THE COURT:  Do you want to swear the interpreter?

7          MS. BERG:  He needs to be sworn in.

8          THE COURT:  That's what we're doing right now.

9                        **(Interpreter sworn.)**

10         THE INTERPRETER:  Okay.

11         MR. ALY SAAD ALY:  They will call in a minute.

12         MS. BERG:  All right.  Thank you, Mohamed.

13         MR. ALY SAAD ALY:  No problem.

14         MS. BERG:  Mohamed, how should we address your

15    mother?

16         MR. ALY SAAD ALY:  I think that the interpreter

17    should start.  Try to speak with her in Egyptian and slow

18    with the words.  She is an illiterate woman.

19                        **(Pause.)**

20         MR. SAAD ALY SAAD ALY:  Hello?

21         MS. BERG:  Hello.

22         MR. SAAD ALY SAAD ALY:  Yes, I am with you.

23         MS. BERG:  We are ready to proceed.  We have a

24    translator on here.  Please put your mother on the phone.

25         MR. SAAD ALY SAAD ALY:  My mom is here and with

1    you.

2              THE COURT:  She needs to be sworn as a witness,

3    so we will do that.

4              THE INTERPRETER:  Okay.  I will do that but one

5    by one.

6                        **(Witness sworn.)**

7              MS. BERG:  Does she swear to tell the truth?

8              THE WITNESS:  Yeah.

9              MS. BERG:  Is that yes?  Is she hearing us?

10             THE WITNESS:  Yes.

11             MS. BERG:  All right.

12

13             **SAADIA MOHAMED ATTIA FARAG (VIA TELEPHONE),**

14   after having been first duly sworn, was examined and

15   testified as follows:

16                      **DIRECT EXAMINATION**

17   BY MS. BERG:

18   Q.  You have been asked to swear the truth.  Do you swear

19   the truth?

20   A.  Yes.  I will say upon to God what she told me.

21   Q.  All right.  Are you Mohamed Aly Saad Aly's mother?

22   A.  Yes, I am his mother.

23   Q.  And did you have a telephone conversation with his

24   wife?

25   A.  Yes.

1    Q.  His wife's name is Amal Aden?

2    A.  Aden.

3    Q.  And is she the mother of your granddaughter Princess?

4    A.  Yes.

5    Q.  What did she tell you when she made the phone call to

6    you?

7    A.  She talked to me, and she was saying that, that she is

8    getting irritated and occasionally she gets, she gets

9    irritated and she gets some nerve breaking.

10   Q.  And she gets what?

11              THE INTERPRETER:  Nerve breaking.

12              MS. BERG:  Okay.

13   BY MS. BERG:

14   Q.  And did you complete a declaration of your testimony

15   today?

16   A.  Say that one by one.

17   Q.  Yeah.  It was too big.

18              Did you complete -- did your son help you write a

19   statement to the Court?

20   A.  Yes, because I don't read or write.  My son was with

21   me.

22   Q.  And that statement was dated October 29th, 2012?

23   A.  What?

24   Q.  Did you sign the statement on October 29th, 2012?

25   A.  Yes.

```
1      Q.  Okay.

2      A.  Sign what again?

3      Q.  Say that again?

4      A.  I'm sorry.  What did I sign again, if you don't mind?

5      Q.  Okay.  You signed a statement written with the

6      assistance of your son on October 29th, 2012, is that

7      correct?

8      A.  In October?  Yes.  In the last month, October, yes.

9      Q.  Was your -- was Mohamed's wife angry, believing he was

10     married to an Egyptian woman?

11     A.  Yes, of course.

12     Q.  Okay.  All right.

13          I have nothing further.  Don't let her go,

14     though.

15          THE COURT:  Before she goes, can we have her name

16     and spelled?

17          THE INTERPRETER:

18          MS. BERG:  S-a-a-d-i-a, Mohamed, M-o-h-a-m-e-d,

19     Attia, A-t-t-i-a, Farag, F-a-r-a-g.

20          So now you have to be, the other side gets to ask

21     you questions.

22          THE WITNESS:  Yeah.  You can tell me questions

23     and whatever I know, I will respond.

24          THE COURT:  Cross-examination?

25
```

```
 1                      CROSS-EXAMINATION

 2    BY MR. CARTER:

 3    Q.  Good afternoon, Ms. Attia.  Ms. Aden only called you,

 4    the first time she called you was in early June, isn't that

 5    correct?

 6    A.  She contacted me before June.

 7    Q.  And the only other time she contacted you was about two

 8    months later?

 9    A.  Yes.

10    Q.  So Ms. Aden only contacted you two times, isn't that

11    correct?

12    A.  She also contacted me to say happy holiday, happy

13    holiday on November.

14    Q.  So she contacted you once in November saying happy

15    holidays?

16    A.  Yes, and I had asked her how is the daughter doing.

17    Q.  And so that means your testimony today is that she

18    contacted you three times, that's correct?

19    A.  Yes, honest to God, she had contacted me.

20    Q.  Mr. Aly Saad Aly is your son, isn't he?

21    A.  Yes, my son.

22    Q.  In fact, he is your oldest son, isn't that correct?

23    A.  Mohamed Aly Saad is my oldest and Saad Aly Saad is one,

24    the one who is helping me now.

25    Q.  And of course you love Mr. Aly Saad Aly very much?
```

