UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
Mohamed Aly Saad Aly,            File No. 12CV1960
                                      (JRT/FLN)
          Petitioner,

vs.                              Minneapolis, Minnesota
                                 November 14, 2012
Amal Aden,                       9:38 A.M.

          Respondent.
------------------------------------------------------------
BEFORE THE **HONORABLE JOHN R. TUNHEIM**
UNITED STATES DISTRICT COURT JUDGE
**(EVIDENTIARY HEARING-VOLUME II)**

APPEARANCES
For the Petitioner:      Walling, Berg & Debele, PA
                         **NANCY ZALUSKY BERG, ESQ.**
                         **LILO KAISER, ESQ.**
                         121 South Eighth Street
                         Suite 1100
                         Minneapolis, MN  55402

For the Respondent:      Robins Kaplan Miller & Ciresi
                         **BRIAN S. CARTER, ESQ.**
                         **DAVID P. SWENSON, ESQ.**
                         **KATHERINE K. BRUCE, ESQ.**
                         **ANDREA C. YANG, ESQ.**
                         **LAURA E. NELSON, ESQ.**
                         Suite 2800
                         800 LaSalle Avenue
                         Minneapolis, MN  55402

Present via phone:       Mohamed Aly Saad Aly

Court Reporter:          **KRISTINE MOUSSEAU, CRR-RPR**
                         1005 United States Courthouse
                         300 Fourth Street South
                         Minneapolis, Minnesota 55415
                         (612) 664-5106

     Proceedings recorded by mechanical stenography;
transcript produced by computer.

1                                                    **9:38 A.M.**

2

3                          **(In open court.)**

4            THE COURT:  You may be seated.  Good morning,

5    everyone.  We are ready to continue this morning.

6            What's our first step, Ms. Berg?

7            MS. BERG:  I think I want to finish -- I want to

8    finish redirect of Mr. Aly Saad Aly.

9            THE COURT:  Okay.  Let's proceed with that, then.

10   He's on the phone?

11           MS. BERG:  Mohamed?

12           MR. ALY SAAD ALY:  Yes, ma'am.

13           MS. BERG:  All right.  Thank you.

14

15              **MOHAMED ALY SAAD ALY (Via telephone),**

16   after having been previously duly sworn, was examined and

17   testified as follows:

18                       **REDIRECT EXAMINATION**

19   BY MS. BERG:

20   Q.  Did you hear the testimony of Ms. Boyle yesterday?

21   A.  Yes, ma'am, I did.

22   Q.  Ms. Boyle is speculating based on the fact that you're

23   Egyptian that you ascribe to all of the cultural beliefs

24   she associates with Egypt, is that correct?

25   A.  No, ma'am.  That's not correct.

1    Q.  What is?

2    A.  First of all, none of my family members that are

3    females are circumcised.  This is a very old habit that is

4    currently only done in rural areas and being watched by the

5    government so strictly, so it's illegal for any, any

6    practitioners to do so.

7         So neither me nor my family believe this, and

8    second of all, I don't live in Egypt.  I live in Canada,

9    and so third of all, my wife, herself being Somalian, her

10   family, her mother, she was asking us so many times about

11   when are you going to do this to our daughter and the way

12   to do it.  I was rejecting so many times about this.

13   Q.  Mohamed, I'm going to ask you to summarize your

14   statements again more slowly.  Again you have to speak very

15   slowly for us to understand.

16   A.  Okay, ma'am.  This, this, this, this practice is, was

17   done in the rural area in Egypt, and this is long time ago,

18   which is now it's illegal to be practiced in the country,

19   and there is no doctor or nurse or anybody in the medical

20   field allowed to do so, otherwise it would be asked

21   illegally.

22        None of my family members, female family members,

23   have been circumcised.  I was born and raised in Cairo in a

24   big city, so none of my family live in the village.  Third

25   of all, most men don't believe in this to be raised Islam,

1   and last but not least, my wife, herself coming from

2   Somalian culture, they do this even more than Egyptian

3   does, and on several occasions, she and her mother ask me

4   about when are you going to do this to Hafsah the Somalian

5   way, and I was refusing so badly.

6   Q.  All right.  Now, it's also been suggested that you're a

7   Salafi Muslim, which would mean I guess the link is that

8   you also, as a Salafi Muslim, would advocate these

9   practices.  Are you Salafi?

10  A.  No, I'm not, ma'am.

11  Q.  But you are strictly --

12  A.  I'm a Muslim that pray and fast.  I don't find myself

13  in any of those.  I do not name myself.  I'm just a Muslim.

14  Q.  Okay.  What is a Salafi Muslim?

15  A.  It is a group of people that want to apply whatever in

16  the Koran has been for 300 years ago now literally, not

17  taking the cultural aspects or the events in the culture in

18  respect.  So that's what I was -- I was learning from

19  Ms. Boyle yesterday, and I think there they are more

20  fundamentalist than others.

21  Q.  Now, we're going to change topics, Mohamed, and talk

22  about this Acer laptop that you had in June of 2012.

23  A.  Yes, ma'am.

24  Q.  Did we understand your testimony correctly that you

25  purchased an Acer in order to write a paper and then

1    returned it to the store?

2    A.  Actually because my, my, my wife has took the computer

3    that I was using and, you know, was bought and using

4    personally, and she left me at a very important time to me

5    as a grad student, which is preparing for my proposal.  In

6    order to prepare for my proposal and I need to prepare a

7    Power Point presentation, and I need to have a laptop with

8    me during the presentation.

9         So I purchased an Acer laptop which is the

10   cheapest brand.  That's the reason I purchased an Acer

11   laptop, and then three weeks, two weeks or three weeks, I

12   returned it back to the store.  That's why I happened to be

13   at the same time that the police came to my house.

14   Q.  All right.

15        Your Honor, if I could take a moment?

16        THE COURT:  You may.

17   BY MS. BERG:

18   Q.  One other question, Mohamed.

19   A.  Yes, ma'am.

20   Q.  Did you assume responsibility for caring for Princess?

21   A.  I do.

22   Q.  And did you during the time that the two -- you and

23   respondent were living together, did you assume primary

24   responsibility for caring for Princess?

25   A.  Yes, ma'am.

1    Q.  And was that during the period of time that she would

2    go to work at the hospital?

3    A.  Even during the weekdays, she, more than one time, she

4    said to me, I'm tired, come take care of your daughter.  So

5    I changed diapers.  I prepared meals.  I give her baths.  I

6    enjoy doing this.  I was even with Princess Hafsah in the

7    operation room when she was delivered.

8            So I did everything that, that any mother could

9    do.  I did everything almost, and beside that, Saturday and

10   Sunday I was carer of Princess Hafsah fully.

11   Q.  Mohamed, why do you think that respondent has made

12   these claims of domestic violence and claims she had to

13   flee Canada?

14           MS. YANG:  Objection.

15           THE COURT:  Just a minute.

16           MS. YANG:  Objection.  Speculation.

17           THE COURT:  I couldn't hear you.

18           MS. YANG:  Speculation.

19           THE COURT:  Overruled.  Go ahead.

20   BY MS. BERG:

21   Q.  Go ahead, Mohamed.

22   A.  I believe because she doesn't have -- her motive at the

23   beginning, as she told my mother and told me, the jealousy.

24   She was under impression or believed that I was married to

25   a woman in Egypt, which is not true.  I divorced this woman

 1     almost a year before, and so there is no other reason.

 2              So in order to justify her leave, she has to make

 3     this up or assume this.

 4              MS. BERG:  I have nothing further, Your Honor.

 5              THE COURT:  Any recross?

 6              MS. YANG:  Very briefly, Your Honor.

 7              THE COURT:  Go ahead.

 8

 9                      **RECROSS-EXAMINATION**

10     BY MS. YANG:

11     Q.  Mr. Saad Aly Saad, this is Ms. Yang.

12     A.  Yes, ma'am.

13     Q.  So it's your testimony right now that this Acer laptop,

14     the second laptop, was something that you held onto for

15     about three weeks, and then you returned it, correct?

16     A.  Two to three weeks as far as I remember.

17     Q.  All right.  I want you to turn back to Respondent's

18     Exhibit 75, page 10.

19     A.  One second, please.  Tell me the number at the bottom,

20     please, the Aden 000.

21     Q.  Yes.  Aden 00082.

22     A.  Okay, ma'am.

23     Q.  I want you to go down to the fifth paragraph on the

24     page starting, Officer Diaz:  What would she use?

25              Do you see that paragraph?

1    A.  Yes.

2    Q.  That paragraph reads, Diaz:  What would should use,

3    that laptop?

4         And your response was:  She used to, this laptop.

5    That power supply was not working.  It was left in the

6    closet for almost six months.

7         That's what you said, correct?

8    A.  I was referring to the laptop she took, ma'am.

9         MS. YANG:  Thank you.  No further questions.

10        THE COURT:  Anything further, Ms. Berg?

11

12                    **REDIRECT EXAMINATION**

13   BY MS. BERG:

14   Q.  Mohamed, this is Nancy again.

15   A.  Yes, ma'am.

16   Q.  Do you understand why they're questioning your

17   statement that you were using -- the laptop she took with

18   her was the one you were using?

19   A.  I understand.  I say the truth, and the Acer laptop

20   that, that we using, we were using when she was living in

21   Canada, I swear she took it with her, along with her other

22   laptop, and I have to buy another laptop to get my proposal

23   done.

24   Q.  All right.  But you told the police that the Acer

25   laptop wasn't working and was in the closet.  So what

1    laptop were you working on at the time she left and took

2    that laptop with her?  What was it?

3    A.  When she left I didn't have any laptop, but when the

4    police came, a few days before the police came, I purchased

5    the laptop to go to my proposal.

6    Q.  No.  Stop, Mohamed.  That's not what I asked you.

7    A.  Okay.

8    Q.  At the time she left --

9    A.  I had no laptop at all.

10   Q.  Before she left, did you have a laptop?

11   A.  Before she left, we were -- this laptop that you're

12   talking about, it was left in the closet for six months.

13   We back -- it's kind of like, it was, you know --

14   Q.  Mohamed, we understand that.

15   A.  Yes.  We were using the same computer, but it was like

16   on and off.  This computer was like sometime work, sometime

17   does not work.  Kind of like a short circuit inside the

18   laptop.  Sometimes it's connected, we use it.  Sometimes

19   it's not connected, we don't use it.

20   Q.  What was the brand of the computer -- she took two

21   computers with her, correct?

22   A.  Yes.

23   Q.  What were the brands of the two computers?

24   A.  I believe hers was either Toshiba or Sony, and the

25   other computer that we bought using, it was Acer.

1    Q.  All right.

2    A.  An old Acer.

3    Q.  All right.  And were you using her Sony or Toshiba

4    computer for your work?

5    A.  No, because she drop it, and she broke it, and it was

6    like completely 100 percent dead.

7    Q.  Okay.  So am I correct in understanding at the time

8    respondent left, you didn't have a working laptop computer?

9    A.  No, I did not, ma'am.

10            MS. BERG:  All right.  Thank you.

11            THE COURT:  Anything else, Ms. Yang?

12            MS. YANG:  Nothing further.

13            THE COURT:  All right.  Very well.  Let's move on

14    to the next witness, then.

15                    **(Witness excused.)**

16            MS. BERG:  Ms. Kaiser will handle this witness.

17            THE COURT:  Very well.

18            MS. BERG:  Mohamed, go on mute again, please.

19            MR. ALY SAAD ALY:  Yes, please.

20            MS. KAISER:  Your Honor, I would like to call our

21    next witness, Helen Gladkykh.

22            Ms. Gladkykh, are you on the line?

23            MS. GLADKYKH (Via telephone):  Yes, I am.

24            MS. KAISER:  Could you please -- you're going to

25    be sworn in.

1                          **(Witness sworn.)**

2               THE COURT:  Okay.  You may proceed, Ms. Kaiser.

3               MS. KAISER:  Thank you.

4

5                     **HELEN GLADKYKH (Via telephone),**

6     after having been first duly sworn, was examined and

7     testified as follows:

8                          **DIRECT EXAMINATION**

9     BY MS. KAISER:

10    Q.  Ms. Gladkykh, you've stated your name for the record.

11    Could you tell us your occupation?

12    A.  I'm a barrister, solicitor and notary public,

13    practicing in Canada and Ontario.

14    Q.  And I would like to direct you to the report you

15    created for this proceeding.  Do you have it before you?

16    A.  Yes, I have it in front of me.

17    Q.  It is dated October 11th, 2012?

18    A.  Correct.

19               MS. KAISER:  And for the record, Your Honor, it

20    is Petitioner's Exhibit 27.

21               THE COURT:  Okay.

22    BY MS. KAISER:

23    Q.  Ms. Gladkykh, could you please describe to the Court

24    your education and experience as it relates to this report?

25    A.  My educational degrees include a Bachelor of Arts in

1     Administration, Juris Doctorate from the Belarusian State

2     University and LLB, which is Bachelor of Law Degree, from

3     the University of Windsor in Canada, which was converted in

4     2011 to a Juris Doctor Degree.

5             I'm a member in good standing with the Law

6     Society of Upper Canada, Ontario, and I have private law

7     practice in Cambridge, Ontario, and specialize in family

8     law.

9     Q.  Ms. Gladkykh, in this report, you describe the

10    conditions that exist in the province of Ontario, these

11    conditions which exist to protect children and families.

12    Would you please describe -- would you describe Canada as

13    tolerant towards domestic violence?

14    A.  Absolutely not.

15    Q.  Could you please describe for us the family violence

16    initiative that you discuss in your report?

17    A.  The family violence initiative is a long-term

18    commitment of the government of Canada to address violence

19    within the relationship of kinship, intimacy, dependency or

20    child, and there are several government agencies that

21    participate in this initiative.

22            And the Public Health Agency of Canada leads and

23    coordinates this initiative.  This initiative promotes

24    public awareness of the risk and factors associated with

25    family violence, and it works with government research and

1    community partners.  This is a significant federal force to

2    reduce family violence in Canada, and in particular in

3    Ontario.

4         The issue of family violence has been integrated

5    into ongoing programming in many government departments,

6    and so far, we have learned that the best way to address

7    family violence is to support a common vision and advance a

8    coordinated approach.

9    Q.  I was -- could you describe the obligation that Ontario

10   citizens have in reporting child abuse or instances of

11   domestic violence?

12   A.  Section 72 of the Child and Family Services Act

13   provides that despite the provisions of any other act, if a

14   person, including persons which perform professional or

15   official duties with respect to children, but not limited

16   only to professionals, all people have -- who have

17   reasonable grounds to suspect that a child is subject to

18   moral, physical or sexual abuse have positive obligation to

19   report such suspicions and information to the government

20   agencies.

21        And one of the government agencies that deals

22   with such situations is Children and Family Services.

23   Q.  So this obligation extends beyond just professionals?

24   A.  Yes.  This is obligation that extends beyond

25   professionals.  In case of certain professionals, including

1    healthcare providers and teachers and day-care providers,

2    failure to report can lead to criminal prosecution under

3    the criminal code of Canada.

4    Q.  What type of resources are available to the Canadian

5    courts to assist and -- to assist families who maybe

6    experienced domestic violence or where allegations have

7    been brought domestic violence occurred?

8    A.  Victims of family violence in Canada and in particular

9    in Ontario and in Kitchener regions have various resources

10   available to them, and those resources include assistance

11   of police and ambulance services, counseling services,

12   crisis lines and distress centers, house clinics and

13   hospitals, legal assistance, transitional houses, victim

14   services.

15          In addition to that, there are legal sources that

16   are available, which include restraining orders, orders

17   with exclusive possession of the matrimonial home,

18   supervised access and criminal sanctions.

19   Q.  Could you describe what supervised access is?

20   A.  Certainly.  Section 34 of the Children's Law Reform Act

21   provides that where an order is made for custody or access

22   to a child, a court may give such directions as it

23   considers appropriate for the supervision of the custody or

24   access by a person, a children's aid society or other body.

25          The parent seeking the supervision of access has

```
1    the burden of proof that supervision is appropriate, and
2    supervised access can be provided by either a relative or a
3    government body.  There are different types of supervised
4    access, and there are different types of facilities
5    available for supervised access.
6            So in case the Court decides that there is at
7    least a minimal risk of violence towards the child, the
8    Court has obligation to impose supervised access regime on
9    that child so that all the parents could have access to the
10   child only during the supervised time.
11   Q.  In the event that this Court returns the parties'
12   daughter to Canada, what proceedings would be available to
13   respondent or in the event she has safety concerns for her
14   daughter or herself?
15   A.  As the Court is probably aware, the mother of the
16   child, Amal Aden, is the respondent in an ongoing family
17   court proceedings initiated by the father, Mr. Mohamed Aly
18   Saad Aly, and if she returns to Canada, she can fully
19   participate in such court proceedings.
20           And if she wishes and if the Court finds this
21   request reasonable, she can obtain custody order with
22   respect to the child, and she can obtain any other
23   assistance that is available through the Court or through
24   the police or medical services, and all undertakings that
25   are described in my letter dated October 11th would be
```

```
1     available for Ms. Aden to use in Canada and Ontario.

2          MS. KAISER:  Thank you, Ms. Gladkykh.  I have no

3     further questions at this time.

4          THE COURT:  Is there cross-examination?

5          MS. NELSON:  Briefly, Your Honor.  Thank you.

6          THE COURT:  Go right ahead.

7

8                    CROSS-EXAMINATION

9     BY MS. NELSON:

10    Q.  Good morning, Ms. Gladkykh.  My name is Laura Nelson.

11    I'm one of the attorneys for the respondent in this case.

12    A.  Good morning.

13    Q.  Now, it's not your testimony that the Canadian systems

14    are able to prevent all domestic violence in Canada, right?

15    A.  Could you repeat your question?

16    Q.  Sure.  It's not your testimony that the Canadian legal

17    and social services systems are able to prevent all

18    domestic violence in Canada, right?

19    A.  The system in Canada tries to address as many as

20    possible ways to prevent violence in Canada, but I don't

21    know any system in the world that can prevent it totally,

22    including the U. S. system.

23    Q.  So that's a yes, right?  It's not your testimony that

24    the Canadian systems are able to prevent all domestic

25    violence?
```

1    A.  Correct.

2    Q.  And it's not your testimony that the Canadian legal and

3    social systems are able to prevent all child abuse in

4    Canada, right?

5    A.  Correct.  Child abuse exists in all countries in the

6    world, but Canada is --

7    Q.  Okay.  Hold on.

8    A.  -- one of the leading countries --

9    Q.  Ms. Gladkykh?  Ms. Gladkykh?

10            THE COURT:  Just let her finish.  Go ahead.

11   BY MS. NELSON:

12   Q.  Okay.  It is a little difficult because you are on the

13   phone, but I want you just to listen to my question.

14   A.  I am trying to answer your questions as fully as I can.

15   Q.  Okay.  Ms. Gladkykh, you're aware that women have been

16   and continue to be killed by their husbands in Canada,

17   right?

18   A.  There are certain cases, definitely, yes.

19   Q.  And you're aware that children have been and continue

20   to be killed by family members in Canada, right?

21   A.  Correct.  As I said, it's in any country in the world,

22   yes.

23   Q.  Okay.  And if the Ministry of Industries family

24   violence in Canada statistical profile from 2009 showed

25   that over one-third of all solved homicides were committed

 1     by family members in Canada, that wouldn't surprise you?

 2     A.  I'm not familiar with this specific statistic, but I

 3     wouldn't be surprised because family violence exists in any

 4     country, yes.

 5     Q.  And that's just by all of the policies and procedures

 6     that you testified to, right?

 7     A.  Correct.

 8     Q.  Okay.  Now, in writing your letter, you didn't consider

 9     any research into the specific experience of undocumented

10     immigrant domestic violence victims in Canada, did you?

11              MS. BERG:  Objection.  Relevance.

12              THE COURT:  Overruled.

13              THE WITNESS:  I was not asked to provide evidence

14     on that specific issue.

15     BY MS. NELSON:

16     Q.  So that's a no, Ms. Gladkykh?

17     A.  No.

18     Q.  And you didn't consider the implications of a victim

19     not having legal immigration status in Canada?

20     A.  For citizens of the United States, there are not so

21     many limitations, and definitely if immigrant from any

22     country, including the United States, has, is subject to

23     family violence in Canada, all of those undertakings are

24     available to such person, and it doesn't matter whether

25     it's a Canadian citizen or immigrant.

1    Q.  It's true, Ms. Gladkykh, isn't it, that immigrant women

2    who do not have legal status in Canada who are victims of

3    domestic violence can potentially face being detained or

4    deported after calling the police or Social Services,

5    right?

6    A.  If they're illegal immigrants, yes, but not all

7    immigrants are illegal immigrants.

8    Q.  Right.  I'm specifically asking you about immigrants

9    who do not have legal status.  That's correct, right?

10   A.  There is a possibility that they will be deported.  In

11   other cases, they can apply for refugee status in Canada.

12   Q.  Okay.  Ms. Gladkykh, you are Mr. Aly Saad Aly's

13   attorney in Canada for the custody proceedings there,

14   correct?

15   A.  Correct.

16   Q.  And you are being compensated for that work through a

17   Legal Aid certificate, correct?

18   A.  Correct.

19   Q.  And you're not licensed to practice law in Minnesota,

20   right?

21   A.  No.

22   Q.  So if this Court denies Mr. Aly Saad Aly's petition and

23   further custody proceedings are here in Minnesota, you

24   wouldn't be able to represent him in those proceedings,

25   right?

1   A.  I have no authorization to practice in the United

2   States.

3           MS. NELSON:  Thank you, Ms. Gladkykh.  No further

4   questions.

5           THE COURT:  Anything else, Ms. Kaiser?

6

7                    **REDIRECT EXAMINATION**

8   BY MS. KAISER:

9   Q.  Ms. Gladkykh, my final question for you:  Do you agree

10  with respondent's theory of the case, which is that

11  prevention of child abuse is best dealt with by child

12  abduction?

13          MS. NELSON:  Objection, Your Honor.

14          THE WITNESS:  Absolutely not.

15          THE COURT:  Just a moment.  I'm sorry.  Objection

16  basis?

17          MS. NELSON:  Excuse me.  This goes beyond the

18  scope of her report.  It's not a disclosed opinion, and

19  it's not a fair, accurate or credible recitation of the

20  facts.

21          THE COURT:  I'm not sure it has much value, but

22  I'll overrule the objection.

23          Go ahead.  You may answer the question.

24          THE WITNESS:  Thank you, Your Honor.

25          Child abduction is, should not be the way of

1  dealing with legal problems.  The child's residence was in

2  Canada, and this was the proper venue of deciding the case

3  and any issues that the applicant and respondent had with

4  respect to the child.

5          MS. KAISER:  Thank you, Ms. Gladkykh.  I have no

6  further questions.

7          THE COURT:  Anything else, Ms. Nelson?

8          MS. NELSON:  Nothing further, Your Honor.

9          THE COURT:  Okay.  Very well.

10         Thank you, Ms. Gladkykh.  We're done with you.

11         THE WITNESS:  Thank you, Your Honor.

12                      **(Witness excused.)**

13         THE COURT:  Okay.  Next witness?

14         MS. YANG:  I call Jeffrey Edleson, who I suspect

15  may be --

16         MR. SWENSON:  I think there may be --

17         MR. EDELSON (Via telephone):  Yes, I'm on the

18  phone.

19         MS. BERG:  All right.  Just a minute,

20  Mr. Edleson.

21         Dalia, are you on the line?

22         MR. ALY SAAD ALY:  She's supposed to be there in

23  five minutes, ma'am.

24         MS. BERG:  Oh, in five minutes.  All right.  We

25  told her 10:15.

1            THE COURT:  Okay.  So who do you want to proceed

2      with now?

3            MS. BERG:  Let's see if we can get her on right

4      now.

5            THE COURT:  Okay.

6            MS. BERG:  Mohamed, Jen is going to see if she

7      can get her on right now.

8            MR. ALY SAAD ALY:  Yes, she will be -- she might

9      be able to get now.

10           MS. BERG:  Mohamed, would you send her a message

11     to get on the phone?

12           MR. ALY SAAD ALY:  I did, ma'am.  I just did.

13           MS. BERG:  Okay.  Good.  Whoever is typing,

14     please put it on mute.

15                        **(Pause.)**

16

17                     **(In open court.)**

18           THE COURT:  Since we're still waiting, why don't

19     we take about a five-minute break here and take our break

20     now rather than in about 15, 20 minutes when I planned.

21     Okay?

22           MS. BERG:  My apologies.

23           MR. ALY SAAD ALY:  Thanks, sir.

24           THE CLERK:  All rise.

25                     **(Recess taken.)**

1           **(In open court.)**

2           THE COURT:  Okay.  Do we have the next witness on

3   the phone yet?

4           You may be seated.

5           MS. BERG:  We had her, and then we asked her to

6   call back because of the background buzz.  They're all

7   using calling cards, so that's what is slowing things down.

8   This is a five-minute witness.

9           If you want to go ahead with Edleson, and if we

10  can interrupt?

11          THE COURT:  Let's do that.

12          MS. YANG:  I call Jeffrey Edleson.

13          Dr. Edelson, are you on the phone?

14          MR. EDELSON (Via telephone):  I am on the phone.

15          MS. YANG:  This is Andrea Yang.

16          MR. EDELSON:  Hi, Andrea.

17          THE COURT:  All right.  Just a moment.

18          **(Witness sworn.)**

19          THE COURT:  Okay, Ms. Yang.  You may proceed.

20          MS. YANG:  In the interests of time, counsel for

21  petitioner have agreed to the qualifications of

22  Dr. Edelson, and so we would offer to that extent exhibits,

23  Respondent's Exhibit 42, which is a curriculum vitae, and

24  Respondent's Exhibit 43, a biographical sketch, into

25  evidence.

1          THE COURT:  Any objection?

2          MS. BERG:  Yes, Your Honor.  Again, we renew our

3    objection.  This testimony is speculative, and it is not

4    grounded in fact.  It is founded on stories told by

5    respondent, and we would move to exclude.

6          THE COURT:  All right.  I'm going to overrule the

7    objection.  42 and 43 are admitted, and you may proceed,

8    Ms. Yang.

9          MS. YANG:  Thank you.

10

11             **JEFFREY EDELSON (Via telephone),**

12    after having been first duly, was examined and testified as

13    follows:

14                    **DIRECT EXAMINATION**

15    BY MS. YANG:

16    Q.  Dr. Edelson, have you been retained to reach an expert

17    opinion in this case?

18    A.  I've been retained, but I am not being paid.

19          MS. BERG:  Your Honor, if I could request.  I

20    have great difficulty hearing Ms. Yang.  I'm not sure if

21    her voice is soft.

22          THE COURT:  Move the other microphone down.

23          MS. MOTALEB (Via telephone):  Hello?

24          MS. BERG:  Dalia, we had to go ahead and start.

25    What do you want me to do?  We're going to have this

1    background buzz.

2              THE COURT:  She is a short witness?

3              MS. BERG:  Short witness.

4              THE COURT:  Let's take care of her.  I'm sorry,

5    Mr. Edelson.  We're going to put you on hold for less than

6    five minutes.

7              MR. EDELSON:  Thank you.  I will put my phone on

8    hold.

9              THE COURT:  We need to have the new witness sworn

10   in.

11             Why don't you officially call her, Ms. Berg?

12             MS. BERG:  At this time, petitioner calls Dalia

13   Motaleb.

14             THE COURT:  Okay.  Just a moment.

15                        **(Witness sworn.)**

16             THE COURT:  All right.  You may proceed,

17   Ms. Berg.

18

19                  **DALIA MOTALEB (Via telephone),**

20   after having been first duly sworn, was examined and

21   testified as follows:

22                     **DIRECT EXAMINATION**

23   BY MS. BERG:

24   Q.  Ms. Motaleb, do you know the parties in this

25   proceeding?

1    A.  I know one of the party, yes.

2    Q.  And is that Mohamed?

3    A.  Yes.

4    Q.  How long have you known him?

5    A.  Since 2008.

6    Q.  And have you ever met Ms. Aden?

7    A.  I have not.

8    Q.  Okay.  Did you have occasion in June of 2012 to be

9    present at Mr. Aly Saad Aly's home during a telephone

10   conversation he had with his wife?

11   A.  Yes.

12   Q.  And did you hear that conversation?

13   A.  I did.

14   Q.  Why did you hear the conversation?  How were you able

15   to hear the conversation?

16   A.  The phone rang, and Mohamed was looking for the headset

17   which wasn't attached to the base, and so he was looking

18   around his apartment and he couldn't find the headset, but

19   then he came back to the base and just put the speaker on.

20   Q.  And do you know who was on the other end of the line?

21   A.  It was a woman who identified herself as Amal.

22   Q.  And can you tell us the substance of the conversation?

23   A.  The conversation went something like, the woman on the

24   other line said hi, Mohamed this is or salaam, Mohamed,

25   this is Amal.

1          Mohamed said, how are you and Hafsah.  She said

2     fine.  Then she went to say we, and I didn't understand

3     what she was talking about, but she said, we have

4     communicated before.  I'm not trying to trick you.  I only

5     did the police protection because the police came to my

6     door, and I can't afford to have the police come to my door

7     often.

8          And in response Mohamed said, you took away, you

9     took away my daughter, so expect the police to come more

10    often.  Then she got upset and said something, and Mohamed

11    hung up the phone.

12    Q.  Okay.

13          Thank you, I have nothing further.

14          THE COURT:  Cross-examination?

15

16                    **CROSS-EXAMINATION**

17    BY MR. SWENSON:

18    Q.  Ms. Motaleb, this is David Swenson.  Can you tell me

19    what language was Amal speaking when she made the phone

20    call at that time?

21    A.  English.

22    Q.  So she was not speaking Arabic.  Is that your

23    testimony?

24    A.  Yes.

25    Q.  And so the conclusion of the telephone call you heard

1    was Mohamed threatening Amal that he was going to send the

2    police to her again, is that correct?

3    A.  No.

4    Q.  I'm sorry.  Wasn't it your testimony that the police

5    would be visiting her again if she didn't return the child?

6    A.  He made a statement, I believe.

7    Q.  So it was a statement, not a threat?

8    A.  Right.

9           MR. SWENSON:  Okay.  Thank you.  No further

10   questions.

11          MS. BERG:  Nothing -- nothing further.

12          THE COURT:  Okay.  Thank you, Ms. Motaleb.  We're

13   done with you, so you can hang up now.  Thank you very

14   much.

15          THE WITNESS:  You're welcome.  Bye.

16                **(Witness excused.)**

17          THE COURT:  We'll return now to Mr. Edelson.

18          Are you still on the phone?

19          MR. EDELSON:  I am now, Your Honor.

20          THE COURT:  Okay.

21          MR. EDELSON:  Can you hear me clearly?

22          THE COURT:  Yes, we can hear you just fine, and

23   Ms. Yang will question you now.

24          MR. EDELSON:  Okay.

25

1              **JEFFREY EDELSON (Via telephone),**

2      after having been previously duly sworn, was examined and

3      testified as follows:

4              **DIRECT EXAMINATION (Resumed)**

5      BY MS. YANG:

6      Q.  Dr. Edelson, how are you familiar with the specific

7      facts of this case?

8      A.  Well, I've read through most of the documents.  I have

9      four, five volumes here in my office and Mr. Aly Saad Aly's

10     petition and the supporting affidavit.  I have read Mrs. --

11     Ms. Aden's counter petition, the protection order from

12     Anoka County.

13     Q.  And for the protection order from Anoka County, which

14     one are you referring to?

15     A.  The one I see is June 6th, 2012.

16     Q.  And that's the one that Ms. Aden sought against Mr. Aly

17     Saad Aly, correct?

18     A.   True.  Yes.  And then the order for protection granted

19     to Nora Roundtree in Louisiana in January of 2002.  I also

20     interviewed Ms. Aden last month in October.  I did not

21     interview the child, the infant, because she is too young

22     really to interview, and I did listen to expert

23     testimony -- to the Aly Saad Aly, Mohamed Aly Saad Aly's

24     testimony yesterday and his mother's testimony and then

25     this morning the testimony starting at 10:00 a.m. your

1      time.

2      Q.  And, Dr. Edelson, did you review any police records in

3      connection with this case?

4           MS. BERG:  Objection, Your Honor.  May I voir

5      dire Mr. Edelson briefly?  He testified that he listened to

6      Aly Saad Aly's testimony yesterday.  It's our understanding

7      that he did not.

8           MR. EDELSON:  I was --

9           THE COURT:  Just a moment.  I think he listened

10     to part of it, but you may ask him a question about that,

11     Ms. Berg.

12

13                   **VOIR DIRE EXAMINATION**

14     BY MS. BERG:

15     Q.  Mr. Edelson, what time did you call in?

16     A.  Let me look at my schedule.  It was right after your

17     lunch break when he testified about police, three different

18     police events.

19     Q.  So you did not hear any of the testimony during the

20     morning?

