# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| MOHAMED ALY SAAD ALY, | Civil No. 12-1960 (JRT/FLN) |
| Petitioner, | |
| | **FINDINGS OF FACT,** |
| v. | **CONCLUSIONS OF LAW AND** |
| | **ORDER GRANTING PETITION FOR** |
| AMAL ADEN, | **RETURN OF MINOR CHILD** |
| Respondent. | |

Nancy Zalusky Berg and Lilo D. Kaiser, **WALLING BERG & DEBELE, PA**, 121 South Eighth Street, Suite 1100, Minneapolis MN 55402, for petitioner.

Brian Scott Carter, Katherine K. Bruce and Laura E. Nelson, **ROBINS KAPLAN MILLER & CIRESI LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, for respondent.

On August 10, 2012, petitioner Mohamed Aly Saad Aly ("Aly") filed a petition against respondent Amal Aden ("Aden"), pursuant to the Hague Convention, 19 I.L.M. 1501 (1980) (the "Convention"), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.*, alleging that Aden wrongfully removed their child to the United States. Aly contends that the child is a habitual resident of Canada within the meaning of the Convention, and accordingly seeks an order from the Court directing the prompt return of the child to that country. Aden opposes the petition, alleging that Aly has not met the requirements under the Convention and raising

affirmative defenses to the return of the child – including that there is a grave risk of harm should the child be returned to Canada.

The Court held an evidentiary hearing on November 13 and 14, 2012. The Court heard testimony from numerous witnesses, including Aly and Aden. The Court then gave the parties an opportunity to submit closing briefs. Based on the entire record and proceedings, the testimony at the hearing and arguments of counsel, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT[1]

1.      To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

2.      The following facts are found to be established by a preponderance of the evidence, except to the extent characterized below as allegations.

## I.      THE PARTIES

3.      Petitioner Aly was born and raised in Cairo, Egypt. (Tr. 145:23-24.)[2] Aly has been a permanent resident of Ontario, Canada since 2007, where he is currently pursuing a PhD in engineering at the University of Waterloo. (Tr. 30:9-11, 30:23-31:2,

---

[1] Although the parties presented extensive evidence on myriad topics during the two day evidentiary hearing, the Court includes in its Findings of Fact only those facts which are relevant to providing context for the parties' arguments and to determining the merits of the petition.

[2] All citations to "Tr." refer to the transcript of the evidentiary hearing that took place on November 13, 2012, and November 14, 2012. (Tr. of Evidentiary Hr'g, Nov. 27, 2012, Docket Nos. 63-64.)

91:5-7.)  Aly has applied for Canadian citizenship, and his application is currently being processed.  (Tr. 30:12-15.)

4.      Aly supports himself financially with a stipend he receives from serving as a research/teaching assistant at the University of Waterloo, a temporary position that terminates when Aly has completed his PhD.  (Tr. 30:23-21:5, 91:2-7.)

5.      Respondent Aden is a United States citizen who was born in Somalia and immigrated to Minnesota in 1999.  (Tr. 291:2-7, 339:23-24.)  Aden received a Bachelor's Degree in nursing in 2007 and currently works part-time at the Hennepin County Medical Center.  (Tr. 288:1-7, 291:15-18.)

6.      Aden and Aly are the parents of P.H.A.S.A., born August 27, 2011, in Canada.

## II.      THE BEGINNING OF ALY AND ADEN'S RELATIONSHIP

7.      Aly and Aden met in 2009 through muslima.com, a Muslim dating website. (Tr. 29:10-13, 32:2-5, 294:14-15.)  In February 2010, Aden traveled to Ontario to meet Aly in person.  (Tr. 32:6-9, 296:8-12.)

8.      Aly and Aden were religiously married in an Islamic ceremony in April 2010.  (Tr. 33:10-13, 296:17-18.)  On June 7, 2011, the couple was civilly married in Canada.  (Pet. Ex. 16.)[3]

---

[3] When citing to "Pet. Ex." and "Resp. Ex." the Court is referring to the exhibits offered by each party that the Court admitted at the evidentiary hearing.

9.    In May 2010, Aden moved from Minnesota to Ontario and began living with Aly in his apartment. (Tr. 33:18-34:9, 339:9-10.)  Aden had purchased a townhome in Minnesota in 2007, which she continued to rent to a tenant after moving to Canada. (Tr. 80:14-17, 82:1-11, 288:8-11, Pet. Ex. 31.)  Aden's immigration status in Canada was one of a visiting American. (Tr. 339:25-340:1.)  Upon moving to Canada, Aden retained her Minnesota driver's license, and when it expired obtained a New York driver's license. (Tr. 341:21-23.)

10.    Shortly after Aden moved to Canada, Aly learned that Aden was legally married to another man. (Tr. 34:10-14.)  Aden was married to a Somali man in 2007. (Tr. 291:19-292:7.)  In 2008, Aden separated from this man and the couple was religiously divorced. (Tr. 292:8-18, 293:1-4.)  In 2010, Aden initiated civil divorce proceedings in Hennepin County, and the divorce was finalized on September 3, 2010. (Tr. 293:1-15; Pet. Ex. 25.)

11.    In September 2010, Aden learned that Aly had been married and divorced four times prior to meeting Aden. (Tr. 324:4-9; Pet. Exs. 1-8, 26 at 1-2.)  Aly's marriages to two of these women overlapped for a period of time. (Tr. 104:7-10.)  Aden also believed, erroneously, that as of September 2010, Aly was still legally married to an Egyptian woman. (Tr. 311:3-7; Pet Ex. 4.)

12.    After learning of Aly's relationship history, Aden purchased a one-way plane ticket to Minnesota. (Tr. 342:7-11.)  Aden alleged that Aly checked Aden's e-mail and upon finding the ticket confirmation slapped Aden in the face several times. (Tr. 324:4-17.)  Aden also alleges that Aly smashed her laptop on the floor and threw her

cell phone into the sink where he ran water over it. (Tr. 324:16-25.) Immediately following this alleged outburst, Aly drove Aden to the airport to board her flight for Minnesota. (Tr. 324:16-25.) Aly testified that in the fall of 2010 he and Aden enjoyed a "loving relationship," and denied any allegations of physical abuse. (Tr. 37:25-38:4.)

13. Aden returned to Canada on October 4, 2010, several days after flying to Minnesota. (Tr. 325:4-5; Pet. Ex. 32.)

14. In November 2010, Aden and Aly applied for marriage license authorization in Canada, and Aly added Aden to the lease agreement for his apartment. (Pet. Exs. 11, 13.)

15. Also in November 2010, Aden became pregnant with P.H.A.S.A. (Tr. 313:9-22.)

16. In December 2010, Aden began working as a nurse at Millard Fillmore Gates Hospital ("Millard") in Buffalo, New York. (Tr. 41:8-15, 332:12-15, 340:2-8.) Shortly after beginning her employment, Aden fell and broke her ankle. (Tr. 340:10-11.) The injury forced her to quit working until May 2011, when she resumed her nursing job. (Tr. 340:11-16.) Aden rented a room from a family in Buffalo, and stayed overnight there on days when she worked at Millard. (Tr. 342:15-18.)

17. In January 2011, Aden alleges that she told Aly she wanted to separate. (Tr. 313:16-18.) Aden alleges that Aly told her that she could leave, but would first need to abort the fetus. (Tr. 313:18-21.) Aden alleges that she called an abortion clinic to schedule a procedure, but was told she could not obtain an abortion because she was taking blood thinners. (Tr. 313:22-314:6.) While Aden was on the phone with a second

clinic, she alleges that Aly took the phone from her and hung up. After this incident, Aden went to stay at her cousin Asha's house for approximately two weeks. (Tr. 314:11-12.) Asha lived in Canada, less than a twenty minute drive from Aly and Aden's apartment. (Tr. 217:17-18.) During the course of Aly and Aden's relationship, Aden went to stay with Asha six or seven times. (Tr. 214:23-215:2.)

## III.    THE FEBRUARY 27, 2011 INCIDENT

18.    On February 27, 2011, Aly and Aden were involved in a violent incident. (Resp. Ex. 75 at 036.) An argument began when Aly became upset that Aden did not make him lunch, and instead suggested that he prepare his own lunch. (Tr. 314:16-20.)

19.    Aden alleges that the argument escalated verbally, and she began to pack her bags, planning to end the relationship with Aly and move out of the apartment. (Tr. 315:3-7.) At this point, Aden alleges that Aly threw her onto the bed, punched her in the head several times, and lay on top of her. (Tr. 315:7-15.) When Aden got off the bed, she alleges that Aly grabbed her by the shoulders to prevent her leaving the room and kneed her forcibly in the stomach. (Tr. 315:15-18.) Finally, Aden alleges that she locked herself in the bathroom and vomited. (Tr. 315:24-316:1.)

20.    Aly had an entirely different version of the February 27 events. Aly testified that as the verbal argument over the preparation of lunch escalated, Aden threatened him with a kitchen knife and also threatened to kill herself or stab her belly. (Tr. 49:13-14.) Aly further alleges that he, not Aden, sought refuge in the bathroom. (Resp. Ex. 75 at 036.)

21.     Aly called 911 and two police officers reported to Aly and Aden's apartment.  (Resp. Ex. 75 at 036.)  The officers observed that neither Aly nor Aden had any injuries.  (*Id.*)  In their report, the officers indicated that they did not believe either Aly's or Aden's description of the events.  (*Id.*; Tr. 50:10-12.)  The officers found Aly's story to be not credible because although he told them that Aden had threatened him with a knife, he did not provide the police with a detailed threat and could not find or describe the knife that Aden had allegedly threatened him with.  (Resp. Ex. 75 at 036-037.)  The officers also found Aden's version of the events and her description of her injuries not credible.  (*Id.* at 036.)  Aden told the officers that Aly had pushed her, and she believed her fingers were broken.  (*Id.*)  At the time Aden was using her hands without difficulty to pack bags and carry suitcases.  (*Id.* at 036-037.)