1          MR. SAAD ALY SAAD ALY:  May I interrupt?  May I

2    interrupt?  May I interrupt, please?

3          THE COURT:  No.  Let's continue with the

4    questioning here.  Okay?

5          MR. SAAD ALY SAAD ALY:  She, she, the way you

6    said the names is different than Egyptian say it, so that's

7    why.

8          THE COURT:  Let's go ahead with the next

9    question.

10   BY MR. CARTER:

11   Q.  All right.  I'll move on.  You have two other children,

12   isn't that correct?

13   A.  Yes, we have two.

14   Q.  You have one daughter?

15   A.  Yes, I have a daughter.

16   Q.  And you have one son who is the youngest, isn't that

17   correct?

18   A.  Yes.

19   Q.  And aside from Mohamed Aly Saad Aly's children, the

20   only grandchildren you have are from your daughter, that's

21   correct, isn't it?

22   A.  From my daughter?

23   Q.  Your daughter has children, isn't that correct?

24   A.  She has four.

25   Q.  But your youngest son doesn't have any children, isn't

1    that correct?

2    A.  Not married yet.

3    Q.  And you must love all of your grandchildren very much?

4    A.  Of course.

5    Q.  But the children of your son are particularly

6    important, isn't that correct?

7    A.  Of course.

8    Q.  And that's because the children of a son are the

9    extension of the family?

10   A.  Yeah, they are the ones that actually extend the

11   family.

12   Q.  But the children of a daughter are the extension of her

13   husband's family, isn't that correct?

14   A.  Yes, of course.

15   Q.  Your son Mohamed Aly Saad Aly has been married before

16   he married Amal Aden, isn't that correct?

17   A.  Yes, he was.

18   Q.  In fact, he was married to Nora Roundtree, isn't that

19   correct?

20           THE INTERPRETER:  The interpreter would like the

21   name of --

22   BY MR. CARTER:

23   Q.  In fact, he was married to Nora, N-o-r-a, Roundtree,

24   R-o-u-n-d-t-r-e-e?

25   A.  Yes, for two months, and there was no result.

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

1    Q.  He has a child with Ms. Roundtree, doesn't he?

2    A.  I didn't hear the question.

3    Q.  Your son Mohamed Aly Saad Aly has a daughter with Nora

4    Roundtree, isn't that correct?

5    A.  No.

6    Q.  Your son, you testified today that your son helped you

7    write this declaration, isn't that correct?

8    A.  Because I don't write or read, I tell him the

9    statement, and he write it because I can't read or write.

10   Q.  And so you've discussed this case with him, haven't

11   you?

12   A.  Talk to who?

13   Q.  Your son, Mohamed Aly Saad Aly?

14   A.  Talk to him about what?

15   Q.  About this case.

16   A.  I was, I was, I was, I was, I was telling, I was

17   talking to him and telling him what she had told me.  She

18   had said this and this and that.

19        MR. CARTER:  No further questions.

20        THE COURT:  Go ahead, Ms. Berg.

21

22                  **REDIRECT EXAMINATION**

23   BY MS. BERG:

24   Q.  What was the name of the son who helped you write this

25   statement?

1      A.  My son Saad Aly.

2      Q.  Not Mohamed Aly Saad?

3      A.  (No response)

4      Q.  So the name of the son that wrote the affidavit is

5      different than the son who is testifying in this trial, is

6      that correct?

7      A.  My son.  My son who is with me because I don't know how

8      to read or write.

9      Q.  Not Mohamed, the son that is with her, not Mohamed?

10     A.  (No response)

11             MS. BERG:  I have nothing further.

12             THE COURT:  Anything further from the petitioner?

13     Anything further from the respondent?

14             MR. CARTER:  No.  I think that will do it.  Thank

15     you.

16             THE COURT:  Thank you.  We're done with you as a

17     witness.

18             THE WITNESS:  Is there something else?

19             THE COURT:  No.

20             THE WITNESS:  Is this done or should I call

21     central again?