21     A.  I heard some before that, but probably not all of it.

22     Correct.

23           MS. BERG:  Thank you.

24           THE COURT:  Okay.  Go ahead.

25           MS. YANG:  Thank you.

1            **DIRECT EXAMINATION (Resumed)**

2    BY MS. YANG:

3    Q.  Dr. Edelson, after reviewing these materials and

4    listening to the testimony you described, have you formed

5    any opinions related to this case?

6    A.  Yes, I have, and I do believe that there is a grave

7    risk of physical harm and psychological harm to the infant

8    child involved in this case.

9            MS. BERG:  Objection.  Lack of foundation.

10           THE WITNESS:  Should she be returned --

11           THE COURT:  Just a moment, Mr. Edelson.

12           THE WITNESS:  Okay.  Sorry.

13           THE COURT:  Go ahead, Ms. Berg.

14           MS. BERG:  Your Honor, we object to the

15    expounding of an opinion at this point.  There is no

16    foundation that he has relied on credible information in

17    forming this opinion.

18           THE COURT:  Okay.  Well, I'm going to overrule

19    the objection.  I will allow him to state his opinions, and

20    obviously those issues are issues for cross-examination.

21           Go ahead.

22    BY MS. YANG:

23    Q.  Dr. Edelson, are your opinions contained in an expert

24    report labeled Respondent Exhibit 41?

25    A.  Yes.

1           MS. YANG:  Your Honor, we offer Respondent's

2     Exhibit 41 into evidence.

3           MS. BERG:  Previous objections as noted.

4           THE COURT:  Very well.  Exhibit 41 is admitted.

5     Objection is overruled.

6     BY MS. YANG:

7     Q.  Dr. Edelson, are there any risk factors in this case

8     that lead you to your conclusions today?

9     A.  Well, I think there is four major risk factors that I

10    see in the record here.  One is the prior record of

11    violence as documented in police reports, both in Canada,

12    in the restraining order filing in Anoka County and then in

13    the restraining order for the prior wife in Louisiana, so

14    evidence of prior violence.

15          Again, Mr. Aly Saad Aly's threat, alleged threat

16    to kill Ms. Aden, their estrangement which is a key factor

17    in future danger, and I can talk more about that.  And then

18    I put all of this in a context of what I would -- what's

19    been labeled in the scholarly literature as coercive

20    control, but it's a pattern of coercive behaviors.

21          And there are a number of other behaviors in

22    addition to the prior violence, the threats to kill and

23    estrangement that together add up to a, for me, a very

24    dangerous situation for both Ms. Aden and the infant

25    involved in this case.

1    Q.  And, Dr. Edelson, the prior violence, the threat to

2    kill, the estrangement and the coercive control factors,

3    what are these factors based on?  Are there studies?

4    A.  Yeah.  There are many studies, and I believe those are

5    in one of the exhibit books.  In particular, I rely a lot

6    on Jaclyn Campbell's work.  Jackie Campbell is an endowed

7    professor at Johns Hopkins University, and she is a member

8    of the Institute of Medicine, which is an honorific and

9    scientific society, a national society.

10              And she is really the international expert on

11   intimate partner homicide and has studied what she calls

12   femicide, the killing of women partners in intimate

13   relationships, and in particular her classic study in 2003

14   that looked at partner homicides and key factors in

15   predicting those homicides.

16              I also base it on my own work with -- on the

17   Hague Convention and domestic violence cases where the

18   Hague Convention was invoked, and I have a new book that

19   will be out.  It's actually not listed in the materials

20   here, but it is in my CV, a new book that will be out this

21   month that is a study funded by the Natural Institute of

22   Justice.

23              I believe the report is in the exhibits.  That is

24   the first national study of domestic violence cases that

25   involved international child abduction and were Hague cases

1    in U. S. courts in the U. S., and then also on some

2    European studies and in particular the book by Evan Stark

3    on coercive control and some of the work by Mary Ann Dutton

4    on coercive control.

5    Q.  Now I would like to talk about the first risk factor

6    you addressed, that of prior violence.

7    A.  Yes.

8    Q.  Why is prior violence important to consider?

9    A.  Well, prior violence is very important to consider

10   because if you look in particular at Dr. Campbell's 2003

11   study, she found that prior violence was a key risk factor

12   for future violence, and that runs through the literature.

13        But in particular, prior violence increased

14   dramatically, the likelihood of future violence increased

15   dramatically if prior violence had occurred in the

16   relationship, and that's somewhat logical.  Also, if there

17   were threats to kill, the likelihood of future violence and

18   even femicide, homicide, increased by two and a half times.

19        So there is a fair amount of evidence, not only

20   in Dr. Campbell's work but others', that prior violence is

21   probably the key predictor of future violence.

22   Q.  Dr. Edelson, how did you apply the prior violence risk

23   factor in this particular case?

24   A.  Well, I mean, my understanding of the case from what I

25   saw in the record from Nora Roundtree from Louisiana that

1   there was, you know, physical abuse of her, punishment of

2   her by squeezing her jaw, withholding -- and then there was

3   coercive control as well, threatening to take away her

4   baby, threats against her, she would be sorry later, and

5   punched her and -- punched her when she would not wake up

6   and tend to his needs.

7          So there were sort of multiple incidents in Nora

8   Roundtree's record of prior violence against a prior

9   partner, and that would be a concern, too, that this is not

10  just in one instance, but it's a serial set of instances

11  across relationships.  So I would be concerned in that

12  case.

13  Q.  And how about in the context of Ms. Aden and her

14  daughter?

15  A.  Yes, and Ms. Aden and her daughter, you know, there are

16  several incidents that are documented in the record:  April

17  of 2012, July of 2011, February of 2011, and the end of

18  2010, so going back to 2010 first.  And it's really

19  interesting that the, when she tells him that she wants to

20  leave, that's one of the most severe violent events.

21          He slaps her several times in the face, smashes

22  and destroys things in the house, other belongings, cell

23  phone, laptop and the like.  Then moving up to February,

24  there was another incident, and this is a particular

25  concern for me that she was already pregnant at this time,

1    when she is telling him she wants to leave, and he strikes

2    her in the stomach with his knee, and of course this is

3    alleged by Amal, and pushes her onto the bed and holds her

4    down and hits her in the head.

5            Another one in July of 2011 and then another one

6    in April of 2012, and one of -- in April of 2012, he

7    actually picks up, picked up the infant, and at least by

8    Amal's allegation, throws her across the room and then beat

9    Amal in the presence of the child, kicked and punched her

10   from Amal's testimony.

11           And so I, you know, I would be very concerned.

12   This is sort of the center of my research for the last 20

13   years is focused on the co-occurrence of domestic violence

14   against adults and child abuse against children in the same

15   families, and what we find in over 20 years of research,

16   really 25 years of research, is there is a great

17   co-occurrence of physical abuse against multiple family

18   members, against mothers and children in the same families.

19           And so I would say that the record of abuse

20   against Ms. Aden and then the involvement of the daughter

21   at least on two of these instances, one in the kicking of

22   her stomach when she is in her first trimester and then

23   grabbing the child and throwing her across the room and

24   then beating a mother in front of the child, and I think

25   the mother, Ms. Aden, testifies in her documents that the

1    child was hysterical for a long period of time after that

2    event, that I would say that that is great concern that

3    this child would be exposed to future, grave risk of

4    future, both physical and even more importantly

5    psychological violence going forward in this case.

6    Q.  Thank you.  Go ahead.

7    A.  Yeah.  No.  I think that's enough.  If you want to ask

8    me anything, go ahead.

9    Q.  I do.  Dr. Edelson, I want to talk about the second

10   risk factor, that of the threat to kill.

11   A.  Mm-hmm (Yes).

12   Q.  Why are threats to kill important to consider?

13   A.  Well, again, going back to Dr. Campbell's research,

14   threats to kill increase the likelihood by 2.6 times that

15   the mother or the woman would be killed, and so -- compared

16   to abused women who are not killed.  So just threats to

17   kill is a key lethality factor in the research and the

18   concern that many clinicians and researchers would have if

19   that's present in a case.

20        And I guess I would put this in the context of

21   another factor that we may talk about, estrangement, but

22   the early research from Donald Dutton at the University of

23   British Columbia show that men who batter their partners

24   when presented with various vignettes that they, the ones

25   in which they escalated the most rapidly were ones in which

1        the women were saying they wanted to leave.

2               And logically and the interpretation of that

3        research is that when men are, when their current

4        controlling, coercive controlling behaviors aren't working

5        and the partner is pulling away and trying to leave that

6        they escalate their tactics, and that's where threats to

7        kill and other kinds of extreme violence happen.

8               In fact, over 55 percent of the women who are

9        killed by intimate partners each year based on FBI data

10       shows that those women are estranged from their partners,

11       not living with them at the time of their death.  So I

12       think this wraps, you know, the threat to kill sort of

13       wraps around with the idea of estrangement that Ms. Aden is

14       moving away from Mr. Aly Saad Aly.

15              And as she emotionally and physically tries to

16       move away from him, he escalates his behavior, and that's

17       pretty classic and pretty common in the literature on

18       domestic violence and abuse.  So I think his behavior does

19       show greater risk of harm to, potential harm to Ms. Aden,

20       as well as to the infant in this case.

21       Q.  And so in the context of threat to kill as well as

22       estrangement, what are the specifics in this particular

23       case that trouble you?

24       A.  Well, I mean, I think the specifics of all of this are

25       that they happen in an escalating -- from reading the

1    documentation in this case and from talking to Ms. Aden,

2    interviewing her and listening to the portions of testimony

3    that I've listened to, my concern is that there is evidence

4    of escalating violence in this relationship, that Ms. Aden

5    pulls away because of that violence, and then Mr. Aly Saad

6    Aly escalates his violence, which is a classic --

7             Unfortunately, it represents a very common

8    experience as greater danger is introduced and more risky

9    behaviors are committed by the perpetrator of violence, and

10   it does raise some lethality concerns for me of Ms. Aden's

11   safety and that of her child.

12   Q.  So, Dr. Edelson, estrangement, generally speaking, is a

13   strong predictor of future violence.  Is that what you're

14   saying?

15   A.  Yes.  Absolutely, yes.  In Jackie Campbell's research,

16   I believe that it increased the likelihood of femicide, of

17   homicide against the woman, by three-point -- more than

18   three times, and also going back to Donald Dutton's early

19   research in this area that estrangement was probably the --

20   when a woman moved away from the abusive partner, that was

21   the situation in which the partners escalated their

22   violence most rapidly and were most likely to use violence

23   against their partner again in the future.

24             So that estrangement, both on the lethality side

25   as well as on what we know about what escalates men who

1    batter, in research for me is represented in this case by

2    both.  As Ms. Aden says she wants to leave is when the

3    violence starts to escalate, and the threats tend to

4    escalate after that point as well in this relationship.

5         So I think estrangement is a strong predictor of

6    future violence, as well as potential homicide, and I do

7    think in this case it is evident here that Mr. Aly Saad Aly

8    is escalating his violence as she makes efforts to protect

9    herself and her child and leave the relationship.

10   Q.  And, Dr. Edelson, is estrangement also a strong

11   predictor of future psychological harm?

12   A.  Well, certainly Mr. Aly Saad Aly may be trying to

13   continue using other coercive behaviors in addition to the

14   threat to kill that we have there, but I would be concerned

15   that not only for Ms. Aden, but for the infant, that should

16   they be returned -- should the infant be returned to Canada

17   and if Ms. Aden followed the child, I would be concerned

18   that there would not only be future risk of exposure to

19   Ms. Aden of physical violence and also the child, but also

20   that the child may be exposed to the violence against the

21   mother and threats against the mother and that that would

22   represent a risk of psychological harm to the infant in the

23   future.

24   Q.  Now, finally, I would like to discuss coercive control

25   that you mentioned earlier.

1    A.  Yes.

2    Q.  Based on the materials that you've reviewed and what

3    you have heard in court in this particular case, how would

4    you characterize petitioner's relationship with Ms. Aden?

5    A.  Well, coercive control is a term that's been defined

6    probably in the last seven or eight years in the

7    literature.  Both Mary Ann Dutton from Georgetown

8    University and Evan Stark, who wrote a classic book on that

9    about five years ago from Rutgers University, the two of

10   them have worked to redefine and -- redefine domestic

11   violence as a violence that occurs in a context and a

12   pattern of ongoing coercion by one partner towards the

13   other.

14        And in fact, this has gained wide acceptance to

15   the point that the United Kingdom has accepted it as a

16   definition in their child welfare system and applied it

17   broadly across the country and in the UK, and it's being

18   applied more broadly in the U. S. now as well.

19        But the idea that there are a variety of

20   instances in this case record where Mr. Aly Saad Aly is

21   manipulating and controlling her access to others,

22   isolating Ms. Aden from family and friends, interrupting

23   her relationships with them, withholding on several

24   occasion travel documents, which if you look in the

25   National Institute of Justice report on Hague Convention

1    cases that we, the study that we did, that many of the men

2    in fact did do that as a way of controlling their partner's

3    movement.

4         You know, all of this happens within a context of

5    him monitoring her on a regular basis.  So when she is at a

6    friend's house, I think there is someplace in there in the

7    record that he repeatedly called her, asked her to leave,

8    come back, just when she was on a visit to a friend's

9    house.

10        There is also allegations in the record that he

11   hacked into her e-mail, her social media, other Internet

12   accounts, posed as her, and tried to undermine her ability

13   to gain employment in one case, and also erased her e-mail

14   so that she would not be able to access them and connect

15   with other people that had written to her.

16        So I do think that there is a lot of record here

17   about coercive control and that the violence and threats to

18   kill happen within the context of a larger set of behaviors

19   that together make me very concerned, not just for

20   Ms. Aden, but for the child's psychological well-being.

21        And that's where I come to a conclusion that this

22   infant is at grave risk of not only psychological harm in

23   the future, but because of the co-occurrence of violence in

24   families and the allegations that Mr. Aly Saad Aly on two

25   occasions tried to harm the child, once when the child was

1    in -- was a fetus and once again threw the child across the

2    room in one of the incidents in Canada, that I would be

3    very concerned for and believe that there is a grave risk

4    to the infant if returned to Canada.

5            Even if returned and in Ms. Aden's custody, I

6    would be concerned about Mr. Aly Saad Aly's ability to

7    perpetrate violence against both the mother and the child.

8    Q.  Dr. Edelson, in reviewing the materials, are you aware

9    of any allegations regarding female genital mutilation in

10   this particular case?

11   A.  I believe there are.  I'm not an expert in that area,

12   so I did not focus on those.

13   Q.  If those allegations are true, how would that factor

14   into your analysis of grave risk?

15   A.  Well, again --

16           MS. BERG:  Objection, Your Honor.

17           THE COURT:  Just a moment.  Mr. Edelson, just a

18   moment.

19           Go ahead.

20           MS. BERG:  He has already testified he doesn't

21   have expertise in this area.  They have already produced

22   their own witness on this topic, so this is just piling on.

23   It's irrelevant.

24           THE COURT:  What is the basis for asking him this

25   question, Ms. Yang?

1          MS. YANG:  I'm just curious as to Dr. Edelson's

2    opinion as to how allegations of female genital cutting

3    would factor into his analysis of grave risk.

4          THE COURT:  Well, you better establish some

5    foundation that he has, he has some expertise in the

6    matter.

7          MS. YANG:  I think he has already commented that

8    he is not an expert on female genital cutting.

9          THE COURT:  Okay.  Then let's go on to another

10   question.

11         THE WITNESS:  Yeah.  I would prefer not to

12   testify on that since I am not an expert on that.

13         MS. YANG:  That's fine.

14         Thank you, Dr. Edelson.

15         THE WITNESS:  Thank you.

16         THE COURT:  Cross-examination?

17         MS. BERG:  Thank you, Your Honor.

18         THE WITNESS:  Nancy, can you hear me okay?

19         MS. BERG:  Yes, I can.

20

21                    **CROSS-EXAMINATION**

22   BY MS. BERG:

23   Q.  Good morning.  How are you?

24   A.  Good morning.  Good.

25   Q.  Good.  You interviewed Ms. Aden over the phone, is that

1    correct?

2    A.  I did.

3    Q.  And in your experience, do in-person interviews permit

4    you greater ability to assess credibility than telephone

5    interviews?

6    A.  It would be nice to have nonverbal cues, and, you know,

7    that's one of the hard parts for me also testifying by

8    phone here and listening to so many phone testimonies in

9    this case.  I think it is harder to read the nonverbal

10   cues, but I did find Ms. Aden credible in the information

11   she gave me, and it was consistent with other information

12   in the case.

13   Q.  Did Ms. Aden tell you that she had two separate bank

14   accounts which were not joint with Mr. Aly Saad Aly?

15   A.  I have no knowledge of her finances.

16   Q.  Well, you testified that Mr. Aly Saad Aly was exerting

17   coercive control through financial means.

18   A.  Yes.

19   Q.  So is that not correct?

20   A.  No.  That's -- he was exerting control by withholding

21   her travel documents.

22   Q.  Well, I'm not talking about --

23   A.  Can you point to that in my testimony?

24   Q.  I'm looking at -- I'm sorry.  I'm confused now.

25        Are you talking about travel documents or

1    financial control?

2    A.  You were asking about financial control, and I

3    testified that he is withholding, that he was withholding

4    her travel documents.

5    Q.  I believe --

6    A.  Do you want to point me to that in my testimony?

7    Q.  No.  I will point you to it in your expert report.

8    A.  Yeah.  That's what I mean.

9    Q.  Page 41 through 43.

10   A.  There are a lot of documents in this case.

11   Q.  Yeah, there are.

12   A.  Oh, yes.  You're right.  She did talk to me about,

13   about her earnings and that he was, he was -- she was

14   working -- she had a very tough work schedule, actually.  I

15   do remember that and --

16   Q.  Mr. Edelson --

17   A.  And he was asking her, he took control of the earnings

18   from her nursing job.

19   Q.  Well, Mr. Edelson, that's simply not believable since

20   she was working in New York, had a New York bank account,

21   non joint --

22   A.  New York was just across the border from --

23              THE COURT:  Just a moment.  Just a moment.  We've

24   got -- we can't talk over each other.

25              THE WITNESS:  All right.

1             THE COURT:  So let's wait until the question is

2     done.

3             THE WITNESS:  Okay, Judge.

4             THE COURT:  And the questioner should wait until

5     the person on the phone is done.  Okay?

6             Now go ahead with a new question.

7     BY MS. BERG:

8     Q.  Mr. Edelson, Mr. Aly does not have the ability to

9     travel to the United States.  It was a non joint account

10    where her paycheck was deposited in her name alone.  So did

11    Ms. --

12    A.  Are you asking me --

13    Q.  Did Ms. Aden lie to you?

14    A.  No, she didn't.  I don't believe she did.  What I

15    understood is that the hospital is just across the border

16    and that she was commuting to that from their joint

17    residence.  Is that incorrect?

18    Q.  I don't understand what that has to do with whether or

19    not she had her own independent funds.

20    A.  My understanding is that she was working at the

21    hospital in New York while living in Canada in their joint

22    residence.

23    Q.  Correct.

24    A.  Yes, and that he took control of those finances.  It

25    may have been an American account.  It may have been a

1    Canadian account or she may have transferred funds.  I

2    don't know the records of the bank account.  It is quite

3    common that people take control of accounts or even

4    coercively pressure their partners to make transfers from

5    one account, from their paycheck to a joint account or a

6    solely owned account by the husband.

7    Q.  So if we have no evidence of that sort of conduct, then

8    that would be a lie, is that correct?

9    A.  No, it wouldn't be a lie.  It just would mean that you

10   don't have any evidence of whether that occurred or not.

11   Q.  So regardless of what evidence is produced that Mr. Aly

12   Saad Aly did not have access to these funds, you wouldn't

13   believe it, is that correct?

14   A.  I -- what I heard was the, in the interview with

15   Ms. Aden that he had taken control of her paychecks --

16   Q.  Did she --

17   A.  -- from that hospital work.

18   Q.  Did she tell you that she used her funds to send money

19   to her family?

20   A.  No, she didn't, but that is quite common among migrant

21   workers, immigrant workers.

22   Q.  Were you aware that she had a Minnesota checking

23   account in which the funds from the rental of her town home

24   were deposited and that Mr. Aly Saad Aly had no access to

25   that account?

1    A.  No.  I was aware that she had a town home in Minnesota

2    and that it was rented, but I had no knowledge of where

3    those funds went.

4    Q.  Interestingly, we compared your report in this case

5    with the case we had last spring, the Acosta matter.

6    A.  Mm-hmm (Yes).

7    Q.  And I'm wondering if you can explain why the language

8    concerning economic control is identical in both of your

9    reports.  Did you just cut and paste?

10   A.  The economic control?

11   Q.  Yes.

12   A.  Well, I'm basing it on the scholarly research in that

13   area, and so I am, yeah, I'm probably rewriting and using

14   some of the text.  You know, I don't get the point.

15   Q.  Okay.  Now --

16   A.  I --

17   Q.  There is no question before you.  Were you aware that

18   the OFP, the order for protection, that Ms. Aden obtained

19   in Minneapolis -- or I'm sorry -- in Anoka was obtained

20   only after she learned that Mr. Aly Saad Aly was pursuing

21   the return of his daughter?

22   A.  I don't know the sequence of him filing the Hague

23   petition.

24   Q.  Are you aware that he was never served with the OFP,

25   and therefore it was obtained ex parte without contest?

1    A.  I did see the record of that, that they could not serve

2    it on him in Canada.

3    Q.  Would you agree with me that a --

4    A.  They tried multiple times.

5    Q.  Would you agree with me that an OFP obtained solely

6    based on an ex parte affidavit has not been tested for

7    credibility?

8    A.  No.  I believe the Court issues those based on their

9    understanding of the case and their understanding of the

10   credibility of the person who is filing the OFP.

11   Q.  And are you aware that the order for protection

12   obtained by Ms. Roundtree over ten years ago was also never

13   served on Mr. Aly Saad Aly?

14   A.  I don't know that there was a record of whether that

15   was attempted to be served or not or received.  I do

16   believe, though, that two different courts in two different

17   states were concerned about the safety of the women in

18   those cases and the children and did issue a protection

19   order out of that concern, so --

20   Q.  And in both cases Mr. Aly Saad Aly was not served, had

21   never appeared in the proceedings and had not had an

22   opportunity to contest the issuance of the order, is that

23   correct?

24   A.  I believe that he -- there were attempts, multiple

25   attempts to serve him.  Should he not have received that, I

1     don't know.

2     Q.  Now, are you aware that Ms. Aden received advice and

3     counseling from the Ontario Domestic Abuse Services when

4     she -- after the February 2011 incident?

5     A.  I'm not aware of it, but I would hope she did.

6     Q.  Well, it was attached to her verified -- her answer.

7     A.  Yeah.  I didn't see that.

8     Q.  You didn't see that?

9     A.  I'm glad she did.  I'm glad she did.

10    Q.  Now, and then two months later, they married?

11    A.  Mm-hmm.  Yeah.

12    Q.  And that incident in which she went to the domestic

13    abuse unit in Ontario was the one where there was a police

14    report which if you read it clearly indicated the police

15    felt there was no domestic violence and that neither party

16    was believable.

17             Did you read that report from February 27?

18    A.  Can you point out -- can you point -- which one is

19    that?

20    Q.  The February 27, 2011.

21    A.  Which exhibit is that?

22    Q.  It's Exhibit 75.

23    A.  Can you point to the exhibit for me?

24    Q.  Yes.  It's exhibit --

25    A.  I have four volumes here of exhibits so --

1    Q.  Exhibit 75 of respondent.

2    A.  Okay.  Hold on one second while I get that volume.  I

3    have Exhibit 75 is Mr. Mohamed Aly.  This is court

4    document.  Kimberly Nunez?  Do you want to point to the

5    page that you're speaking about?  This is the Waterloo

6    Regional Police.

7            Is that the one you're referring to.

8    Q.  Please don't talk until there is a question because

9    then we are talking over each other.

10   A.  Okay.

11   Q.  On the lower right-hand corner, it would be Aden 00110.

12   A.  No.  I have Aden 00 -- oh, okay.  Looking back.  Okay.

13   Almost there.

14   Q.  I'm sorry.  It's 108.

15   A.  Two pages back?

16   Q.  Aden 00108 of Exhibit 75.

17   A.  Yes.

18   Q.  Do you have it?

19   A.  Yeah.

20   Q.  Take a moment to read that page and the following page

21   109.  Let us know when you have completed your review.

22   A.  Mm-hmm.  Go ahead.  I've read this, but I have read a

23   lot of documents.  I'm ready.  I'm waiting for you to ask a

24   question.

25   Q.  All right.  Now, it's pretty clear the police felt

1     neither one of the parties was credible regarding whatever

2     happened in this incident, is that right?

3     A.  No, I don't believe that.  The police factually report

4     what they receive from both Mohamed and Amal in this case,

5     and Amal called from St. Mary's Hospital later.

6     Q.  And the police in their credibility assessment report

7     at the top of page 109, Amal had no visible signs of injury

8     and neither did Mohamed.

9     A.  That is true.

10    Q.  Right?

11    A.  That is true.

12    Q.  And --

13    A.  Two paragraphs down, yep.

14    Q.  And --

15    A.  Sorry.

16    Q.  And Captain Reitzel --

17    A.  Mm-hmm (Yes).

18    Q.  -- reports that she says her fingers are broken.  Yet

19    he observes her packing her suitcase, is that right?

20    A.  Well, this is 18:00 hours, so it was later that I

21    believe it was reported, and she went to the hospital to

22    get x-rays.

23    Q.  Yeah.

24    A.  That's how I understood the statement.

25    Q.  Okay.  So -- and she received information from the

1    Domestic Violence Center in Ontario.  Yet, she never filed

2    an order for protection.  No charges were filed by the

3    police.

4    A.  Where do you see the Ontario?  I don't see that in this

5    report, the domestic violence services in Ontario.  This is

6    St. Mary's Hospital.  It doesn't say domestic violence

7    services.

8         Are you referring to a different document?

9    Q.  No.  Look at the bottom of 109.

10   A.  Mm-hmm (Yes).

11   Q.  Family and Children Services was not notified.  Amal

12   was provided with the Breaking the Cycle of Domestic

13   Violence?

14   A.  So you're saying a pamphlet with services was domestic

15   violence services?

16   Q.  Yes.

17   A.  Oh.  Well, I didn't understand what you were -- I would

18   not refer to that as domestic violence services.  Those are

19   pamphlets that are commonly available, both in hospitals

20   and family and children service agencies.  I wouldn't call

21   that domestic violence services, but she was provided with

22   that pamphlet, yes.

23        Hopefully, she learned from it and took

24   protective actions for herself and her daughter.

25   Q.  But she didn't.

1    A.  Well --

2    Q.  There is no evidence she ever sought an OFP in Canada.

3    There is no evidence that criminal charges were ever filed

4    against Aly Saad Aly in Canada for any act of domestic

5    violence, isn't that true?

6    A.  I would look at this very differently.

7    Q.  I'm asking if you are aware --

8    A.  Could you repeat your question?

9    Q.  Were any criminal charges ever filed against Mohamed

10   Aly Saad Aly in Canada?

11   A.  No.  And that is true of most domestic assault

12   abusers --

13   Q.  You know, Mr. Edelson --

14   A.  -- in the United States and in Canada.

15   Q.  -- it will go much faster if you just answer the

16   question and not offer your editorial comment.

17   A.  Okay.  I'm just putting it in context of the larger

18   context.

19   Q.  Is it also true that Ms. Aden never sought an order for

20   protection in Canada?

21   A.  That is true, although she did seek police help and

22   hospital help, clearly.

23   Q.  Well, the only time she sought police help from the

24   evidence that we've seen is on February 27th, and she

25   didn't seek the police help.  Mr. Aly Saad Aly is the one

1    that sought the police help, is that not correct?

2    A.  I believe there are a number of police incidents.

3    Let's go back.

4    Q.  Let's take a moment.  You identified for me a police

5    incident report in Ms. Aly Saad -- I'm sorry -- Ms. Aden

6    reported she had been assaulted by Mr. Aly Saad Aly.

7    A.  Well, she has reported she has been assaulted, and she

8    did go to the hospital following that police intervention

9    on page Aden 00109.

10   Q.  Right.  You told me --

11   A.  Yeah.

12   Q.  -- there were other instances when you believe she had

13   contacted the police because of acts of domestic violence.

14   A.  No.  She had contact with police, yes.

15   Q.  Okay.

16   A.  I'm sorry if you misheard that.  I'm sorry if you

17   misheard that.

18   Q.  Now, Ms. Aden is a registered nurse, is she not?

19   A.  I believe so.

20   Q.  And are registered nurses mandated reporters of

21   violence in the family?

22   A.  I don't know the Canadian laws on that.

23   Q.  Well, she is a registered --

24   A.  They are not, they are not -- no one in the United

25   States is a mandated reporter of adult domestic violence

1    except if you're in the U. S. military, then it is mandated

2    and the state of Kentucky.  Otherwise, no one in the United

3    States is a mandated reporter of adult-to-adult domestic

4    violence.

5    Q.  Are nurses trained in domestic violence?

6    A.  Some are.  Some are not.  In fact, that's been my

7    life's work is to try to get professionals trained about

8    domestic violence.

9    Q.  Are you aware that Ms. Amal on at least two occasions

10   traveled without Mr. Aly Saad Aly's knowledge?

11   A.  I am aware of the time that she left Canada and came to

12   the U. S. without his knowledge.  I don't know about the

13   other --

14   Q.  If she traveled to Toronto without his knowledge and

15   traveled back to Minnesota without his knowledge,

16   independently purchasing the tickets and somehow securing

17   her travel documents, would that affect your opinion at

18   all?

19   A.  Yes.  I would say that she is resourceful and

20   protecting herself and her child and that that is

21   consistent with my research for the National Institute of

22   Justice that women do take a period of time to decide how

23   they can protect themselves from --

24   Q.  Is it consistent with the stories that she told you

25   that you reported in your report, that she was isolated,

1    did not have access to her travel documents?

2    A.  Yes, but then she did travel.  He removed her travel

3    documents at times, not always withholding them.

4    Q.  How did she get into the U. S. to go to work?

5    A.  She must have had a travel document for those days.

6    Her daughter was left in Canada.

7    Q.  You know, having read several of your reports now,

8    Mr. Edelson, would you tell me what steps you take to

9    determine the veracity of the information you're given?

10   A.  Mm-hmm.  Well, I, you know, I interview usually the

11   respondent in these cases.  I try to listen as much as I

12   can to the testimony.  Unfortunately, this time because of

13   that time difference, it was hard for me to listen to all

14   the testimony.

15            And then I base it on the documentation that I'm

16   given, and I have five volumes of documentation here that

17   I've looked through at various times over the last month

18   and then put together my report, and that's based on my

19   writings.

20   Q.  Do you have any concern at all for the fact that the

21   dramatic details recounted in Ms. Aden's description of the

22   February 27th incident were never given to the police?

23   A.  No.  Most domestic violence incidents are never

24   reported to the police.  The great majority are never

25   reported.  In fact, you know, usually it's just, you get

1    the tip of the iceberg, and there are many tips of icebergs

2    here.

3    Q.  Is it at all possible that Mr. Aly Saad Aly is the one

4    telling the truth and that Ms. Aden is lying?

5    A.  That's always a possibility.  I, in this case, I don't

6    believe so based on the record of, that's present here.

7    Q.  Okay.  Now the record that is present here is, no

8    police report where there has been domestic violence

9    observed by the police or found to be credible and no

10   documentation to support the claim of financial control and

11   two OFP's ten years ago apart, two different marriages for

12   a man who has been married five times --

13   A.  Mm-hmm (Yes).

14   Q.  -- in which there has never been a judicial finding of

15   domestic abuse beyond the ex parte order being issued, and

16   all of this only comes to a head after she abducts the

17   child illegally from the child's place of habitual

18   residence?

19          MS. YANG:  Objection.  Counsel is testifying.

20          THE COURT:  Well, I think, I think she is asking

21   a question.  Go ahead.

22   BY MS. BERG:

23   Q.  Go ahead, Mr. Edelson.

24   A.  Yes.  Well, so I would disagree with your

25   characterization of the record here.  There is testimony by

1    Ms. Aden of increasing violence while she lived in Canada.

2    There are not police records of that, but there are seldom

3    police records of domestic violence incidents.  In fact,

4    only about 3 percent end up being documented by the police.

5         I -- there is increasing violence.  There is a

6    record of serial restraining orders.  They may be ten years

7    apart, but there are multiple against two different women

8    or restraining orders on behalf of two different women in

9    two different jurisdictions.

10        So I do think I would characterize it very

11    differently than you have.  It is true that there is not a

12    lot of record, and unfortunately, most battered women do

13    not create those records.  They're not thinking about a

14    court case down the road.  They're thinking about their

15    safety and the safety of their child.

16        And so they take actions, most of those not

17    documented by official sources.

18    Q.  Do you endorse the notion that the only way to prevent

19    child abuse is international child abduction?