22.     At some point during the February 27 argument, Aly called Asha and asked her to come get Aden.  (Tr. 211:18-24, 316:2-3.)  Asha arrived at Aly and Aden's apartment and, upon the suggestion of the police, took Aden to the emergency room at St. Mary's hospital.  (Tr. 214:13-14.)

23.     At the hospital, Aden reported that on February 27 she had attempted to leave the apartment, and Aly had pushed her against the wall and also pushed her onto the floor.  (Resp. Ex. 23 at 014.)  Aden repeated this recount of the events to domestic violence center workers in early March 2011.  (Resp. Ex. 25 at 003.)

24.     The emergency room doctor documented six small bruises on Aden's wrist, two swollen and painful fingers, and two small bruises on Aden's upper arm.  (Tr. 319:13-320:2; Resp. Ex. 23 at 021-022.)  An x-ray of Aden's fingers showed no

fractures or dislocations.  (Resp. Ex. 23 at 009.)  Aden also reported pain in her shoulder and thigh, although the doctor reported that there were no visible injuries to those areas.  (Resp. Ex. 23 at 019-020.)  Aden's medical report also indicates that she complained of abdominal cramping.  (Tr. 320:3-6.)

25.    After Aden left the hospital she went to her cousin's home and alleges that she stayed with Asha for over a month, before returning to live with Aly.  (Tr. 214:18-22, 322:19-23.)  In early March 2011, Aden went to the Domestic Violence Center in Waterloo to receive services related to the February 27, 2011 incident.  (Tr. 50:13-17; Resp. Ex. 25.)  Reports from the Center indicate that Aden attended a counseling session on March 4, 2011, and when the social worker called Asha, Asha stated that Aden had returned to Aly.  (Resp. Ex. 25 at 008.)  Additionally, Aden booked a plane ticket to Minnesota on March 15, 2011, suggesting that her testimony about the length of her stay at her cousin's house is not credible.  (Pet. Ex. 32.)

26.    The Court finds neither Aly's nor Aden's version of the events of February 27, 2011 to be entirely credible.  First, the police did not believe either of the parties, and the Court gives weight to the objective observations of the two officers that responded to the incident.[4]  The Court finds Aly's testimony not credible because he was

_____

[4] Additionally, in this, and other credibility determinations in this matter, the Court is influenced by the lack of truthfulness of both of the parties throughout their relationship to one another and these proceedings.  For example, both parties concealed their previous marriages from one another.  Additionally, Aden lied in her initial counterpetition about how she and Aly met, and misstated the events precipitating at least one of Aly's alleged assaults.  (Tr. 297:4-298:4.)  Aly, as explained more fully below, lied extensively to the police when he called to report his car missing on June 5, 2012.  The parties have presented polar opposite accounts of

(Footnote continued on next page.)

unable to identify for the police the knife with which Aden allegedly threatened him. Additionally, Aly's testimony that he did not assault Aden is not credible due to the injuries sustained by Aden that were documented at the emergency room. The Court finds Aden's testimony credible to the extent that it believes Aly perpetrated some violence against her during the course of the February 27, 2011 incident. This testimony is corroborated by Aden's emergency room records which revealed bruising and swollen fingers. However, the Court does find Aden's testimony to be exaggerated regarding the nature and extent of the violence perpetrated against her. Specifically, the Court finds Aden's testimony that Aly threw her onto the bed, punched her in the head, and kneed her forcibly in the stomach not credible. This description of the events is different than that which she gave to the responding police officers, the emergency room doctors, and the domestic violence center workers, and also seems inconsistent with the injuries she sustained.

27. Aden testified that in July 2011 she and Aly were involved in another physical altercation, which arose out of a woman claiming to have married Aly in March 2011 contacting Aden. (Tr. 323:3-11.) Aden packed her belongings, intending to leave, and Aly allegedly hit her in the head several times. (Tr. 323:21-324:3.) Aden also

_____
(Footnote continued.)

nearly every relevant (and irrelevant) event in this matter. Because neither Aly nor Aden appeared completely credible to the Court, it believes that the truth underlying many of the alleged incidents likely lies somewhere in between the stories told by the parties. With respect to those incidents the truth of which is material to the outcome of this matter, the Court has made specific credibility determinations, and has relied on the parties' general lack of truthfulness only as one factor in that determination.

alleges that Aly deleted instant messages in which he admitted that he hit her in the head in July 2011.  (Tr. 357:2-4.)

## IV.    P.H.A.S.A'S BIRTH

28.    Aly and Aden initially planned for P.H.A.S.A. to be born in Minnesota. (Resp. Ex. 33 at 003, Tr. 72:18-22, 103:1-10, 342:14-16.)

29.    In April 2011, Aden sent a letter to the American Consul's Office requesting a visa for Aly, so he could attend their child's birth in the United States.  (Pet. Ex. 12.)  The visa was denied.  (Tr. 72:4-10, 343:20-25; Resp. Ex. 33 at 003.)  When the visa was denied, Aly and Aden next made plans for Aden to deliver the baby in Buffalo, New York, where she had health insurance and had been attending her prenatal visits. (Tr. 344:1-5.)

30.    When Aden was seven months pregnant she and Aly both signed a lease on an apartment in Canada with a term extending from June 1, 2011, through May 31, 2012. (Pet. Ex. 30; Tr. 80:22-81:4.)

31.    Aden was two weeks past her due date when she saw her doctors in Buffalo on Monday, August 22, 2011.  (Tr. 344:7-8.)  The doctors scheduled Aden for a cesarean section procedure on Saturday, August 27, 2011.  (Tr. 344:8-9.)   After her Monday appointment, Aden returned to Canada to spend the week with Aly, and went into labor on Friday, August 26.  (Tr. 343:10-17.)  Aly took Aden to a Canadian hospital, and the doctors indicated that it would not be safe for Aden to be transported to Buffalo. (Tr. 343:12-19.)  Aly and Aden's daughter, P.H.A.S.A., was born on August 27, 2011, in

Canada.  (Tr. 51: 22-23; Pet. Ex. 15.)  Because Aden did not have health insurance in

Canada, she was ultimately billed $13,000 for her delivery at the Canadian hospital.

(Tr. 344:20-24.)

32.    P.H.A.S.A. is a Canadian and an American citizen.  (Tr. 344:25-345:6;

Resp. Ex. 8.)   P.H.A.S.A. also has a United States passport and social security card.

(Tr. 345:10-21; Resp. Ex. 19.)

33.    Aden took maternity leave from her job at Millard immediately following

P.H.A.S.A.'s birth.  (Tr. 342:8-9.)  During this period of time, Aden was P.H.A.S.A's

primary caregiver, and Aden, Aly, and P.H.A.S.A. continued to live in Aly and Aden's

apartment in Canada.  (Tr. 346:3-13.)  Aden returned to her nursing job at Millard in

October 2011 and began working weekends.  (Tr. 340:13-19, 342:8-9.)  On weekends

Aly would care for P.H.A.S.A.  (Tr. 346:20-22.)  Aly and P.H.A.S.A. would accompany

Aden to the Canadian border near Buffalo and stay at a bed and breakfast while Aden

worked.  (Tr. 346:14-347:5.)

34.    Aden alleged that she "fear[ed] for [P.H.A.S.A.]'s safety" and "was

terrified" when she went back to work and left P.H.A.S.A. in Aly's custody.  (Tr. 326:7-

11.)  The Court finds this testimony to be not credible.  Aden consistently left P.H.A.S.A.

in the sole care of Aly.  These actions are inconsistent with Aden's alleged terror.  This is

particular true in light of Aden's history of a willingness and ability to leave Aly.  If

Aden truly feared for P.H.A.S.A.'s safety, the Court finds it somewhat unlikely that Aden

would have left her child with Aly.  Additionally, Aden has made no allegations that

P.H.A.S.A. was harmed physically, psychologically, or emotionally while in the sole

custody of Aly. Instead, instant messages between Aden and Aly reveal that Aly woke early to care for the child, was aware of P.H.A.S.A.'s physical needs, and worried about raising P.H.A.S.A. properly. (*See* Pet. Ex. 21.)

35.     After her birth, P.H.A.S.A. began receiving Canadian and Ontario Child Benefits. (Pet. Ex. 10.) In December 2011, Aden filed a declaration with the Summerside Tax Center declaring that Aly was P.H.A.S.A's primary caregiver and should therefore receive Canadian Child Benefits and Ontario Child Benefits on behalf of P.H.A.S.A. (Pet. Ex. 10.) Aden alleged that this declaration was written by Aly, and signed by Aden under duress. (Tr. 347:17-348:24.) Aly alleged that he, in fact, assumed primary responsibility for caring for P.H.A.S.A. (Tr. 147:22-25.)

36.     Prior to April 26, 2012, P.H.A.S.A. attended all of her medical appointments in Canada, including specialist appointments for a possible genetic disease. (Pet. for Return of Minor Child, Ex. 3, Oct. 18, 2012, Docket No. 32.)

37.     In February 2012, Aden entered into another rental agreement with the tenant for her Minnesota townhome. (Pet. Ex. 31.) The agreement granted the tenant a lease through April 30, 2013. (*Id.*)

## V.     P.H.A.S.A.'S REMOVAL

38.     On April 25, 2012, Aly and Aden had an argument during which Aden told Aly she wanted to separate. (Tr. 299:10-15.) Aly began yelling, and told Aden she should not leave with his child and would regret doing so. (Tr. 299:16-300:4.) Aden alleges that while she was holding P.H.A.S.A. Aly slapped Aden in the face. (Tr. 300:7-

10.)  Aden alleges that this was the seventh time Aly had physically assaulted her. (Tr. 313:7-8.)  Aden testified that Aly then grabbed P.H.A.S.A. from Aden's arms and threw P.H.A.S.A. into the corner of the room.  (Tr. 300:13-15.)  P.H.A.S.A. landed on the floor and began crying hysterically according to Aden's account of the evening. (Tr. 300:20-301:3.)  Aden alleges that using her background as a neurological intensive care unit nurse she examined P.H.A.S.A. for signs of injury, and checked on P.H.A.S.A. hourly throughout the night to assess the infant for head trauma.  (Tr. 300:22-301:17.) Aden testified that she observed no injuries to P.H.A.S.A. during these examinations. (Tr. 301:18-19.)