22             MS. BERG:  No.

23             THE WITNESS:  So that's it?  No one is going to

24     contact me again or ask me?

25             THE COURT:  Yes.  That's it.

1           MS. BERG:  Say good-bye.  Tell her to hang up.

2           THE WITNESS:  Okay.  Peace be with you.

3                   **(Witness excused.)**

4           MR. ALY SAAD ALY:  Hello?

5           THE COURT:  All right.  We have about ten or

6      eleven minutes left.  What would you like to do, Ms. Berg?

7           MS. BERG:  I have a brief redirect of Mohamed.

8           Mohamed, are you there?

9           MR. ALY SAAD ALY:  Yes, ma'am.

10           THE COURT:  Ms. Bruce?

11           MS. BRUCE:  Your Honor?  Your Honor, our expert

12      Ms. Boyle is only available until 2:10 today.  She is

13      booked all day tomorrow.  She could reserve her redirect.

14      We will try and squeeze in a 20-minute direct in six

15      minutes.

16           MS. BERG:  That's fine.

17           THE COURT:  Well, go ahead.  I've got to quit at

18      ten after.

19           MS. BRUCE:  Yeah.

20           THE COURT:  Just have to take her by phone or

21      something if we can't finish.  Okay?

22           Go ahead.

23           MS. BRUCE:  All right.  Thank you.

24           MS. BERG:  Mohamed, are you still there?

25           MR. ALY SAAD ALY:  Yes, ma'am, I'm here.

1          MS. BERG:  I think they are going to have their

2     witness, their expert come in now.

3          MR. ALY SAAD ALY:  Okay.

4          MS. BERG:  Your Honor, would you excuse the

5     interpreter?

6          THE COURT:  Yes.

7                    **(Witness sworn.)**

8          THE COURT:  Go ahead.

9          MS. BRUCE:  Hi, Ms. Boyle.

10         Your Honor, I would offer the CV and attachment

11    Exhibit 2 into evidence covering her publications, books

12    and qualifications since we are pretty quick on time.

13         THE COURT:  Is that Exhibit 68?

14         MS. BRUCE:  Yep.  68 and 69, Your Honor.

15         THE COURT:  Very well.  Any objection?

16         MS. BERG:  Your Honor, just to renew the

17    objection as to relevance, and this is based on facts like

18    that Ms. Aden reported they met at a wedding.  This is only

19    information from Ms. Aden.

20         THE COURT:  I understand your argument.

21    Overruled, and the exhibits will be admitted.

22         Go ahead.

23

24

25

1                        **ELIZABETH BOYLE,**

2      after having been first duly sworn, was examined and

3      testified as follows:

4                        **DIRECT EXAMINATION**

5      BY MS. BRUCE:

6      Q.  Hi, Ms. Boyle.  I'm just going to skip right ahead.

7      What's your role in this case?

8      A.  I am an expert witness for Amed Aly -- I'm sorry -- for

9      Amal Aden.

10     Q.  And have you arrived at an opinion in this matter?

11     A.  Yes, I have.  I think that if the child Princess is

12     returned to her father in Canada that she is at grave risk

13     of experiencing female genital cutting, which is associated

14     with physical and psychological harm.

15     Q.  Just very briefly, if you could tell the Court what you

16     did to arrive at this opinion?

17     A.  Well, this is based on my 16 years of research in areas

18     related to this issue, a review of recent trends concerning

19     female genital cutting in Egypt, review of the record,

20     including the petition, the answer and the expert report

21     from Mr. Awad and speaking to Ms. Aden.

22     Q.  You've just stated that it's your opinion that the

23     child will be exposed to grave risk of harm if returned and

24     subjected to female genital cutting.  Why is it a problem

25     if the child is subjected to female genital cutting?

1          MS. BERG:  Actually, Your Honor, we'll stipulate

2     that that's not an attractive practice.

3          THE COURT:  Let's have her testimony.

4          Go ahead.

5          THE WITNESS:  Yes.  There are physical and

6     psychological harms associated with female genital cutting.

7     Of course, the most prominent one is the purpose of the

8     practice, which is to prevent the woman from ever having an

9     orgasm, but there are also other kinds of side effects from

10    the practice just because it's a surgical procedure.

11         So hemorrhaging is a problem, post traumatic

12    stress disorder, infection, and then a recent study with

13    the World Health Organization has shown that increases the

14    risk of a woman giving still birth when she is having

15    children.  It increases the risk of excessive bleeding and

16    has other complications associated with childbirth.