20    A.  No, not at all.  In fact, I'm a strong supporter of the

21    Hague Convention and the need for protocols between

22    countries for observing these.  I do think, though, the

23    Hague Convention is written with exceptions to the return,

24    and in this case, I think there is a grave risk of

25    psychological and physical harm to the child upon return.

1          And the drafters of the Hague Convention in 1980

2     took that into account even before there was any really

3     research on domestic violence.  They were concerned about

4     those issues and built those exceptions into the Hague

5     Convention so that judges would have latitude to make a

6     decision based on the safety of the child.

7     Q.  And is it your opinion that the United States is better

8     able to ensure the safety of this -- of Ms. Aden and the

9     child than Canada?

10    A.  It is my opinion that Ms. Aden has family support and

11    resources as well as a residence and a job in Minnesota and

12    can be better established and provide for her child in

13    Minnesota than in Canada.  I'm not sure what her legal

14    status would be upon return to Canada and whether she could

15    even work.

16    Q.  Well, let's say the child is returned to Canada, and

17    she can live in Buffalo and do what she did before,

18    couldn't she?

19    A.  I'm not sure if she can still travel back and forth

20    across the border easily.  I don't know.  I haven't gone

21    through the border at Buffalo.  I haven't gone through the

22    Canadian border recently at all.

23    Q.  Have you looked into the research at all about the

24    effect on children of being separated from a parent?

25    A.  Yes, and in fact I've looked into the research on the

1    impact of child abduction, and we have an entire section in

2    the new book that is coming out this month from

3    Northeastern University Press on that research.

4             Did you have a question related to that?

5    Q.  Sure.  What -- is there, is it a benefit to this child

6    to be separated from her father?

7    A.  I think the research on that is conditional.  It

8    depends on the quality of the relationship of the

9    caregiving parent, the primary caregiver to the child.

10            Did you want me to answer?

11   Q.  Yeah.  Go ahead.

12   A.  The research is conditional based on the degree to

13   which it interrupts the primary attachment figure for the

14   child, which is the primary caregiving parent, as well as

15   the relationship between the other parent and that primary

16   caregiver.

17            If it's a disrupted relationship and conflictual,

18   actually the research shows that it's better for the child

19   not to have contact.  If it's a relationship in which the

20   child can see conflict resolved, resolved amicably even if

21   it's a divorced relationship, children can do well and

22   benefit from that contact.

23            So it's really conditional on the quality of the

24   relationship of the child to each parent and the quality of

25   the relationship between the parents.  In this case, I

1    would say it's a high conflict and violent interaction

2    between the two -- by one parent towards the other, and I

3    would say it's probably not very beneficial to this infant

4    at this moment to have a lot of contact.

5    Q.  If I tell you there is evidence in the record that

6    Ms. Aden has identified Mohamed Aly Saad Aly as the primary

7    caregiver of the child, would that affect your opinion at

8    all?

9    A.  Well, I would want to know about the quality of the

10   caregiving based on the allegations of his behavior towards

11   the child in these high conflict and violent incidents.  I

12   would be quite concerned about his parenting behaviors, and

13   that's an area of research that I've started to work on a

14   lot right now is new and expectant fathers and their

15   relationships with their infant child.

16              MS. BERG:  I have nothing further.

17              THE COURT:  Any further questions?

18              MS. YANG:  Very briefly.

19              THE COURT:  Go ahead.

20

21                    **REDIRECT EXAMINATION**

22   BY MS. YANG:

23   Q.  Dr. Edelson, would it be surprising to you if Ms. Aden

24   were to withdraw cash from her checking account for her

25   husband because she felt pressured to do so?

1    A.   No.   It would fit within the context of coercive

2    control that I outlined in my testimony and that I've

3    talked about today.

4    Q.   Is it common for women to withdraw cash for husbands

5    because they feel such pressure in abusive relationships?

6    A.   It is quite common for abusive partners to take control

7    of finances, whether -- I don't know about the particulars

8    of withdrawing cash.

9    Q.   Dr. Edelson, as for the medical reports that Ms. Berg

10    alluded to, are you aware of any medical reports that

11    document injuries from February 2011?

12    A.   I was trying to think about that, and I don't recall

13    reading those.   Is there an exhibit that has those records?

14    Q.   There is.   One second.

15          MS. BERG:   Your Honor, we object.   If the witness

16    has testified he doesn't recall, that's -- I don't think

17    it's necessary for us to sit here and wait while he

18    refreshes his recollection to testify about something that

19    he already testified about in his report that he allegedly

20    read and now has testified he doesn't recall seeing.

21          It goes to the weight of his report, his

22    testimony and this evidence.

23          THE COURT:   Well, you can ask further questions

24    to establish foundation on this, Ms. Yang, if you wish.

25

1    BY MS. YANG:

2    Q.  Dr. Edelson, were you provided with medical reports in

3    connection with the respondent's counter petition?

4    A.  The respondent's counter petition?  I believe there was

5    from a hospital.

6    Q.  And I would direct your attention to Respondent's

7    Exhibit Number 23.

8    A.  Okay.  I have to get that volume.  Hold on.  Yes.  This

9    is from St. Mary's from the same incident, and this is

10   during the time that she is pregnant.

11   Q.  Now if you'll turn to page 3 of Respondent's

12   Exhibit 23.

13   A.  Mm-hmm.  Yep.

14   Q.  Are you there?

15   A.  Yes.  In that she was referred to the hospital by the

16   police.

17   Q.  Right.  And in the middle of the page, there is a

18   presenting complaint of domestic assault.  Do you see that?

19   A.  Right.  True.

20   Q.  And then there is a triage assessment states --

21   A.  That she is four months pregnant.  Assaulted by husband

22   four months pregnant, thrown on the floor, which is

23   consistent with her testimony.

24   Q.  And then there was shoulder pain that was reported?

25   A.  Yes.  Yes.

1    Q.  And that there was soreness in the fingers reported?

2    A.  Yes, and stated that this was the fourth or fifth

3    assault by Aly Saad Aly and that it does say that on

4    several pages back that fingers were swollen and painful.

5    Q.  And where do you see that?

6    A.  It's page 05, 005 at the top.  It's a handwritten

7    entry.  It says hand, third, fourth fingers swollen and

8    painful and that she has been assaulted fourth, fifth time

9    before.

10   Q.  And then if you will turn to page 24 of Respondent's

11   Exhibit 23.

12   A.  23?  What page?

13   Q.  Actually.  I'm sorry.  One second.  Page 21.

14   A.  Okay.  Yes.  So these are the diagrams by the medical.

15   Q.  And you see that there is a diagram of some hands and

16   fingers --

17   A.  Yes.

18   Q.  -- and marks that --

19   A.  Third and fourth fingers as I documented earlier and a

20   bruise on the arms on both sides -- on both arms -- wrists.

21            THE COURT:  Excuse me --

22            THE WITNESS:  On the next page there are marks on

23   the arm, upper arm on this document.

24            THE COURT:  Okay.  Just, my screen isn't working.

25   Where is this exhibit, in which book?

1          MS. YANG:  This is Respondent's Exhibit

2     Number 23.

3          THE COURT:  What book is it in?  I can't find it

4     in any of the books you've given to me.

5          Thank you.

6          MS. YANG:  So it's page 21 of Respondent's

7     Exhibit 23.

8          THE COURT:  Okay.  Go ahead.

9     BY MS. YANG:

10    Q.  Now, finally, Mr. Edelson, was there anything in the

11    record that made you question the credibility of petitioner

12    himself?

13    A.  Well, what I listened to yesterday was his testimony

14    about three police calls on one day and the changing

15    tapestry of that, his allegations on that day, which made

16    me question his credibility.

17         MS. YANG:  I think that's all I have for you.

18    Thank you, Dr. Edelson.

19         THE COURT:  Is there any additional --

20         THE WITNESS:  Am I finished?

21         THE COURT:  Is there any additional examination,

22    Ms. Berg?

23         MS. BERG:  No.

24         THE COURT:  Okay.  You're done, Mr. Edelson.

25    Thank you.

1          MR. EDELSON:  Thank you, Your Honor.  Bye.

2          THE COURT:  Okay.

3                    **(Witness excused.)**

4          THE COURT:  Okay.  Who is our next witness?

5          MR. CARTER:  Excuse me, Your Honor.  I believe we

6     have Asha Aden, who has called in on the line.

7          Asha, are you there?

8          MS. ASHA ADEN (Via telephone):  Yes, I am.

9          MR. CARTER:  So respondent would call Asha Aden

10    as a witness.

11         THE COURT:  Ms. Berg, that's okay with you?

12         MS. BERG:  Yes.

13         THE COURT:  Okay.  How long is this testimony?

14         MR. CARTER:  Probably five minutes.

15         THE COURT:  Okay.  Go ahead.

16                    **(Witness sworn.)**

17         THE COURT:  You may proceed.

18

19                  **ASHA ADEN (Via telephone),**

20    after having been first duly sworn, was examined and

21    testified as follows:

22                    **DIRECT EXAMINATION**

23    BY MR. CARTER:

24    Q.  Good afternoon, Ms. Aden.  How are you?

25    A.  Good.

1    Q.  Could you state -- could you state your name for the

2    record, please.

3    A.  My name is Asha Aden.

4    Q.  And how old are you, Ms. Aden?

5    A.  I'm 39.

6    Q.  Are you related to Amal Aden, the respondent in this

7    case?

8    A.  Yes.

9    Q.  How so?

10   A.  We are cousins.

11   Q.  And where do you live, Ms. Aden?

12   A.  I live in Kitchener.

13   Q.  And what do you do there?

14   A.  I work as a settling worker.

15   Q.  Could you repeat what you do for a living, please?

16   A.  I assist new immigrants settling to the community.

17   Q.  Okay, Ms. Aden.  I want to turn your attention to

18   February 27th, 2011.  Do you remember that day?

19   A.  Yes, I do.

20   Q.  Did you get a call from Mr. Aly Saad Aly on that day?

21   A.  Yes, I did.

22   Q.  And what did he say?

23   A.  He said come get your crazy cousin from my home or I

24   will call the police and have her arrested like Fowzia.

25   Q.  What -- how did you understand that?  What did he mean,

1     I'll have her arrested like Fowzia?

2     A.  Fowzia is one of my acquaintance who was arrested for

3     domestic violence for assaulting her husband.

4     Q.  And did he mention a knife at all when he called you?

5     A.  No, he did not.

6     Q.  Did he say anything about what Ms. Aden was doing?

7     A.  He said she was screaming, and she was going from

8     window to window.

9     Q.  And so what did you do?

10    A.  I told him, because I was working as a volunteer doing

11    some other stuff, and I said I cannot deal with that issue

12    right now, but as soon as I'm done whatever I'm doing, I

13    will come and get her from your home.

14    Q.  And did you do that?

15    A.  Yes, I did.  I went an hour or an hour and a half later

16    approximately to their home.

17    Q.  And what happened when you got there?

18    A.  When I got there, there was a police officer, two

19    police officers, male and female, at the home and talking

20    to them.

21    Q.  And did you happen to hear any of the conversation

22    between the police officers and Mr. Aly?

23    A.  Not really.  I didn't.

24    Q.  You didn't hear anything about this Fowzia?

25    A.  At one point after and the police told me you can take

1    Fowz -- I mean Amal with you, and Fowzia tried to help us

2    carry the luggage downstairs, and Mr. Aly told her you

3    cannot leave the home because Mr. Aly felt Fowzia -- and

4    was staying with them at that time --

5    Q.  Okay.  Sorry to interrupt you, Ms. Aden.  So you --

6    A.  That's okay.

7    Q.  So you testified that Fowzia was there staying with

8    Mr. Aly and Ms. Aden at the, on February 27th, correct?

9    A.  Yes.  That's correct.

10   Q.  And what was Mr. Aly saying to the police about Fowzia?

11   A.  She -- he said that she cannot leave from the home of

12   Mr. Aly.  She cannot help Amal carrying the luggage, and

13   the police, the female police officer, asked him where does

14   she stay, and she asked him, the police officer stated that

15   there was nothing saying on this record that she is not

16   allowed to leave from the home.  She can go and come in the

17   home as she wishes.

18           It only states that at night she has to reside

19   with you, but on a daily basis, she can do whatever she

20   wants.

21   Q.  Okay.  And this Fowzia, you testified that it's a

22   female, it's a woman.  How did she --

23   A.  How was what?

24   Q.  Could you tell what her attitude toward Mr. Aly was?

25   A.  She's very quiet.  I can -- she wouldn't say a word.

1    She was a little bit afraid, so she didn't say.  She said I

2    will do whatever you wish.  She didn't want to really to

3    make him mad or do anything that he doesn't wish her to do.

4    Q.  Okay.  I would like to move on now.  Did you see any

5    injuries on Ms. Aden?

6    A.  One of her hands was swollen, fingers, the fingers.

7    Q.  Okay.  And then what happens?  What happened next?  Did

8    you leave the apartment?

9    A.  When we left the apartment, we came downstairs.  The

10   police officer approached us, and she give us a flier of

11   domestic violence shelters, and she tell, she told me to

12   take her to that, but Amal didn't want to go there.

13   Q.  Did you go anywhere with her?

14   A.  I took her to St. Mary's Hospital, the emergency room.

15   Q.  Okay.  And after you went to the hospital, where did

16   you go from there?

17   A.  She saw the triage, and she saw one of the social

18   workers, but I was waiting for her outside.  And after she

19   was done with the hospital, she came back with me to my

20   place.

21   Q.  And she stayed with you for some time?

22   A.  Yes, she did.

23   Q.  Had she ever come to your, to your home and stayed with

24   you in the past?

25   A.  During that time and before.  At least within the time

1    she was living with Mr. Aly, a minimal of six, seven times

2    she came in and out of my home.

3    Q.  Do you remember the first time you met Mr. Aly?

4    A.  Yes, I do.

5    Q.  What do you remember about that meeting?

6    A.  That's before they got married.  She came down to

7    Kitchener from Minnesota, and she said I want to introduce

8    you to someone that I want to marry, and he took us to a

9    restaurant, a Middle Eastern restaurant.

10          And after we ordered food and we were eating, and

11   Amal wouldn't be able to finish her food, and he was

12   telling her, you have to finish the food.  You cannot leave

13   the food, in an intimidating voice it was used in, but at

14   the end he took the food with him.

15   Q.  Could you describe some of the things you've heard

16   Mr. Aly say about women?

17   A.  He used to kind of put them down, especially Somali

18   women.  He would say they are always lying and calling her,

19   calling them names like sluts, needy, something like that.

20   He used to put it that way.  Desperately looking for a man,

21   those things he used to say.

22   Q.  Okay.  Thank you.  Just a couple more questions.  Could

23   you describe what type of contact you had with Ms. Aden

24   before she went to Kitchener?

25   A.  We had a good contact.  We used to call each other and

1    see how she is doing and everything, but after she moved to

2    Kitchener and it -- I saw her behavior change.  She was

3    excited actually to move to Kitchener.  She said at least I

4    have you there, and we're going to see each other more

5    often, but after she got married to Mr. Aly, we wouldn't

6    see each other that much.

7              Our relationship become less and less, and I

8    didn't want to really interfere, and whenever she tries to

9    visit us at our home, she would get a phone call.  Mr. Aly

10   would keep calling her, and she would leave right away.

11   Q.  Could you describe that last part a little bit in more

12   detail?  You said what would happen when she would come,

13   come to visit you?

14   A.  She used to receive a phone call from her husband, and

15   she would leave right away.  She wouldn't stay with us that

16   much.

17   Q.  So would she receive multiple phone calls in one visit?

18   A.  Yeah.

19   Q.  And then she would feel obliged to leave?

20   A.  Yeah.

21             MR. CARTER:  Okay.  Thank you, Ms. Aden.  I don't

22   have any further questions.

23             THE COURT:  Cross-examination, Ms. Kaiser?

24             MS. KAISER:  Yes, Your Honor.  Thank you.

25

1                    **CROSS-EXAMINATION**

2      BY MS. KAISER:

3      Q.  Ms. Aden, my name is Lilo Kaiser.  I'm an attorney for

4      Mr. Aly Saad Aly, and I'm going to ask you just a few

5      follow-up questions.

6            Okay?

7      A.  Okay.

8      Q.  Okay.  You are her cousin, correct?

9      A.  Yes.

10     Q.  And you lived nearby her when she lived with her

11     husband Mr. Aly Saad Aly?

12     A.  Yes.

13     Q.  How, how close were you?  How far were your homes?

14     A.  I'm not good with that, but one time they were living

15     in Waterloo approximately 10, 15 minutes' drive, and then

16     they moved to near my home, 5 minutes' drive from my home.

17     Q.  So at the last residence that she was living in Canada,

18     she was about five minutes from you?

19     A.  Yes.

20     Q.  And does she have any additional family members, or do

21     you have any additional family members there in Canada?

22     A.  Yes.

23     Q.  Would you call the family that you have and that

24     Ms. Aden has as supportive?

25     A.  They -- she didn't know them that much, the other

1     family.  They really hardly know each other.  She was

2     raised -- we are related from her father's side, and she

3     was raised by her mother.  So that family, they are

4     supportive to me because we know each other, but with her,

5     they don't really know each other.  Some of them she never

6     even met them.

7     Q.  Were you, are you aware that she provides support to

8     her mother and their family in Kenya?

9     A.  Yes.  When she was living in Minnesota, yes, she did.

10    Q.  She gave her family money?

11    A.  When she was living in Minnesota, from my knowledge,

12    that's what I knew, but from when she was living in

13    Kitchener, I think from what she said, she wasn't sending

14    them money.

15    Q.  Were you aware that she has a town home in Minnesota?

16    A.  Yes.  I believe, yes, she told me that.

17    Q.  And that she rents that town home?

18    A.  Yeah, I believe she told me that.

19    Q.  Did she tell you what she did with the rental money?

20    A.  No.

21    Q.  When she -- when you picked her up on February 27th,

22    did she tell you that her fingers were broken?

23    A.  I don't recall.  I don't remember.  Her hands was

24    obviously was swollen.

25         MS. KAISER:  I have no further questions, Your

1      Honor.

2                 THE COURT:  Anything further, Mr. Carter?

3                 MR. CARTER:  Nothing, Your Honor.  Thank you.

4                 THE COURT:  All right.  Thank you, Ms. Aden.

5      We're done with you.

6                 THE WITNESS:  Thank you.  Bye bye.

7                 THE COURT:  All right.

8                          **(Witness excused.)**

9                 THE COURT:  Okay.  Who is the next witness?

10                MS. BRUCE:  Your Honor, can you hear me?  We have

11     Ms. Roundtree.  She can call pretty much anytime between

12     twelve and one, so I don't know if you would like to go

13     ahead right away at noon or take a break and have her call

14     right away after.

15                THE COURT:  Why don't we take a break here for

16     lunch, does that sound okay, and resume at 12:30.  Is that

17     all right?

18                MS. BRUCE:  That works fine.  Thank you.

19                THE COURT:  Ms. Berg, okay with you?

20                MS. BERG:  Yeah, I'm looking at the schedule.

21     They have got Boyle at 1:30, and then we've got Abed Awad

22     at two, so I think that should work.  What time are we

23     coming back?

24                THE COURT:  12:30?  Does that work?

25                MS. BRUCE:  Yeah.  Ms. Boyle is only available at

1    1:30.  She had to cancel her class, and then we did have

2    Ms. Mustafa sometime this morning, but she is here and can

3    go anytime.

4         THE COURT:  Okay.  So if we start at 12:30, we

5    have an hour in there before Ms. Boyle calls in.  Do we

6    have enough for that hour?

7         MS. BERG:  Looks like they have got three.

8         MR. CARTER:  We have two.

9         MS. BRUCE:  Two, Your Honor.

10        THE COURT:  Mustafa and Roundtree.

11        MS. BRUCE:  And they're probably shorter than a

12    full hour, but they will fit, certainly.

13        THE COURT:  Well, we don't want to run out of

14    witnesses.  Professor Boyle is only available at 1:30?

15        MS. BRUCE:  That's correct.

16        THE COURT:  Okay.  How about the next witness,

17    the two o'clock call in?

18        MS. BERG:  He is going to be driving at 1:30

19    because we asked him if he could listen to Boyle, so I

20    don't know.  We've got, I mean, what about the respondent?

21    She is here.

22        THE COURT:  She could start her testimony if we

23    have time in there.

24        MR. SWENSON:  Your Honor, could we -- is Mr. Awad

25    not available before 1:30 because we would really like the

1    opportunity to present our respondent in full continuously

2    at the end.

3            THE COURT:  I understand that, but we're trying

4    to figure out timing for everybody here.

5            MR. SWENSON:  I understand, Your Honor.

6            MS. BERG:  I can check.  I know that his comment

7    was that when we asked him to listen to Boyle was that he

8    would be in the car driving.  I don't know.  He's a

9    full-time lawyer so --

10           THE COURT:  Let's see if he is available at one.

11           MS. BERG:  I'll e-mail him right now.

12           THE COURT:  And if not, we can start with

13   Ms. Aden.

14           All right.  Let's take a break, and we will start

15   again at 12:30.

16           THE CLERK:  All rise.

17                   **(Lunch recess taken.)**

18

19                   **(In open court.)**

20           THE COURT:  You may be seated.  All right.

21           Who are we going with next?

22           MS. BRUCE:  Nora Roundtree is on the line, Your

23   Honor.

24           THE COURT:  Ms. Bruce, are you questioning her?

25           MS. BRUCE:  I am.

1          THE COURT:  Ms. Roundtree, are you there?

2          MS. ROUNDTREE:  Yes, sir.

3          THE COURT:  All right.  We're going to take you

4    next as a witness.  Okay?

5          MS. ROUNDTREE:  Yes, sir.

6          THE COURT:  And we're going to have you sworn

7    first, so just hang on just a minute.

8                    **(Witness sworn.)**

9          THE COURT:  All right.  You may proceed,

10   Ms. Bruce.

11

12                **NORA ROUNDTREE (Via telephone),**

13   after having been first duly sworn, was examined and

14   testified as follows:

15                    **DIRECT EXAMINATION**

16   BY MS. BRUCE:

17   Q.  Good afternoon, Ms. Roundtree.

18   A.  Good afternoon.

19   Q.  Thank you for calling in on your lunch break.

20   A.  That's okay.

21   Q.  Ms. Roundtree, what state do you live in?

22   A.  Louisiana.

23   Q.  Do you know the petitioner in this matter, Mr. Aly Saad

24   Aly?

25   A.  Yes, I do.

1    Q.  How do you know him?

2    A.  He's my ex-husband.

3    Q.  When were you married, Ms. Roundtree?

4    A.  Around in 2001, in the summer of 2001, I believe, in

5    July.  I try and forget.

6    Q.  That's fine.  Are you still together?

7    A.  No.

8    Q.  Why did you separate?

9    A.  Abuse and -- oral abuse and physical abuse.

10   Q.  Can you tell the Court what you mean by that?

11   A.  There were two occasions where I was held by the jaw

12   and told not to speak the minute that I spoke, and another

13   time it was like at three o'clock in the morning.  I'm

14   tired.  Because I didn't get up to tend to his needs and I

15   refused.  I got sarcastic.  He got equally sarcastic and

16   said what did you say, and he punched me in the head.

17   Q.  Okay.  Ms. Roundtree, the first thing you described was

18   an incident where Mr. Aly Saad Aly grabbed your jaw?

19   A.  Correct.

20   Q.  Can you tell the Court just a little bit more about how

21   that came to be?

22   A.  He refused to eat on the table with everybody else.  He

23   wanted to eat in the room.  I got aggravated, and I asked

24   him why.  He didn't answer and said that's what I feel like

25   doing.  I slammed the door and walked out, and he came out

1    after me.

2              And at that point, I basically felt like I was a

3    slave in this marriage, and he grabbed my jaw basically and

4    told me don't you ever speak to me this way.  Before he

5    did, I also said, do you think I'm your slave or something.

6    The way I said it in Arabic is very sarcastic.

7              So he grabbed my jaw quite hard.  In fact my jaw

8    is not functioning correctly anymore, and my mom tried to

9    separate us, and she finally got to it and he went away,

10   but you know --

11   Q.  All right.  Ms. Roundtree, did you seek a protective

12   order or a temporary restraining order from the Court --

13   A.  Yes.

14   Q.  -- at any point?

15   A.  Yes, I did.  Yes, I did.

16   Q.  And the documents that you have, did you recognize

17   those as your petition and the order for the --

18   A.  Yes.  I did in my handwriting.

19   Q.  Okay.

20   A.  Yes.

21   Q.  And also child custody support order that you have

22   there?

23   A.  Correct.  Correct.

24   Q.  And those are all the -- you recognize those as all the

25   documents related to your case regarding the order for

1    protection from Mr. Aly Saad Aly, correct?

2    A.  Correct.

3         MS. BRUCE:  Your Honor, I offer Exhibits 38, 39

4    and 40 into evidence, which are certified copies of these

5    documents.

6         MS. BERG:  Same objections as to relevancy and

7    character.

8         THE COURT:  I think we had 38 and 39 already

9    admitted, but we'll admit 40 as well.

10        MS. BRUCE:  Thank you, Your Honor.

11   BY MS. BRUCE:

12   Q.  Ms. Roundtree, could you please turn to page 3 of

13   Exhibit 30 -- 40?  Excuse me.  So on the bottom there you

14   will see it says RTX 40 and then 003, and in fact actually

15   004?

16   A.  You said RTX what now?

17   Q.  040-004.  This is the petition that you filed, the

18   third page of your petition.

19   A.  Actually, I didn't print it.

20   Q.  That's fine.  Have you looked at it?

21   A.  Go ahead.  Yes.

22   Q.  And I'm just, on the third page there is some

23   handwriting involving some descriptions of abuse.  Is that

24   consistent with the incidents that you just described to

25   me?

1    A.  Yes.

2    Q.  Do you know if this temporary restraining order was

3    ever served on Mr. Aly Saad Aly?

4    A.  It was not.

5    Q.  Do you know why not?

6    A.  Well, he was escaping, I mean.  That was the last known

7    address I knew because those were the people that

8    introduced me to him, and that's who I thought he would run

9    back to.

10   Q.  Okay.

11   A.  I was told by several people that they could be facing

12   the sheriff, but because the sheriff doesn't carry a

13   picture, he could say, no, he doesn't live here, and the

14   restraining order would not be reserved.

15   Q.  Okay, Ms. Roundtree.  I'm going to switch subjects

16   really quickly.  Do you and Mr. Aly Saad Aly have children

17   together?

18   A.  Yes, I have one child, one daughter.

19   Q.  And how do you know he was the father, or excuse me, is

20   the father of this daughter?

21   A.  I was a virgin before I got married, and after I got

22   married, I conceived.

23   Q.  I'm sorry.  Did you just say a couple weeks after you

24   got married?

25   A.  Yes.

1    Q.  Okay.  Was Mr. Aly Saad Aly ever ordered to pay child

2    support for your daughter?

3    A.  Yes, he was.

4    Q.  And is this reflected in the document that you've seen

5    that says child support should be paid?

6    A.  Yes.

7    Q.  Okay.  And has Mr. Aly Saad Aly been involved in your

8    child's life?

9    A.  She has never met him.

10   Q.  Why is that?

11   A.  Because I decided to finish the marriage before my

12   daughter was born.

13   Q.  And why is that?

14   A.  Because there was too much of -- I felt personally that

15   this would escalate.  We were about to move into our own

16   apartment, and there was just too much oral abuse and his,

17   his morals and the way he just did not agree with normalcy.

18   I mean, he always said I don't know my religion very well,

19   and he thought he knew Islam very well and how to treat a

20   woman.

21          But unfortunately I have Egyptian -- I have an

22   Egyptian family on my mother's side that I have lived with

23   for ten years of my life, and none of my uncles have been

24   treated or treated any woman in the manner that this man

25   has treated me.

1    Q.  Ms. Roundtree, did you give your daughter a special

2    last name?

3    A.  I gave her my father's, my family's last name.

4    Q.  Why did you do that?

5    A.  Because he believes in the mutilation of the sexual

6    organs of a female and because after -- I gave him time to

7    correct himself.  You know, maybe something would happen,

8    but nothing happened.  All I got was tell immigration that

9    you need me here to raise this child for you to get your

10   divorce.

11        Apparently, he has the wrong idea of how divorce

12   happens here in the United States, and that's the only way

13   you would get your divorce.  Basically after I found out

14   that I had conceived a child, the attitude and the way and

15   the manner that he treated me went, changed 360 degrees

16   from wooing and everything right to everything like this

17   child cornered me, is going to keep me in this marriage

18   whether I like it or not and --

19   Q.  Excuse me.  When you say "me," are you referring to the

20   petitioner, Mr. Aly Saad Aly cornered me?

21   A.  Yes, ma'am.

22   Q.  And you said that you gave your daughter your father's

23   last name because he believes in mutilation of the female

24   genitals?

25   A.  Yes.

1    Q.  What do you mean by that?

2    A.  Cutting the clitoris off to prevent her from ever

3    enjoying sexual contact, or they believe that it prevents

4    them from having sex before marriage.

5    Q.  And you thought changing the last name might protect

6    her.  Is that what you're saying?

7    A.  That, protect her because he would not be able to enter

8    a school and say, you know, I'm picking up so and so.

9    There would be no mistaking, you know.  I did not want to

10   take a chance with anything happening, and on top of that,

11   if she took his last name, I felt like I would have to

12   contact him for certain things that I would have to do with

13   my daughter, you know, and I just could not stand to see

14   him anymore.

15          He's just not -- he didn't have her for the

16   reasons of having a child.  He had her for the reasons of

17   gaining papers.

18   Q.  Okay.

19   A.  And that means to me he doesn't care about that child

20   one bit.  It's just all about him.

21   Q.  Okay.  Thank you Ms. Roundtree.  I just have a few more

22   questions.

23   A.  Sure.

24   Q.  Did Mr. Aly Saad Aly ever try and get in touch with you

25   after the OFP went into place?

1   A.  Yes, he did.  I have several e-mails in case my

2   daughter has questions later on in life that would prove

3   what he said and what he did and why I chose to get a

4   divorce.

5   Q.  Did he ever come to your -- excuse me.  Did he ever

6   come to your home?

7   A.  Yes, he did.

8   Q.  What did he do when he came to your home?

9   A.  Him and my mother -- not him and my mother.  My

10  mother's friend again tried to get us to an agreement and

11  come back together, but this was like a set-up marriage

12  culturally, and I lived with him.  I realized it was a

13  mistake to go the cultural, the --

14          It's not religion per se.  The way that you

15  listen to your mother, and everything she says is correct.

16  It was a mistake.  These people don't know what is best for

17  me.

18  Q.  Ms. Roundtree, I'm sorry to interrupt.  Can you just

19  tell us about what happened when he came to the house?

20  A.  He just tried to -- I walked into my house.  I found

21  out beforehand that he was coming, and I had a restraining

22  order at the time that I could not get enforced, and he

23  tried to get my attention from inside, from indoors.  I

24  didn't answer the door.

25          I just called the police and explained to them

```
1    that I have a restraining order because by that time, I

2    was, you know, totally afraid of this person that only

3    cared about himself --

4    Q.  Okay.

5    A.  -- to come anywhere near me.

6    Q.  Thank you.  Has he ever threatened to take your

7    daughter away?

8    A.  You know, I don't really remember him threatening to

9    take my daughter away.

10   Q.  Okay.

11   A.  He just --

12   Q.  Do you feel that your daughter would be safe if she was

13   with Mr. Aly Saad Aly?

14   A.  No, I would not.

15   Q.  What kind of harm are you afraid of?

16   A.  She would probably be sent, you know -- the child

17   belongs with either parent, but my child will probably be

18   sent to his mom's home to be raised, and again, this man

19   has no feelings for the soul that he created; therefore,

20   this child would be in danger for her future and, you know.

21   Q.  Okay.  And one just simple --

22   A.  I would not see her again.  I'm sorry?

23   Q.  I'm sorry.  I just have one last question.

24   A.  Uh-huh (Yes).

25   Q.  Have you ever talked to Ms. Amal Aden, the petitioner
```

1    in this matter?

2    A.  I have never spoken to her, no.

3    Q.  Okay.  So now what is going to happen is, opposing

4    counsel is going to get up and ask you a few questions.

5    Okay?

6    A.  Sure.

7            MS. BRUCE:  I have no further questions.

8            THE COURT:  All right.  Cross-examination?

9

10                      **CROSS-EXAMINATION**

11   BY MS. BERG:

12   Q.  Good afternoon, Ms. Roundtree.

13   A.  Hi.

14   Q.  If I understand you correctly, this was a marriage that

15   was arranged between your mother and Mr. Aly Saad Aly?

16   A.  His friends and him.  Actually the friend was a lawyer,

17   I believe was the responsible party for me when I got

18   married in the mosque.

19   Q.  And was this pursuant to an Islamic tradition?

20   A.  Yes.

21   Q.  And isn't it a fact that at the time that you consented

22   to this marriage, you were involved in a relationship with

23   another male individual?