39.    Aden alleges that immediately after Aly threw the child he left the bedroom, began pacing, and ultimately began watching something on his computer. (Tr. 302:4-9.)  Aly then requested that Aden make dinner for him, grabbed her, and asked her to sit down and eat with him.  (Tr. 302:17-25.)  After Aly went to bed, Aden testified that she began packing her and P.H.A.S.A.'s belongings and put the packed bags into a storage room next to Aden and Aly's apartment.  (Tr. 303:4-8.)

40.    Aly denied all of the allegations of the April 25, 2011 event, and specifically denied that he threw P.H.A.S.A. across the room.  (Tr. 55:5-14.)

41.    The next day, April 26, 2011, Aden took P.H.A.S.A. to a doctor's appointment in Hamilton City, Ontario, that had previously been scheduled.  (Tr. 57:12-19.)  Aden brought the bags she had packed the previous night.  (Tr. 304:5-15.)

42.    The medical records from P.H.A.S.A.'s appointment with a pediatrician on April 26, 2012, indicate that P.H.A.S.A. was examined by a doctor, and had suffered no

apparent injuries from the previous night. (Tr. 56:10-13; 304:20-23.) Moreover, Aden did not mention the alleged throwing incident of the previous night to the pediatrician. (*Id.*)

43.    The Court again finds neither party's testimony regarding the events of April 25 to be entirely credible. The Court discredits Aly's testimony that no incident of any kind occurred on the evening of April 25. Aly's testimony is not credible because he was unable to provide any details about the admitted conflict in his and Aden's relationship, and instead merely denied any and all accusations of physical or verbal abuse. The Court finds Aden's testimony credible to the extent that it believes a verbal argument erupted between the parties and that Aly did become physically violent toward Aden. The Court, however, finds Aden's testimony that Aly grabbed P.H.A.S.A. from Aden's arms and threw her across the room to be not credible. The Court finds this testimony not credible because Aden, a trained nurse, did not seek medical attention for her eight-month-old child after the child was allegedly thrown across the room. Additionally, the Court believes that if the allegations were true Aden would have mentioned the incident at P.H.A.S.A's doctor's appointment the next day, since Aden's conduct on February 27, 2011, showed that she was not afraid to report incidents of domestic abuse. Finally, the Court finds the testimony not credible to the extent that an eight-month-old child grabbed forcibly from someone's arms and thrown across a room, landing on the floor, would likely have sustained some injuries visible to a doctor at an appointment that occurred the day after the incident.

44.     After P.H.A.S.A.'s doctor's appointment, Aden drove with the child to Buffalo, New York.  (Tr. 304:24-25.)  Aden withdrew her final paycheck from Millard and began driving to Minnesota.  (Tr. 305:1-3.)

45.     Aly called Aden in the afternoon on April 26 and asked where Aden and P.H.A.S.A. were.  (Tr. 305:6-9.)  Aden told him that P.H.A.S.A.'s appointment was not finished.  (Tr. 305:6-9.)

46.     On April 27, 2012, shortly after midnight, Aly sent Aden an instant message asking her to call him back or answer his calls.  (Pet. Ex. 21 at 96.)  Aden alleges that Aly called her shortly after midnight on April 27 and she told Aly that she had left for Minnesota with P.H.A.S.A. and would not return to Canada.  (Tr. 305:10-12.) Aden further alleges that Aly continued to call her repeatedly and eventually he stated "if you take the child and leave, then I never want to hear from you or her the rest of your life." (Tr. 305:14-18.)  Aly denies that any of these phone calls occurred, and alleges that he did not learn that Aden and P.H.A.S.A. were in Minnesota until he called one of Aden's relatives in Minnesota.   (Tr. 64:16-20.)   The Court finds Aden's testimony credible to the extent that it believes Aly knew from phone calls on April 27 that Aden and P.H.A.S.A. were en route to Minnesota.  Aly's testimony about when he learned that Aden and P.H.A.S.A. were in Minnesota was vague, and he did not testify as to which relative he talked to or when.  Additionally, Aly's inaction after the departure of his wife and daughter are inconsistent with him not knowing their whereabouts.

47.     Aden and P.H.A.S.A. arrived in Minnesota on April 27, 2012.  (Tr. 305: 19-20.)  Aden sent Aly an instant message informing him that she and P.H.A.S.A. had

arrived safely in Minnesota. (Tr. 306:25-307:2.) Aden's townhome tenant made other living arrangements, and Aden and P.H.A.S.A. eventually moved into this home. (Tr. 350:3-16.)

48.     Aden testified that on June 1, 2012, Aly called and asked her to return to Canada. (Tr. 307:20-308:2.) Aly called several more times. (Tr. 308:6-7.) Aden testified that on June 5, 2012, Aly called Aden and told her that he would kill her for taking away his daughter. (Tr. 308:9-11.) Aly denied making a threat to kill Aden and alleges that Aden called him to tell Aly he would never see P.H.A.S.A. again. (Tr. 86:4-9.)

49.     In response to the allegedly threatening phone call, Aden filed an order for protection in Anoka County against Aly on June 6, 2012. (Tr. 308: 13-16; Resp. Ex. 79.) Aly was not served with the order for protection (Tr. 309:2-3.) An affidavit attached to the order for protection indicates that Aly refused to accept service when it was attempted by Canadian authorities. (Resp. Ex. 79 at 002.)

50.     Also on June 5, 2012, Aly contacted the Waterloo Police Department to report that his car was missing. (Tr. 64:23-25, 65:14-18; Resp. Ex. 75 at 019.) When Aly contacted the police, he told him that his wife had left but he was concerned only with the car and did not want to report Aden missing. (Tr. 65:24-66:1; Resp. Ex. 75 at 009.) Initially, Aly did not report that P.H.A.S.A. was missing. (Resp. Ex. 75 at 006, 014.) Instead, Aly concocted an elaborate story and lied to the police, telling them that P.H.A.S.A. was still in Canada and was staying with his cousin. (Tr. 112:8-10, 114:5-15; Resp. Ex. 75 at 004-015.) Aly told the police that he visited P.H.A.S.A. at his cousin's

home weekly and called his cousin daily to check on P.H.A.S.A. (Resp. Ex. 75 at 006.) Aly claims he did not tell the police that P.H.A.S.A. was missing because he did not want to get Aden "in trouble." (Tr. 66:23-25.) Aly told the police that he had last seen Aden on May 3, 2012, and did not initially attempt to contact her when she did not return home. (Resp. Ex. 75 at 004, 007.) Aly stated that he contacted Aden's family in Minnesota and they told him that Aden had not come to Minnesota. (*Id.* at 005.) Aly also told the police that Aden had stolen his laptop, a claim the Court finds not credible based on the documentary evidence. (Tr. 93-101.)

51.     On June 13, 2012, Aly filed an application in an Ontario court seeking an order awarding custody of P.H.A.S.A. to Aly. (Resp. Ex. 33.) The court ordered on an interim basis that Aly "shall have sole custody of [P.H.A.S.A.]," and that "the primary residence of [the child] shall be with [Aly]." (Pet. for Return of Minor Child, Ex. 2 at 10.)

## VI.     CONTROL ISSUES BETWEEN ALY AND ADEN

52.     Aly and Aden share a joint bank account at the TD Canada Trust Bank. (Tr. 43:9-11; Pet. Ex. 23.) Aden has other bank accounts in New York and Minnesota, which she never made joint with Aly. (Tr. 43:23-25, 44:3-7.) However, Aly had the user names and passwords for online access to Aden's American accounts. (Tr. 335:11-13.) Aden provided extensive testimony that Aly exerted some control over her finances, primarily by requesting that Aden withdraw money from her accounts and provide it to Aly. (Tr. 332-37; Resp. Ex. 28.)

53.     Aden also offered extensive testimony about Aly's access to and use of Aden's online accounts.  In July 2012 Aly accessed Aden's facebook account and had an instant messaging conversation with one of Aden's friends while posing as Aden.  (Resp. Exs. 30, 30T; Tr. 238:25-239:15, 240:5-241:13, 243:4-249:25.)    Aden also provided testimony, which the Court finds credible, that Aly accessed Aden's e-mail account, and may have sent e-mails posing as Aden.  (Tr. 351-58; Resp. Ex. 13-14.)

54.     Aly holds some beliefs about women, their abilities, and value, which have manifested in distasteful remarks and attacks on the self-esteem of his various female partners.  (Tr. 215:15-21, 236:14-22, 331:12-14, Resp. Ex. 25 at 004.)  Aly has made disparaging remarks about women, calling them "sluts," "needy," and "[d]esparately looking for a man."  (Tr. 215:15-21.)  Additionally, Aly believes that women should be subservient to their husbands.  (Resp. Ex. 75 at 36; Tr. 236:14-22.)

55.     With respect to Aden specifically, Aly viewed her – a 30-year-old divorced woman from Somalia – as a woman of little value.  (Tr. 330:14-19.)  Aly found less educated women to be more appealing and would have preferred Aden to stay at home rather than work.  (Tr. 331:2-11, 332:16-20.)  Finally, Aly told Aden she was "just a nurse, woman" and "d[id]n't count for much."  (Tr. 331:13-14.)

## VII.    ALY'S PREVIOUS RELATIONSHIP

56.     One of Aly's ex-wives, Nora Roundtree, offered testimony about her relationship with Aly.  (Tr. 222:23-223:3.)  Ms. Roundtree alleges that during their relationship, Aly physically abused her three times – twice squeezing her jaw and once

punching her in the head.  (Tr. 223:10-16.)  Ms. Roundtree also alleges that Aly verbally abused her and undermined her self-esteem.  (Tr. 223:8-9, 236:14-22.)  Aly denies that he abused Ms. Roundtree.  (Tr. 104:14-21.)

57.     In April 2002, Ms. Roundtree obtained a temporary restraining order from a Louisiana State Court against Aly.  (Resp. Ex. 38; Tr. 224:11-13.)  The Louisiana court found that based on the allegations presented by Ms. Roundtree, she had "good and reasonable grounds to fear for her . . . safety."  (Resp. Ex. 38 at 002.)  This temporary restraining order was never served on Aly.  (Tr. 226:2-4.)  Aly allegedly came to Ms. Roundtree's house during the time period when the temporary restraining order was in effect.  (Tr. 230:5-7, 20-24.)