17    BY MS. BRUCE:

18    Q.  When you stated earlier that you relied on facts and

19    materials from this case --

20    A.  Yes.  There are a few facts that I think are important.

21    Of course, it's important that Mr. Aly Saad Aly is Egyptian

22    because --

23    Q.  Excuse me.  Can you tell the Court why that's

24    important?

25    A.  Yeah.  That's important because Egypt is one of the

1    countries that has been resistant to change in this area,

2    and my particular area of interest is looking at laws

3    related to female genital cutting, and what you see is that

4    countries pass these laws as a result of international

5    pressure if there is not local change on the ground.

6           And that is nowhere more true than in Egypt, and

7    then there is some additional facts that also support my

8    opinion.

9    Q.  Ms. Boyle, if I can just ask you one more question

10   about Egypt.

11   A.  Sure.

12   Q.  Isn't female genital cutting illegal in Egypt?

13   A.  Yes, it's been illegal since 2008, and yet 60 percent

14   of women still favor the practice, and the numbers are even

15   higher among men.  Among women who -- well, in the 1990s it

16   was true that 96 percent of Egyptian women were

17   circumcised.

18          The numbers have gone down, but recent events

19   with the ousting of President Mubarak and the installation

20   of President Morsi have reversed the trends, and there is

21   some movement toward legalizing female genital cutting

22   again, but I think the really important point is, even if

23   it's illegal, it's still widely practiced.

24          It's practiced by over half of the population

25   still.

1    Q.  And would you say it's easy to obtain --

2    A.  Yes.

3    Q.  -- the procedure?

4    A.  Yes, it's definitely easy to obtain.

5    Q.  Are there certain groups in Egypt who are more prone to

6    taking the practice, undertaking the practice of FGC?

7    A.  Yes, the current president, Mohamed Morsi, is from the

8    Muslim Brotherhood and has said that this is a private

9    matter, so he is -- which is kind of like saying that wife

10   battering is a private matter, sort of taking the State's

11   role out of eliminating the practice.

12           And then the other party that is very prevalent

13   in the current legislative makeup is the Salafis, and they

14   have proposed, the al-Nour party, which is the Salafi

15   party, has proposed legislation making female genital

16   cutting legal in Egypt.

17           So the Salafis in particular seem to be

18   supportive of the practice.

19   Q.  And who are the Salafi?

20   A.  Salafis are a group of Muslims who believe that the,

21   that Islamic law the way it was written in Muhammad's time

22   is the way that it should be observed today, and so unlike

23   most Muslim groups which think that you have to read the

24   Koran in the social context of contemporary times, the

25   Salafis think that you have to look at the texts and

1    interpret them the way they were interpreted in, you know,

2    600 to -- 650 to 700 AD.

3              MS. BRUCE:  Your Honor, I see that it's about

4    eight past.  I would at least offer Ms. Boyle's expert

5    report, which is Exhibit 67, into evidence.  We will try

6    and work with her for tomorrow.

7              THE COURT:  All right.  67, any objection?

8              MS. BERG:  Continuing objection, Your Honor.

9              THE COURT:  All right.  Very well.  It's

10   admitted.

11             Okay.  Let's wrap up for the day, and then we

12   will start at 9:30 tomorrow, and we will just work with

13   each other in a schedule and see if we can get everything

14   done.

15             MS. BERG:  Can we leave things here?

16             THE COURT:  You can.  All right.  We will be in

17   recess.  Thank you.

18             THE CLERK:  All rise.

19                      *         *          *

20

21

22

23

24

25

1           I, Kristine Mousseau, certify that the foregoing

2     is a correct transcript from the record of proceedings in

3     the above-entitled matter.

4

5

6

7     Certified by:  s/  Kristine Mousseau, CRR-RPR
                           Kristine Mousseau, CRR-RPR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3    Mohamed Aly Saad Aly    29     89

4    Saadia Mohamed Attia Farag

5                           126     129      132

6    Elizabeth Boyle        136

7


8
     PETITIONER'S EXHIBITS:
9
     1, 2 and 3                                         69
10   4, 5, 6, 7 and 8                                   70
     9 and 10                                           71
11   11                                                 42
     12, 13 and 14                                      73
12   15                                                 74
     16                                                 42
13   17                                                 74
     19                                                 76
14   21                                                 65
     22                                                 77
15   23                                                 78
     24                                                 79
16   25                                                 36
     28                                                 59
17   29                                                 80
     30                                                 81
18   31                                                 82

19
     RESPONDENT'S EXHIBITS:
20
     26                                                107
21   27                                                 95
     33, 38 and 39                                     107
22   67                                                140
     68 and 69                                         135
23   75                                                 99

24

25
```

                    KRISTINE MOUSSEAU, CRR-RPR
                          (612) 664-5106