24   A.  No, ma'am.

25   Q.  Did you say no?

1    A.  No.

2    Q.  Okay.  And do you recall securing a divorce from

3    Mr. Aly Saad Aly?

4    A.  Yes.

5    Q.  And isn't it a fact that this child is not mentioned

6    anywhere in the divorce pleadings or --

7    A.  That is true.  That is true.

8    Q.  Yet you pursued a child support action against the

9    Mr. Aly Saad Aly?

10   A.  Yes, I did.

11   Q.  So you want him to pay child support, but you don't

12   want him to know the last name of the child or ever have

13   any contact with her, is that correct?

14   A.  Yes.

15   Q.  And the order for protection that you obtained against

16   him was never served on him, isn't that correct?

17   A.  Yes.

18   Q.  So he never --

19   A.  Well, when he came to my house, those policeman told

20   him you have a restraining order against you, do not show

21   up here again.

22   Q.  Were you present when they said that?

23   A.  Yes.  I was on the side of my house.  He was at the

24   neighbor's, and the policeman came back and told me that's

25   what they told him.

1    Q.  So you didn't actually hear what they told him, did

2    you?

3    A.  No, ma'am, I did not.

4    Q.  Are women expected to be obedient to their husbands in

5    Muslim religion?

6    A.  Yes, they are, and husbands are expected to do certain

7    things as well.

8    Q.  And isn't it a fact that Mr. Aly Saad Aly's

9    expectations regarding your, if you will -- if you'll

10   accept this term, obedience were different?

11   A.  No, ma'am.

12   Q.  They weren't different?

13   A.  Repeat your question again, please?

14   Q.  Isn't it correct that the expectations of Mr. Aly Saad

15   Aly about your conduct as a wife was different than yours?

16   A.  They were different than what the religion said, yes,

17   ma'am.

18   Q.  Where were you raised?

19   A.  I was raised my first ten years of my life in Cairo,

20   Egypt, and the rest here in the United States.

21   Q.  Okay.  Are you currently married?

22   A.  Yes, I am.

23   Q.  And what nationality is the individual to whom you are

24   married?

25   A.  Egyptian.

1    Q.  And how long have you been married?

2    A.  Since January 16th of 2010.

3    Q.  What do you think of Mr. Aly Saad Aly's character?

4    A.  Only cares about himself.  He doesn't care about anyone

5    else, and he has the religion -- he has, his knowledge of

6    religion is not right at all, not just with women,

7    different subjects, all kinds of subjects across the board

8    so --

9    Q.  So do you believe that your knowledge and

10   interpretation of Islamic religion is correct?

11   A.  Yes, ma'am, to as much as I know, but no one is

12   perfect, and there is a lot more knowledge to find out

13   about.

14   Q.  Okay.  Thank you, Ms. Roundtree.

15        Your Honor, I move again to have this testimony

16   stricken for the record.  It serves no purpose.  It's

17   character slander.  It's over ten years old, allegations,

18   no opportunity to dispute the allegations at the time.

19   Totally unhelpful to the finder of fact in this case.

20        THE COURT:  Well, I'm going to overrule the

21   objection and the motion to strike.  All those arguments go

22   to the extent of the Court's ability to take into account

23   the evidence as opposed to its admissibility.

24        All right.  Is there any additional examination,

25   Ms. Bruce?

```
 1                 MS. BRUCE:  Just one question, Your Honor.

 2                 THE COURT:  Sure.  Go ahead.

 3

 4                      REDIRECT EXAMINATION

 5     BY MS. BRUCE:

 6     Q.  Ms. Roundtree, it's Ms. Bruce again.

 7     A.  Yes.  Hi.

 8     Q.  Take a minute.  Catch your breath.

 9     A.  I'm sorry.

10     Q.  Don't apologize.  Tell me when you're ready.

11     A.  I'm ready.  Go ahead.

12     Q.  Okay.  I just have one more question.

13     A.  Yes.

14     Q.  Was there also ever any verbal abuse in your

15     relationship with Mr. Aly Saad Aly?

16     A.  Yes, there was.

17     Q.  Can you please describe that for the Court?

18     A.  You are not to speak unless spoken to.  If I ever asked

19     a question, he always mentioned that I do not know enough

20     about the religion making me think that I'm, you know, less

21     of a person than I am.  These are the only two that I

22     remember that come to my mind.

23     Q.  Just catch your breath.

24     A.  Go ahead.

25     Q.  Ms. Roundtree, I have no further questions --
```

1    A.   Okay.

2    Q.   -- at this time.   Thank you so much for calling.

3    A.   Thank you.

4              THE COURT:   Ms. Berg, anything else?

5              MS. BERG:   No, Your Honor.

6              THE COURT:   All right.   Thank you, Ms. Roundtree.

7              THE WITNESS:   Thank you.

8              THE COURT:   You're done now.   We appreciate it.

9              THE WITNESS:   Okay.   No problem.

10                    **(Witness excused.)**

11             THE COURT:   All right.   Next witness?

12             MS. BRUCE:   Your Honor, we call Ms. Heba Mustafa

13   to the stand.   She's here in the courtroom.

14             THE COURT:   Very well.

15                     **(Witness sworn.)**

16             THE COURT:   You may proceed, Ms. Bruce.

17

18                        **HEBA MUSTAFA,**

19   after having been first duly sworn, was examined and

20   testified as follows:

21                   **DIRECT EXAMINATION**

22   BY MS. BRUCE:

23   Q.   Good afternoon, Ms. Mustafa.

24   A.   Good afternoon.

25   Q.   Ms. Mustafa, what do you do for employment right now?

1    A.  I work as an interpreter and going back to school.

2              MS. BERG:  Could you put the mic up closer,

3    please.

4              THE WITNESS:  Am I okay?  Can you hear me?

5    BY MS. BRUCE:

6    Q.  Yes, I do.

7    A.  Okay.

8    Q.  What languages do you interpret?

9    A.  Arabic, Arabic to English.

10   Q.  Excuse me?

11   A.  Arabic to English, yes.

12   Q.  Okay.  And do you interpret different dialects of

13   Arabic?

14   A.  Yes, I do.

15   Q.  How many?

16   A.  So many.  I can mention some of them.  There are

17   different countries in the Middle East.  Speaking of the

18   Gulf area, there is so many dialects.  I was born and

19   raised in one of these countries, so I know that, and then

20   I know Egyptian, Lebanese.  I'm originally from Palestine,

21   so I speak -- Palestine and Egypt speak similar.  I know

22   Sudanese, Moroccan variety, Iraqi.

23   Q.  That's a lot.

24   A.  Yeah.

25   Q.  Do you know the respondent in this matter, Ms. Amal

1    Aden?

2    A.  Yes, I do.

3    Q.  How do you know her?

4    A.  We went to school together.  We met at Minneapolis

5    Community and Technical College.

6    Q.  Do you remember about what year that was?

7    A.  2001.

8    Q.  And when did you -- excuse me.  Where and how did you

9    meet?

10   A.  We used to meet in the cafeteria.  There was Muslim

11   organization and different activities in the school that we

12   met through.  We became good friends with other girls as

13   well.

14   Q.  And you're still friends?

15   A.  Yes, we do.

16   Q.  Do you know the petitioner in this matter, Mr. Aly Saad

17   Aly?

18   A.  No, I don't.

19   Q.  Have you heard of him?

20   A.  Yes.  As a husband of my friend, yes.

21   Q.  And how did you first hear of him?

22   A.  When Amal -- we had a gathering when she was getting

23   married and moving to Canada, and so that's how I heard

24   about him and what he does.  Very little.  Not much

25   details.

1    Q.  Has the petitioner ever contacted you?

2    A.  Mr. Aly?

3    Q.  Yes.  Mr. Aly Saad Aly, yes, the petitioner.

4    A.  Not directly.

5    Q.  Has he ever contacted you indirectly?

6    A.  Yes.

7    Q.  When has he done that?

8    A.  It was July 1st of 2012.

9    Q.  Can you tell the Court what happened on July 1st, 2012?

10   A.  I was browsing my Facebook, and on the right corner, we

11   see, you know, list of friends who are online, and there

12   was, I saw Amal Aden's name that shows that she is online

13   with a green circle and another friend who we both, three

14   of us went to the same school.  We have been friends since

15   then.

16   Q.  What is that friend's name?

17   A.  Aziza, Aziza Abdelwase.

18   Q.  Was it common to see Amal online?

19   A.  No.

20   Q.  Why not?

21   A.  Before Amal got married, you know, she works hard full

22   time.  We do more talking on the phone than chatting, and

23   then when she moved to Canada, I probably didn't see her

24   online that often at all.  I would say maybe once.

25   Q.  Excuse me.

1   A.  Sorry.  Go ahead.

2   Q.  Are you ready?  When you saw her online, what did you

3   do?

4   A.  Actually Amal Aden popped up saying salaam, which is

5   hi, and so we started the conversation from there.

6   Q.  Okay.  Ms. Mustafa, can you turn your attention to in

7   your binder what is marked as Exhibit 30, please?

8   A.  Yes.

9   Q.  Do you recognize this?

10  A.  Yes, I do.

11  Q.  What is this?

12  A.  This is a conversation that happened between me and

13  supposedly Amal Aden.

14  Q.  And how do you know that that's what this is?

15  A.  How do I know what?  I'm sorry.

16  Q.  How do you know that this is that conversation?

17  A.  Because it's from my Facebook page.

18  Q.  Who is that picture of there?

19  A.  That's my son.

20  Q.  Your son?

21  A.  My son, yes.

22  Q.  When you first started typing on Facebook messaging,

23  did you notice anything out of the ordinary, anything

24  strange?

25  A.  No, not right away.

1    Q.  I'm sorry.  I just want to go back.  I forgot to ask

2    one question.  Can you turn your binder to what is marked

3    Exhibit 30T?

4    A.  Yeah.

5    Q.  And do you know what this is?

6    A.  This is the same thing, just translated.

7    Q.  Translated, okay.

8            Your Honor, I offer Exhibits 30 and 30T, the

9    translation of Exhibit 30, into evidence?

10            MS. BERG:  Again, Your Honor, we object.  This is

11   speculative.  It is -- there is no direct knowledge of this

12   witness as to who or what was going on, and it's

13   irrelevant.

14            MS. BRUCE:  May I?

15            THE COURT:  Go ahead.

16            MS. BRUCE:  This witness is going to testify to

17   what this evidence speaks to, and it's directly relevant to

18   the petitioner's credibility in this matter.

19            THE COURT:  Objection is overruled.  Go ahead.

20   30 and 30T are admitted.

21   BY MS. BRUCE:

22   Q.  Okay.  So I had asked you if there was anything strange

23   at the beginning of this conversation.

24   A.  Not right at the -- no.

25   Q.  And at some point was there something strange you

1    noticed?

2    A.  Yes.

3    Q.  What did you notice?

4    A.  As the conversation goes, there is a few things I

5    noticed as far as words are used that I'm not familiar that

6    Amal would say.

7    Q.  What kind of words?  What do you mean?

8    A.  More of Egyptian words.  Also the Arabic typing, I was

9    very, at first I was surprised because at the beginning I

10   believed it's Amal.  Nothing came to my head that it

11   couldn't be Amal, especially I saw her about a week or so

12   before.  I know she was in town and --

13   Q.  What about Arabic typing stood out to you?

14   A.  Amal doesn't type in the laptop or computer.  First,

15   there is no Arabic keyboards, doesn't have the Arabic

16   letters.  I know that because I got an Arabic keyboard from

17   overseas, and I trained on that for a while.

18           That's why when she spoke to me, I typed in

19   Arabic.  I get comfortable because we speak in Arabic when

20   we are together.  So when I saw Amal type in Arabic, I

21   thought, oh, that is kind of like, oh, Amal learned to type

22   in Arabic fast because she is good in English, too.  That's

23   the first thing.

24   Q.  Can you turn to page 1, 30T-001.  I'll look at the

25   English one.  Maybe you can, too.  At the bottom there it

1  says, I missed you.  What does this say in Arabic?

2  A.  Wahshtenee.

3  Q.  Is that strange in any way?

4  A.  That's Egyptian.

5  Q.  Egyptian.  Turn to page 3, please?

6  A.  Page 3?

7  Q.  Three lines down it reads, I created a big mess, is

8  that right?

9  A.  Yes.

10  Q.  Is that strange to you?

11  A.  That's straight Egyptian.  No other dialect use that

12  word.  That ana aaket, specifically that's an Egyptian

13  word.

14  Q.  And page 6, at the top, any words that stand out there

15  to you?

16  A.  Yes.  Nothing.

17  Q.  Nothing?

18  A.  Yes.

19  Q.  Where is that?

20  A.  Ma fesh.  That's Egyptian.  That's how they say it.

21  That means nothing.

22  Q.  So that's at page 6 at the top of the page?

23  A.  Mm-hmm (Yes).

24  Q.  Ms. Mustafa, is there anything else that made you think

25  that this was not Amal?

1    A.  Yes.  There is one thing that I also felt it's not

2    Amal, but I still wanted to support her when she said I did

3    a big mess, I want somebody to help me to get back to my

4    husband and, you know, the whole conversation.

5    Q.  Was the tone of the conversation Amal's typical tone?

6    A.  No.

7    Q.  Why not?

8    A.  Absolutely not.  When I met her, when I saw her first

9    time after she moved back to Minnesota, she was very

10    comfortable in what she did, and she felt safe, and you

11    know, I know Amal.  When she speaks, I mean, I learned from

12    her to be, you know, a strong person and very calm, and

13    even if she does something not right, she will not put

14    herself down like I'm worthless, I'm not this, I'm not

15    that.  No.

16         So that when she started talking this way, I

17    still give her the excuse that she is stressed.  This is

18    something she wasn't expecting, so I offered help.  We can

19    help her.  If that's what she wants, I will support her

20    even if I know she might not be happy to go back to him.

21    Q.  Can you please turn to page 010, 010?

22    A.  010?

23    Q.  Yep.  Then about halfway down, you ask Amal, Are you

24    all right, isn't that correct?

25    A.  Yes.

1    Q.  And what does she respond?

2    A.  Yes, I feel disappointed.  Yep.

3    Q.  And is this what you're talking about?

4    A.  That's what I'm talking about.

5    Q.  So what did this "I feel disappointed" make you think?

6    A.  That's when I started feeling this is not Amal, and I

7    wanted to know more.  I asked why.

8    Q.  Can you please turn to page 8.  I would like you to

9    start on the third line and just read to the Court.  It's

10   pretty short, but through to page 10.  I'll tell you when

11   to stop.

12   A.  So start from page 8, third line?

13   Q.  Third line down.

14   A.  When I said call her, is that --

15   Q.  Yeah.  When you say call her, who did you mean?

16   A.  I meant my mom.

17   Q.  Go ahead and read, please.

18   A.  Call her right away.  She is up.  I called her and told

19   her.  She is telling you to call her and explain everything

20   in order for her to call him.

21   Q.  And actually before you keep reading, what is going on

22   here?  Can you tell the Court what you're talking about?

23   A.  Sorry.  That's when she said I'm disappointed, I need

24   somebody to get involved between me and him and get me back

25   with him, whatever.  I offered my mom because, as I said, I

1    know Amal over ten years.  All of my friends from college,

2    we know each other very well.  They come to my mom's, and

3    you know, she is well-known in the community.

4         And I just thought maybe she can talk to him.

5    She can help.  She has been there to a lot of my friends,

6    and I know she is capable of doing that.

7    Q.  When you say talk to him, you mean Mr. Aly Saad Aly?

8    A.  Yes.

9    Q.  Please go ahead.  Now I'm ready for you to read.

10   A.  Amal then said, yes.  And I said, and I give my mom the

11   number, too.

12   Q.  Okay.

13   A.  You know, I provided her here in the conversation with

14   my mom's number, and then I told my mom here is Amal's

15   number, call her, and she said, thank you so much for

16   helping me, Amal.  And then I said, no, sweetheart, we

17   didn't, we did nothing.

18        And I said, you know, God's willing, she will be

19   able to help you more.  Just call my mom right away, and

20   everything will be fine.  And she said, yes, and I kept

21   asking, did you call her?  And she said, no, I didn't call.

22        I said, why?  Where are you?  And she said, at

23   home.  I said, okay.  Just call.  Where is your daughter?

24   And that's where I started getting worried.  She is not

25   answering.  Is she home?  Is she not home?  I said, where

1    is your daughter.  She said, with me, and that's when I

2    said, Amal, are you okay.  There was a little bit of pause

3    and stop typing and back typing and so on.

4    Q.  Would Amal have typically called your mom?

5    A.  No.

6    Q.  When you were asking her to call your mom if you were

7    talking to Amal?

8    A.  Yes.  Yeah.  As I was saying, are you okay.  I called

9    my mom right away, and I said, did she call you.  And she

10   said, no.  I have the phone right here.  She didn't call

11   me.

12   Q.  Okay.  And if you will go to page 13, please, at the

13   very bottom where it reads, Amal call me, my sweetheart.

14   That's you, right?

15   A.  Yes.  What happened.  Let's talk.  Of course, I didn't

16   get a call.  She said, yes.  I said, call me.  Let's talk.

17   She said, yes.  I said, where are you.  You didn't call,

18   and what happened is, I started calling her.  My phone was

19   in the other room on my charger.

20          So I ran and called -- the other room and grabbed

21   the phone and started dialing, and it said it's

22   disconnected?

23   Q.  You were not able to connect with Amal?

24   A.  No.

25   Q.  Who you thought was Amal at the time?

1    A.  Yes.

2    Q.  And who was Amal on the conversation able to connect

3    with you?

4    A.  No.  I didn't receive any phone calls, nothing.  I kept

5    calling and I said, your phone is disconnected.  It says

6    out of service.

7    Q.  Can you go to the bottom of page 14 and read the last

8    two sentences.

9    A.  The last two?

10   Q.  Yep.

11   A.  So Amal saying, I keep calling.  No one is answering.

12   I said, no, you didn't call.

13   Q.  And Amal never called?

14   A.  No.

15   Q.  And at the very end of the chat on page 15, you say,

16   what number do you have?  You are talking to the person on

17   the other end of the chat, correct?

18   A.  Yes.

19   Q.  You say, Amal, what number do you have?

20   A.  I said, Amal.  This took a while.  I kept calling her.

21   It was getting late.  This started after 12:00 a.m., and so

22   it was very late to call anybody else from the girls about

23   Amal to say is she okay, where is she.  I said, I will come

24   to you.  I will meet with you.

25            That's the only thing that came to my head.  I'm

1    just going to drive to go see her and see if she is okay,

2    if the baby is okay.

3    Q.  After you asked Amal, what number do you have, where

4    are you, what happened?

5    A.  There was a pause and nothing, and actually I was -- my

6    other friend who I said was online, I was asking her.  I

7    said, are you chatting with Amal, and she said, yes.  And I

8    said, don't you feel there's something weird, that's not

9    Amal.  She said, oh, I think so, too.  I said, I believe

10   so.

11   Q.  And then what happened?  Can you read the Court the

12   last two chunks that you typed?

13   A.  Yes.  I was really upset, and I wanted to say worse,

14   but I just wanted to make sure that he knows I know that's

15   not Amal.  I said, you are sick and this is not right, and

16   you know, how dare you, you know, using her name talking to

17   us, her family and friends, and --

18   Q.  You can just read it.

19   A.  You are in sick and in need for psycho therapy.  How

20   dare you talk to me and Amal's friends as if you were her.

21   Really, you are a Godless person.

22   Q.  And who were you intending this for?

23   A.  To him.

24   Q.  Him?

25   A.  Mr. Aly.

1    Q.  Okay.  And did you ever talk to Amal about this?

2    A.  Yes.

3    Q.  When?

4    A.  As soon as -- it was Sunday, this all was July 1st.  So

5    in the morning, around eleven or twelve, I started getting

6    calls from my other friend, Aziza.  She was online.  She is

7    in Canada.  She was like, are you able to reach Amal.  I

8    said, I'm calling everybody who knows her to see if we can

9    get a number.

10            And finally we did, and apparently, she changed

11   her number completely, and it was 651 area code.

12   Q.  Who is she?  What do you mean by "she," she changed her

13   number?

14   A.  Amal changed her number.

15   Q.  Okay.

16   A.  Ms. Aden, she changed her number, and so I spoke to her

17   and explained everything happened.

18   Q.  And what happened when you spoke to Amal?

19   A.  She was fine.  She said, I don't have Internet at home.

20   I, you know, I wasn't on Facebook last night.  I was asleep

21   at home with my daughter.

22   Q.  I'm sorry.  Amal said she had no Internet at the time?

23   A.  Mm-hmm, yes.

24            MS. BRUCE:  I have nothing further, Your Honor.

25            THE COURT:  Cross-examination?  Ms. Kaiser?

1           MS. KAISER:  Yes, Your Honor, just one question.

2

3                     **CROSS-EXAMINATION**

4     BY MS. KAISER:

5     Q.  Ms. Mustafa, you don't know who you were chatting with

6     on July 1, is that correct?

7     A.  Yes.

8           MS. KAISER:  No further questions, Your Honor.

9           THE COURT:  Anything else, Ms. Bruce?

10

11                    **REDIRECT EXAMINATION**

12    BY MS. BRUCE:

13    Q.  You said you don't know for sure who you were talking

14    with, right?

15    A.  As I started the conversation, I thought it's Amal, and

16    then as we went on, I was actually very sure that's not

17    Amal.

18          MS. BRUCE:  No further questions, Your Honor.

19          THE COURT:  Anything else, Ms. Kaiser?

20          MS. KAISER:  No, Your Honor.  Thank you.

21          THE COURT:  All right.  Thank you, Ms. Mustafa.

22    You may step down.

23          THE WITNESS:  Thank you.

24                    **(Witness excused.)**

25

1          THE COURT:  Okay.  Next witness?

2          MS. BERG:  Your Honor, we e-mailed Mr. Awad to

3     start earlier and have not received a response.

4          MS. BRUCE:  That's fine.  We have Ms. Boyle at

5     1:30.  She hasn't dialed in yet.

6          THE COURT:  Why don't we take a five-minute

7     break, and then we will be ready for Ms. Boyle.  Okay?

8          THE CLERK:  All rise.

9                    **(Recess taken.)**

10

11                    **(In open court.)**

12          THE COURT:  All right.  You may be seated.

13          Who do you have on the phone?

14          MS. BRUCE:  Ms. Boyle I believe is on the line.

15          Are you on the line?

16          MS. BOYLE (Via telephone):  Yes, ma'am.

17          THE COURT:  All right.  Thank you for returning

18     by telephone.  We'll continue with your testimony.

19          Go ahead, Ms. Bruce.

20          Ms. Boyle, you're still sworn.  We don't need to

21     re-swear you.

22          MS. BOYLE:  Okay.

23

24

25

1          **ELIZABETH BOYLE (Via telephone),**

2     after having been previously duly sworn, was examined and

3     testified as follows:

4              **DIRECT EXAMINATION (Resumed)**

5     BY MS. BRUCE:

6     Q.  Good afternoon, Ms. Boyle.

7     A.  Hello.

8     Q.  Thank you for cancelling your class.  Could you just

9     really quickly refresh the Court on your area of expertise

10    here today?

11    A.  Yes, my area of expertise with respect to this case

12    would be the history of female genital cutting,

13    particularly with respect to Egypt.

14    Q.  Ms. Boyle, yesterday you stated that if the child in

15    this case underwent female genital cutting it would be

16    harmful because of the physical and psychological problems

17    frequently linked to FGC.

18           Can you explain what FGC is?  I don't think we

19    had a chance to do that yesterday.

20    A.  Mm-hmm.  Sure.  Well, the type of FGC that is performed

21    in Egypt most typically is called type two under the World

22    Health Organization guidelines or rubric, and that's

23    clitoridectomy, which is exactly what it sounds like.  It

24    is the removal of the clitoris.

25    Q.  And yesterday you testified that there were physical

1    and psychological complications.  I think you covered the

2    physical pretty thoroughly, but can you please address the

3    psychological implications?

4    A.  Yeah.  There have been a number of studies done that

5    show the psychological consequences of the practice.  So a

6    recent study in the American Journal of Psychiatry found

7    that about 80 percent of circumcised women were suffering

8    from anxiety disorders, and about a third of the women,

9    over 30 percent, were suffering symptoms of post traumatic

10   stress disorder.

11        And this level is comparable to the levels of

12   PTSD among children who have been abused, physically abused

13   as children.  In addition to those consequences, other

14   psychological consequences that are typical are depression,

15   sleeplessness, anxiety, fear of sexual intercourse.

16        So those are the psychological consequences of

17   the practice.

18   Q.  Ms. Boyle, yesterday you also briefly testified that a

19   number of facts about petitioner make you particularly

20   afraid that petitioner will seek to have his daughter

21   undergo female genital cutting.

22   A.  Mm-hmm (Yes).

23   Q.  Can you tell the Court again what those facts or

24   factors are, please?

25   A.  Yes.  Well, yesterday when I was testifying, we talked

1    about the fact that he is from Egypt.  There is a number of

2    factors in addition to that.  Any one of these I think is

3    important in my, my assessment that this is a likely

4    possibility of grave risk.

5             First, the petitioner apparently said that he

6    wanted to have Princess circumcised, and he has shown an

7    interest I think in a number of ways in women's chastity,

8    and since female genital cutting is performed to keep

9    women's sexuality in check, this would be consistent with

10   that kind of idea.

11            In addition, the Salafi, as I mentioned

12   yesterday, Salafi Muslims have taken a very conservative

13   view towards women's rights, and my understanding is that

14   Mr. Aly Saad Aly is Salafi, and recently, the Salafi party

15   introduced legislation in Egypt that would legalize female

16   genital cutting, which goes to the specific issue.

17            And in addition to that -- oh, go ahead.

18   Q.  No.  Please go ahead.

19   A.  Okay.  In addition to that, there is a number of things

20   in the record that suggest that Mr. Aly Saad Aly takes a

21   conservative perspective like that of the Salafi with

22   respect to women.  So the fact that he has been married and

23   divorced -- married five times in the last ten years

24   suggests that he is following a particular view of Islam

25   that allows, that gives men easy access to divorce.

1           Also, yesterday when he was testifying about
2     polygamy, I was struck by how he talked about what the
3     Koran literally says, but there wasn't a but after that.
4     When I talk to Muslims who take a more balanced view toward
5     men and women and interpret the Koran that way, they often
6     talk about those parts of the Koran, but then they go on to
7     say, but, you know, the Koran makes it difficult to do
8     polygamy, or but my personal opinion is, but it's against
9     the law here.
10          So I was sort of struck by how he talked about
11    polygamy such as this is what the Sharia says with no kinds
12    of qualifications on that, and so it seems to me that from
13    what I've seen, Mr. Aly Saad Aly is culturally very
14    conservative and is taking a view of Islam or perceiving
15    Islam as requiring a particular kind of response to women's
16    sexuality that would be, that would involve female genital
17    cutting.
18    Q.  Okay.  And so if Mr. Aly Saad Aly were not Salafi and
19    couldn't be shown to be Salafi, were not Salafi in any way,
20    would your opinion change on this matter?
21    A.  No, because I think he has demonstrated the kinds of
22    views that the Salafi hold in other things that he has
23    said.
24    Q.  Okay.  I just want to switch gears a little bit.  Are
25    you concerned that Ms. Aden is interested in having her

1    daughter circumcised since she is from Somalia where you

2    have testified that female genital cutting is more common

3    than Egypt?

4    A.  Right.  No, I'm not concerned.  You know, first in

5    terms of the studies, you find that among immigrant women,

6    support for female genital cutting tends to be very low.  I

7    think having experienced female genital cutting themselves

8    and all the consequences, negative consequences from it,

9    these women are eager to abandon the practice.

10          And then the second thing is just in terms of,

11   I've spoken to many individuals about female genital

12   cutting, individuals who live in practicing communities,

13   and in my conversations with Ms. Aden, I've had the sense

14   that she is very adamantly opposed to it.

15          She didn't, you know, when we were chatting about

16   it, she was very adamant, but just like when I was talking

17   about some of these provisions in the Sunna that are

18   somewhat contested, it was clear that she knew about them,

19   but I couldn't even finish my sentences.

20          She would just say, no, no, that's not Islam.  So

21   it just seemed like it was a really strong and sincere

22   belief that female genital cutting was wrong and was not

23   allowed under Islam.

24   Q.  I'm sorry if you just stated this, but do you know if

25   Ms. Aden herself underwent female genital cutting?

1    A.  Yes, she did.

2    Q.  Okay.  And these conversations with immigrant women you

3    were mentioning, were these in the process of your

4    research?

5    A.  Yes.  In the process of my research, and then because

6    of my topic of research, of course, I talk to a lot of

7    other academics who are from Africa, and so it's also in

8    that context.

9    Q.  Okay.  Does your opinion that the things we've talked

10   about today, that someone who is very conservative,

11   Egyptian, mostly would favor and seek out FGC, does it

12   change given the fact that Mr. Aly Saad Aly is in Canada

13   and not in Egypt?

14   A.  It doesn't.  I still think that Princess is at grave

15   risk because Mr. Aly Saad Aly can take her to Egypt, and in

16   Egypt, it's easy to get the practice performed.  And then

17   unfortunately, even though it's against the law in Canada,

18   it is possible to, to have it done there if one thinks it's

19   important.

20          And it seems like based on the conversation,

21   everything I have just said, it seems like he does want to

22   have it done.

23   Q.  Okay.  Have you had a chance to review the report of

24   Mr. Awad in this case?

25   A.  Yes, I have.

1    Q.  And do you agree with his opinion in this matter with

2    respect to the FGC issue?  I know he talked about some

3    other issues, but just on the FGC issue?

4    A.  I think -- well, Mr. Awad is kind of talking about a

5    snapshot in time, and he's focused on the formal law, which

6    is problematic in two ways.  He has focused on the period

7    2006 to 2008 when Egypt was making progress, but as I

8    talked about yesterday, politics have changed in Egypt.

9         Mubarak was actively mobilizing to change

10   behavior about female genital cutting, and it seems like

11   Morsi has no interest in doing that.  So it's not so much

12   in that sense that I disagree with him.  I just think that

13   he is taking a particular moment in time and kind of

14   highlighting that.

15        And then the second thing I would say is that I'm

16   not focusing on individual behavior.  He's really missing

17   the disconnect.  You know, when over 90 percent of women

18   are circumcised, over 60 percent of girls under 17 are

19   circumcised, the practice is still happening regardless of

20   what the law is.

21        And then finally, just I think as a smaller

22   matter, he said that female genital cutting is rapidly

23   decreasing in Egypt, and I would take issue with the term

24   "rapidly."  Relative to other countries, Egypt has been

25   slower to change.

1    Q.  Okay.  Thank you.

2    A.  You know what?  I do think that in terms of his facts,

3    I wasn't seeing anything that I would disagree with.

4    Q.  Ms. Boyle, just to tie everything together since this

5    has been over two days, what is your opinion in this

6    specific case?

7    A.  My opinion is that if Princess is returned to her

8    father in Canada that she, she is at grave risk of being

9    circumcised and suffering the physical and psychological

10   consequences of that procedure.

11          MS. BRUCE:  No further questions from me.  I

12   think Ms. Berg will come up now.

13          THE WITNESS:  Okay.

14          THE COURT:  All right.  Cross-examination,

15   Ms. Berg?

16          MS. BERG:  Thank you.

17

18                 **CROSS-EXAMINATION**

19   BY MS. BERG:

20   Q.  Ms. Boyle, so the prevalence of female genital

21   mutilation is greater in Somalia than it is in Egypt, is

22   that correct?

23   A.  Yes.

24   Q.  So am I correct in understanding the only reason that

25   Princess is at grave risk if returned to her father is

1    because he's a man?

2    A.  No.  It's different perspectives on Islam and the

3    practice between Amal and Mr. Aly Saad Aly.

4    Q.  They both come from cultures where this is a practice.

5    Ms. Amal is in fact a victim of the practice.  Mr. Aly Saad

6    Aly has testified vigorously he is opposed to the practice,

7    but apparently none of that matters, right?

8    A.  Well, I think that when you look at the totality of the

9    orientation, when you look at the totality of the

10   orientation toward women and toward Islam and then you

11   compare that to the substance of research, you get a sense

12   that, you know, every individual is obviously different.

13          And my opinion is that Mr. Aly Saad Aly appears

14   to take a perspective on -- with respect to Egyptian

15   culture and with respect to Sharia that says that female

16   genital cutting should happen, whereas --

17   Q.  What's your direct source of information for that fact

18   that you just stated?

19   A.  The sources of information are what I know about

20   Islamic beliefs and then what's in the record in terms of

21   the things that Mr. Aly has said or that Ms. Amal had said

22   about Mr. Aly.