## VIII.  FEMALE GENITAL MUTILATION

58.     Aden alleges that Aly approves of the practice of female genital mutilation ("FGM").  (Tr. 327:2-9.)  Aden also alleges that Aly asked Aden to take P.H.A.S.A. to Aden's mother, who lives in Kenya, to have the child undergo FGM.  (Tr. 327:24-328:4.)  Aden testified that Aly then stated that if Aden's mother would not do the procedure, Aly would take P.H.A.S.A. to his mother in Egypt to have the procedure done.  (Tr. 328:5-11.)

59.     Aly denies that he approves of FGM or that he would subject P.H.A.S.A. to FGM and instead alleges that Aden's mother and Aden herself have been advocates of subjecting P.H.A.S.A. to the procedure.  (Tr. 145:7-12, 146:1-5.)

60. Aden has undergone FGM, and Aden's mother had the procedure performed on Aden's younger sister despite Aden's protests. (Tr. 327:24-328:4, 328:21-329:1.) None of Aly's female family members have undergone FGM, and Aly alleges that none of his family members support the practice. (Tr. 145:2-6.)

61. Ms. Roundtree also alleges that Aly believes in FGM. Ms. Roundtree alleges that she and Aly had a daughter together and Ms. Roundtree gave her daughter a different last name to protect her from Aly. (Tr. 226:15-18, 228:22-229:14.) Aly denies that he is the child's father. (Tr. 105:17-22.)

62. Aden presented expert testimony from Elizabeth Boyle about the practice of FGM. (*See* Resp. Exs. 67-69.) Aly presented expert testimony from Mr. Abed Awad, an expert on Islamic law, about the practice of FGM. (*See* Pet. Ex. 26.)

63. FGM is associated with physical and psychological harm. (Tr. 136:11-14, 275:19-276:1.) FGM can cause, among other things, hemorrhaging, infection, and complications with childbirth, as well as anxiety disorders, depression, and post-traumatic stress disorder. (Tr. 137:5-16, 255:4-17.)

64. Boyle testified that a number of factors specific to Aly put P.H.A.S.A. at risk of being subjected to FGM. These factors include that Aly is a Salafi Muslim from Egypt, that Aly "apparently said he wanted to have [P.H.A.S.A.] circumcised," that Aly "has shown an interest . . . in women's chastity," and that Aly has demonstrated a conservative approach toward Islam as evidenced by his belief in polygamy for males and his history of serial divorces. (Tr. 137:20-22, 256:5-257:17.) Boyle alleges that the

most likely cause of harm to P.H.A.S.A. would be if Aly took her to Egypt, where "it's easy to get the practice performed." (Tr. 259:14-19.)

65.     Mr. Awad testified that many variables enter into whether a child is subjected to FGM.  FGM is less likely as the level of education and economic status of the child's parent's increases, and is also less likely where parents were raised in a metropolitan area and currently live in a country where the practice is not prevalent. (Tr. 270:9-271:3, 281:25-282:3, Tr. 282:23-283:2.)

66.     FGM is not a practice mandated by Islam.  (Tr. 277:13-18.)   And the mainstream Islamic organizations' position is that the practice is unIslamic.  (Tr. 282:19-21.)  Additionally, FGM is not an accepted or prevalent practice in North America and is illegal in both Canada and the United States.  (Tr. 284:21-25.)

## IX.     EXPERT TESTIMONY ON DOMESTIC VIOLENCE

67.     Dr. Jeffrey Edelson holds a PhD in social work, and provided expert testimony regarding the likelihood of future domestic violence based on a perpetrator's history.  (Resp. Ex. 41.)

68.     Dr. Edelson testified that four risk factors influenced his opinion that Aly was likely to commit physical and psychological abuse in the future: (1) the prior record of violence; (2) Aly's alleged threat to kill Aden; (3) Aly and Aden's estrangement since April 2012; and (4) Aly's pattern of exerting coercive control over Aden.  (Tr. 174: 7-25, 176-84.)  Of these factors, Dr. Edelson's was particularly concerned about the previous violence and threats to kill, and viewed coercive control as troubling in light of these

other factors.  (Tr. 184:16-185:7.)  Dr. Edelson also testified that "there is a great co-occurrence of physical abuse against multiple family members, against mothers and children in the same families."  (Tr. 178:16-18.)  Finally, Dr. Edelson opined that "there is a grave risk of physical harm and psychological harm to the infant [P.H.A.S.A.] involved in this case . . . [s]hould she be returned" to Canada.  (Tr. 173:6-10.)

## X.  CANADA'S LEGAL RESOURCES

69.  Helen Gladkykh provided expert testimony about the legal systems available in Canada for victims of abuse.  (Tr. 153:10-13.)  Gladkykh is a barrister, solicitor, and notary public, specializing in family law, who practices in Ontario.  (*Id.*)

70.  The Public Health Agency of Canada coordinates a family violence initiative, which "is a long-term commitment of the government of Canada to address violence within the relationship of kinship, intimacy, dependency or child."  (Tr. 154:17-24.)

71.  Pursuant to Ontario's Child and Family Services Act, all Ontario citizens "who have reasonable grounds to suspect that a child is subject to moral, physical or sexual abuse have [a] positive obligation to report such suspicions and information to the government agencies."  (Tr. 155:9-20.)

72.  Victims of family violence in Ontario have various resources available to them including "assistance of police and ambulance services, counseling services, crisis lines and distress centers, house clinics and hospitals, legal assistance, transitional houses, [and] victim services."  (Tr. 156:8-14.)

73.     Legal resources in Ontario for victims of family violence include restraining orders, orders for exclusive possession of the matrimonial home, and orders requiring supervised access to children.  (Tr. 156:15-157:5.)  In cases where a Canadian court determines that "there is at least a minimal risk of violence toward the child," the Court is under an obligation to impose arrangements where the potentially violent parent has access to the child only during specific periods of supervised time.  (Tr. 157:6-10.)

74.     If P.H.A.S.A. is returned to Canada, Aden would be entitled to participate fully in the custody proceedings that Aly initiated.  (Tr. 157:15-19.)

## CONCLUSIONS OF LAW

This case is brought under the Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501, 1988 WL 411501 (1980) (the "Convention").  The United States is a contracting state to the Convention, and the International Child Abduction Remedies Act ("ICARA") implements its provisions.  *See* 42 U.S.C. §§ 11601 *et seq.*  Canada is also a signatory to the Convention.  *See Miller v. Miller*, 240 F.3d 392, 395 n.1 (4th Cir. 2001).

The Convention was adopted "in response to the problem of international child abductions during domestic disputes."  *Abbott v. Abbott*, ___ U.S. ___, 130 S. Ct. 1983, 1989 (2010).  The purpose of the Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention caused either by the removal of a child from the state of its habitual residence or the refusal to return a child to the state of its habitual residence."  *Barzilay v. Barzilay*, 536 F.3d 844, 846 (8th Cir. 2008)

(internal quotation marks omitted). To effectuate its goal, the Convention seeks "'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure the rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.'" *Id.* (quoting Convention, art. 1). The central operating feature of the Convention is the return remedy. *Abbott*, 130 S. Ct. at 1989. Unless certain exceptions apply, the Convention provides that a child under the age of sixteen who is wrongfully removed in violation of "rights of custody" must be returned to the child's country of habitual residence. Convention, arts. 3, 5, 12; 42 U.S.C. § 11601.[5] Returning the child to the country of habitual residence "restore[s] the pre-abduction status quo" and serves to "deter parents from crossing international borders in search of a more sympathetic forum." *Furnes v. Reeves*, 362 F.3d 702, 710 (11th Cir. 2004). A decision under the Convention is not an adjudication of the merits of any underlying custody claim. Convention, arts. 16, 19; 42 U.S.C. § 11601(b)(4); *Barzilay*, 536 F.3d at 847. Rather the Convention and ICARA merely "govern[] selection of the forum where such a [custody] dispute should be brought." *Stern v. Stern*, 639 F.3d 449, 451 (8th Cir. 2011).

---

[5] P.H.A.S.A. is one year old, and therefore is within the age range of children subject to the Convention's provisions. Convention, art. 4.

# I.  WRONGFUL REMOVAL UNDER THE CONVENTION

## A.  Prima Facie Case

To obtain relief under the Convention, the petitioner must prove by a preponderance of the evidence that his children were "wrongfully removed or retained within the meaning of the Convention."  42 U.S.C. § 11603(e)(1)(A).  The Convention provides:

> The removal or retention of a child is to be considered wrongful where –
>
> a)  it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b)  at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3.  To establish that removal was wrongful within the meaning of the Convention, the petitioner must therefore prove that: (1) the petitioner was exercising a right of custody at the time of the removal, which right was breached by the removal; and (2) the country petitioner seeks to have the child returned to is the child's country of habitual residence.  Convention arts. 3, 5, 12; 42 U.S.C. § 11601.

## B.  Right of Custody

The Convention defines "right of custody" as including "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Convention, art. 5(a).  Courts broadly interpret a parent's right of custody under the Convention.  *See Abbott*, 130 S. Ct. at 1991 (concluding that even parental

rights which do "not fit within traditional notions of physical custody" can be sufficient to establish a right of custody under the Convention's "broad definition").

The parties here do not dispute that in April 2012 Aly was exercising a right of custody over P.H.A.S.A. Ontario law provides that "the father and the mother of a child are equally entitled to custody of the child." Children's Law Reform Act, R.S.O. 1990, c. C.12, s. 20(1).[6] Prior to her removal, P.H.A.S.A. lived with both Aly and Aden, and Aly, as her father, was exercising his right to custody under Canadian law. The parties agree that this right included the right to determine where P.H.A.S.A. resided, and that the right was breached when Aden removed P.H.A.S.A. from Canada.