23   Q.  What things has Mr. Aly said that you can use to

24   support your conclusion that --

25   A.  Mm-hmm (Yes).

1    Q.  -- he would have his daughter mutilated?

2    A.  Mm-hmm.  Well, in the record, Amal has indicated that

3    he told her --

4    Q.  No.  I'm asking you what he said.

5    A.  Oh, direct from him?  Well, listening to his testimony

6    yesterday, as I mentioned, I think his testimony regarding

7    polygamy suggested to me that kind of orientation, and then

8    the second --

9    Q.  Let me stop you there.

10   A.  Sure, mm-hmm.

11   Q.  I asked him a direct question about whether or not men

12   could be in polygamist marriages and whether women could be

13   in polygamist marriages.  I wasn't asking for an

14   intellectual discourse from the Koran.

15   A.  Right.  Yeah, I understand that.  It's just usually,

16   the Koran is not -- most, I would say most Muslims today

17   view the Koran somewhat differently than the way that

18   Mr. Aly Saad Aly talked about it yesterday.

19        I mean, he was taking it very literally with kind

20   of no, no kind of nuance around that, and I think that most

21   Muslims today would introduce more cautionary notes about

22   male polygamy under the Koran.

23   Q.  Are you Muslim?

24   A.  No, I am not.

25   Q.  Where were you raised?

1    A.  In the United States.

2    Q.  So all your information about the cultural belief of an

3    Egyptian man who lives in Canada are based on research,

4    correct?

5    A.  Right.  Research and talking to people.

6    Q.  Okay.  None of whom included Mr. Aly Saad Aly?

7    A.  No.  I would mention one other issue, though, because

8    you asked about direct evidence.  I guess the other, the

9    other part of the record that struck me was the five

10   marriages in ten years, which again suggests to me a more

11   conservative orientation with respect to women's rights

12   under Islam because it seems like it's linked to a more

13   literal interpretation of the Koran with respect to men's

14   access to divorce.

15            MS. BERG:  I have nothing further.

16            THE COURT:  Ms. Bruce, anything else?

17            MS. BRUCE:  I also have nothing further.

18            THE COURT:  All right.  Thank you, Ms. Boyle.

19   We're done with you.

20            THE WITNESS:  Okay.  Thank you.

21            THE COURT:  Thanks very much.

22            THE WITNESS:  Bye bye.

23                       **(Witness excused.)**

24            MS. BERG:  Your Honor, we have Mr. Awad on the

25   phone.

1          THE COURT:  Okay.  Very well.

2          MS. BERG:  Abed, would you take off your mute?

3          MR. AWAD (Via telephone):  Yes.  I'm going to

4    call you from a land line.

5          MS. BERG:  Okay.

6          THE WITNESS:  I'm going to call right back.

7          MS. BERG:  Okay.

8          MR. AWAD:  Good afternoon.

9          MS. BERG:  Very good.  Thank you, Mr. Awad.

10         MR. AWAD:  Yes.  How are you doing, Nancy?

11         MS. BERG:  Good.  How are you?

12         MR. AWAD:  I'm doing well.

13         THE COURT:  Mr. Awad, before you testify, we have

14   to have you sworn.  We'll just take a moment.  Okay?

15         THE WITNESS:  Okay, Judge.  Thank you.

16                        **(Witness sworn.)**

17         THE COURT:  Okay.  You may proceed, Ms. Berg.

18         MS. BERG:  Thank you.

19

20                   **ABED AWAD (Via telephone),**

21   after having been first duly sworn, was examined and

22   testified as follows:

23                     **DIRECT EXAMINATION**

24   BY MS. BERG:

25   Q.  Mr. Awad, very slowly.

1    A.  Yes, I know.  I talk quite fast, so I will be

2    conscience of speaking slowly.

3    Q.  Perfect.  That's the pace.  Reminding you again to let

4    me finish because you just cut me off again.

5    A.  Sorry.

6    Q.  Please, what is your professional -- what is your

7    profession?

8    A.  I am an attorney admitted to practice law in the state

9    of New Jersey and the state of New York, and I am a partner

10   at a law practice in northern New Jersey.

11   Q.  And what is your religion?

12   A.  Muslim.

13   Q.  Where were you born and raised?

14   A.  I was born in Inglewood, New Jersey.  When I was six

15   and a half, my father after leaving the military relocated

16   to his little village where he originated from in

17   Palestine, a village in the outskirts of the main city,

18   Ramallah, and I started second grade in Ramallah, and I

19   stayed there from second grade through eleventh grade.

20          My father as an American residing abroad wanted

21   me to have an American education, so the school that I

22   attended was the Friends Boys School, a Quaker school, in

23   Ramallah, and we studied both Arabic and English together.

24   Q.  Are you -- are you fluent in Arabic?

25   A.  Yes, I read, write Arabic fluently.  In fact, when I

1    was a law student, I did professional translations of legal

2    texts.

3    Q.  And do you consult courts on Sharia law?

4    A.  I have testified as an expert on Islamic law, Sharia

5    law and the laws of the Middle East probably around 30

6    times around the country in different capacities,

7    whether -- I testified as an expert on Egyptian law

8    numerous times, and I have written many reports about

9    Egyptian law.

10    Q.  And did you prepare a report in this case?

11    A.  Yes, I did.

12    Q.  And that is Exhibit 26 which has previously been

13    admitted?

14    A.  That is correct.

15    Q.  What information did you review in preparation of this

16    report?

17    A.  Given that I am an expert on the areas or the questions

18    that I raised and articulated in the beginning of my

19    report, I'm not a finder of fact.  I relied upon the

20    following documents --

21    Q.  You know what, Mr. Awad, that's in your report.  I

22    neglected to consider that fact when I asked the question.

23    It's at page 3 of your report, so I'm going to assume the

24    Court will read the report and understand what documents

25    you have reviewed.

1           Did you have the opportunity to listen to

2    Ms. Boyle's testimony this afternoon?

3    A.  Yes.

4    Q.  And did you have an opportunity to review her report?

5    A.  Yes.

6    Q.  Now, do you also handle Hague Convention child

7    abduction cases?

8    A.  Yes, I do.  A substantial part of my practice is

9    devoted to family law related matters, including custody

10   and international custody disputes.  I do a fair amount of

11   expert work, but I also represent left behind parents in my

12   private practice, including Hague cases.

13   Q.  Now, it seems that the theory of the case that has

14   developed here is that in the event that there is an

15   allegation of domestic violence that child abduction is the

16   preferred remedy for securing the safety and well-being of

17   the child.

18           Is that a fair reading of the grave risk defense

19   or what seems to be the defense in this case?

20           MS. NELSON:  Objection, Your Honor.  Mr. Awad was

21   not noticed as an expert on the Hague Convention, nor is

22   such an expert needed in this case.

23           MS. BERG:  I'm just asking his opinion based on

24   his review of the pleadings in this matter and the

25   particular attack on Egyptian culture.

1           THE COURT:  Well, I will allow him to testify,

2       not as an expert on this subject, but he can testify as to

3       his views.

4       BY MS. BERG:

5       Q.  Go ahead, Mr. Awad.

6       A.  Yes.  In addition to my private practice, and I think

7       this is relevant to my opinion, I'm on the adjunct faculty

8       of three university law schools, and one of the courses

9       that I teach is matrimonial litigation, which is a

10      matrimonial litigation class on motion practice.  And

11      sometimes we do address issues relating to international

12      child abduction and do discuss the Hague Convention in

13      class.

14          My opinion in reviewing the report and reviewing

15      the pleadings is that it appears that the entire theory of

16      the case is hinged on the speculation that if the Court

17      finds that domestic violence took place that that alone is

18      sufficient to raise enough question that the father is

19      likely to have his daughter subjected to female genital

20      mutilation simply because of the fact that he committed

21      domestic violence against his wife and that alone should be

22      a risk of returning his child.

23          I find that speculative in that opinion, and

24      unless there are substantial findings of fact that -- other

25      than what I have seen, there is no basis for it.

1   Q.  Now, both parties are products of a culture where

2   female genital mutilation occurs.  Yet we seem to be only

3   concerned about Mr. Aly Saad, is that correct?

4   A.  That is correct.  And given the -- there is really no

5   generalization you can make about cases like this because I

6   remember when I was a freshman in studying political

7   science and statistics, when you do polling and when you do

8   surveys, it depends on the variables that are controlled.

9        And if you control a variable based on race,

10  you're going to get a different answer.  If you control it

11  based on income, you're going to get a different answer.

12  So because there is so many different variables, in the

13  female genital mutilation circumstance, when you control

14  the variable to the level of education, automatically you

15  see this drastic drop.

16       So the higher the education of the parties, of

17  the parents, the higher the education of the mother, the

18  less likely that they would subject their daughter to

19  female genital mutilation.  So I think that taking these

20  huge generalizations from statistics, without taking into

21  account these other variables, is doing a disservice, and

22  it's really not giving us a full picture.

23       When you see in the recent statistics that I

24  attached to my report, when a mother has a college

25  education, the prevalence of female genital mutilation

1    drops to like 20 percent from 65 percent.  So that just

2    says something about how we need to be careful in viewing

3    the circumstances regarding female genital mutilation.

4    Q.  You've also heard testimony, I believe, that supports

5    the notion that Mr. Aly Saad Aly is of a patriarchal

6    mindset, which is explained by the fact that he has been

7    married five times.

8            Do you see the linkage there?

9    A.  No, I do not.  And in fact, I come from a small

10   village, a rural village, very conservative.  In my part in

11   Palestine, we never even heard of female genital

12   mutilation, and the level of religiosity in my town is very

13   high, and they never conducted genital mutilation.

14           So it's clear that it's a cultural aspect of the

15   practice that is not linked to Islam but rather to non

16   Muslims and animists and other communities, but there is a

17   very strong awareness currently in advocacy groups around

18   the world and in Egypt trying to raise awareness that this

19   practice is inconsistent with the dictates of Islam and

20   should not be performed.

21           And we do see the drop in the prevalence of this

22   procedure, and that means that the advocacy and the

23   education is actually working.

24   Q.  Now, did you hear Ms. Boyle's testimony that because

25   Mr. Aly Saad Aly has been married five times, that's a

 1    predictor for female genital mutilation?

 2    A.  Yes, I did.  And there is no basis whatsoever for such

 3    a conclusion, and again, this is a, a, a factual finding

 4    that the Court will make, but when I -- when you think of

 5    sexual relationships in a Muslim society, Islam views

 6    unlawful sexual relations as the source of social

 7    disharmony and social problems in society.

 8            And because of that, Islam has a very strict view

 9    of regulating sexual relations through marriage.  So that's

10    the only way that you can have lawful sexual relations in

11    Egypt religiously, because the other thing we may want to

12    keep in mind here is that for a Muslim, his concern is with

13    the hereafter and his moral accountability to the religious

14    dictates of the divine.

15            So if the Muslim is pious and he believes that

16    unlawful sexual relations would lead him to eternal

17    damnation and that unlawful sexual relations is a grave

18    moral sin, well, of course, he is going to be very worried

19    about committing such act, and this goes both ways for

20    Muslim women and Muslim men.

21            I have seen so many Muslim women who are dating

22    other men and refuse to engage in sexual relations unless

23    they enter into a marriage contract.  So this is not

24    peculiar to a male.  This is a two-way street.  Mr. Aly

25    does not want to have unlawful sexual relations because he

1    does not want to commit a capital grave moral sin, and the

2    woman who he is sleeping with, who is also likely to be

3    pious like himself, is also not going to want to have sex

4    with him unless she is married from a legal perspective so

5    that she avoids committing sin.

6            This is not a patriarchal system.  This is a

7    moral system that applies both to male and female.  Now

8    saying that somebody was married five times and that means

9    he is very religious and he is using that as his simple

10   access to divorce, from my review of the documents, all of

11   the divorces were judicial divorces.

12           These are not religious divorces.  Other than the

13   divorce that took place in Egypt, which was also

14   registered, these are judicial divorces in European

15   countries, in a western country, divorces in Louisiana,

16   divorces in Florida, divorced in Canada.

17           So these divorces that Mr. Aly was involved in

18   did not reflect anything relating to the patriarchal system

19   and his easy access to divorce.  It reflected a foreigner,

20   a student from a conservative country who is pious.  Now he

21   has exposure to a western culture, is alone, doesn't have

22   family, and does not want to commit the moral sin.

23           So when he does meet people and he meets a woman

24   and he is interested in her, the only way he can proceed to

25   the next level is, he has to be married to her, and that's

1    why he married.  And unfortunately, these relationships,

2    he's young, he's a student, they were probably destined not

3    to work out to begin with, and they ended up in divorce.

4    And I see this prevalence as a divorce lawyer who

5    represents a lot of people in the immigrant community.  I

6    see these multiple divorces that immigrant students go

7    through quite regularly.

8    Q.  Did you read the report of Jeffrey Edleson?

9    A.  I glanced at it.  I did go through it, yes.

10              MS. BERG:  I have nothing further.  Thank you,

11   Mr. Awad.

12              THE WITNESS:  Thank you.

13              THE COURT:  Cross-examination?  Go ahead when

14   you're ready, Ms. Nelson.

15              MS. NELSON:  Thank you, Your Honor.

16

17                     **CROSS-EXAMINATION**

18   BY MS. NELSON:

19   Q.  Mr. Awad, this is Laura Nelson.  I'm one of the

20   attorneys for the respondent in this case.

21   A.  Nice to meet you.

22   Q.  Mr. Awad, would a devote Muslim man be alone in his

23   apartment with an unmarried woman that he is not related

24   to?

25   A.  Would feel alone?

1    Q.  Would he be alone in his apartment with an unmarried

2    woman he wasn't related to?

3    A.  I mean, it's kind of difficult to make such an absolute

4    generalization.  It would depend.  Is this alone where?

5    Alone in his room?  Is she Muslim like him?  Is she a

6    foreigner?  It may be inappropriate.  It may be a

7    temptation for him to maybe engage in a sexual

8    relationship.

9         It's not a moral sin, as engaging in sexual

10   relations, but if you want to generalize, depending on the

11   level of piety and religiosity of the individual, it may

12   not be appropriate.

13   Q.  Turning to female genital mutilation, if I call it FGM,

14   do you know what I'm talking about?

15   A.  Yes, I do.

16   Q.  So you agree that FGM is a horrible crime against

17   girls, right?

18   A.  Yes.

19   Q.  Okay.  And you know that it can have long term physical

20   health consequences, like depression -- chronic pain and

21   higher rates of birth complications?

22   A.  Yes.

23   Q.  And you know that it can have long term psychological

24   consequences, like depression or post traumatic stress?

25   A.  Well, based on some of the surveys that I have read,

1    yes.

2    Q.  Okay.  And you would agree that if the child in this

3    case, if she were to be circumcised, that would be a great

4    harm to her?

5    A.  Of course.

6    Q.  Okay.

7    A.  But that's what the father told me.  He believed

8    wholeheartedly in my interview that he does not believe in

9    female genital mutilation, that he subscribes to the

10   religious decree that was issued by the highest authority

11   at Azar University that says that the procedure is

12   unIslamic and that he would never subject his daughter to

13   that.

14        So I believe that the petitioner also concedes

15   with my opinion that it's not something that I would have

16   my daughter be subject to.

17   Q.  Okay, Mr. Awad.  And you stated in your report that FGM

18   has no basis in Islamic law, right?

19   A.  I said that FGM has been found to be unIslamic based on

20   the interpretation of the head religious scholar, the

21   highest authority in Egyptian legal circles, that it is

22   unIslamic, that there are small minority opinions that

23   would say that while it is not --

24        Let me explain.

25   Q.  Actually, Mr. Awad, what I would like you to do is just

1      listen to my questions and just answer them.

2      A.  Yes.

3      Q.  If opposing counsel wants to get an explanation from

4      you, she can jump up here and clarify from you, but I just

5      want to move this along.

6           So you agree that there is not complete consensus

7      on this issue of whether or not FGM is based in Islamic

8      law?

9      A.  No.  I need to explain because it's -- a yes and no

10     answer for this question won't work because under Islamic

11     law, there is a level of saying something is required and

12     then something that is not required.

13          There is consensus that it is not a required

14     ritual under Islamic law, but there is dispute on whether

15     maybe it's a discretionary thing for people to do.  So

16     there is dispute on that, that that -- that that's the only

17     saying that it is discretionary.  There is no dispute that

18     it is not a required procedure.

19          The dispute is others who say it's not required,

20     period, and it's not even recommended.  And others say,

21     well, it's a discretionary issue to be made on an

22     individual basis.

23     Q.  Okay.  So it's your testimony that certain Islamic

24     scholars say that it's prohibited by Islam and other

25     religious scholars believe that it is permitted but not

1    required by Islam?

2    A.  Yes.

3    Q.  Okay.

4    A.  That the majority position is that it is not required,

5    and the minority position is that it is not required, but

6    it is permitted on an individual basis, and the law evolves

7    and changes, of course.

8    Q.  Sure.  It does change.  And I would like to talk about

9    those changes specifically in Egypt.  Now it's been your

10   testimony that historically the rates of FGM in Egypt were

11   high, but they have been dropping, correct?

12   A.  That is correct.

13   Q.  Okay.  And in your report, you rely on -- it's

14   Exhibit 15 to your report -- you rely on some UNFPA

15   statistics, correct?

16   A.  That is correct.

17   Q.  And those statistics are from 2006 through 2008,

18   correct?

19   A.  That is correct.

20   Q.  Okay.  And you know that since 2008, there has been a

21   revolution in Egypt, right?

22   A.  Last year.

23   Q.  And you're aware that after that revolution, there has

24   been a significant change in the political landscape in

25   Egypt, right?

1    A.  That is correct.

2    Q.  Okay.  And are you aware that a member of parliament,

3    Nasser al-Shaker of the Nour party, has proposed a bill

4    that would allow FGM and has argued on public television

5    that FGM is mandated by Islam?

6    A.  Yes.

7    Q.  And are you aware that Mr. al-Shaker pointed to what he

8    called notable Egyptian scholars, such as Imam Mohamed

9    Sayed Tantawi and Abdel Halim Mahmoud and Sheikh Attiya

10   Saqr, S-a-q-r, as well as the former Egyptian Mufti Nasr

11   Farid Wasel, all of whom he has stated have said that FGM

12   was authorized under Islam and is part of the Sunna?

13   A.  Well, I would need to review those decisions and review

14   that information because the highest authority and Mufti of

15   Egypt during just the past year or so, Mufti Jumma, who is

16   very influential, he said and issued his ruling that it is

17   unIslamic and unacceptable.

18           And when you also look at authorities, you will

19   find authorities that would go both ways, and the

20   interesting thing about Sharia and Islamic law is that

21   there is no monopoly over divine will, so the

22   interpretation of these minority schools are not going to

23   have similar persuasive and important authority in the

24   strait of Egypt like the majority position.

25           And also you want to keep in mind, even though

 1    there was a revolution, the Salafi group, the Nour group

 2    that you mentioned, is really in rural areas and on the

 3    margins.  The Muslim Brotherhood, which is a mainstream,

 4    political Islamist group, is not known for advocating that

 5    female genital mutilation should be the norm, not the

 6    exception.

 7    Q.  Okay.

 8    A.  So we can't generalize about these Muslim groups that

 9    they all came from the same position.  The Salafi minority

10    group are extremists that don't have much of a following in

11    the cities, especially in Cairo where the petitioner is

12    from, and the petitioner is doing a PhD in engineering, and

13    his family is educated.

14         So we can't lump him into a group of the rural,

15    uneducated illiterate who are following some of these

16    psychos who are spewing interpretation of Islam that don't

17    have a basis in reality.

18    Q.  Okay, Mr. Awad.  You mentioned that the Nour party is a

19    fringe party and that the Muslim Brotherhood party is the

20    dominant party, correct?

21    A.  That is correct.

22    Q.  Okay.  Are you aware that MP Azza al-Garf of the Muslim

23    Brotherhood political party has also called for the FGM ban

24    to be appealed?

25    A.  I didn't see it.  If you show me exactly what he said,

1    I will review that, and that is, there is one person from

2    the Muslim Brotherhood asking for the repeal, doesn't mean

3    that the repeal is going to take place.  Also I was on

4    Egyptian TV on the mainstream progressive liberal dream TV

5    just a day before yesterday, discussing the role of Sharia

6    in Egypt and the U. S. elections and the things that are

7    going on.

8            There is no unanimity in the street in Egypt for

9    the Muslim Brotherhood.  The person who was the former

10   prime minister during the Mubarak got almost 40 million

11   votes, and the left leaning group in the follow-up election

12   got 22 million votes, only a couple of hundred less than

13   Mufti, who is currently now the prime minister, received.

14           So the point is is that their civil society is

15   quite engaged and dynamic at this point.  No one group is

16   able to overturn the other.  So when you have this type of

17   dynamic civil society, the ultimate outcome is moderation

18   because you can't rule unless you're with a coalition.

19           So my perspective is, there is authority from the

20   highest level that female genital mutilation is not

21   Islamic.  There are very strong pro feminist groups in

22   Egypt that are working to aware -- to raise awareness about

23   this procedure and why it's not medically necessary, not

24   medically in the best interests of women.

25           So I think the issue here is, it's really, we are

1    speculating and not taking into account the level of

2    education and the other variables on the likelihood of

3    somebody subjecting his daughter to this procedure.

4    Q.  Mr. Awad, you're saying that we're speculating.  We

5    don't know for sure what Mr. Aly Saad Aly is going to do,

6    correct?

7    A.  No, we don't.

8    Q.  And you don't know, either, right?  You don't know what

9    he is going to do?

10   A.  Absolutely not.

11   Q.  Okay.  And you're basing your opinion that he would not

12   have his daughter circumcised based in part on your

13   conversation with him, right?

14   A.  I'm basing my opinion, number one, again, in the end

15   this is a finding of fact.  I can only give some general

16   aid to the Court to make this decision.  The Court hears

17   all the testimony of the, of the petitioner and the

18   respondent and looks at the evidence and makes the call.

19        I'm saying that he told me he supports the

20   position of the mainstream Islamic organization's position

21   that it is unIslamic.  He told me he won't do it.

22   Q.  Okay.

23   A.  And I am looking at the variables in all of these

24   studies that show somebody of his educational level and

25   that he comes from a city, and he lives in Canada, that the

1    likelihood of him doing this is very, very nil, and you can

2    enter into many safeguards to protect against it.

3           And the fact that Ms. Boyle will testify that he

4    would find somebody in Canada to help him perform the

5    surgery on his daughter, well, I think he probably can go

6    to jail for 20 years in Canada for doing that, and I would

7    assume that the mother is going to know he did that.

8           So there are a lot of safeguards.  The Canadian

9    legal system is pretty developed like our legal system.  It

10   gives protections and restraining orders and domestic

11   violence protections and so forth.  So that's based on all

12   of these circumstances, I don't believe it's likely, but

13   that's a call that the honorable court is going to make.

14   Q.  Now, your conversation with Mr. Aly Saad Aly, was that

15   an in-person conversation?

16   A.  On the phone.

17   Q.  So you have never met him in person?

18   A.  No, I did not.

19   Q.  You have never observed his appearance?

20   A.  No, I did not.

21   Q.  Okay.  And it's your understanding that different --

22   there is a cultural component.  The different levels of

23   conservativeness dictate different dress among Muslims,

24   correct?

25   A.  I don't judge a book by its cover.

1    Q.  If Mr. Aly Saad Aly were to meet with you wearing short

2    pants, would that tell you, give you any insight into his

3    religious bent?

4    A.  Again, I don't judge a book by its cover.  I would need

5    to speak to him, ask him questions.  The level of

6    religiosity can vary from one thing to another.  I have

7    very devote Muslims in my family, but they deposit their

8    money, and they take interest, and that's prohibited.  Some

9    don't miss a prayer, and they fast Ramadan, but they will

10   drink beer during the regular year.

11            I don't know.  I would need to sit down with him

12   and talk to him and have intellectual discussions about

13   issues to understand his level of religiosity, not just by

14   looking at him.

15   Q.  Okay.  You didn't speak to Ms. Aden in preparing your

16   report, did you?

17   A.  No, I did not.

18   Q.  You didn't speak to Ms. Roundtree in preparing your

19   report, did you?

20   A.  No, I did not.

21   Q.  And you would agree that FGM is not culturally accepted

22   in North America, right?

23   A.  It is not accepted in North America.

24   Q.  And it's not legal in Canada or the U. S.?

25   A.  That is correct.

1    Q.  And it's your understanding that Mr. Aly Saad Aly knows

2    that, right?

3    A.  Yes, he does.

4    Q.  Okay.  And if Mr. Aly Saad Aly had told you that he

5    intended to have his daughter circumcised, that would have

6    changed your opinion and your testimony here today, right?

7    A.  Well, if somebody is going to tell me, listen, I'm

8    going to circumcise my daughter, of course I'm going to

9    change my testimony.  My position would be -- that the

10   whole question that is before the Court right now, is this

11   guy going to perform this procedure on his daughter or not.

12          If he tells us he is going to perform it, there

13   is no purpose for my report or your report or our

14   testimony.

15   Q.  Okay.  Mr. Awad, one last question for you.  It's a

16   very simple question.  You were paid $2,000 for your report

17   before this Court, right?

18   A.  That is correct.

19   Q.  Thank you.

20   A.  That was a reduced --

21          THE COURT:  All right.  Any redirect examination?

22   Ms. Berg?

23          MS. BERG:  No, Your Honor.  Thank you very much,

24   Mr. Awad.

25          THE WITNESS:  Thank you very much, Your Honor.

1            THE COURT:  Mr. Awad, we're done with you.  Thank

2    you very much.

3            THE WITNESS:  Thank you very much, Your Honor.

4    Bye bye.

5                      **(Witness excused.)**

6            THE COURT:  Next is Ms. Aden, is that correct?

7            MR. CARTER:  That's correct, Your Honor.

8            THE COURT:  Do we have any other witnesses

9    besides her?

10            MR. CARTER:  I believe this is it.

11            THE COURT:  Is that correct?

12            MS. BERG:  We're done.

13            THE COURT:  All right.  Let's take about a

14    seven-minute break before we hear her.

15            THE CLERK:  All rise.

16                      **(Recess taken.)**

17

18                      **(In open court.)**

19            THE COURT:  You may be seated.  All right.

20            Let's continue.

21            MR. CARTER:  Respondent calls Amal Aden.

22            THE COURT:  Very well.

23                      **(Witness sworn.)**

24

25            MR. CARTER:  Your Honor, before I begin, may I

1    just inquire as to timing?

2              THE COURT:  You may.

3              MR. CARTER:  I suspect that it probably will take

4    an hour and 45 minutes or so to get through her testimony.

5              THE COURT:  Through her direct?

6              MR. CARTER:  Mm-hmm.

7              THE COURT:  And cross will be how long?

8              MS. BERG:  I can't imagine very long.

9              THE COURT:  Let's just get started.  I have one

10   other hearing which is going to be relatively short this

11   afternoon.  So let's just get started, and we will see how

12   far we can get.  Hopefully we can finish.

13             MR. CARTER:  Okay.  Thank you, Your Honor.

14

15                          **AMAL ADEN,**

16   after having been first duly sworn, was examined and

17   testified as follows:

18                     **DIRECT EXAMINATION**

19   BY MR. CARTER:

20   Q.  Good afternoon.

21   A.  Hi.

22   Q.  Could you please state your name for the record?

23   A.  Amal Aden.

24   Q.  How old are you, Ms. Aden?

25   A.  I'm 33.

1     Q.  Where do you work?

2     A.  Hennepin County Medical Center.

3     Q.  And what do you do there?

4     A.  I'm a nurse.

5     Q.  How long have you been a nurse?

6     A.  I got my Associate Degree in 2005, so about seven

7     years.

8     Q.  And where do you live?

9     A.  Hennepin -- Anoka County, Columbia Heights.

10    Q.  And what kind of home is that?

11    A.  Townhouse I purchased back in 2007.

12    Q.  And how long have you -- how long have you lived there?

13    A.  I lived there from late 2007 to middle of 2009.  The

14    mortgage was too much for me, so I had to rent it out.  I

15    was living in an apartment from the middle of 2009 until

16    May of 2010 when I moved or relocated to Canada.

17          MR. CARTER:  Your Honor, actually in the

18    interests of efficiency, I wonder if it might be best to

19    quickly take a look at the exhibits.  As I understand it,

20    the authenticity of everything has been stipulated to, and

21    I believe that prior evidence and testimony has made them

22    all relevant, so I think the foundation is there for

23    everything if we can go through them quickly.

24          THE COURT:  Let's go through them as you need to

25    use them, and then if there is any objection, you can raise

1    that at the time.  Otherwise we'll assume it's admitted.

2    Okay?

3              MR. CARTER:  Okay.  Thank you, Your Honor.

4    BY MR. CARTER:

5    Q.  Okay.  You were just testifying that you lived in the

6    town home until 2009.  Do you remember about what month

7    that was?

8    A.  March of 2009.

9    Q.  And tell the Court again why it is you, you stopped

10   living there?

11   A.  I purchased it initially because I was expecting my mom

12   and my siblings, and as I was unable to bring them here in

13   two years.  The mortgage was too much for me to pay by

14   myself.

15   Q.  And did you want to continue living there?

16   A.  Of course, if I could afford keeping it.

17   Q.  And how is it that you can now afford to live there?

18   A.  I had a chance to refinance it while I was in Canada,

19   so I got a much less interest rate, and it cost me close to

20   1300 mortgage right now.  Still a little high, but it's

21   much better than 2500 a month.

22   Q.  And you said you rented it out until when,

23   approximately?

24   A.  From March of 2009 up to July of this year.

25   Q.  Okay.  I'm going to pull up on the screen Petitioner's

1      Exhibit 31.

2                          **(Pause.)**

3           THE COURT:  All right.  We can continue.

4    BY MR. CARTER:

5    Q.  Okay.  I have Petitioner's Exhibit Number 31 on the

6    screen.  Do you see that there?

7    A.  I do.

8    Q.  And that's the most recent lease that you executed for

9    the town home, correct?

10   A.  Yes.

11   Q.  That's identifies, who was the tenant?

12   A.  Sarah Hassan and her kids.

13   Q.  Okay.  Now, this is the signature page of that same

14   lease.  What's the dates above the signature that is shown

15   there?

16   A.  February 26th, 2012.

17   Q.  And that's your signature below that?

18   A.  Correct.

19   Q.  Okay.  Thank you.

20           Okay.  So you have been back in the town home

21   since July 2012?

22   A.  Yes.

23   Q.  And who do you live there with?

24   A.  My 14-month-old child, Princess.

25   Q.  How long have you been in Minnesota?

1    A.  I came back to Minnesota April 27th, 2012.

2    Q.  And when did you, when did you first come to Minnesota?

3    A.  Oh, Minnesota, I came 1999, December.

4    Q.  And where are you from originally?

5    A.  I was born and raised in Somalia, and I had moved to

6    Egypt for a little over two years before I immigrated to

7    the States in '99.

8    Q.  And did you come here with anyone else?

9    A.  No.  I was by myself.

10   Q.  Have you obtained any education in Minnesota?

11   A.  Yes.  I was out of high school, and I started first

12   year college in Egypt, and when I came here, I didn't know

13   much English, so I did a year and a half of English and

14   then moved in for the requirements for nursing.

15          And I got my Associate Degree in 2005 from

16   Minneapolis Community College and then started working as a

17   nurse at Abbott Northwestern and pursued my Bachelor Degree

18   from Metro State University, and I got that in 2007.

19   Q.  Now, there has been testimony that you were previously

20   married, is that correct?

21   A.  I was once married before, yes.

22   Q.  And what was this person's name?

23   A.  Abdi Ali.

24   Q.  How did you meet him?

25   A.  I met him through family in my visit to my mom in Kenya

1     in 2007.

2     Q.  What happened after you met him?

3     A.  It was sort of an arranged marriage, so we really

4     didn't know each other very much.  We got married at the

5     end of that year.  He was Somali born but Canadian

6     citizenship and got a Master Degree from Canada in

7     international law.

8          Our original plan was to reside here in the

9     States, and he came and visited here for a month in

10    December of that year and went back to Africa and decided

11    that he had a better career job in Somalia.  He was part of

12    the government at that time, so plans changed for him, and

13    he wanted me to move back to Africa and join him.

14    Q.  How did that affect the marriage?

15    A.  I did not want to go back there.  Actually, I was

16    working on trying to bring my mom and siblings here.  So

17    that kind of caused the marriage to end and at the end of

18    2008.

19    Q.  How did it end exactly in 2008?

20    A.  Petitioner talked about how easy it is to get married

21    in Islam.  It takes two people that want to get married and

22    two witnesses, and to dissolve that marriage, it takes also

23    the same two witnesses and the man actually, and the

24    divorced woman doesn't have to be present.  And that's what

25    Abdi did.

1          Two of my relatives is who he called on and

2     explained to them that I am not planning to join him and he

3     has no plans to come to North America, therefore I was

4     divorced.