## C.    Habitual Residence

Removal of a child is only wrongful within the meaning of the Convention, if it "breaches the rights of a custodian under the law of the State in which the child was habitually resident immediately before removal." *Sorenson v. Sorenson*, 559 F.3d 871, 873 (8th Cir. 2009) (internal quotation marks omitted). Accordingly, if P.H.A.S.A.'s habitual residence was not Canada in April 2012, the Convention would not compel her return to Canada.

A habitual residence determination is a mixed question of law and fact. *Silverman v. Silverman*, 338 F.3d 886, 896 (8th Cir. 2003). The Convention does not define "habitual residence" but directs courts to determine the habitual residence of the child at

---

[6] The full text of the Children's Law Reform Act can be found at http://www.e-laws.gov.on.ca/html/statutes/english/elaws_statutes_90c12_e.htm

the point in time "immediately before the removal or retention." Convention, art. 3.

A child can have only one habitual residence, and "it should not be confused with domicile." *Silverman*, 338 F.3d at 898. A child's habitual residence is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). "[S]ettled purpose need not be to stay in a . . . location forever, but the family must have a 'sufficient degree of continuity to be properly described as settled.'" *Silverman*, 338 F.3d at 898 (quoting *Feder*, 63 F.3d at 223).[7] In determining whether a particular place satisfies the standard for habitual residence, "[t]he child's perspective should be paramount," and "[p]arental intent is not dispositive." *Stern*, 639 F.3d at 452. Finally, habitual residence is determined by examining "past experience, not future intentions." *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 379 (8th Cir. 1995) (internal quotation marks omitted).

This case involves a different question than the typical Convention case. Rather than determining whether there was a change in habitual residence, the Court must determine whether eight-month-old P.H.A.S.A. ever established a habitual residence in

---

[7] *See also Feder*, 63 F.3d at 223 (explaining that settled purposed does not require an intent "to stay where [the child] is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love spring to mind as common reasons for a choice of regular abode[.]" (internal quotation marks omitted)).

Canada before being removed to the United States.[8]  *See Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003).  In cases where the parents lack a settled intent to reside together at the time of the child's birth, the infant may not acquire a habitual residence in the country in which she is born.[9]  However, "where a matrimonial home exists, *i.e.*, where both

---

[8] Aden argues that P.H.A.S.A.'s habitual residence has been the United States since her birth. Aden asserts that she always intended for P.H.A.S.A. to reside in the United States. Aden bases this argument upon two Eighth Circuit cases that have examined parental intent as one factor in determining habitual residence. *See, e.g.*, *Stern*, 639 F.3d at 451 (determining whether the United States or Israel was the child's habitual residence where the child was born in Israel and later moved with his mother to Iowa by examining, among other factors, the parents' intent regarding the length and nature of the child's stay in Iowa); *Barzilay*, 600 F.3d at 914-15, 918 (determining whether the United States or Israel was the children's habitual residence where the children had lived in the United States and traveled to Israel for the summer by examining the parents' intent regarding the move to Israel).  Although both of these cases examined parental intent as one relevant factor, neither of these cases involved a choice between two countries of habitual residence, one of which the child has never even been to prior to the child's removal.  In both of these cases, the Court examined parental intent "regarding **the move**."  *See Barzilay*, 600 F.3d at 918 (emphasis added).  In this case there was no move; P.H.A.S.A. lived exclusively in Canada for the first eight months of her life.  Therefore the parental intent inquiry, as well as the other factors examined in *Stern* and *Barzilay* regarding a change in habitual residence are largely irrelevant to determining P.H.A.S.A.'s habitual residence.  *See Barzilay*, 600 F.3d at 918 (examining such factors as "the purpose of the move to **the new country**," "the **change** in geography," and "the acclimatization of the child to the **new country**" (emphases added)).

[9] *See Delvoye*, 329 F.3d at 333-34 ("Where the parents' relationship has broken down, however . . . the character of the problem changes.  Of course, the mere fact that conflict developed between the parents does not *ipso facto* disestablish a child's habitual residence, once it has come into existence.  But where the conflict is contemporaneous with the birth of the child, no habitual residence may ever come into existence.").  In *Delvoye*, for example, the child's mother and father had met in New York where the mother resided.  *Id.* at 332.  The father was a resident of Belgium, but moved into the mother's New York apartment, spending a quarter of his time there.  *Id.*  Several months after learning that she was pregnant, the mother traveled to Belgium for purposes of delivering the baby, because the father refused to pay the cost of delivery in the United States, and Belgium offered free medical services.  *Id.*  The mother applied for a three-month visa which she did not extend when it expired.  *Id.*  She maintained her New York apartment and left the majority of her belongings there.  *Id.*  The mother and father's relationship had broken down by the time the baby was born, and when the child was two months old the mother removed him to the United States.  *Id.* The court concluded that the child never developed a habitual residence in Belgium because the mother and father "lack[ed] the

(Footnote continued on next page.)

parents share a settled intent to reside, determining the habitual residence of an infant presents no particular problem, it simply calls for application of the analysis under the Convention with which courts have become familiar." *Id.* at 333. Under these circumstances, even very young infants can acquire a habitual residence. *See Nunoz-Escudero v. Tice-Menley*, 58 F.3d 374, 378-39 (8th Cir. 1995).[10] In *Nunoz-Escudero*, the child's father, a Mexican citizen, married the child's mother, an American citizen, in Mexico. *Id.* at 375. Less than a year later, the mother gave birth to the child in Mexico. *Id.* Two months later the mother left Mexico, and took the child with her to her family's home in Minnesota. *Id.* The mother argued that she had "no intention of remaining in Mexico," and that the child was too young to form a habitual residence in Mexico. *Id.* at 378. The Court rejected the mother's argument because "the baby was born and lived only in Mexico until his mother fled to the United States. To say that the child's habitual residence derived from his mother would be inconsistent with the Convention, for it would reward the abducting parent and create an impermissible presumption that the child's habitual residence is wherever the mother happens to be." *Id.*

_____

(Footnote continued.)

requisite 'degree of common purpose' to habitually reside in Belgium." *Id.* at 334. Instead, the evidence showed that the mother had traveled to Belgium solely for purposes of giving birth, and intended for the child to be a habitual resident of the United States immediately following his birth. *Id.* ("Where a child is born while his . . . mother is temporarily present in a country other than that of her habitual residence it does seem . . . that the child will normally have no habitual residence until living in a country on a footing of some stability." (internal quotation marks omitted)).

[10] Although the *Nunoz-Escudero* court left the ultimate determination of habitual residence to the district court on remand, the analysis and decision to remand indicate the court's belief that an infant is capable of acquiring a habitual residence.

In the present case, the Court finds that P.H.A.S.A. was a habitual resident of Canada prior to her removal. Aly and Aden were married in Canada before P.H.A.S.A.'s birth. At the time of their daughter's birth Aly and Aden had lived together in a Canadian apartment for over fifteen months. Both Aly and Aden were obligated on the lease, which extended through May 31, 2012. Additionally, P.H.A.S.A. was born in Canada, acquired Canadian citizenship, and lived in Canada for eight months before being removed to the United States. Prior to her removal, P.H.A.S.A. had never been to the United States. All of these facts indicate that Aly and Aden shared a settled intent to reside with P.H.A.S.A. in their matrimonial home in Canada.[11]

That Aden retained numerous ties with the United States does not alter the Court's conclusion that P.H.A.S.A. was a habitual resident of Canada. Although Aden worked in New York and stayed there on days she worked, and also maintained a driver's license, bank accounts, property, and family connections in the United States, the evidence shows that Aden maintained her residence with Aly and P.H.A.S.A. in Ontario both before and after P.H.A.S.A.'s birth. Aden's contacts with the United States show that she may have intended to relocate her family to the United States in the future, but it does not contradict her and Aly's settled purpose to remain in Canada, and raise their child there at least until

---

[11] *See Nicolson v. Pappalardo*, 605 F.3d 100, 104 (1st Cir. 2010) (finding that Australia was the child's habitual residence, even though the mother claimed she had formed the intent to move from Australia to the United States before the child was born where the child's father was a citizen of Australia, her mother, being pregnant had returned to Australia to marry the father, the couple had married and was living together in Australia at the time of the child's birth, the child was born in Australia and lived there for three months with both of her parents before her mother removed her to the United States).

Aly was finished with graduate school.[12]  *See Feder*, 63 F.3d at 223 (explaining that

habitual residence may be based on the settled purpose of obtaining education, albeit for

a limited period).[13]

Additionally, Aly and Aden's original plans for P.H.A.S.A. to be born in the

United States say nothing about their plans for where P.H.A.S.A. was to reside after her

birth, which is the relevant inquiry in determining habitual residence.  *See Delvoye*, 329

---

[12] To the extent Aden characterizes her intent regarding P.H.A.S.A. as a present intent to raise P.H.A.S.A. in the United States immediately following her birth, this intent is insufficient to establish habitual residence.  A parent's unilateral intention to move to another country does not establish a child's habitual residence in that country.  *See Silverman*, 338 F.3d at 898; *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1253 n.3 (11th Cir. 2004) ("Standing alone, of course, the mother's intent that the child should one day live in the United States could not support a finding of habitual residence.").  Further, the Court need not decide whether Aly sincerely intended to move away from Canada in the future, because these are future intentions which do not form the basis of the habitual residence inquiry.  *See Nunez-Escudero*, 58 F.3d at 379 (explaining that habitual residence is determined by examining "past experience, not future intentions").

[13] Aden has asked for an adverse inference with respect to habitual residence due to e-mails and instant messages which she alleges that Aly deleted.  These e-mails allegedly contained discussions of Aly's intention to ultimately move to Minnesota with Aden and the child.  Because Aly allegedly destroyed these e-mails, Aden asks that the habitual residence of P.H.A.S.A. be determined in her favor.  To invoke the adverse inference sanction "there must be a finding of intentional destruction indicating a desire to suppress the truth." *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004).  An adverse inference is a severe sanction that is only appropriate "upon a showing of bad faith." *Stepnes v. Ritschel*, 663 F.3d 952, 965 (8th Cir. 2011).  The Court need not determine whether an adverse inference would be appropriate, because even if the e-mails revealed Aly's intention to move to Minnesota eventually, those e-mails would not contradict the settled, present intention of Aden and Aly to raise their daughter in Canada.  There was no evidence presented that Aly had any intention of prematurely abandoning his graduate studies in order to move to the United States immediately upon P.H.A.S.A.'s birth.  Furthermore, to the extent the e-mails contained evidence of Aly's agreement to allow Aden and P.H.A.S.A. to move to Minnesota without him following her birth, this evidence would be irrelevant in light of (1) Aden's failure to move P.H.A.S.A. to Minnesota until eight months after her birth; and (2) Aden's refusal to give birth in Minnesota when Aly's visa application was denied, suggesting that Aden had no intention of raising P.H.A.S.A. apart from Aly until she made the unilateral decision to return to Minnesota in April 2012.