5     Q.   And where did he do that?

6     A.   In Nairobi, Kenya.

7     Q.   And how was that effective in the U. S. and Canada?

8     A.   Of course, I needed official document from him.

9     Initially, he did say he will go to court in Kenya and

10    obtain a divorce certificate, but he never did that, and I

11    waited the whole 2009 for that.  In early 2010 before I

12    even made any plans to marry the petitioner, I had started

13    divorce papers here in Hennepin County.

14    Q.   And eventually you did receive those divorce papers?

15    A.   I received in September of the same year, 2010.

16    Q.   Now you heard Mr. Aly Saad Aly's testimony that you

17    received, I believe it was, $10,000 in payment to obtain

18    papers for this Abdi.  Is there any truth to that?

19    A.   I don't know what is that about.  I married this guy

20    who was a Canadian citizen.  I did apply for papers for him

21    because he had, as he said, better chances to find a law

22    job in U. S., and that was our initial plan, for him to

23    join me here.

24          And I don't know where the money is coming from

25    or why would I need money for my husband to bring him here.

1    Q.  And so your testimony is that you received no payment

2    in return for that marriage?

3    A.  No.

4    Q.  Okay.  So let's, let's talk a little bit now about

5    petitioner.  How exactly did you meet him?

6            THE COURT:  Before we go on, Mr. Carter, can I

7    clarify?

8            So the answer to the question is that you did not

9    receive $10,000 from him, is that correct?

10           THE WITNESS:  No, I did not.

11           THE COURT:  You did not receive.  Okay.

12           MR. CARTER:  Thank you, Your Honor.

13   BY MR. CARTER:

14   Q.  Okay.  How did you meet Mr. Aly Saad Aly?

15   A.  I met him online dating, Muslim site, actually.

16   Q.  And you said you met him on a Muslim site.  What kind

17   of Muslim is he?

18   A.  He's Sunni and I'm Sunni as well.  I'm not sure if

19   that's your question.

20   Q.  Is there any other -- is there any more specific type

21   of Muslim that he is, other than Sunni?

22   A.  I consider myself being conservative, but I found him

23   being more conservative than I am.

24   Q.  And how so?

25   A.  I cover my body, and that's what I believe Islam

1    requires of me as a woman.  And in addition to that, I

2    found out when I moved to him that he wanted me to cover my

3    face, like a minority of Muslims do such as in Saudi

4    Arabia.  I also found him appearance-wise when you first

5    look at him, he looks very conservative.

6              Big beard for a young person like him.  Wears his

7    pants short as a sign of very religious man in Islam.  He

8    doesn't shake hands with a woman.  He doesn't have credit

9    cards because it bears interest.  He blamed me a lot for

10   buying a house in Minnesota because that is an interest,

11   and he considered that being a sin.

12             He also was surprised that I took student loans

13   to go to school because he doesn't believe in that as well.

14   So you could see how different we are in these things and

15   how I considered myself a conservative, but I found him to

16   be a little more than I am.

17   Q.  Is he a Salafi Muslim?

18   A.  He was a regular guy early in Florida or in Louisiana

19   when he came to this country, and in Florida he was

20   introduced to more extreme Islam through Salafi group of

21   friends of his in Florida mosque, and that's when he grew

22   his beard and started being much more conservative.

23             He defined himself as a Salafi, the closest

24   people to follow Islam at the time of Mohamed.

25   Q.  How tall is he?

```
 1    A.  He's about six, two.

 2    Q.  And how much does he weigh?

 3    A.  Close to 200, maybe 190, about 200.

 4    Q.  And how tall are you?

 5    A.  I'm five, four.

 6    Q.  How much do you weigh?

 7    A.  145.

 8    Q.  Okay.  So after you met Mr. Aly on an online dating web

 9    site, what happened after that?

10    A.  I went to visit in February of 2010 to where he was

11    living, Kitchener, Waterloo, and we met in person in a

12    three-day weekend.

13    Q.  And then what happened after that visit?

14    A.  I -- he was pressuring me so much at the time to get

15    married while I was there, and I needed time to come back

16    home and think about it.  So that's what I did, and I

17    believe March, it was probably April when we got married

18    Islamically.

19    Q.  You said it was probably April.  Was it May?

20    A.  It was either end of April, beginning -- I relocated to

21    Canada in mid-May, but I was already married to him

22    Islamically, so it probably was in April.

23    Q.  Were you married civilly eventually?

24    A.  July of 2011.

25    Q.  Now, this story about meeting him online, that's not
```

1   what has been your answer that was originally filed in this

2   case, is it?

3   A.  No, it was not.

4   Q.  And what is it that you said in the original answer?

5   A.  I had made up this story that I told my mom back in

6   2010 that I met him in a friend's wedding in Toronto, and

7   back then, I was very ashamed from admitting to my mom that

8   I'm leaving my work and my country and relocating to

9   another country for someone that I met online, and in my

10  culture, it's not many girls do that.

11  Q.  And why did you continue on with that story?

12  A.  For a couple of things.  I did not see that has

13  anything to do with the case we're in.  I didn't see it

14  relevant, and the other thing was, my family that I

15  initially made up the story for them, they will be hearing

16  about this, and I was still concerned this will get to

17  them.

18  Q.  Now, there are a couple of other corrections made in

19  your amended answer.  Could you just explain briefly how

20  those errors came to be in the original?

21  A.  I believe these were misunderstanding between me and my

22  lawyers.  I had stated to them I was aware of one marriage.

23  He told me he was divorced once before we got married, and

24  so that makes that I knew about one wife or one of the

25  three.

1              And the other correction was, in July of 2010,

2    our argument did not start whether I have the child in

3    Canada.  I had already decided to have the child in the

4    States, and that was not what started the argument.

5    Q.  Is there anything else in the amended answer that's not

6    correct?

7    A.  No.  I went through this document close to 50 times,

8    and I made the corrections that needed to be made before I

9    appear before this Court.

10   Q.  Now, when you speak with Mr. Aly, what language do you

11   speak in?

12   A.  Arabic.

13   Q.  And so you heard Dalia Motaleb's testimony earlier

14   today that she overheard a conversation between you and

15   Mr. Aly in English.  You heard that testimony, correct?

16   A.  I did.

17   Q.  Is there any possible way that you had a conversation

18   with him in English?

19   A.  We speak both languages, so English will come in and

20   out of the conversation, but 100, 99 percent of our

21   conversation is in Arabic.

22   Q.  What was the event that precipitated you leaving Canada

23   and coming back home to Minnesota?

24   A.  I have been through a lot of abuse from this man, and I

25   stayed in this marriage especially after I got pregnant to

1   provide a better life for my child.  I grew up with a

2   single mother.  I knew how hard that is, so sticking with

3   him in my mind back then it was providing the complete

4   family, the father, the mother, the siblings for my child.

5           And I was going to put up with more abuse if she

6   was going to have a better life, but that abuse actually

7   extended to her.

8   Q.  And when, what was the -- when did that happen or when

9   was the last time that happened?

10  A.  April 25th, I had been arguing with him, and I really,

11  even after the baby came, I had some distraction from him.

12  I was busy with her and my work, and I was really hoping

13  that he will come into an understanding that our marriage

14  is over and that I -- we need to find out a way to separate

15  and he still has access to his child.

16          And the conversation, like it does always with

17  him, turned violent, and he started screaming and yelling.

18  He had just came back home from school, and I was feeding

19  the child in the living room, and as soon as, as soon as he

20  got loud, I took the child to the bedroom and tried to get

21  her ready for bed.

22          He comes after me, and he is pacing, and he is

23  yelling and screaming.  I come back out --

24  Q.  What was he, what was he yelling and screaming?

25  A.  That I will not be leaving with his child, that if I

1    leave, then I will be destroyed.  I'm not going to be any

2    good for anything, that he will break me to pieces, if I

3    want to translate the exact words he used, and that I was

4    going to regret.

5    Q.  So you were in the bedroom, and you brought the baby

6    back out.  What happens after that?

7    A.  I try to go back and finish feeding her, but he comes

8    after me, grabs me from the back.  Again, he starts

9    slapping me in the face, slapping me in the face, and after

10   he -- I didn't see that coming, so I was shocked.

11          And I started right away screaming at him that

12   I'm holding the baby and get away from me and her, and the

13   next thing I know is, he grabs her from me and turns

14   around, and she goes in the corner of the room is where he

15   threw her.

16   Q.  And what did you do?

17   A.  I was just running after the child, trying to get to

18   her before she hits her head on the wall.

19   Q.  Did you see the baby land?

20   A.  Yes.  She landed on her back.

21   Q.  And what did she do when she landed?

22   A.  I grabbed her, and I right away started looking at her

23   back, and I come from a neuro ICU background as a nurse,

24   and I started looking at her pupils, if she was tracking

25   me, and I started moving her extremities and up and down,

1   and she was screaming.  She was hysterically crying, and I

2   just took and ran to the bedroom and started looking,

3   checking her whole body.

4          And I -- it took me close to an hour to really

5   get her calm again.

6   Q.  You said you checked her out.  You examined her

7   immediately after you got to her.  Did you do anything else

8   over the --

9   A.  I did not sleep that night.  I was checking on her

10  hourly.  That's what we do as neuro nurses.  Usually we

11  have to check patients that had trauma to their head hourly

12  of or even more frequent.

13  Q.  And what would you do when you checked her?

14  A.  I was making sure she was breathing and she had no

15  bruises on her head, and as in any child, she would turn

16  and toss in her bed, and I made sure she was just doing the

17  normal things she would do.

18  Q.  And you didn't see any injuries in these checks?

19  A.  No.  Thankfully, no.

20  Q.  Okay.  You said that the baby started screaming and

21  crying.  You brought her back to the bedroom.  What did you

22  do then?

23  A.  I came out again, grabbed a bottle of milk for her.  I

24  took her back to the room and helped her sleep.

25  Q.  Were you able to calm her down?

1    A.  Maybe after 50 minutes, close to an hour.

2    Q.  And what happened after that?

3    A.  She went to bed.  I came out.

4    Q.  What was the petitioner doing during the time you were

5    trying to calm her down in the bedroom?

6    A.  Initially, he was not talking, but he was pacing

7    outside of the bedroom like a crazy person, but he wasn't

8    saying anything, and he eventually sat down and started

9    watching something on the computer.

10   Q.  And what happened after you came out of the bedroom?

11   A.  I had a big mess in the kitchen.  He was expecting

12   about six or seven friends of him coming for dinner the

13   next day, so I was preparing food.  I just came out of the

14   room and started putting whatever I cooked in the fridge

15   and wanted to go back to the room and stay there.

16   Q.  And what happened?

17   A.  He calls me that he wants dinner ready.  So I grabbed

18   something for him and set it in front of him in the living

19   room.

20   Q.  And then what did you do?

21   A.  I was trying to leave, and then he grabs me from my

22   neck, the shirt, and he asks me to sit down and have dinner

23   with him.

24   Q.  And did you?

25   A.  I sat down there, but I wasn't able to eat.

1      Q.  And what happened after dinner?

2      A.  He got up and went to bed.

3      Q.  And what did you do?

4      A.  I started packing the baby diaper bag and whatever

5      bottles I could, and I remember I packed about three or

6      four bags, and next to our apartment was the storage room

7      for the building.  I was able to take these bags that I

8      packed and store them in the storage room.

9      Q.  And were you afraid that he might see you doing that?

10     A.  I was terrified if he wakes up.

11     Q.  So what happened after you got the, got the bags to the

12     storage room?

13     A.  I was up most of the night, all the night actually.  I

14     did not sleep.  I was trying to go in the room and check on

15     the baby and come out, and he woke up about 6:00 a.m.

16     Q.  And what happened when he woke up?

17     A.  He came out and told me to make sure everything was

18     ready for his friends before I go.

19     Q.  And what happened next?

20     A.  He got into the bathroom, and I was able to pack some

21     of the baby clothes with a bag of my own belongings that

22     always was packed in the bedroom, and I was able to sneak

23     that bag out to the hallway.  I wasn't able to take it to

24     the storage room, but I was able to put it in the hallway

25     of the building.

1     Q.  And then what happened after that?

2     A.  He went back to sleep, and I kept packing and getting

3     ready.

4     Q.  And what happened next?

5     A.  He woke up about 9:00 a.m. with the baby when the baby

6     woke up, and I fed her breakfast, and we had a doctor

7     appointment in Hamilton, the city that was about an hour

8     away, and I was getting her ready to go there.

9     Q.  And did you end up going there?

10    A.  Yes.  As I was leaving, he was sitting on the couch,

11    turning on the Acer computer that he claims that I took,

12    and as I was leaving, he said don't be late.

13    Q.  And were you able to get the bags that you had stored

14    in the storage room?

15    A.  I was.  I had to move my car to come to the building

16    entrance that was closer to the apartment, and I had used a

17    couple bags to hold doors for me, and I loaded the car, and

18    I drove off to Hamilton, and we finished our appointment

19    there, and then I drove to Buffalo, New York.

20    Q.  And did a doctor examine Princess?

21    A.  Yes.

22    Q.  And luckily not injured?

23    A.  Thankfully no.

24    Q.  What did you do after the doctor's appointment?

25    A.  I drove to Buffalo, New York.

1    Q.  And where did you go after Buffalo?

2    A.  I had my last paycheck coming there, so I pulled that

3    money out, and I drove home here to Minnesota.

4    Q.  Did you have any communication with petitioner during

5    that drive?

6    A.  I had a pay-as-you-go phone that he had.  He called me

7    about 3:00 p.m., and where are you, why are you not home

8    yet, and we were just finishing up at the hospital, and I

9    told him we're not done yet at the hospital.

10            Next time he called me, it was past midnight, and

11   I was driving, I believe, Ohio highway, and I told him that

12   I left for Minnesota and I was not coming back.

13   Q.  And what did he say?

14   A.  In an angry voice, he said you need to come back now,

15   and I repeated myself and told him, no, I'm not coming

16   back.  And after several calls, he said if you take the

17   child and leave, then I will never want to hear from you or

18   her the rest of your life.

19   Q.  And when did you arrive in Minnesota?

20   A.  5:00 or 6:00 p.m. on the 27th.

21            MR. CARTER:  Your Honor, I'm turning to Exhibit

22   Number, Respondent's Exhibit Number 28.  It's a series of

23   bank account records from Ms. Aden's Buffalo bank account.

24   I offer it in evidence.

25            THE COURT:  Any objection?

```
 1                    MS. BERG:  What was the number again?

 2                    THE COURT:  28.

 3                    MR. CARTER:  28.

 4                    MS. BERG:  I'm sorry.  Are you waiting for me?

 5                    THE COURT:  Yeah.

 6                    MS. BERG:  I'm sorry.  No objection.

 7                    THE COURT:  28 is admitted.

 8       BY MR. CARTER:

 9       Q.  You recognize this document, don't you, Ms. Aden?

10       A.  Bank of America statement, my account.

11       Q.  And do you see that -- I'm not sure how the computer

12       got -- sorry.

13                    The callout there on the screen is the

14       highlighted transaction there.  It has a date posted of

15       April 30th, isn't that right?

16       A.  Yes.

17       Q.  And it shows a purchase at Wal-Mart's in Woodbury,

18       isn't that correct?

19       A.  Correct.  That was on the 29th but posted to my account

20       on the 30th.

21       Q.  And you remember going to Wal-Mart on that day?

22       A.  Yes, on the 29th.

23       Q.  After, after you got back into -- after you returned to

24       Minnesota, did you contact petitioner at all?

25       A.  I was tired on the 27th.  I sent him an instant message
```

1    on the 28th.  I told him I was in Minnesota in my friend's

2    mother's home in Woodbury and that Princess was doing fine.

3    Q.  And you heard petitioner's testimony that you did not

4    send him an instant message on the 28th, isn't that

5    correct?

6    A.  Yes.

7    Q.  And you've reviewed the instant chat messages that

8    petitioner has produced?

9    A.  Yes.

10   Q.  And there is no -- there is an instant message chat

11   from April 27th, isn't that correct?

12   A.  Yes.

13   Q.  But there is no message chat from April 28th?

14   A.  No.  I hoped he would include that in because it would

15   show my message to him.

16   Q.  Has petitioner ever threatened to kill you?

17           MS. BERG:  Objection.  Leading.

18           THE COURT:  Overruled.  Go ahead.

19           THE WITNESS:  I haven't heard from him for the

20   whole month of May.  First of June is when he found my new

21   phone number and called me.  He called also my mom in

22   Kenya.  He called two or three friends of mine here in

23   Minnesota.

24           In that first call, was very nice, please come

25   back.  I will fix this relationship.  I will do whatever

1    you want.  I will do whatever it takes for this marriage to

2    work, and I told him that I have left several times before,

3    but this time I have left for good and that I had no

4    objections for him to see his daughter, but for me and him,

5    it was over.

6           He was nice for two days, and then it was the 4th

7    and the 5th when he turned aggressive.  I had no idea that

8    he had reported me missing or the baby or my baby missing

9    in Canada yet, but he had.  His last phone call to me was,

10   you took my baby.  This is happening to me for the second

11   time losing a daughter, but this time I will kill you.

12   BY MR. CARTER:

13   Q.  And did you do anything in response to that threat?

14   A.  I knew he knew my address, and because I had told him,

15   I mean I was at my friend's mom's home, so I went to Anoka

16   County, and I obtained an order of protection against him.

17          MR. CARTER:  Your Honor, I am holding

18   Respondent's Exhibit Number 79.  If you have the witness

19   binder for Amal Aden, it's in the front pocket of that.

20   This is a copy of the most recent petition and order in the

21   OFP matter pending in Anoka County.  It was issued on

22   November 8th.  I offer it in evidence.

23          THE COURT:  Any objection?

24          MS. BERG:  Just a minute.  No objection.

25          THE COURT:  79 is admitted.

1     BY MR. CARTER:

2     Q.  Ms. Aden, have you been able to serve Mr. Aly this OFP

3     petition?

4     A.  I was not.  Anoka County Sheriff tried, office tried

5     several times.  After several times of trying, I got from

6     the sheriff office the contact of police he was talking

7     with in Ontario.  I talked with her, and she -- I don't

8     remember her name, but she said this address exists, but

9     this apartment does not exist.

10              So I went back to Anoka County Sheriff's Office,

11    and they told me later, maybe two months later, that the

12    police had tried, but he would not let them into the

13    building.  It's a secured building, and someone has to buzz

14    you in.

15    Q.  And in fact, that's what it says in this order here,

16    that he failed to accept service, isn't that right?

17    A.  Correct.

18    Q.  The April 25th, 2012, assault wasn't the only time you

19    and Princess have suffered physical abuse from petitioner,

20    is it?

21    A.  No.  There were several other incidents.

22    Q.  And this abuse had, did it have both a physical and

23    psychological component?

24    A.  Physical, psychological, emotional.

25    Q.  I'm going to go back one -- for one brief moment and

1    talk about the OFP in Anoka County.  In fact, you attempted

2    to serve this OFP on Mr. Aly through his counsel in this

3    case, isn't that correct?

4    A.  Correct.  We -- I have talked to actually if his

5    counsel was able to serve him, and you informed me that she

6    said she was not representing him in this case; therefore

7    she was not going to deliver.

8    Q.  All right.  I'm sorry for the interruption.  I want to

9    go back now to the abuse.  What were some of the common

10   sources of conflict that would begin these arguments that

11   led to his abuse?

12   A.  Our main conflict started right after I moved there for

13   about two months.  The picture I had from him was a man

14   divorced one time from Firyuza, wife number three, and when

15   I relocated there two months later, he told me he was

16   married to Nora Roundtree and that he had a daughter with

17   her that he never saw before.

18         He also told me about Nora, that her crazy sister

19   had called the police on him, and he's the one who told me

20   that she had an OFP against him.  Alleged abuse is what he

21   said.  That's why he was unable to go back and see his

22   daughter.

23         He also said that he was married a total of three

24   times in the U. S. and that he had a current wife in Egypt,

25   an 18-year-old.

1    Q.  And in fact, it's this wife that petitioner's mother

2    testified you had called and spoken to her about, correct?

3    A.  Must be.  I have heard of one Egyptian wife in Egypt.

4    Q.  And she says, you heard her testimony, that you were

5    angry and still believed that this woman was married to

6    Mr. Aly, correct?

7    A.  Yes.

8    Q.  And Mr. Aly never showed you a divorce certificate?

9    A.  Never from this Egyptian woman.  To him she was the

10    dream wife.  18-year-old.  Just went to middle school.  I

11    don't even think if she finished high school because to him

12    educated woman is a challenge for the man.  She was wearing

13    a head cover that I refused to wear.  She was from a

14    wealthy Saudi family.  Her father had other four wives, so

15    polygamy was accepted.  She was not refusing for him to

16    seek other woman.

17         Basically, she was the perfect package for him or

18    the perfect woman, so he was always proud to have a wife

19    like that.

20    Q.  So I think from the testimony that is already on the

21    record, we have a good understanding of Mr. Aly's approach

22    toward marriage.  Could you please describe yours and what

23    you expect with your marriage to Mr. Aly?

24    A.  My expectation was commitment to a marriage.  Yes,

25    Islam does allow men to have more than one woman, but it's

1    under very strict circumstances.  This man was a student,

2    and to have multiple wives, you have to be able to provide

3    for all of them, and had he been honest about his views on

4    polygamy, I would not have been engaged in this

5    relationship.

6            I was divorced once, and I was honest with him

7    about that, and he never told.  He only told me about one

8    divorce, and he never told me about this Egyptian wife.  To

9    him I was a temporary wife who didn't really require a lot

10   of money from him.

11           In our culture, a woman require a lot of dowry,

12   and I was very understanding of his situation as a student

13   that has no money, so I don't require much.  My dowry from

14   him was about $2,000 that he never paid to me.  So after

15   living with this guy for over two years, I found out that I

16   was the perfect person for him now.

17           Get through his education, and he has someone to

18   sleep with at the end of the night, and just the way he

19   divorced four others before me or three others before me,

20   he would just divorce and walk away.  So we came in this

21   relationship with really two different views.

22           I'm as a woman in my religion is allowed to marry

23   to one man, so I was into this marriage committed 100

24   percent, but that's not what I found in this person.

25   Q.  So aside from the conflict over his previous marriages

1    and his approach to marriage, were there any other triggers

2    of his violence?

3    A.  Whenever I would mention I want to leave, that's when

4    he gets wild, like a wild animal that you cannot stop and

5    cannot expect or cannot predict what to expect from him

6    next.

7    Q.  How many times has he assaulted you?

8    A.  Physically?  More than seven times.

9    Q.  So let's talk about another incident of, of physical

10   assault.  Do you remember the day February 27th, 2011?

11   A.  Yes, I do.

12   Q.  And did Mr. Aly assault you on that day?

13   A.  Yes, he did.

14   Q.  And how?  How did this, how did the -- how did it

15   begin?

16   A.  Going back a little bit in January of the same year,

17   he -- I wanted to leave again, and really, I did not see

18   any changes in this guy.  I told him I want to leave, and

19   he picked up the phone, actually picked up the Internet

20   first, and he said, you're going to abort before you go,

21   then.

22            I was about two months' pregnant back then.  I

23   actually did call two clinics in Toronto.  I talked with

24   the first one, and I told them I want an abortion, and they

25   have to do an intake form.  And the questions were, do you

1     have another condition, and I had a deep vein thrombosis,

2     which is a clot in the leg, from a fall of December of

3     2010, so I was on blood thinner.

4            So I told them I'm on blood thinner for that

5     reason, and they excluded me from an abortion.  They said,

6     no, we're not going to do anything with you.  I picked up

7     the phone and called a second clinic, and the middle of

8     that talk -- I was not going to tell them this time that I

9     had a clot and I was on blood thinners.

10           In the middle of the conversation, he took the

11    phone and hung up.  So I left his apartment to my cousin

12    Asha's house, and I was at her place for about two weeks.

13    I was really afraid he would physically try to hurt me is

14    why I left him, and I had just come back to his apartment

15    in February when all this is happening.

16           And it started over a -- I was very tired, and I

17    had a bad cold that day, and it was about eleven or twelve.

18    He comes storming in the room, and he says why is my lunch

19    not ready, and I just said, go on, prepare it yourself.

20    You can do it, and he gets verbally abusive.

21           A lady was staying with us that I had asked him

22    to bail out a week or a few days prior, so she came out,

23    and I told her, just go back to your room and just to stay

24    there, don't come out.

25    Q.  And what was this lady's name?

1    A.  Fowzia.

2    Q.  And what happened after that?

3    A.  He kept calling me names and insulting me, and I had

4    just come back to his apartment, and I was sick of it all,

5    and I said, I'm sorry for the word, but I said just to heck

6    with you.

7            I started packing.  I wanted to just get away

8    from him because when he gets mad, he is just a 200 pound

9    man that can just crush me if he really wanted.  I started

10   packing, and that's when he grabs me and throws me first on

11   the bed, and like he usually does, he goes for my head, and

12   it was his fist that hit my head several times.

13           And I remember getting dizzy, and I remember

14   feeling all his weight on my stomach, and I remember trying

15   to scream.  He gets off of me.  I run for the door.  He

16   grabs me for my shoulders, and that's when he kneed me in

17   the stomach.  I knew I was not going to go for the door, so

18   I run to the, I run to the window screaming.

19           He catches up with me.  Closes the window.  Grabs

20   me from my shoulders again.  Here I go into the other

21   corner.

22   Q.  And what happened after that?

23   A.  This lady Fowzia came out, and as she was trying to

24   stop him.  I was able to run and lock myself in the

25   bathroom.  I was there for about ten minutes, and I

1    remember that I vomited, and she knocks on the door, and

2    she said, come out.  He has called your cousin Asha, and

3    she is on her way to get you out of here.

4    Q.  During this -- during that attack, did you try to call

5    for help, aside from going to the windows?

6    A.  He had a habit that as soon as we start arguing about

7    anything that he will grab all the phones.  We had two

8    headsets, and he grabbed those, and he also grabbed from

9    this Fowzia lady her cell phone.

10         So I was unable to call, and she was not able to

11   call.  I have asked her from the bathroom to call 911, and

12   she said he has her cell phone.

13   Q.  And so after Fowzia came and told you that he had

14   called your cousin, what happened next?

15   A.  I think I spent there another five minutes.  I could

16   not hear him.  He must be in the living room or in the

17   kitchen, which was a little distance from the bathroom, and

18   two rooms were between where he was and I was.  I came out.

19         I had just pajamas on me, and I started putting

20   clothes on, and that's when I heard him talking on the

21   phone with the police.  I couldn't quite hear what he said,

22   but he had called 911.

23   Q.  And then what happened after he called 911?

24   A.  Two officers came within probably three or four

25   minutes.  A female officer came to me in the bedroom, and

1    she has said what's going on, your husband has called us

2    and said that you have a knife and you're threatening to

3    hurt yourself and your baby, and he wanted us here to

4    protect you.

5              And a male officer was in the kitchen talking

6    with him.

7    Q.  And what happened after that?

8    A.  The female officer started examining my arms, and I had

9    bruises and two middle fingers in my left hand were

10   swollen, and she was also concerned because I was still

11   wearing an orthopedic boot.  My broken ankle hasn't healed

12   well yet.

13             And two officers switched, and the male officer

14   was talking with me, and he said, well, you're saying that

15   you're hurt, but your husband also says that you pulled a

16   knife on him.

17             And I said I had no access to knife, and that's

18   not what the female officer told me he called about.  He

19   called about protecting me, not protecting him.

20   Q.  And did the police officers know you were undocumented

21   in Canada?

22   A.  He did not, but Mohamed started telling him that I was

23   staying illegally in Canada, that I -- I wasn't coming and

24   going at the time.  I didn't fully start working, but he

25   told them that I was overstayed in Canada.

1    Q.  Do you have any idea where Mohamed got the idea to

2    accuse you of pulling a knife on him?

3    A.  The lady that he bailed out was accused of pulling a

4    knife at her husband.  We were talking about this over

5    dinner the night before, and this woman was about five, one

6    and weighs maybe 110 pounds, and her husband was as the

7    size of Mohamed.

8         So we were just laughing about it the night

9    before how even the size of this woman and the size of the

10   man she was dealing with, how he would accuse her of such a

11   thing.

12   Q.  What, what, what happened after you talked to the

13   police officers?

14   A.  Prior to that, he was holding onto my passport, and he

15   pulled it out and gave it to me, and I had told him I just

16   want to be out of this place.  I finished packing my bags

17   with the help of my cousin, and I told him at the time that

18   I was having cramps and I needed to go to the hospital.

19        Officer Reitzel didn't really get back to me.  He

20   continued taking me, telling me to pack what I need to pack

21   if I don't want coming back to this place, so we finished

22   packing and got to the car, and my cousin drove me to the

23   hospital.

24   Q.  And were you examined at the hospital?

25   A.  Yes, I was examined by the ER doctor and also a nurse

1    and a social worker from domestic violence team.

2              MR. CARTER:  Your Honor, this is Respondent's

3    Exhibit TX Number 23.  It is a series of medical records

4    from the visit to St. Mary's Hospital.  I offer it in

5    evidence.

6              THE COURT:  Any objection?

7              MS. BERG:  No objection.

8              THE COURT:  23 is admitted.

9    BY MR. CARTER:

10   Q.  This is page 21 of that exhibit, RTX 023-021.  Do you

11   recognize this page of the report?

12   A.  Report from St. Mary's Hospital, yes.

13   Q.  I'm highlighting a drawing of a right hand, and there

14   are five circles on the wrist just below that hand that are

15   indicated as being bruises.  What are those?

16   A.  Those are Mohamed's fingers that left bruises on me.  I

17   don't bruise that easily.  I'm actually surprised that

18   these showed up there.

19   Q.  And I've highlighted now the drawing of the left hand.

20   Is there a mark just below the hand on the wrist there?

21   A.  That's another bruise.

22   Q.  And the two fingers on that hand, what is shown on

23   those two fingers?

24   A.  They were swollen and painful.

25   Q.  And in fact, the report indicates that those fingers

1    are swollen, isn't that correct?

2    A.  Yes.

3    Q.  Now, after the assault, did you have any abdominal

4    pain?

5    A.  I did mention to the ER doctor that I was having

6    cramps, abdominal cramps.

7    Q.  And this is another portion of the report.  This is

8    page 14, and the section there that I've called out

9    indicates, can you just read it there I guess real quick,

10   please?

11   A.  Any effect of --

12   Q.  You can just read the highlighted portion, please.

13   A.  She was being or she is having an abdominal pain.

14   Q.  This is page 022 of the same exhibit, and it shows a

15   drawing of a female figure in profile from the left side?

16   A.  Yes.

17   Q.  And what does the drawing show on the upper left arm

18   there?

19   A.  Irregular shaped blue bruise four by three centimeters.

20   Q.  I'm sorry.  You said those marks were bruises, correct?

21   A.  Yes.

22   Q.  After you finished your visit at the hospital, what did

23   you do?

24   A.  After I met with the ER doctor, I had told him that

25   these two fingers hurt, and he wanted to x-ray them, and I

1    told him I didn't really want to subject myself to x-ray

2    being three months' pregnant, and he still thought that I

3    should x-ray them in case they are broken, then they need

4    to do something about it.

5         So I ended up being x-rayed, and he did listen to

6    the fetal heart rate and assured me that I -- the baby was

7    still having a heartbeat.

8    Q.  This is page 24, excuse me, of Exhibit 23, and you just

9    described how you were concerned about having your fingers

10   x-rayed and the doctor saw fit to go ahead and have those

11   x-rays done, and this called out portion of the report is

12   consistent with that, isn't that correct?

13   A.  Initially I did tell him and the social worker that I

14   did not want an x-ray, but the recommendation was get

15   x-rayed, and I did go ahead and agree with that.

16        MR. CARTER:  Your Honor, I have what's marked as

17   Respondent's Exhibit 25.  It was -- they are records from

18   the Domestic Violence Treatment Center in Waterloo.  I

19   offer them in evidence.

20        THE COURT:  Any objection?

21        MS. BERG:  Nope.

22        THE COURT:  25 is admitted.  Go ahead.

23   BY MR. CARTER:

24   Q.  Did you have the -- were you checked out for your

25   injuries at any other point in time after the visit to the

1    hospital?

2    A.  No.  I haven't went back to the hospital, but I have

3    met with Ms. Rimmer, who is from social work from the

4    Waterloo regional sexual and domestic assault team.  I have

5    met with her two more times in her office.

6            MR. CARTER:  Your Honor, I also have -- let me

7    back up.

8    BY MR. CARTER:

9    Q.  And in fact, this exhibit that's on your screen now,

10   Number 25, are notes from your visits with Ms. Rimmer,

11   isn't that correct?

12   A.  Yes, I do see her signature at the bottom.

13           MR. CARTER:  Your Honor, I also have Respondent's

14   Exhibit 24.  It's a series of photographs of the injuries

15   from the February 27th events.  I offer it in evidence.

16           MS. BERG:  No objection.

17           THE COURT:  24 is admitted.

18   BY MR. CARTER:

19   Q.  Okay.  So after you were finished with the hospital,

20   where did you go?