F.3d at 333-34 (finding that merely traveling to another country to give birth due to health care costs did not establish a child's habitual residence in the country of birth). No evidence was presented that Aly and Aden intended to move to the United States immediately following P.H.A.S.A.'s birth. Instead, the record reflects only that the couple intended P.H.A.S.A. to be born in the United States due to Aden's health insurance coverage. Indeed, shortly before P.H.A.S.A. was born Aly and Aden entered into a year-long lease in Canada, indicating that Canada is where they intended to reside with their child. Moreover, after P.H.A.S.A. was born, Aden entered into another lease with the tenant living in her Minnesota townhome extending through April 30, 2013, suggesting that, although Aden may have contemplated moving back to Minnesota in the future, for the time being, Aden, Aly, and P.H.A.S.A. were settled in Canada. Furthermore, Aly did not have a United States passport, could not legally enter the United States, and was in the midst of pursuing his graduate degree in Canada. The evidence presented by Aden merely indicates that, at some point, she and possibly Aly intended to change P.H.A.S.A.'s habitual residence, which is insufficient to demonstrate that P.H.A.S.A.'s habitual residence was anywhere but Canada at the time when she brought P.H.A.S.A. to Minnesota. *See In re Kim*, 404 F. Supp. 2d 495, 514 (S.D.N.Y. 2005) ("[E]ven if there is some evidence that the parties intended to shift the habitual residence of [the child], the law requires both a change in geography and that the child become acclimatized to the new residence for a shift in habitual residence.").

Finally, although the intent of the parents is relevant, the Court must also examine the habitual residency inquiry from the perspective of P.H.A.S.A. *See Stern*, 639 F.3d at

452.  Although P.H.A.S.A. was only eight months old when she was removed from Canada, unlike cases involving very young infants, there is evidence suggesting some degree of acclimatization.  In eight months, P.H.A.S.A. had never been outside of Canada.  P.H.A.S.A. had begun to form important contacts in Canada.  P.H.A.S.A. was a Canadian citizen and was the recipient of Canadian child benefits.  Moreover, P.H.A.S.A. attended all of her doctor's appointments in Canada, including several visits to specialists related to a possible genetic disorder.  *See Sorenson v. Sorenson*, 559 F.3d 871, 873 (8th Cir. 2009) (finding the child's habitual residence to be Australia, the country she in which "the majority of her connections were" and where she "had spent the majority of her life").[14]  Therefore, the Court concludes that P.H.A.S.A. was a habitual resident of Canada at the time of her removal, and Aly has therefore made out a prima facie case for return under the Convention.

## II.  AFFIRMATIVE DEFENSES

### A.  Acquiescence or Consent

In her counterpetition, Aden alleges that P.H.A.S.A.'s removal was not wrongful because Aly consented and acquiesced to P.H.A.S.A. remaining in Minnesota.  The Court is not bound to order the return of the child if the person who opposes the return establishes that "the person . . . having the care of the person of the child . . . had

---

[14] *See also Friedrich v. Friedrich*, 983 F.2d 1396, 1402 (6th Cir. 1993) ("This is a simple case.  Thomas was born in Germany and resided exclusively in Germany until his mother removed him to the United States . . . therefore, we hold that Thomas was a habitual resident of Germany at the time of his removal.").

consented to or subsequently acquiesced in the removal or retention." Convention, art. 13(a). Aden has the burden of proving Aly's consent or acquiescence by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). The Court narrowly construes both of these exceptions. *See* 42 U.S.C. § 11601(a)(4); *Larbie v. Larbie*, 690 F.3d 295, 308 (5th Cir. 2012).

Consent refers to "the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). Both acquiescence and consent are subjective inquiries, and focus on the "actual subjective intention of the wronged parent, not o[n] the outside world's perception of his intentions." *Antunez-Fernandes v. Connors-Fernandes*, 259 F. Supp. 2d 800, 813 (N.D. Iowa 2003) (internal quotation marks omitted); *see also Larbie*, 690 F.3d at 308-09 & n.14. "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Baxter*, 423 F.3d at 371. Consent can be evidenced by a petitioner's informal statements or conduct. *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010). For example, helping prepare for the child's departure and arranging alternative living arrangements with the knowledge that one parent will be leaving with the child can be evidence of consent. *Id.* at 106. Acquiescence may be established in various ways, including, "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or

a consistent attitude of acquiescence over a significant period of time." *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996) (internal quotation marks and footnotes omitted); *see also Nicolson*, 605 F.3d at 106-07.

Aden has not presented any evidence that Aly consented to her taking P.H.A.S.A. to Minnesota before April 26, 2012. Instead, the evidence shows that Aly did not help in preparing Aden and P.H.A.S.A. for their journey to the United States. Nor did Aly know about Aden's planned trip and fail to object. Rather, Aly thought that Aden was merely taking P.H.A.S.A. to a doctor's appointment.

Similarly, Aden has failed to present evidence of acquiescence. Only two facts in the record could possibly support a claim of acquiescence. First is the phone call from Aly to Aden in which he allegedly stated "if you take the child and leave, then I never want to hear from you or her the rest of your life." This statement provides only speculative support at best for a claim of abandonment of Aly's right of custody over P.H.A.S.A. Moreover, a single emotional statement does not amount to evidence of a consistent attitude of acquiescence over a significant period of time. Second is the fact that Aly waited almost a month before contacting authorities regarding P.H.A.S.A. and initially lied to the police about her disappearance. A month does not constitute a "significant period of time" for purposes of proving acquiescence under the Convention. *See Friedrich*, 78 F.3d at 1070 (finding that a delay of 21 days before obtaining a custody order did not constitute acquiescence). Additionally, Aly's initial failure to tell the police that P.H.A.S.A. was missing does not constitute an affirmative renunciation of his rights to custody, nor does Aly's constantly shifting story to the police demonstrate "a

consistent attitude of acquiescence over a period of time." *Id.* Instead, the Court finds that Aly's filing of an application for custody in an Ontario court, and "resolutely s[eeking] custody of his [daughter] since that time" demonstrates that Aly did not consent or acquiesce in P.H.A.S.A.'s removal. *See id.*

### B. Grave Risk of Harm

Aden argues that returning P.H.A.S.A. to Canada would put the child at a grave risk of physical and psychological harm because of Aly's history of abuse and desire to subject P.H.A.S.A. to FGM. Under the Convention, the Court is not bound to order the return of the child if the person who opposes the return establishes that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). Aden has the burden of proving a grave risk of harm by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). As an exception to operation of the Convention, the grave risk of harm defense is narrowly construed. *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995).

"[S]erious abuse or neglect" can qualify as a grave risk of harm under Article 13(b)." *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003) (en banc) (internal quotation marks and citations omitted). The grave risk inquiry is narrow in scope, and "there must be evidence of a grave risk of harm to [the] child, not solely to a parent or some other third party." *Acosta v. Acosta*, Civ. No. 12-342, 2012 WL 2178982, at *7 (D. Minn. June 14, 2012).

> The Article 13b inquiry does not include an adjudication of the underlying custody dispute, and only requires an assessment of whether the child will

face immediate and substantial risk of an intolerable situation if he is returned to [his home country] pending final determination of his parents' custody dispute.  It is not relevant to this Convention exception who is the better parent in the long run, or whether [the mother] had good reason to leave her home . . .  and terminate her marriage to [the father], or whether [the mother] will suffer if the child she abducted is returned to [the home country].

*Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995).  "[B]ecause the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the **immediate** future."  *Gaudin v. Remis*, 415 F.3d 1028, 1037 (9th Cir. 2005) (emphasis added).[15]  The petitioner cannot rely on generalized evidence but must produce "specific evidence of potential harm."  *Rydder*, 49 F.3d at 373.

With respect to physical and psychological abuse specifically, where the child herself has been subjected directly to serious physical and psychological abuse, the grave risk defense is typically met.  *See Blondin v. Dubois*, 238 F.3d 153, 161-62 (2d Cir. 2001) (explaining that where "the child faces a real risk of being hurt, physically or psychologically" the grave risk of harm exception is met).[16]  Typically, however, "general evidence concerning abuse of the mother is not sufficient to establish the Article

_____

[15] *See also Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996) (explaining that there is only a grave risk of harm "when return of the child puts the child in immediate danger **prior** to the resolution of the custody dispute" (emphasis in original)).

[16] *See also Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456, 459-60 (D. Md. 1999) (denying a petition for return where the petitioner belt-whipped, punched, and kicked the child, and choked and broke the respondent's nose)

13(b) exception that return will expose the child to a grave risk of harm." *Rowe v. Vargason*, Civ. No. 11-1966, 2011 WL 4529341, at *7 (D. Minn. Sept. 28, 2011) (citing *Nunez-Escudero*, 58 F.3d at 376). In cases where abuse toward a spouse "is relatively minor . . . it is unlikely that the risk of harm caused by return of the child will rise to the level of a '**grave** risk' or otherwise place the child in an '**intolerable** situation.'" *Simcox v. Simcox*, 511 F.3d 594, 607 (6th Cir. 2007) (emphasis in original). But "where spousal abuse evinces a propensity towards violence and is accompanied by other risk factors specific to the child, a grave risk of harm to a child may be found." *Acosta*, 2012 WL 2178982 at *7 (citing *Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008)). A petitioner must demonstrate a connection between the harm to her in returning to the home country and a risk to the child. *See Abbott*, 130 S. Ct. at 1997.