21   A.  I went to my cousin's house, Asha.

22   Q.  And about how long did you stay there?

23   A.  Over a month.

24   Q.  I want to turn to another incidence of abuse in July of

25   2011.  Do you remember being assaulted by petitioner?

1     A.  Yes, I was --

2                 MS. BERG:  I'm sorry.  What was the date?

3                 MR. CARTER:  July of 2011.

4     BY MR. CARTER:

5     Q.  And what happened?

6     A.  I was nine months pregnant.  I received an e-mail from

7     a lady called Lala Fowzia.  She identified herself as being

8     a Moroccan in Montreal, Canada, and she said Mohamed had

9     went to Montreal and married her in March of that year.  At

10    the time she said she did not know that he was married or

11    he was expecting a child.

12                And she had found that out now, and she was

13    seeking my help to get a divorce from him.

14    Q.  And you said you were -- she said she had met him in

15    March of that year.  That would be what year exactly?

16    A.  2011.

17    Q.  Where were you in March of that year?

18    A.  I was staying with Asha.  I was still in Kitchener.

19    Q.  Okay.  So what happened after you got the e-mails?

20    A.  It shouldn't be a surprise to me knowing this person at

21    the time or by then.  I, like I did many times, I packed

22    what I can, and I wanted to leave him, and my plan was to

23    deliver in Buffalo.  And I just said, I'm just going to go,

24    and I can only drive two hours.  I will just go and stay in

25    Buffalo.

1         We argued, and thankfully this time he did not

2    hit me in the stomach, but he hit me in my head several

3    times.

4    Q.  Next I want to talk about what happened in the fall of

5    2010, September, end of September, early October.  Were you

6    assaulted by petitioner then?

7    A.  We had been just married for a few months, and it's --

8    when I found out he was still married and he had this long

9    list of women in his life, and I was not pregnant yet.  I

10   bought a one-way airline ticket to Minnesota, and he came

11   home.  I was using my Toshiba computer, and he did what he

12   always does when he comes home at night.

13        He goes and checks my e-mails, so he found this

14   ticket, and he got angry.  And I told him we're just in the

15   beginning of this, and I will leave, and each one of us,

16   we're young and can have their own life.  And he got angry,

17   slapped me in the face several times, grabbed my laptop,

18   smashed it on the floor.

19        I had an i-Phone.  He grabbed my i-Phone, put it

20   under the sink in the kitchen and put water on it.  I was

21   ready, so I just went inside and grabbed the bags.  He

22   tried to prevent me from leaving, but he knew I was, I was

23   going.  So he actually, when he said she went to Toronto,

24   he took me himself and drove me to Toronto International

25   Airport.

1    Q.   Did he assault you during that argument?

2    A.   He did slap me in the face several times.

3    Q.   And did you end up going back home to Minnesota?

4    A.   Yes.  I was here in Minnesota for about three or four

5    days.

6    Q.   Why did you go back?

7    A.   Stupid.  I received an e-mail from him three days after

8    I got here saying how devastated he was and that his father

9    passed away.

10   Q.   And so that convinced you to go back?

11   A.   I had just lost my father in 2009, so I had, I felt

12   sorry for him, and I went back.

13   Q.   Was his father dead?

14   A.   No.  As soon as I went back there, I found out that he

15   lied about it.  In fact, he said his brother Saad has sent

16   him an e-mail.  His father is diabetic and probably had a

17   diabetic coma and that his brother wanted him to go back to

18   Egypt to see his father.

19        I couldn't believe that because this man was not

20   that connected to his family.  He's not someone that's

21   there visiting them every year, and it's 2010, and as far

22   as my knowledge, he was in Egypt in 2009, so I don't know

23   how his brother would want him to come and see his father.

24   It's just a lie he made up to cover up the first lie.

25   Q.   Why didn't you leave Mr. Aly sooner?

1    A.  I left him that time, and I should not have gone back,

2    and unfortunately I got pregnant right after I got back,

3    and maybe I stated this earlier.  I wanted a better life

4    for Princess than what I had, and until he assaulted her

5    physically earlier this year, I was still willing to endure

6    more from this guy to have a better life for my baby.

7    Q.  Would you fear for Princess's safety if she were in his

8    custody?

9    A.  I would.  I was terrified the first time I went back to

10   work.  She was two months old, and he has no patience with

11   kids.  He would get angry and frustrated very easily with

12   her.  One incident, we were at bed and breakfast place at

13   the Canadian border, and I woke at 2:00 a.m. and my baby

14   was crying.  And I just ask him, give me the baby, I will

15   be able to help her sleep.

16            And he said no.  Go back to sleep.  You have to

17   work in the morning.  Go back to sleep, and I a couple

18   times told him, just give me the baby.  I will be able to

19   help her go back to sleep, and next thing I know is, he has

20   got the baby this way (indicating), and he just threw her

21   at me.

22            That's how impatient he is with her, and the fact

23   that he in a moment of anger with me, he took her from my

24   hands and just, he didn't even look where he was throwing

25   her to, doing that.

1    Q.  Has he made any direct threats against Princess?

2    A.  He did.  Before she was born, he had admiration for

3    circumcising a woman.  He had pulled this article talking

4    about why circumcision is good for a woman, especially in

5    African countries where it's warm because they reach

6    puberty earlier and become sexual earlier than other girls,

7    and so it was a way to suppress down their sexuality.

8    Q.  And he spoke favorably of this article's theory?

9    A.  He did.

10   Q.  What else has he said specifically about female genital

11   mutilation?

12   A.  After he started taking care of Princess, I was a

13   little shocked with this, how educated he is and how long

14   he has lived in North America.  He stated how shameful he

15   was to have a daughter because in the Arabic culture,

16   daughters could bring home a pregnancy outside the

17   marriage, and that's a shame.

18        And a lot of girls and women are killed in Middle

19   East yearly for honor killing, so he would be worrying

20   about these two daughters he has until they are married and

21   he is sure they are with one man.

22   Q.  Has he ever spoken about any specific plan to have her

23   circumcised?

24   A.  First time he said, why don't we take her to your mom

25   in Kenya to circumcise her, and I was in tears because I --

1    at seven years old, they had me go through this, which is
2    an inhumane thing.  It's mutilation, and it's just cutting
3    part of your body, and I told him how inhumane was this
4    procedure and how dare he would think about it.
5           And he said, well, if you're not going to have
6    your mother do it, then he had plan to go to the pilgrimage
7    this year in Mecca, and he said on way back, I will stop by
8    Egypt and have my mom do it, then.
9    Q.  Did he repeat these plans to anyone else?
10   A.  I always heard him talking with his mom on the phone
11   about how he wants his daughter to be circumcised, and
12   really having these few months away from him, I'm just
13   thinking, he's trying to do this to protect his daughter
14   from men like him, men that see marriage as their way to
15   sleep with woman and just move on to the next one.
16          I guess he was afraid what he have done to other
17   women would be haunted by, in his daughter.
18   Q.  You heard Mr. Aly's testimony that it was actually you
19   who wanted to have Princess circumcised.  Is that, is there
20   any truth to that?
21   A.  I am a victim of that procedure, so I would not dare to
22   do that to my little one.  I had, and I still haven't
23   forgiven my mother.  She had done this to my little sister
24   after I immigrated to the states.  She was four years old,
25   and I repeatedly told my mom not to do that to Fatima, but

1    she went ahead and did it to my sister.  I'm sorry.

2            THE COURT:  We have been going for a while.

3    Let's take a five-minute break.

4            THE CLERK:  All rise.

5                    **(Recess taken.)**

6

7                    **(In open court.)**

8            THE COURT:  You may be seated.  Okay.

9            You may continue, Mr. Carter.

10           MR. CARTER:  Thank you, Your Honor.

11   BY MR. CARTER:

12   Q.  Ms. Aden, you were talking about female genital

13   mutilation.  You've testified that petitioner has stated

14   that he wanted to have Princess undergo the procedure.  Do

15   you think he will go through with it?

16           MS. BERG:  Objection.  Calls for speculation.

17           THE COURT:  Overruled.  Go ahead.

18           THE WITNESS:  I believe so.  If Princess is in

19   his custody, he will.

20   BY MR. CARTER:

21   Q.  Why do you think that?

22   A.  He wanted to do that to her despite my disagreement

23   with it.  So what do you think when he has sole custody of

24   the child?

25           THE COURT:  Just a moment.  You can proceed.

1          MR. CARTER:  Thank you, Your Honor.

2     BY MR. CARTER:

3     Q.  Petitioner's abuse also had emotional and psychological

4     components, didn't they?

5     A.  Yes, it did.

6     Q.  Could you describe those?

7     A.  To me, he seemed educated, modern man.  Lived here same

8     amount of time I lived.  I believe he immigrated or came to

9     the States about '99 as well.  I knew that Arab men are not

10    fond of colored person, but that didn't seem to me when I

11    first met him, but after I moved back or I relocated to

12    Canada, I found out that he had told his family that I was

13    from Yemen.

14          It's a small Arabic country in neighboring Saudi

15    and that he was actually ashamed to admit to them that I

16    was from Somalia.  To him divorced woman, 30 years old as

17    me at the time, it's -- I guess they're very cheap to find

18    in Egypt.  He would say I could find five like you for ten

19    cents in Egypt.

20    Q.  What, what other things would he say to you?

21    A.  From -- I don't think this is the belief of Egyptians,

22    but the family he comes from, woman there in his

23    immediately, immediate family is uneducated.  His mother is

24    illiterate.  His sister went up to middle school, and to

25    him, a woman, the picture he has about woman is a

1    stay-at-home mom.

2           The plans he had for Princess were like she's not

3    going to go to mixed schools, and this is not something he

4    said, but I came to understanding that educated woman

5    equaled challenge for him.  The less educated a woman is,

6    the more obedient she is, the more she appealed to him.

7           So even though my education goes up to just a

8    Bachelor Degree, that had opened my eyes to have a voice of

9    my own and be a person of my own.  He would prefer I would

10   be uneducated like the 18-year-old he was married to in

11   Egypt.

12   Q.  What, what other things would he say to put you down?

13   A.  I'm just a nurse, woman.  I don't count for much.  He

14   really attacked my self-esteem.  You might ask yourself why

15   I stayed in this relationship this long, but when your

16   self-esteem is attacked day and night, you start feeling

17   that you are less than what you are, and you start looking.

18          He actually made me believe that I was lucky to

19   have a person like him.  It's true in the Arabic culture

20   that once a woman is divorced, she has hard time being,

21   being remarry.  That's not true in my culture.  After,

22   divorce woman gets to re-marry.  Where I come from I should

23   have considered myself lucky being 30 and re-marrying

24   someone in my age, which was him, a candidate for a

25   doctorate degree.

1          I guess he saw himself too much for me.

2    Q.  Who controlled the finances when you were staying with

3    Mr. Aly?

4    A.  When I first moved there, I had a little bit of money

5    still in my Wells Fargo account, and at the time I had to

6    add some money to the rent I was getting from the tenant

7    until I was able to refinance in early 2010 is when I was

8    able to refinance it.

9          And at the time it was paying for itself, and I

10   was actually getting maybe close to 75, $85 left in that

11   account, so at the beginning when I moved to him, I really

12   had no income.  As soon as I started working in December of

13   2010, that was after a lot of fight between me and him.

14   That was another source of conflict because he did not want

15   me working.

16         He would have rather me stay home, cover my face

17   if I'm going in the public and be just a stay-at-home mom.

18   When I was finally to convince him to start working, I only

19   worked for a couple of weeks and fell and broke an ankle,

20   and I was out of work until May of the next year.

21         As soon as I went back to work, he came up with

22   the idea of, we need to do something for Princess's future,

23   and his first plan was real estate in North America, it's

24   been really hit badly, and real estate in Egypt is booming.

25   So his first idea was to buy land in Egypt.

1          And the lie he lied to me was that his father had

2    purchased the land in his name and that we had to make a

3    payment of $4,000 a month.  That's about what I was making

4    after taxes, $4,000 a month, I did in Buffalo.  I worked

5    just the weekends.

6    Q.  What was the procedure with this money each month,

7    then?

8    A.  It's not true that I was sending money to my family.

9    Actually, my mom had -- I was supporting my mom and

10   siblings up until I moved to Canada, and then I had no job

11   for some time, from May to December.  So I had no way to

12   send them money, and my stepfather stepped in, and he was

13   taking care of his children, including my mom.

14         So I would pull out money each month from my Bank

15   of America, and I would give it to him in cash, and in one

16   incident my mom kept asking me why I don't have a cell

17   phone in Canada, and he never let me have a cell phone

18   there because I was home all the time, and I didn't need a

19   cell phone until I was close to give birth is when he got a

20   pay-as-you-go phone, and my mom actually sent $500 from

21   Africa for me to get a cell phone.

22   Q.  So Amal, excuse me.  I want you to take a look at the

23   screen there.  I have page 008 out of Respondent's Exhibit

24   Number 28.  Do you see that?

25         MS. BERG:  Could you give me the number again?

```
 1              MR. CARTER:  Exhibit Number 28, page 8.
 2              MS. BERG:  8.
 3     BY MR. CARTER:
 4     Q.  Do you see the first line of that or that callout?
 5     A.  Yes.
 6     Q.  And what is that?
 7     A.  That's the direct deposit from Kaleida Health.
 8     Q.  And what's the next transaction?
 9     A.  Cash withdrawal from Bank of America.
10     Q.  And how much was the initial deposit?
11     A.  2,062.41.
12     Q.  And how much was the cash withdrawal?
13     A.  2,020.
14     Q.  I'm turning to page 22 of the same exhibit.  The second
15     line, what type of transaction was that?
16     A.  That's another direct deposit.
17     Q.  And the last line?
18     A.  Another cash withdrawal.
19     Q.  Page 35.  Sorry.  And the first line there?
20     A.  Another direct deposit from Kaleida Health.
21     Q.  And the last line?
22     A.  Online banking transfer.
23     Q.  One line down, I think.  It says $2,034, right?
24     A.  Yes, a cash withdrawal.
25     Q.  Okay.  Now I'm going to page 28, and what does that
```

1    show?

2    A.  That's a check I wrote out to Mohamed.

3    Q.  For how much?

4    A.  3,064.59.

5    Q.  And explain for the Court, please, why you wrote a

6    check to him for $3,000 approximately?

7    A.  At the end of July, I had stopped working because I was

8    due in mid-January -- in mid-August, I'm sorry, and for

9    that weekend, he knew I was not going to go back to

10   Buffalo, New York, so he looked up my account.

11        He had both my user names and passwords for Wells

12   Fargo and Bank of America, and I was actually surprised

13   that I made comment to him.  He wrote the exact balance so

14   he makes sure that nothing is left there, and this was not

15   in preparation for Princess's birth.

16        I had already done some shopping for her before I

17   stopped working, and I had things ready for her birth in

18   the room I was renting in Buffalo where I had plans to

19   deliver her.

20   Q.  Okay.  So I would like to talk a little bit about the

21   Wells Fargo account.  Did petitioner have any access to

22   that?

23   A.  Well, the question was raised several times that he had

24   no access to these accounts.  He could not be added.  He

25   tried to be added to my accounts, but he had to be present

1    in the States to do so, but what he had access to was my

2    password and user name to log into them and know what the

3    balances are.

4    Q.  The joint Canadian account, what happened with that

5    account in January of 2011?

6    A.  I had left his apartment and stayed with Asha in

7    January, as I mentioned before, and because I had access to

8    the account, he went in the same -- next day and pulled out

9    all the money he had in there so I would not have access to

10   it, and I think that's what that withdrawal is.

11          In fact, I went back.  The same day I withdrew

12   out to buy something, and the card was declined because

13   there was no money left in it.

14   Q.  So on the screen in front of you, Ms. Aden, I have page

15   20 of Petitioner's Exhibit 23, and that is, as has been

16   previously testified, I believe, a statement from the joint

17   Canadian account you were just referring to, and what do

18   those two highlighted lines show there?

19   A.  This is the cash withdrawal he did.  I left his home

20   January 16th, and this is the next morning when he withdrew

21   all the money from that account, and after that, he would

22   keep a couple of hundred dollars in that account every

23   month for car insurance, and he had CBC account and

24   Resident's Choice account or bank account.

25          And that's where he kept his money because I have

1    no access to these two.

2    Q.  When you were with petitioner in Kitchener, did you

3    suffer from depression?

4    A.  Shortly after I moved there and the humiliation and the

5    put-down and the referring to me as cheap and five like me

6    are, could be bought in Egypt for ten cents, I of course

7    went into a very bad depression.  I withdrew from my family

8    normal activities.

9         I'm a very outgoing person.  I stopped enjoying

10   what's -- I stopped enjoying life, basically.

11   Q.  And what was the major cause of that?

12   A.  I got into marriage hoping that I will have the family

13   I separated from over twelve years.  This marriage to me

14   was creating my own family, but I shortly after I got into

15   it, I realized I was less the woman in his life that will

16   be there for some time and will be checked off, and he will

17   move to the next wife.

18   Q.  And what about the abuse?

19   A.  It was a whole disappointment, the whole thing.  I was

20   very disappointed in him as a person, and he made that even

21   worse with the verbal, emotional and psychological abuse.

22   Q.  Okay.  I want to just go back to the cash withdrawals

23   for one quick question.  Each time you withdrew cash, what

24   did you do with that, those large cash withdrawals?

25   A.  I gave it to him as he claimed every month that his

1    father had actually, the way he put it was, his father had

2    signed checks to the other party he bought the land from.

3    And in Egypt -- in America and Canada, if you write a check

4    and it bounces back, it's easily returned back to the

5    person, and you are charged a fee.

6             In Egypt, people go to prison for signing a

7    check, and he kept that fear in me.  My dad is going to go

8    to jail if you don't make that money every day, every

9    month.

10            He's not the guy that will drive to the border

11   two hours and stay in a bed and breakfast place so I can go

12   work for twelve hours and take care of the baby so I can at

13   the end of the month send that money to my family.  He's

14   the guy that isolated me from my family.

15            I'm very connected to my mom and siblings.  I've

16   called them twice a week minimum when I was in Minnesota.

17   Q.  And was Mr. Aly telling the truth about this land in

18   Egypt?

19   A.  No.  Actually he was lying about it.

20   Q.  How do you know that?

21   A.  After I moved back here for about a month, I called his

22   mother in Egypt, and that was the first time I actually

23   called her in my life.  The rest of the time she would

24   either call us or he would call her, and in that

25   conversation, I asked her, did Mohamed purchase land in

1    Egypt that you guys bought for him.  And she swore and

2    said, no, and at the end of that conversation, she said

3    he's an adult man.  He could have bought land through his

4    friends, but no, we did not purchase the land for him.

5           MR. CARTER:  Okay, Your Honor.  I would like to

6    move on to a series of questions that bear on the issue of

7    habitual residence.

8    BY MR. CARTER:

9    Q.  You moved up or you went to Canada in May of 2010.  Why

10   Canada?

11   A.  Well, I married this guy.  He was doing his school in

12   Ontario, in Kitchener, and I needed to be there at the time

13   he was finishing his school, and our plan was to move back

14   to Minnesota after he's done with the school.

15   Q.  And did he have any plans to remain in Canada?

16   A.  No.  Canada to him was a second chance to get an

17   American citizenship because he wasn't successful in the

18   U. S., and Canada to him was the place to get his PhD done,

19   and then he was, his initial plan was to look for a job in

20   the Middle East, but recently that plan had changed to

21   Egypt since Egypt now had become my -- a favorable country

22   of him.

23   Q.  What's your citizenship?

24   A.  I'm a U. S. citizen.

25   Q.  And what was your immigration status in Canada?

 1    A.  I was a visiting American.

 2    Q.  You said you've testified you worked as a nurse.  When

 3    did you first start working there?

 4    A.  December of 2010.

 5    Q.  And "there" was where?

 6    A.  Buffalo, New York.

 7    Q.  And what was the name of the hospital there?

 8    A.  Millard Fillmore Gates.

 9    Q.  And how long did you work there?

10    A.  I started in December.  After two weeks into

11    orientation, I fell and broke an ankle.  I was out of work

12    until May of 2012.  I went back and worked from May until

13    July.  I took a maternity leave from July until the end of

14    October.

15              THE COURT:  Excuse me.  Was this in 2011?

16              THE WITNESS:  Yes.

17              THE COURT:  Okay.

18              THE WITNESS:  I went back October 2011, and I

19    worked until I moved back here in April.

20    BY MR. CARTER:

21    Q.  Did you have any friends and family in Buffalo?

22    A.  No, I don't.

23    Q.  What about Kitchener?

24    A.  I had one cousin, Asha Aden.

25    Q.  Now you heard Ms. Aden's testimony that you did have

1    family in the area.  Who was she referring to?

2    A.  I know there were a few other relatives from my daddy's

3    side, but they were people that I've never met.

4    Q.  And how, when you say "relatives," how, how distant

5    relatives?

6    A.  We're from a small client on my daddy's side, and

7    they're probably from my daddy's client or tribe.

8    Q.  So when you say "relative," when Ms. Aden used the word

9    "family," she meant --

10   A.  She meant those distant relatives, yes.

11   Q.  Extending to people who are in the same tribe?

12   A.  As far as I know, there were two guys that were from

13   the same tribe as ours and their families.  Each was

14   married and had families, I think.

15   Q.  Did you ever have a place to stay in Buffalo?

16   A.  I rented a room from a family.

17   Q.  And when did you stay there?

18   A.  I stayed there whenever I was working.

19   Q.  Do you, what kind of driver's license did you have when

20   you were in Kitchener in Buffalo?

21   A.  Up until the beginning of this year, my Minnesota

22   license was valid, and when it expired, I obtained a

23   New York state license or before it expired.

24   Q.  Could you describe how you kept your personal effects

25   during the time you were in Buffalo and staying with

1    Mr. Aly in Kitchener?

2    A.  I don't understand the question.  Can you repeat it?

3    Q.  Could you describe how you, where and how you kept your

4    personal effects, things like clothes and --

5    A.  I had two suitcases that were almost always packed and

6    ready to go.  I would, initially when I started working in

7    Buffalo, I was working three or four days a week, so I was

8    three to four days in Buffalo.  And later on when I had the

9    child or was pregnant, I got a weekend job.

10          So I kept a bag of clothing in Buffalo, New York,

11   where I stayed the weekend and another bag in his house, in

12   his apartment, and I kept some stuff in Asha's place

13   always.

14   Q.  Let's talk about Princess's birth.  Where were you

15   initially planning to have her delivery occur?

16   A.  I wanted her to be born here in Minnesota.

17   Q.  And why is that?

18   A.  It's in my culture, at least, an important event of

19   childbirth, and woman likes to have family and friends

20   around her, and as I don't have my immediate family here,

21   the second best place for me to have the baby was here

22   where --

23   Q.  And --

24   A.  -- where I have uncles and aunts and friends like Heba

25   that I went to school with and still friends from ten

1    years.

2    Q.  Had you made any plans to have Princess's birth in

3    Minnesota, any arrangements?

4    A.  My friend's home that I came to after I moved back here

5    in April, my friend's mother had a room ready for me.  Two

6    of her sons were staying with her, and she did ask them to

7    go to their sister in Blaine for the time being.  And she,

8    she is from Eritrea.  It's another eastern African country,

9    and she, in their culture, they have certain foods that

10   they prepare months ahead for the woman having birth.

11          And she has done that, and she was waiting for me

12   in August, or actually end of June she was expecting me.

13   Q.  And why didn't Princess's birth happen in Minnesota?

14   A.  Her father wanted to be with me or close, so I asked

15   him to apply for a visa, and he did.  And we went to the

16   American Consulate in Toronto, and we were hoping we will

17   get -- we did that early on, maybe even in April, and we

18   were hoping we will get an answer from them, and it took

19   them close to three months to give us an answer.

20          Initially, it looked like they will grant him the

21   visa, but they looked at his history in the States and

22   found that he was staying illegally here for years, I don't

23   remember how many years.  So after six, five trips to the

24   consulate, they decided they were not going to give him a

25   visa.

1    Q.  And so what was the next plan?

2    A.  I did all my prenatal visits in Buffalo, New York.

3    That's where I had insurance, and that was relatively the

4    closest city to where he was, so I was going to deliver in

5    Buffalo.

6    Q.  And why didn't that happen?

7    A.  I was due August 12th, August 11th, and I, I was

8    overdue two weeks, and I saw my doctors on Monday, and they

9    had scheduled me for a C section on Saturday the 27th.  And

10   I had went back to visit Mohamed for that week, and I ended

11   up going into labor in Kitchener.

12              He took me to the hospital.  The labor pain was

13   coming and going, so they examined me, and I had told him I

14   have insurance in Buffalo, and I don't have insurance in

15   Canada, and the Ob-Gyn doctor at the time said I am not

16   safe to drive to Buffalo.

17   Q.  And so --

18   A.  So I ended up staying there and then ended up with a C

19   section next day.

20   Q.  And did your insurance in fact cover Princess's birth

21   in Canada?

22   A.  No.  I have close to 13,000 bill from Grand River

23   Hospital and the two physicians that I owe and have not

24   been paid by any insurance.

25   Q.  What is Princess's citizenship?

1    A.  She obtained the Canadian citizenship being born in

2    Canada, and after she was two months and I was able to

3    travel, I did report her birth to the American Consulate,

4    and they had verified that I am still residing in the U. S.

5    They had an address in Buffalo, and I still was working in

6    the U. S.

7            And they did give us an or granted her the

8    consular report of birth abroad, and in that same day, I

9    applied for U. S. passport for her.

10   Q.  And does she have a U. S. passport?

11   A.  Yes.  That's what we travel with.

12           MR. CARTER:  Your Honor, on your screen is

13   Respondent's Number 8.  It's a full page exhibit.  It is

14   the report of birth abroad for Princess.

15           MS. BERG:  No objection.

16           MR. CARTER:  I'll offer it in evidence.

17           THE COURT:  Respondent's Exhibit 8 is admitted.

18   BY MR. CARTER:

19   Q.  Does Princess have a Social Security card?

20   A.  Yes.  After I went back to work in Buffalo, I did apply

21   for her Social Security card in Buffalo, New York.

22           MR. CARTER:  Your Honor, Respondent's Number 19

23   is a copy of Princess's Social Security card, American.  I

24   offer it in evidence.

25           MS. BERG:  No objection.

1             THE COURT:  Exhibit 19 is admitted.

2     BY MR. CARTER:

3     Q.  So I want to talk briefly about what life was like

4     after Princess was born.  Can you describe immediately

5     after her birth when you took her home who took care of her

6     and the nature of that?

7     A.  He was, Mohamed was partially able to stay and work

8     from home for the first maybe couple of weeks, and then he

9     had to return to the school and work.  For the first two

10    months, I was home taking care of her solely.  He would, he

11    was in a transition of one of his projects being

12    terminated, and he had started a new project, and he was

13    very busy.

14            So he would leave early in the morning and come

15    back sometimes next day in the morning, around 1:00 a.m.,

16    and after I went back to work, I worked Saturday and

17    Sunday.  I would take care of her five days a week when he

18    is in the school, and that Friday, I would cook for the

19    weekend my food and her food and what we eat.

20            And staying at the bed and breakfast, he took

21    care of her while I was at work and was still able to do

22    some work when she was asleep.

23    Q.  So after she was born and you were working in Buffalo,

24    petitioner would accompany you to the border, is that, is

25    that correct?

1    A.  Yes.  I -- his suggestion was first that I go to

2    Buffalo and stay there like I used to do before, but I was

3    breast feeding Princess, and I had to get back at night and

4    breast feed her.  So both were traveling with me to the

5    border.

6    Q.  And how long did you breast feed Princess?

7    A.  Until she was nine months old.

8    Q.  And did -- did you have to do anything at work related

9    to that?

10   A.  Well, I had to pump once or twice in my twelve-hour

11   shift.

12              MR. CARTER:  One second, Your Honor.

13   BY MR. CARTER:

14   Q.  I have on the screen Petitioner's Exhibit Number 10.

15   Do you recognize that letter?

16   A.  The title is, yeah, I cannot forget that title.

17   Q.  Who wrote that letter?

18   A.  Mohamed did.

19   Q.  You signed it, right?

20   A.  I did sign it.

21   Q.  Why did you sign it?

22   A.  He's a guy that would not stop bugging you, and he has

23   a way to get what he wants, and that's in fact the phrase

24   he always repeated.  I wrote -- he wrote this, and I was

25   really afraid from his insults if I don't sign it.

1    Q.   Why did he want this signed letter?

2    A.   There is Canadian child benefits, and the mother is

3    entitled for that money usually, and I had no status in

4    Canada, but when he filed, he filed everything for, under

5    his name, the birth certificate and all that, and they get

6    back to us and said the mother is the only one will be paid

7    these benefits.

8         They went ahead and issued me a temporary social

9    insurance number, which is equivalent to our social

10   security number, and they started paying me the benefits,

11   which was close to $500 a month, very attractive money to

12   him.

13        And as soon as he -- they didn't pay us for

14   several months because it takes time to process me, a

15   social security number and then get the payment processed,

16   and he took that check, and he did not want this money to

17   come in my name.

18   Q.   And so this letter allowed him to get the money in his

19   name?

20   A.   Well, he came up with this story that the money will

21   not be paid anymore to Princess because I had no Canadian

22   status and that he had or I have to write something called

23   female declaration giving that right away to him, and he

24   wrote this.

25        I signed it, and next month he get paid.  The

1    payment was switched to his name.

2    Q.  Let's talk about your contacts with Minnesota while you

3    were in Buffalo and Kitchener.  Did you maintain any

4    contacts in this state?

5    A.  I did.  I didn't have as much contacts as I used to be

6    with my friends, but I still maintained that contact.  I

7    maintained contact with the mosque I used to volunteer at.

8    It's on Central and 22nd, and I kept with the planning of a

9    couple of projects we had going on there.

10   Q.  Can you describe one of those projects?

11   A.  There were several nurses and doctors from the

12   community, the Muslim community, that were putting together

13   an arrangement to take care of females after they die,

14   doing their washing and properly preparing them for burial,

15   and it was, I was part of that, and I continued working

16   with them on that project.

17   Q.  And what about family?  Did you keep up your contacts

18   with your family?

19   A.  I did, with my uncles and aunts.

20   Q.  Could you describe what it was like to return to

21   Minnesota and settle back in?

22   A.  I thought before when I was in Canada that it would be

23   really hard to come back and reestablish my life, but it

24   was much easier than what I had anticipated.  I came back

25   to my friend's mom's house in Woodbury.  They were very

1    nice with me.

2             I applied right away to a job at HCMC in May.  I

3    got that job, and I was looking for an apartment to move

4    into when the tenant in my house at the end of June said

5    she could vacate my house, and she had five kids now in

6    school, and most of them are in private school.  So she

7    wanted to move in with her mom who was living alone at the

8    time, who was living right across from me, who has the same

9    townhouse I have.

10            So I was able to move back into my house.

11   Q.  And were you able to find a good day-care for Princess?

12   A.  Actually this tenant that was renting my house, her mom

13   across from me runs a day-care, and I know this family

14   since 2009.  They took very good care of my house, and they

15   were people I trust Princess with, and that's where she

16   goes to day-care.

17            MR. CARTER:  All right.  One final topic, Your

18   Honor.

19   BY MR. CARTER:

20   Q.  Petitioner, Mr. Aly, he had access to your e-mail, is

21   that right?

22   A.  When he comes home, most of the time he would check out

23   my e-mails, but I never gave him my user names or

24   passwords.

25   Q.  And what about other Internet accounts?  Did he have

1    access to those?

2    A.  He would look at my friend's chats when I chat with

3    them on Skype and Facebook, which Facebook I didn't do a

4    lot, but Skype I've communicated with family and friends

5    through.

6    Q.  Now, you said he would monitor your e-mails at home.

7    Would you just describe that briefly?

8    A.  Well, the same time, the same way he found I had a

9    ticket booked to Minnesota, he would go and check for

10   things like that.

11   Q.  And how often would he do that?

12   A.  Very often.  Whenever he comes and the computer is

13   open, he will just go on it.

14   Q.  And how do you know he did this?

15   A.  How I found out, he would do it a lot of times in front

16   of me, and one incident I had saved several messages with

17   Lala Fowzia, wife number six from Montreal, the e-mails

18   where she is admitting that she is married to him wanting

19   to divorce from him.

20           And I saved that in one of my folders, and I

21   don't know.  I was moving something to that folder, bills

22   or payments, and I found that they were deleted, and I went

23   into the trash, and sure enough, they were deleted, too,

24   from the trash, and nobody else has access to my accounts.

25   Q.  And did you confront Mr. Aly with that?

1    A.  Yes.

2    Q.  And what did he say?

3    A.  Why are you saving it, for what reason?

4    Q.  Now, you have a yahoo account, isn't that right?

5    A.  That's the main account I use.

6    Q.  Do you happen to remember the address?

7    A.  Amal79us@yahoo.com.

8    Q.  And when did you start using this account?

9    A.  When I first started using e-mails in 2000.

10   Q.  Did you correspond with Mr. Aly using this account?

11   A.  That was my main account I used, yes.

12   Q.  You used it for e-mail?

13   A.  E-mail and instant messages, too.

14   Q.  How often would you chat with him with instant

15   messages?