With these principles in mind, the Court concludes that Aden has failed to demonstrate that P.H.A.S.A. will face a grave risk of harm if she is returned to Canada.[17] The Court takes very seriously any and all allegations of domestic abuse – whether physical or psychological. However, for a number of reasons the Court finds Aden's

---

[17] In making this determination, the Court has considered the testimony of Dr. Edelson regarding risk factors for domestic abuse. However, the Court notes that it is tasked with determining whether P.H.A.S.A. will face a grave risk of harm, not whether Aly is statistically likely to continue to abuse Aden if their relationship continues. Additionally, the Court does not rely on Dr. Edelson's ultimate conclusion that P.H.A.S.A. will be subjected to a grave risk of harm because Dr. Edelson's conclusions specific to this case are based on a number of factual allegations which this Court has determined are not credible. Finally, the Court rejects as a basis for its decision Dr. Edelson's reliance on "estrangement" as a factor contributing to a finding of grave risk, as nearly every Convention case, by its very nature, involves some estrangement of the parents.

allegations that P.H.A.S.A. will face a grave risk of physical or psychological harm at the hands of Aly are either not credible or fail to meet the standard of clear and convincing evidence required by the grave risk exception.

First, the Court finds that Aly has not directly abused P.H.A.S.A. as it found Aden's testimony alleging that Aly threw P.H.A.S.A. across the room and kneed Aden in the stomach while she was pregnant to be insufficiently credible to satisfy the heightened standard for establishing the grave risk exception. Therefore, the Court is faced with determining only whether Aden's other allegations of abuse sufficiently demonstrate Aly's general propensity to be violent as well as identify specific risk factors with respect to P.H.A.S.A. *See Acosta*, 2012 WL 2178982 at *7.

The court finds that Aly physically abused Aden on at least four occasions[18] – in the fall of 2010, on February 27, 2011, in July 2011, and on April 25, 2012.[19] However, the Court found Aden's testimony regarding the severity of the February and April violent episodes to be exaggerated. The incidents in the fall of 2010 and July 2011 involved some pushing and slapping. While truly unfortunate, these isolated instances of

_____

[18] Aden has also asked for an adverse inference with respect to grave risk due to the fact that Aly allegedly deleted an instant message in which he admitted to striking Aden in the head. Because the Court finds that Aly did physically abuse Aden, and considers this in making its grave risk determination, it need not consider whether an adverse inference would otherwise be appropriate.

[19] In making this determination the Court gives weight to Ms. Roundtree's testimony that Aly was physically abusive during their relationship. Ms. Roundtree's testimony supports Aden's allegations that Aly was physically abusive. However, Ms. Roundtree's testimony also supports a finding that Aly's episodes of physical abuse were isolated and not particularly severe.

abuse aimed at the mother do not rise to the level of severity required to meet the grave risk exception, which focuses on a grave risk of harm to the child that would occur prior to the resolution of a custody dispute and must be established by clear and convincing evidence. Additionally, Aly's abuse was not characterized by prolonged violent outbursts. *See Acosta*, 2012 WL 2178982 at *8 (finding a grave risk of harm in part because petitioner's "violent outbursts are not only severe, they are of a lasting duration" where one of petitioner's rages lasted for weeks). Indeed the record reflects that Aly's outbursts of rage were short-lived, and after becoming physically violent he would immediately become calm and resume normal life activities. Finally, and most importantly, the Court finds that these incidents of violence have not directly impacted P.H.A.S.A. This violence was not perpetrated against P.H.A.S.A., and only one incident allegedly occurred in P.H.A.S.A.'s presence. Accordingly, the Court finds that, although regrettable, the instances of physical abuse perpetrated by Aly against **Aden** are insufficient to demonstrate by clear and convincing evidence that **P.H.A.S.A.** will be subjected to a grave risk of harm.[20] *See Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir.

---

[20] Aden relies on three cases in particular to support her argument that Aly's abuse constitutes a grave risk of harm to P.H.A.S.A. The Court finds all of these cases distinguishable from the factual situation presented in the instant case. In *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000), the husband had severely beaten his wife for more than five years, including when she was pregnant. The beatings also took place in front of their children. Additionally, the husband threatened to kill a neighbor, fled the country when charged with that threat, refused to return when a fugitive warrant was entered, and violated Irish court orders when he stayed away from his home. *Id.* at 208-11. The court held that such evidence was sufficient to establish a grave risk. *Id.* at 221. In this case, the long history of severe abuse, perpetrated in front of the child, is lacking. Similarly lacking is evidence that Aly has violated Court orders. The Court notes that Aly has not attempted to violate Aden's current order for protection. Additionally, Aly was

(Footnote continued on next page.)

never served with Ms. Roundtree's order for protection; therefore any allegations that Aly came to Ms. Roundtree's house when the order was in effect are insufficient to demonstrate that Aly knowingly violated a court order. The Court believes that Aly's past behavior does not demonstrate that he will be unable to comply with orders of a Canadian court with respect to this child custody proceeding. Finally, although Aly may have threatened to kill Aden in a phone call, in light of the other facts, the Court finds the risks in the current case do not rise to the level present in *Walsh* and do not satisfy the Article 13(b) exception.

Aden also relies on *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008), in which the court concluded that the child, Sam, would be subjected to a grave risk of physical and psychological harm if returned to his father Baran. The district court in *Baran* had concluded that

> Baran abuses alcohol on a daily or near-daily basis, that he is susceptible to lengthy drinking and gambling binges that in no way abated during the five months that Sam habitually resided with him, that he is only marginally able to care for his own basic needs, that he has no close family members or friends that could reasonably be expected to have meaningful involvement in Sam's day-to-day care and protection, that he is emotionally unstable and prone to uncontrolled destructive outbursts of rage, that he was physically and verbally abusive toward Beaty in Sam's presence, that he physically endangered Sam (both intentionally and unintentionally) when Sam lived under his roof, and that Baran repeatedly and pointedly stated to Beaty after Sam's birth that he did not want Sam, that Sam should have been aborted, that Sam would die if Sam "became an American," and that Beaty could not blame him if "something happened to" Sam.

*Id.* at 1345-46 (internal quotation marks omitted). The facts of this case, again, are readily distinguishable. There is no evidence that Aly abused alcohol or engaged in any other addictive behaviors that would put P.H.A.S.A. at risk. Aly is well-educated, supports himself financially, and is able to care for his own basic needs. Additionally, the Court has found not credible allegations that Aly was unable to care for P.H.A.S.A. or endangered her either intentionally or unintentionally. Additionally, Aly has never threatened to kill or harm P.H.A.S.A.

Finally, Aden relies on *Van De Sande v. Van De Sande*, 431 F.3d 567 (7th Cir. 2005). In *Van De Sande*, the husband beat his wife frequently, and seriously – often choking her, throwing her against walls, and kicking her shins. These beatings occurred several times a week, and the husband's mother would often join in the beatings. After their children were born, the beatings continued, and were often carried out in front of the children. The husband also spanked and struck the children, and once grabbed a child by the throat and shoved her out of the room. The husband also repeatedly threatened to kill the children and his wife. *Id.* at 569-70. The facts of this case simply do not present the serious pattern of abuse present in *Van De Sande* sufficient to sustain the grave risk exception.

2000) (finding the mother's "allegations of verbal abuse and an incident of physical shoving" distinct from "the clear and long history of spousal abuse" necessary to establish grave risk).[21]

Additionally, the Court finds the allegations that Aly will subject P.H.A.S.A. to FGM to be too speculative to demonstrate a grave risk of physical and psychological harm by clear and convincing evidence. Although subjecting P.H.A.S.A. to FGM would clearly constitute a grave harm, the grave risk inquiry focuses on "immediate" risks. *Nunez-Escudero*, 58 F.3d at 377.[22] At most, the record contains allegations that Aly believes in the practice and has expressed a desire to subject his daughter to the procedure, potentially by taking her to Egypt. None of the female members of Aly's family have undergone the procedure, suggesting that immediate family pressure is not

---

[21] *See also Nunez-Escudero*, 58 F.3d at 376-77 (holding that evidence that the child's father refused to acquire a car seat, that the child's grandfather hit his child, and that the father physically, sexually, and verbally abused the child's mother were insufficient to prove there was a grave risk to the child); *Vasquez v. Colores*, Civ. No. 10-3669, 2010 WL 3717298, at *9 (D. Minn., Sept. 14, 2010) ("In this case, there is no evidence of severe physical abuse, or evidence that Petitioner threatened others or has a history of violating court orders. Rather the evidence presented demonstrated that Petitioner and Respondent did have arguments during which Petitioner raised his voice and engaged in limited physical contact with Respondent . . . ."); *Lachhman v. Lachhman*, No. 08-CV-4363, 2008 WL 5054198, at *9 (E.D.N.Y., Nov. 21, 2008) (concluding that petitioner's arrest on domestic abuse charges did not establish grave risk because there was no evidence that the petitioner ever harmed the child); *Laguna v. Avila*, No. 07 CV 5136, 2008 WL 1986253, at *8-9 (E.D.N.Y., May 7, 2008) (finding that there was no grave risk where the petitioner had been violent to respondent but there was no evidence that petitioner physically abused the child).

[22] In making this determination, the Court gives little weight to the testimony of Ms. Boyle and Mr. Awad. Both experts testified to the statistical probability of Aly subjecting P.H.A.S.A. to FGM based on Aly's background and religious beliefs. Although these factors are not entirely irrelevant, the Court finds that the heart of this case turns on whether Aly actually **would** subject P.H.A.S.A. to FGM and whether this threat is **immediate** – not whether his background suggests he may be statistically more or less likely to do so.

an issue. The record does not reflect that Aly would be able to obtain this procedure in the United State or Canada, which the Court finds mitigates any immediate risk to P.H.A.S.A. Aly is not currently in possession of P.H.A.S.A.'s passport, and the Court finds no reason the passport cannot be kept in the possession of a neutral party pursuant to a Canadian court order during the duration of the custody proceedings. Should Aly's alleged desire to subject P.H.A.S.A. to FGM manifest itself into actual plans to carry out the procedure, the Court believes that the Canadian court is equipped to prevent this occurrence. Finally, Aden's family history – having undergone the procedure herself and having a mother who subjected Aden's younger sister to the procedure despite Aden's protests – suggests that it is possible that P.H.A.S.A. may face just as great of a risk of undergoing the procedure while under her mother's custody as she would face if she was returned to Canada.