16   A.  Daily, the easiest way to get a hold of me was through

17   messages.

18   Q.  Now, you've examined the chats that have been produced

19   by Mr. Aly in this litigation, haven't you?

20   A.  Yes.

21   Q.  And how many days' approximately worth of chats were

22   produced?

23   A.  A few days, maybe ten or twelve days or occurrences.

24   Q.  Did Mr. Aly access your yahoo account after you

25   returned home to Minnesota?

```
 1     A.  Yes.

 2     Q.  How do you know that?

 3     A.  On June 5th and 4th when he was going crazy and

 4     threatening me to killing, he went into my yahoo e-mail,

 5     saw e-mails I exchanged with Hennepin County Medical Center

 6     manager and human -- the HR department, and he replied back

 7     to one of the e-mails to Jeff, the hiring HR, and he told

 8     him --

 9             That was in June, and I had got interviewed in

10     May.  He had told him I'm turning down the interview and

11     the job offer.  I write formal in e-mails, and it was not

12     formal at all, and it made my manager question,

13     Ms. Fitzgerald, that it really was me.  And she followed up

14     with a phone call saying that we have received an e-mail

15     turning down the interview and the job, is this really you.

16             MR. CARTER:  I have on the screen, Your Honor,

17     Respondent's Exhibit 14.  It is the e-mail that Ms. Aden

18     just described.  I'm sorry it's not in Amal's book, but

19     it's in the larger binder.  It's on the screen.

20             THE COURT:  Are you moving its admission?

21             MR. CARTER:  I offer it in evidence.

22             THE COURT:  Any objection, Ms. Berg?

23             MS. BERG:  Yes, Your Honor.  Again, the same type

24     of objection.  There is no evidence other than the fact

25     that Ms. Amal sent these e-mails.  So -- I give up.  I
```

1      don't object.

2              THE COURT:  Okay.  Exhibit Number, is it, 14 is

3      admitted.

4      BY MR. CARTER:

5      Q.  And the e-mail that is on your screen, Ms. Aden, that's

6      the e-mail that you just described, isn't that correct?

7      A.  Yes.

8      Q.  Now, did he delete anything or was anything deleted

9      from your yahoo account?

10     A.  After I talked with Lisa Fitzgerald, I went into my

11     e-mails, and I saw this e-mail in the send box, and at the

12     time I did not look in my e-mails.  It was early June.  I

13     just changed the password, contacted yahoo and asked them

14     that my e-mail was hacked and how can I protect my e-mail.

15             And their advice was keep changing my password,

16     and I did that about two or three times a week, but in

17     late, in late July is when I looked into my instant

18     messages, and I found they were all deleted, messages with

19     him or with other friends, and my e-mails or the sent

20     e-mails with the inbox were deleted from that time going

21     backward to 2007.

22             MR. CARTER:  Your Honor, on the screen I have

23     Respondent's Exhibit Number 13.  It's a session log from

24     the yahoo account.  I offer it in evidence.

25             MS. BERG:  Foundation?

1        MR. CARTER:  In terms of -- well, it's

2   authenticated.  Its relevance is --

3        THE COURT:  Objection is overruled.  13 is

4   admitted.

5   BY MR. CARTER:

6   Q.  Do you recognize this document, Ms. Aden?

7   A.  This is another way yahoo told me to keep track of my

8   account is to look into the log in activity.  It's not

9   something I knew it exists.  Apparently, when you go to the

10  log in activity, you can see where you're logging in from

11  because I had told them in the e-mails I exchanged with

12  them that the husband I am separated from is logging into

13  my account from Canada.

14        And sure enough, one of those times, he was up

15  late in the night, logging into my account from Canada.

16  Q.  And so the two lines that I have called out on that

17  exhibit, they indicate dates of July 1st, 2012, isn't that

18  right?

19  A.  Yes.

20  Q.  And they indicate for the location, Canada, isn't that

21  correct?

22  A.  Right.  Correct.  Before that and after that you will

23  see I'm logging in from Minnesota, U. S.

24  Q.  Now this log in shows this line from the exhibit has a

25  date July 3rd, 2012, isn't that right?

1    A.  Yes.

2    Q.  It shows a log in from Washington, isn't that correct?

3    A.  Correct.

4    Q.  Could you explain why there is a Washington log in

5    there?

6    A.  As can you see, I'm logging in from my Android phone,

7    and for some reason whenever I log in from Android or

8    i-Phone it will say a different state, but it's still in

9    the U. S.  I have when I check now my e-mail, it will say

10   Wisconsin at times.  So this is logging in from mobile

11   phone.

12   Q.  So to go back to what was deleted in terms of the

13   e-mails, did he delete any e-mails that discussed

14   Minnesota?

15              MS. BERG:  Objection.  Foundation, Your Honor,

16   for the witness's knowledge.

17              THE COURT:  Overruled.  Go ahead.

18              THE WITNESS:  The e-mails we exchanged especially

19   before I moved to Canada were specific about our plan to

20   come back here.  I was putting money into this townhouse.

21   If I have no plans to come back here, I would just let go

22   of that property.  I had plans to come back.  That's why I

23   kept putting money into it until I was able to refinance

24   it.

25

1      BY MR. CARTER:

2      Q.  Did he delete anything related to the abuse?

3      A.  The incident in July when he striked me in the head

4      several times.

5      Q.  And this is when you were nine months pregnant?

6      A.  Correct.  It was probably mid-July, and I stopped

7      working end of July.  I had went to work that weekend, and

8      my head was bruised.  I had a couple bruises in forehead

9      here (indicating), and talking to him from where I was

10     staying, he said he was sorry for what he did and that he

11     will never put his hands on me again, and those instant

12     messages were there.

13     Q.  So he deleted instant messages where he said I'm sorry

14     for abusing you and it will never happen again?

15     A.  The instant message, he said I will never put my hand

16     on you again.

17     Q.  Now, you heard Heba Mustafa testify about him spoofing

18     your Facebook account, isn't that right?

19     A.  I received a phone call from Heba and Aziza, and they

20     told me you were chatting with us last night on Facebook,

21     and I had just moved into my house, and I had no Internet

22     yet.  In fact, I had no computer yet.  I had an Android

23     phone I was using.

24     Q.  And you confronted Mr. Aly with this, didn't you?

25     A.  Yes, online.

1          MR. CARTER:  Your Honor, I have Respondent's

2   Exhibit 71.  This is a compilation of instant message chats

3   and I believe an e-mail or two between the petitioner and

4   the respondent, and I offer it into evidence.

5          MS. BERG:  It's already in, I believe.

6          MR. CARTER:  Is it?

7          THE COURT:  Respondent's?

8          MS. BERG:  Respondent's Exhibit 71?

9          THE COURT:  Respondent's Exhibit 71.

10          MS. BERG:  I'm sorry.

11          MR. CARTER:  I offer it into evidence.

12          MS. BERG:  This is the same as ours, right?

13          MR. CARTER:  I'm not sure if it's the same.  It

14   is from your production, though, Counsel.

15          THE COURT:  Any objection?

16          MS. BERG:  No.

17          THE COURT:  Okay.  71 is admitted.

18   BY MR. CARTER:

19   Q.  And so I believe you just testified, Ms. Aden, that you

20   confronted Mr. Aly about him spoofing your Facebook

21   account, isn't that correct?

22          MS. BERG:  Could you tell us what page you're on?

23          MR. CARTER:  It is Exhibit 71 page 010.

24   BY MR. CARTER:

25   Q.  Okay, Ms. Aden, so when you found out about Mr. Aly

1    spoofing your Facebook account, you confronted him, isn't

2    that right?

3    A.  Yes, I did.

4    Q.  And you did so using instant message chat, didn't you?

5    A.  Correct.

6              MS. CARTER:  So, Your Honor, I am on page RTX,

7    I'm on page 10 of Respondent's Exhibit 71.  I have called

8    out a portion of that exhibit near the top.

9    BY MR. CARTER:

10   Q.  Ms. Aden, could you just read those first two lines

11   there?

12   A.  Amal:  Facebook and everything you have access to will

13   be shut down.

14             Mohamed Aly:  At least I was trying.

15   Q.  Ms. Aden, when petitioner was using a computer when you

16   were there with him in Canada, what computer would he use?

17   A.  Well, when I moved there, I had a brand-new Toshiba

18   computer, and he had an Acer computer a professor of him

19   had given him, so we had two computers, up until October

20   when he smashed my computer.

21   Q.  And --

22   A.  So since then we just had the Acer, up until maybe

23   beginning of the year.  That Acer computer battery died, so

24   he put it in the closet, and he would buy a computer from

25   Best Buy or Wal-Mart, use it for two weeks and return it

1      again.

2      Q.  And so you, you heard Mr. Aly's testimony about how you

3      took the Acer computer with the bad power supply.  Did you

4      take that computer?

5      A.  I did not.

6      Q.  And so, in fact, when the police report states that

7      they observed him using that, that Acer computer, is that

8      surprising to you?

9      A.  No, because that's the most likely the Acer computer

10     that was dead, and he was looking for a battery for it.

11     That's why he did not buy one computer and keep it.  He

12     would buy a computer every two weeks and return it and then

13     go to the next store and get another computer.

14            He lived like that from the beginning of January.

15     I'm not exactly sure, but most likely from January.

16            MR. CARTER:  May I have one moment, Your Honor?

17            THE COURT:  Sure.

18            MR. CARTER:  Your Honor, we have a couple more

19     exhibits we would like to submit into evidence.

20     Respondent's Exhibits Number 10, 11 and 12.  These are

21     filings.  All three are filings and the Anoka County order

22     for protection.

23            MS. BERG:  No objection.

24            THE COURT:  10, 11 and 12 are admitted.

25            MR. CARTER:  All right.  I have nothing further,

1   Your Honor.

2              THE COURT:  Okay.  Will there be

3   cross-examination?

4              MS. BERG:  Yes.

5              THE COURT:  Let's take about a five-minute break.

6              MS. BERG:  I'm sorry?

7              THE WITNESS:  We'll take a five-minute break

8   first.

9              MS. BERG:  Okay.

10             THE CLERK:  All rise.

11                      **(Recess taken.)**

12

13                      **(In open court.)**

14             THE COURT:  You may be seated.

15             You may begin cross-examination.

16             MS. BERG:  Thank you, Your Honor.  I'm going to

17  make this as quick as possible because I can tell everyone

18  is exhausted.

19             THE COURT:  That's all right.

20

21                      **CROSS-EXAMINATION**

22  BY MS. BERG:

23  Q.  Ms. Aden, directing your attention to your Exhibit 71,

24  do you have that in front of you?

25  A.  71?

1    Q.  I'm sorry.  I just do it the old-fashioned way.  Do you

2    want me to put it up there?

3            Will you put it up there, Jen?

4            Starting at page 006 --

5    A.  Did you say 71?

6            MS. BERG:  Is this on?

7            THE COURT:  Yes.

8            MS. BERG:  Your Honor, can I just do the paper?

9    This thing is not hooked up.

10           THE COURT:  Go ahead.  It's on now.

11           MS. BERG:  All right.  Thank you.

12   BY MS. BERG:

13   Q.  Do you have page 6 in front of you?

14   A.  I do.

15   Q.  Now, this, you quoted a little bit of this series of

16   text messages that you had with Mr. Aly Saad Aly, but in

17   fact this went on quite lengthy, didn't it?  And isn't this

18   where he is begging you to tell him where his daughter is

19   and that she is okay?

20   A.  Give me a minute to read this, please.  Yes.

21   Q.  Turning to the next page, 007.

22   A.  Yes.

23   Q.  You tell Mr. Aly Saad Aly that basically life is not

24   fair and this is going to be the way it is, don't you?

25   A.  After what I have dealt with him, yes.

1    Q.  Now, I found it odd in your testimony that July where

2    you found out about -- you're nine months pregnant, and you

3    find out about the Moroccan woman, that's the same month

4    you got married and the same month you allege this assault

5    occurred and the same month you alleged he forced you to

6    give him all this money.

7             That all happened in that same month, right, the

8    month you got married?

9    A.  We got married on the 6th of that month, and a week

10   later is when I got these e-mails from Fowzia.

11   Q.  I'm kind of suspicious, Ms. Aden.  It seems like you're

12   really more upset about these other women that you think

13   he's involved with than anything else and that this whole

14   scene here is a retaliation to punish him for your belief

15   that he has other women in his life, is that correct?

16   A.  I was very angry knowing that he had this history of

17   marriage, and yes, I did say before that I -- one of the

18   reasons of conflict in our marriage was women.

19   Q.  And so -- and you in fact called his mother and

20   complained about this Egyptian wife, didn't you?

21   A.  I called the mother and asked her about the land he

22   purchased, and I told her I had left her son and I am back

23   in the States, and that's when she went on and asking me

24   about -- no, actually she said you're the only family he

25   has in North America, how could you leave him.

1          And at the time I told her, I am his wife

2     currently, yes, but he has an Egyptian wife who is being on

3     hold per his statement since I got pregnant and want to

4     come to Canada to be with him now.

5     Q.  Didn't she tell you that wasn't true?

6     A.  She told me that he divorced that woman, but he had

7     made me live -- and later on he produced a divorce

8     certificate from that lady, but for the two years I've

9     lived with him, that woman was jealous because I got

10    pregnant.

11         That woman that refused to come with him to

12    Canada two years ago per him again had now gotten a

13    scholarship from her father and was going to come to Canada

14    and study because I had to ask him how would she want to

15    come to Canada when we are legally married, and he says

16    well now her father got her scholarship and she wants to

17    come.

18    Q.  So isn't the reason that you left on April 27th the

19    fact that you had lost your job, you felt like you had

20    better opportunities in Minnesota, and you didn't care

21    whether or not you were violating any laws by taking this

22    child out of Canada away from her father?

23    A.  I still had a job, ma'am, until I left.  I terminated

24    my job when I got here, and the reason I left was to

25    protect my baby.  She was in direct -- directly violated by

1    her father the way he threw her.

2    Q.  You saw her -- you were seen at the hospital the next

3    day.  She was seen by a doctor the next day.  You never

4    bring it up.  Why is that?

5    A.  I have no trust.  I have no trust in -- first, she

6    didn't have injuries, and second of all, the Canadian

7    police came to the apartment.  I had bruises.  I had a

8    boot, an orthopedic boot in my leg.  I was three months

9    pregnant.

10         The minute they came, they listened to my story,

11   and he came up, she pulled a knife on me.  I was this close

12   (indicating) on the 25th of April to call the police.  Why

13   I didn't call them?  I did not because the minute they come

14   home, he will come up with another story, and then they

15   will look at us and say she said, he said.  They both are

16   lying or one of them is lying, and they will walk out.

17         I could not imagine that I will be in the U. S.

18   with a broken ankle three months pregnant and have bruises

19   all over me.  I don't bruise easily.

20   Q.  No.  You only --

21   A.  And the fact that these bruises came out --

22   Q.  You had one bruise that was -- or strike that -- two

23   bruises that were found in that medical examination.  There

24   were three places on your body, your thigh, your shoulder,

25   another place where you complained of injuries but no

1    injuries were observed.

2    A.  It takes, it takes a lot for my body to bruise, and the

3    fact that these bruises appeared, I was surprised actually

4    to see them in the pictures.

5    Q.  We only have your word on that, right?

6    A.  Yes.

7    Q.  Now, in fact isn't it correct that you and Mr. Aly Saad

8    Aly each had each other's e-mail accounts and passwords and

9    used them interchangeably?

10   A.  If I had his e-mails, access to his e-mail, I would

11   have done maybe the same thing to him.  I would have

12   deleted e-mails.  Does he have any e-mails deleted?

13   Q.  I'm going to direct your attention to our exhibit book,

14   Exhibit Number 21, page 234.  Can you find that?  I'm going

15   to put it up here as well.  Is that an e-mail that you sent

16   to Mr. Aly Saad?

17   A.  Yes.  He had at this time actually locked the computer,

18   and I had to go back to my work, and I didn't have a phone

19   card to call from Canada to Buffalo, and at that incident

20   he gave me the computer password and his Skype password,

21   and I was able to call Buffalo with his Skype account.

22   Q.  Okay.  Now, I want to show you the next page because we

23   have been, we've heard from Mr. Edleson how controlling he

24   was and making your life hell.  Look at this next page of

25   Exhibit 21, page 231.

1              Mr. Aly Saad Aly got you phone cards to call

2      home, didn't he?

3      A.  Yes, he did at this time.

4      Q.  Same exhibit, page 174, down at the bottom third, I see

5      you asking him how much money in the bank.  Then you say,

6      gas will take $30.  Mr. Aly Saad Aly says, don't worry

7      about it.  Just get gas and come home.

8              So clearly you had access to the bank?

9      A.  He has access to my Bank of America account.  It's me

10     asking him how much is in the bank account.

11     Q.  How did he get access to your Bank of America account?

12     A.  He had access to both my Wells Fargo and Bank of

13     America.  I gave him the password and the user name under

14     pressure like always he did.

15     Q.  And this instant message, you asked him to come home

16     and take care of the baby because your back is killing you.

17     So he was an active involved father, wasn't he?

18     A.  He was taking care of Princess in the weekends, yes,

19     and this instant, yes, I --

20     Q.  There is no question in front of you.

21     A.  Sorry.

22     Q.  And then April 27th, begging you, where are you, where

23     is our daughter?

24              MR. CARTER:  Excuse me.  I'm not sure what page

25     this is.

1          MS. BERG:  I'm sorry.  96.  Same exhibit.

2          MR. CARTER:  And what page number are you

3     referring to?

4          MS. BERG:  96 of Exhibit 21.

5          MS. BRUCE:  They're still not in order.  Can you

6     give us --

7          MS. BERG:  I'm sorry.  Yeah.  I don't know what

8     happened here.  April 27th, 12:22 a.m.

9          MR. CARTER:  What year?

10          MS. BERG:  2012.

11     BY MS. BERG:

12     Q.  Now, I'm confused, Ms. Aden, because I thought you told

13     us in June or July you changed all your passwords and your

14     e-mail addresses, and in fact, now that I think about it,

15     why wouldn't you have done that the minute you left if you

16     were so frightened of this man?

17     A.  I have, ma'am, and he still hacked my e-mails.

18     Q.  But he complains in this Exhibit 21 that his e-mails

19     have been hacked into as well.

20     A.  The same, the time I told him my e-mails were hacked,

21     of course he's going to say my e-mails were hacked, too.

22     My Skype was hacked.  My Skype was hacked.

23     Q.  Now, I'm also still struggling with this story about

24     your departure from Canada because you told us that Mr. Aly

25     Saad threw the baby across the room.  You were so worried

1    about her you stayed up all night checking on her every

2    hour, and that was, I believe, April 24th, if I'm not

3    mistaken -- 25th -- no.  The incident was the 24th.

4         You stayed up all night on the 25th.  Then you

5    took her to the doctor.  Then you drove to Buffalo.  You

6    removed your last paycheck, and then you drove 15 hours

7    straight to Minneapolis, is that correct?

8         MR. CARTER:  Objection.  I believe counsel has

9    misstated the testimony.

10        THE COURT:  How so?

11        MR. CARTER:  April 25th.

12        MS. BERG:  That's what I said.

13        THE COURT:  Well, 24th, what -- it's April 25th

14   is the date, correct?  Let's just go ahead.

15   BY MS. BERG:

16   Q.  I apologize.  It was the 25th that you claim the child

17   was thrown to the floor?

18   A.  Yes.

19   Q.  So you were essentially awake for 48 straight hours?

20   A.  I was awake that whole night, and when I got to

21   Buffalo, I, from Buffalo or the time I drove from Buffalo

22   and I got to Minnesota, it took me 21 hours.

23   Q.  The apartment you mentioned that you had in New York,

24   that was actually an address you used in order to secure

25   some of the benefits from your employer, isn't that

1    correct, because you had to have a U. S. address?  It's a

2    Somali family.

3    A.  I rented a room from them, and I stayed there when I

4    was working in Buffalo.  I could not commute from Buffalo

5    back to Kitchener two hours for every day that I worked.

6    Q.  Did you ever tell Mr. Aly Saad Aly that if he wanted to

7    see his daughter he could go to the State Department?

8    A.  I have received a mail from the State Department asking

9    me to return Princess to Canada, and I told them I was

10   scared for her life and my life, and I believe he

11   communicated with me after that, and I told him there is a

12   legal way you can see your daughter through.

13          I don't feel safe coming back to you, and I'm

14   going to file a divorce, and within that divorce, there

15   will be custody that's decided between you and I, and

16   that's how we will, how we are going to go by because I

17   don't feel safe going back to him.

18   Q.  You understand this isn't a custody proceeding?

19   A.  No, but when I came here, that was my plan, to file for

20   a divorce and a custody.

21   Q.  And you understand that it is very likely that he will

22   be awarded parenting time with your daughter in Canada

23   without you?

24   A.  I'm going to hope --

25          MR. CARTER:  Objection.

1           THE WITNESS:  -- that doesn't happen.

2           THE COURT:  Just a moment.

3           MR. CARTER:  Objection.  I'm not sure what the

4      relevance is or whether the witness is competent to testify

5      on likelihood of --

6           THE COURT:  Objection sustained.

7      BY MS. BERG:

8      Q.  Do you think he's going to have such limited access to

9      his daughter that -- because he can't come to the United

10     States, how is he going to see her?

11     A.  Early this year, January, he had applied for

12     citizenship for Canada, and by now or soon he will be

13     Canadian citizen, and he will be able to enter the U. S.

14     that way.

15     Q.  Okay.  Now, you were trained as a nurse here in

16     Minnesota, is that correct?

17     A.  Yes.

18     Q.  Did you receive any training on domestic abuse?

19     A.  Very little.

20     Q.  And your employer in Buffalo, did they provide you with

21     any training on domestic abuse?

22     A.  These trainings are provided for the nurses that

23     initially do an intake for patients.  I worked in an

24     intensive care unit where most people are comatose or in

25     critical situations.

1    Q.  And do -- sorry.

2    A.  I -- I didn't have the training to do the screening of

3    abuse, and the kind of job I did did not involve those type

4    of people.

5    Q.  But you're not here to tell us that you didn't

6    understand how to protect yourself from this alleged

7    domestic violence by going to the police?

8    A.  I've tried each time of insults to get hold of the

9    phones.  I know 911 exists, but he was overpowering me each

10   time and collecting everything I could use.

11   Q.  You went to work?

12   A.  Yes, and it's a very different cycle.  I don't wish

13   that for my worst enemies to get into it.

14   Q.  But according --

15   A.  When you're getting in a violent situation, you go

16   around in a circle that you break out of it once when

17   you're lucky to do so.

18   Q.  Now, you felt pretty comfortable signing your response

19   to this verified petition under oath and lying about how

20   you met him, didn't you?

21   A.  Yes, I did.

22   Q.  Okay.  But you and your lawyers are pretty concerned

23   that he lied to the police in Ontario when he first tried

24   to make a report that you were missing because he was

25   afraid if he did anything more than have concern about his

1   car, something bad would happen to you.  It was the same

2   kind of lie, wasn't it, out of fear?

3   A.  It is out of fear, but I -- what he lied about has big

4   relevance to this case, and what I lied about has to do

5   nothing with this case.

6   Q.  The fact that he lied to the police and said you were,

7   you had gone to Minnesota and his daughter was somewhere

8   else but he was really worried about the car, that has more

9   relevance to this case?

10  A.  The fact that he is worried about the car and not his

11  daughter after more than a month of us being gone.

12  Q.  But wasn't he calling your family?  Didn't you tell

13  him, stop calling my family, during that month?  They were

14  telling him to give you time.

15  A.  He knew where I was from day one.  April 28th, I

16  messaged him, and he could have provided that text message

17  on April 28th telling him where I was.  He knew where I was

18  on April 28th.

19  Q.  But that's not the point.  You weren't at home with his

20  daughter.  You had disappeared halfway across the country.

21  He didn't have the ability to enter the country.  He didn't

22  have the ability to come here to try to make peace with

23  you.  You disappeared.

24          MR. CARTER:  Objection.  I don't know if there is

25  a question here.

```
 1              THE COURT:  Let's have a question.

 2              THE WITNESS:  What's your question, Ms. Berg?

 3   BY MS. BERG:

 4   Q.  That you have lied in this proceeding as well, have you

 5   not?

 6   A.  I have lied about where I met him, yes.

 7   Q.  And you expect us to believe the legacy of abuse that

 8   you have recounted in the various documents.  It never once

 9   occurred to you to call the police, even if it was the next

10   day?

11   A.  It's a vicious cycle when you get in it.  I'm glad I

12   got out of it and my daughter is safe.

13   Q.  Now, isn't it a fact that your mother, the one that had

14   your sister cut, is the one that is advocating for Princess

15   to be cut?

16   A.  She would not dare to do that because our relationship

17   after she circumcised Fatima has never been the same again.

18   Q.  How is this different than the finger pointing at

19   Mr. Aly Saad about female genital mutilation?  It's just as

20   risky if we leave this child with you, isn't it?

21   A.  I have suffered from it, ma'am.  Men in my culture and

22   his culture don't suffer from this.

23   Q.  But maybe they love their children enough to not make

24   them suffer.  Is that possible?

25   A.  He doesn't love her.  He wants to protect her from men
```

1    like him.

2    Q.  Did you read through the text messages here in

3    Exhibit 21 all of the love that he expresses for you and

4    his daughter from the whole series of text messages?

5    A.  I started reading about abusing and abusers, and when

6    they're not abusing you, they're the sweetest people you

7    can ever meet.  He's the sweetest lover when he is not an

8    abuser, and that's how he kept me in this circle for two

9    years.

10   Q.  Now, I was looking over this exhibit that was presented

11   by your counsel in which you allege this Exhibit 14, that

12   this is an example of Mr. Aly Saad Aly again hacking into

13   your e-mail.  Do you remember that?

14   A.  Yes.  This is to Stephanie in human resources at

15   Hennepin County Medical Center.

16   Q.  Now, I also notice that Stephanie is on an e-mail

17   exchange at your Exhibit 20, page 002.  Let me show you the

18   first page of this exhibit.  So this is a yahoo e-mail from

19   the State Department, it looks like, right?

20   A.  Right.

21   Q.  But I notice on the second page that Stephanie Schriml

22   is involved in this exchange of e-mails.  Can you explain

23   that?

24   A.  My e-mails, the first e-mail that you showed that was

25   sent to the HR from my account was in yahoo, and he deleted

1    those e-mails, part of what he deleted, and later on in

2    August I asked Stephanie to e-mail me back those e-mails on

3    my new e-mails at princesshafsah27@yahoo.com, and he

4    doesn't know that they exist, and that's where I got these

5    e-mails re-e-mailed again and produced them to my counsel.

6    Q.  So these e-mails have been circulated quite a bit and

7    moved around, is that correct?

8    A.  She had -- I saw them in my yahoo.  He deleted them,

9    and in August I did ask Stephanie to e-mail it back to me

10   and she e-mailed it to me in my new e-mail.

11   Q.  Tell me what the AMOexpress is in Kitchener?

12   A.  It's a money wiring company.

13   Q.  And where does the money go?

14   A.  Anywhere in the world that you're sending money to.

15   Q.  And did you ever send money to your family in Kenya

16   through the AMOexpress?

17   A.  After I started working, I probably did in one or two

18   occasions.

19   Q.  And did you ever have Mr. Aly Saad Aly cash a check and

20   transfer money for you to your family?

21   A.  I had written checks to him.  I don't remember about

22   the transfer, but I had -- we had one car, and he would

23   take that car to school every day.  So grocery and

24   everything I need from out there, it's him that does it.

25            I wanted to send money to my mother for the year

1       celebration that was coming about 300 or $400, and he said

2       I will do that, and that's how he got involved in this.

3       Q.  Now I have a question maybe more for your counsel than

4       for you.  I notice that this order for protection, Exhibit

5       79, says on page 3 that there is going to be a hearing on

6       December 13th, and it also says the hearing will not be

7       held.

8              Do you know which it is?

9              MR. CARTER:  I'm sorry, Your Honor.  Would you

10      like me to answer the question, or it seems to have been

11      put to me.

12             MS. BERG:  I just would like for the sake of

13      expediency to know if there is going to be a hearing.

14             MR. CARTER:  I'm more than happy to discuss the

15      matter now or after --

16             MS. BERG:  We'll do it later.

17             THE COURT:  Okay.

18             MS. BERG:  I have nothing further.

19             THE COURT:  Anything further, Mr. Carter?

20             MR. CARTER:  One moment, please.

21             THE COURT:  All right.  Very well.

22                         **(Pause.)**

23             MR. CARTER:  Just a couple short questions.

24             THE COURT:  Go ahead.

25             MR. CARTER:  If my voice holds.

1                    **REDIRECT EXAMINATION**

2    BY MR. CARTER:

3    Q.  Ms. Aden, did you leave Mr. Aly because of his other

4    wives or his previous marriages?

5    A.  That was certainly a problem that created in the

6    marriage, but what really got me -- that was a problem in

7    our marriage, but I still was in that marriage even though

8    these things exist, but what let me leave was the danger

9    towards my daughter.

10            MR. CARTER:  No further questions, Your Honor.

11            MS. BERG:  Nothing further.

12            THE COURT:  Nothing further.  Okay.  Thank you.

13   You may step down.

14            THE WITNESS:  Thank you.

15                    **(Witness excused.)**

16            THE COURT:  All right.  Any further witnesses

17   from either side?

18            MS. BERG:  No, sir.

19            MR. CARTER:  None from us, Your Honor.

20            THE COURT:  Okay.  Question whether you wish to

21   submit any final briefs summing up what you think the

22   evidence has shown or not?  It's up to you.

23            MS. BERG:  I'll leave it up to counsel.

24            MR. CARTER:  We would favor that approach, yes,

25   Your Honor.

1              THE COURT:  Okay.  And, Ms. Berg, do you wish to

2      as well?

3              MS. BERG:  Could you possibly set a page limit?

4              THE COURT:  We certainly can.  There is no

5      problem in doing that.  What would be reasonable?

6              MS. BERG:  Two.

7              THE COURT:  I haven't read a two-page brief for a

8      while.

9              MS. BERG:  Wouldn't it be refreshing, though?  I

10     mean, we have thousands of pages from this group, so I

11     would like a page limit.

12             THE COURT:  How about 15 pages, can you do it in

13     15?

14             MR. CARTER:  Oh, surely, Your Honor.

15             MS. BERG:  Ten?

16             THE COURT:  Let's do 15.  When would you like to

17     have them due?

18             MS. BERG:  A week.

19             MR. CARTER:  That would --

20             THE COURT:  A week from tomorrow I guess is

21     Thanksgiving.

22             MS. BRUCE:  I would just like to look at my

23     calendar real quickly, if that's all right.

24             THE COURT:  How about two weeks?  Is that okay?

25             MS. BRUCE:  That's fine.

```
 1                 MS. BERG:  Fine.

 2                 THE COURT:  Two weeks from today?

 3                 MS. BERG:  Your Honor, are you going to make a

 4      habitual residence before we do the submissions?

 5                 THE COURT:  No.  I will wait for the submissions,

 6      but obviously, that's the primary first issue to resolve

 7      and then resolve the other issue that has been raised.

 8                 MS. BERG:  Thank you.

 9                 THE COURT:  All right.  Thank you very much.  We

10      will be in recess.

11                 MR. CARTER:  Thank you, Your Honor.

12                 THE CLERK:  All rise.

13                 MS. BERG:  Thank you, sir, for taking the time

14      you did for this.

15                 THE COURT:  Sure.  No problem.

16                       *         *         *

17

18

19

20

21

22

23

24

25
```

1          I, Kristine Mousseau, certify that the foregoing

2     is a correct transcript from the record of proceedings in

3     the above-entitled matter.

4

5

6

7     Certified by:  s/  Kristine Mousseau, CRR-RPR
                         Kristine Mousseau, CRR-RPR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        I N D E X

2    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3        VIA TELEPHONE:

4    Mohamed Aly Saad Aly                 144, 150      149
     Helen Gladkykh         153     158      162
5    Jeffrey Edelson  166, 171, 173  186    205
      Voir Dire by Ms. Berg   172
6    Dalia Motaleb          167     169
     Asha Aden              210     217
7    Nora Roundtree         222     232      236
     Heba Mustafa           237     252      252
8    Elizabeth Boyle (Resumed)254   261
     Abed Awad              265     274
9
     Amal Aden              287     361      378
10

11

12
     RESPONDENT'S EXHIBITS:
13
     8                                               345
14   10, 11, 12                                      360
     13                                              355
15   14                                              354
     19                                              346
16   23                                              319
     24                                              322
17   25                                              321
     28                                              306
18   30 and 30T                                      242
     40                                              225
19   41                                              174
     42 and 43                                       166
20   71                                              358
     79                                              308
21

22

23

24

25
```