Further, the Court finds that the generalized evidence presented by Aden about Aly's controlling behavior and disrespect toward women is insufficient to establish that P.H.A.S.A. will be subjected to a grave risk of psychological harm if she is returned to Canada for purposes of resolving Aly and Aden's custody dispute. *See Walker v. Kitt*, ___ F. Supp. 2d ___, 2012 WL 5237262, *7-8 (N.D. Ill., Oct. 24, 2012) ("The Court must reluctantly conclude that returning the Child to a community that may only ever afford her second-class status because of her gender does not pose a grave risk of harm as intended by Article 13(b) of the Convention."). Although Aly's apparent devaluation of women is undoubtedly troubling, the Court does not find that these views will subject P.H.A.S.A. to grave psychological harm in the period of time that custody proceedings

are pending in Canada. Moreover, although Aly may have exerted control of Aden's finances, there is no allegation that this control ever endangered P.H.A.S.A.'s safety or well-being.

Finally, when determining whether a child will face a grave risk of harm, the Court is tasked with considering the environment to which the child would be returning. *See Nunez-Escudero*, 58 F.3d at 377. Although not dispositive of the grave risk question, this environmental consideration may include assessing the availability of a competent judiciary and other resources in the country for dealing with domestic violence. *See Acosta*, 2012 WL 2178982, at *8 (citing *Nunez-Escudero*, 58 F.3d at 377-78). Here, "courts in the abducted-from country are as ready and able as we are to protect children." *Friedrich*, 78 F.3d at 1068. "If return to a country, or to the custody of a parent in that country, is dangerous, we can expect [Canada]'s courts to respond accordingly. . . . When we trust the court system in the abducted-from country, the vast majority of claims of harm – those that do not rise to the level of gravity required by the Convention – evaporate." *Id.*

Canada offers an extensive array of social and legal services to parents engaged in custody disputes and those who are victims of domestic abuse. Upon P.H.A.S.A.'s return to Canada, Aden will be allowed to fully participate in custody proceedings, and will be entitled to challenge the ex parte order of the Ontario court awarding sole custody to Aly. Additionally, Aden can seek a restraining order against Aly, an order for exclusive possession of the matrimonial home, and an order requiring supervised access to P.H.A.S.A. Finally, Aden can seek counseling and victim services. *See Miller v. Miller*,

240 F.3d 392, 403 (4th Cir. 2001) ("[W]e are confident that if [petitioner] truly poses a danger to her children, the Ontario courts are ready and able to take every step to protect them.").[23]  In order to allow Aden time to avail herself of these services to prevent any possibility of harm, of any nature, to herself or P.H.A.S.A. the Court will allow Aden up to twenty days to return P.H.A.S.A. to Canada.  Twenty days allows for P.H.A.S.A.'s prompt return, while giving Aden a reasonable amount of time to make necessary travel and other arrangements.  *See Silverman v. Silverman*, Civ. No. 00-2274, 2003 WL 22076555, at *2 (D. Minn. Aug. 28, 2003) (allowing twenty days to return children to Israel); *see also Antunez-Fernandes v. Connors-Fernandes*, 259 F. Supp. 2d 800, 817 (N.D. Iowa 2003) (allowing approximately thirty days to return child to France).

The Court stresses that under the Convention, it is not charged with resolving this custody dispute between Aden and Aly, determining which party is a better parent, or inquiring into the best interests of P.H.A.S.A.  The Court is constrained to determining whether Aden has demonstrated by clear and convincing evidence that P.H.A.S.A. would be subjected to a grave risk of physical or psychological harm if returned to Canada.  *See Rowe v. Vargason*, Civ. No. 11-1966, 2011 WL 4529341, at *10 ("Although there is evidence that while they were together, the parties had a contentious relationship, and that Petitioner physically and emotionally abused Respondent, the Article 13(b) exception applies only where the evidence is clear and convincing that the child is subject

---

[23] *See also Foster v. Foster*, 654 F. Supp. 2d 348, 362 (W.D. Pa. 2009) (returning the child to Canada where "no evidence has been produced . . . that the Canadian judiciary or other appropriate Canadian authorities are incapable or unwilling to give the child adequate protection" (internal quotation marks omitted)).

to a grave risk of physical or psychological harm or would otherwise be placed in an intolerable situation, if returned to Australia. On the record currently before the Court, the evidence does not meet that threshold.").[24] Here, the Court finds that Aden has failed to make such a showing.

### C.     Violation of Fundamental Humanitarian Rights

Finally, Aden argues that returning P.H.A.S.A. to Canada would be a violation of fundamental humanitarian rights. Article 20 of the Convention provides that "[t]he return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Aden has the burden of proving a violation of humanitarian rights by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). The defense for violation of fundamental human rights is "restrictively interpreted and applied . . . on the rare occasion that return of the child would utterly shock the conscience of the court or offend all notions of due process." *Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 614 (E.D. Va. 2002) (internal quotation marks omitted); *see also Castro v. Martinez*, 872 F. Supp. 2d 546, 557 (W.D. Tex. 2012) (declining to apply the exception where the respondent alleged that corruption in Mexico would prevent a fair determination of child custody upon the child's return). The Court has found no cases in

---

[24] *Antunez-Fernandes*, 259 F. Supp. 2d at 816 ("[T]he Hague Convention . . . does not give the court in the abducted-to country a license to speculate on where the children would be happiest; that decision is a custody matter and is reserved to the court in the country of habitual residence.").

which a United States court has applied this exception to prevent the return of a child. *Hazbun Escaf*, 200 F. Supp. 2d at 614 ("The parties have not cited, nor has the Court found, any authority applying the Article 20 exception . . . .").

Aden relies on the same allegations for invoking the grave risk of harm exception as she does to invoke the exception under Article 20. Because the Court has already determined that these same allegations do not establish by clear and convincing evidence that returning P.H.A.S.A. to Canada would subject P.H.A.S.A. to a grave risk of harm, it need not consider the exception for fundamental humanitarian rights, as the two articles are essentially redundant in the case. *See Hazbun Escaf*, 200 F. Supp. at 614 n.37 ("Article 20 and Article 13b appear to be redundant. If the return of the child would violate fundamental U.S. principles relating to human rights, it would also involve returning him to an intolerable situation."). Nothing about returning P.H.A.S.A. to Canada "utterly shocks the conscience of the [C]ourt" or otherwise offends "notions of due process." *See id.* at 614.

## III.  ATTORNEYS' FEES

In his petition, Aly requests that the Court award all legal costs, fees, and travel expenses incurred in securing the return of P.H.A.S.A. The Convention provides that:

> Upon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

Convention, art. 26. ICARA additionally provides that

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in this action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."

42 U.S.C. § 11607(b)(3). Because the Court has concluded that Aly has successfully petitioned for the return of P.H.A.S.A. to Canada, Aden bears the burden of showing that an award would be "clearly inappropriate." *Id.* The Court has broad discretion in determining whether an award of fees and costs would be clearly inappropriate. *See Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004).

Although Aden is currently employed on a part-time basis, she has demonstrated that due to her monthly income and expenditures, paying Aly's attorneys' fees and costs would present a financial hardship. *See Vasquez v. Colores*, Civ. No. 10-3669, 2010 WL 3717298, at *10 (D. Minn. Sept. 14, 2010) (denying an award of fees and costs because of respondent's "current financial condition"). Additionally, Aden's financial situation is affected by the $13,000 hospital bill for P.H.A.S.A.'s delivery that is still outstanding, an expense that Aden incurred on behalf of both herself and Aly. Moreover, the Court finds that at least some of Aden's current financial hardship is due to the control that Aly exerted over her funds while Aden was living in Canada, including Aly naming himself as the recipient of P.H.A.S.A.'s Canadian Child Benefits. That Aly contributed to Aden's straitened financial circumstances makes an award of fees to Aly inappropriate. Finally, the Court finds that Aly "bears at least some responsibility for the acrimony

between the parties." *See Silverman v. Silverman*, Civ. No. 00-2274, 2004 WL 2066778, at *4 (D. Minn. Aug. 26, 2004). The Court has determined that Aly did not provide truthful testimony, and was physically and verbally abusive toward respondent. These factors are appropriately considered in determining whether a fee award would be appropriate. *See id.* Further, in light of Aden's financial circumstances, an award of fees could compromise Aden's ability to care for P.H.A.S.A. *See Rydder v. Rydder*, 49 F.3d 369, 373-74 (8th Cir. 1995); *see Silverman*, 2004 WL 2066778, at *4. For all of these reasons, the Court therefore finds that an award of attorneys' fees and costs is clearly inappropriate in this case.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Petitioner's Petition for Return of Minor Child [Docket No. 1] is **GRANTED**.

2.      P.H.A.S.A. shall be **RETURNED** to Canada in the company of Aden no later than **twenty (20) days from the entry of this Order**.

3.      Aden shall not remove P.H.A.S.A. from the District of Minnesota prior to her return trip to Canada unless she first receives written permission from this Court. Written requests for such permission shall be copied to petitioner and his counsel.

4.     As soon as arrangements for the return are made, Aden shall inform the Court and petitioner, in writing, of the date and travel information for the journey, and shall inform the Court and petitioner of any subsequent modifications of the schedule.

5.     The passports of P.H.A.S.A. and Aden are to remain in the custody of Aden's attorneys until Aden proffers the Court with the travel plans noted above.

6.     Should Aden be unwilling to accompany P.H.A.S.A. in keeping with this Order, the Court will issue a separate order providing for P.H.A.S.A.'s return through other means, which determination may depend on Aly's ability to enter the United States.

7.     The issue of permanent custody of P.H.A.S.A. is to be determined by the Canadian courts.

8.     Aly's request for attorneys' fees and costs is **DENIED**.


DATED:  February 14, 2013                    _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                           JOHN R. TUNHEIM
                                                     United States District Judge